US Army Corps
of Engineers

# Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System

## Draft Final Report of the Interagency Performance Evaluation Task Force

### Volume I – Executive Summary and Overview

1 June 2006

FINAL DRAFT
(Subject to Revision)



EXHIBIT
A

# Volume I
# Executive Summary and Overview




This report is not intended as a final expression of the findings or conclusions of the United States Army Corps of Engineers, nor has it been adopted by the Corps as such. Rather, this is a preliminary report summarizing data and interim results compiled to date. As a preliminary report, this document and the information contained therein are subject to revisions and changes as additional information is obtained.

# Contents

Preface ..... iii

Executive Summary ..... I-1

- Introduction ..... I-1
- Findings ..... I-2
- Overarching Findings ..... I-3

Synopsis of Principal Findings ..... I-4

- Geodetic Vertical and Water Level Datum (Volume II) ..... I-4
- Hurricane Protection System (Volume III) ..... I-5
- Storm (Volume IV) ..... I-6
- Performance (Volumes V and VI) ..... I-7
- Consequences (Volume VII) ..... I-8
- Risk and Reliability (Volume VIII) ..... I-9

Lessons Learned ..... I-9

- Overarching Lessons Learned ..... I-10
- Synopsis of Principal Lessons Learned ..... I-12

Overview ..... I-14

- Introduction ..... I-14
- Historical Perspective ..... I-15
- Katrina ..... I-17

Interagency Performance Evaluation Task Force ..... I-42

- IPET Objective ..... I-43
- Prior Reports ..... I-44
- Draft Final Report ..... I-45

Appendix 1. IPET Leadership, Affiliations, and Organizations

Appendix 2. American Society of Civil Engineers External Review Panel Members

Appendix 3. National Research Council Committee Members

Appendix 4. Task Force Guardian Inputs


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

## Preface

This report is the result of an intense performance evaluation of the New Orleans and Southeast Louisiana hurricane protection system during Hurricane Katrina. It was conducted by the Interagency Performance Evaluation Task Force, a distinguished group of government, academic, and private sector scientists and engineers who dedicated themselves solely to this task from shortly after Katrina struck through the start of the next hurricane season. Created by the Chief of Engineers, U.S. Army Corps of Engineers and peer reviewed literally on a weekly basis by an equally distinguished external review panel of the American Society of Civil Engineers, the group applied some of the most sophisticated capabilities available in civil engineering to understand what happened during Katrina and why. Their purpose was not just new knowledge, but application of that knowledge to the repair and reconstitution of protection in New Orleans as well as improvement to engineering practice and policies. The results of their work are largely already in the ground, having been transferred and applied prior to the completion of this report. The bulk of the information and documents used or generated by the Task Force has been placed on a public Web site, *https://IPET.wes.army.mil*, as they became available. At the time of the distribution of this draft report, there were well over 4300 documents on this site.

There are nine volumes in the final report, designed to provide a detailed documentation of the technical analyses conducted and their associated findings. They are organized around major technical tasks that together provided an in-depth, system-wide assessment of the behavior of the hurricane protection system and lessons learned that have been incorporated into the immediate repairs and are integrated into the continuing efforts to improve the system and assessing approaches for higher levels of protection. The volumes and their individual focus areas are as follows:

- Volume I: Executive Summary and Overview – Summary of findings and lessons learned. Overview of performance evaluation activities and reports.

- Volume II: Geodetic Vertical and Water Level Datums – Update of geodetic and water level references for the region and determining accurate elevations for all critical structures.

- Volume III: The Hurricane Protection System – Documentation of the character of the hurricane protection system, including the design assumptions and criteria, as built and maintained condition.

- Volume IV: The Storm – Determining the surge and wave environments created by Katrina and the time history and nature of the forces experienced by protection structures during the storm.

- Volume V: The Performance – Levees and Floodwalls – Understanding the behavior of individual damaged structures and development of criteria for evaluation of undamaged sections. Providing input to repairs and ongoing design and planning efforts.

- Volume VI: The Performance – Interior Drainage and Pumping – Understanding the performance of the interior drainage and pumping systems with regard to extent and duration of flooding. Examination of scenarios to understand system-wide performance.
- Volume VII: The Consequences – Determination of the economic, human safety and health, environmental, and social and cultural losses due to Katrina. Examination of scenarios to understand implications of losses and possible recovery paths on future risk.
- Volume VIII: Risk and Reliability – Determination of the inherent risk for all parts of the system prior to and following Katrina. Provision of capability for risk-based decision support for continuing improvement and development of hurricane protection.
- Volume IX: Supporting Appendices – Documentation of information resources and management, program management, and communications.

On behalf of the entire Interagency Performance Evaluation Task Force, the undersigned offer this report and the results therein as a contribution to the well being of the people of New Orleans and Southeast Louisiana and the reconstitution of effective hurricane protection for their future.

Lewis E. Link, Ph.D.
Senior Research Engineer
University of Maryland
College Park, Maryland

John J. Jaeger, Ph.D., P.E.
Chief, Engineering and Construction
U.S. Army Corps of Engineers, Huntington District
Huntington, West Virginia

Jeremy Stevenson
U.S. Army Corps of Engineers, Huntington District
Huntington, West Virginia

Wayne Stroupe
Public Affairs Office
U.S. Army Corps of Engineers, Engineer Research and Development Center
Vicksburg, Mississippi

Reed L. Mosher, Ph.D.
Technical Director, Survivability and Protective Structures
Geotechnical and Structures Laboratory
U.S. Army Corps of Engineers, Engineer Research and Development Center
Vicksburg, Mississippi

Denise Martin
Computer Scientist
Information Technology Laboratory
U.S. Army Corps of Engineers, Engineer Research and Development Center
Vicksburg, Mississippi


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

James K. Garster
Team Leader – Survey Engineer
Topographic Engineering Center
U.S. Army Corps of Engineers, Engineer
Research and Development Center
Alexandria, Virginia

David B. Zilkoski
Director, National Geodetic Survey
National Oceanic and Atmospheric
Administration
Silver Spring, Maryland

Bruce A. Ebersole, P.E.
Chief, Flood and Storm Protection Division
Coastal and Hydraulics Laboratory
U.S. Army Corps of Engineers, Engineer
Research and Development Center
Vicksburg, Mississippi

Joannes J. Westerink, Ph.D.
Professor, Department of Civil Engineering
and Geological Sciences
University of Notre Dame
Notre Dame, Indiana

Donald T. Resio, Ph.D.
Senior Scientist
Coastal and Hydraulics Laboratory
U.S. Army Corps of Engineers, Engineer
Research and Development Center
Vicksburg, Mississippi

Robert G. Dean, Sc.D., P.E.
Professor Emeritus
University of Florida
Gainesville, Florida

Michael K. Sharp, Ph.D., P.E.
Technical Director, Civil Works Infrastructure
Geotechnical and Structures Laboratory
U.S. Army Corps of Engineers, Engineer
Research and Development Center
Vicksburg, Mississippi

R. Scott Steedman, Ph.D., FREng
Steedman and Associates, Ltd.
Reading, United Kingdom

J. Michael Duncan, Ph.D., P.E.
University Distinguished Professor of Civil
Engineering
Virginia Polytechnic Institute & State
University
Blacksburg, Virginia


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

Brian L. Moentenich, P.E.
Hydroelectric Design Center
U.S. Army Corps of Engineers, Portland District
Portland, Oregon

Bob Howard, P.E.
Director of Operations
South Florida Water Management District
West Palm Beach, Florida

Jeff Harris
Chief, Hydrology and Hydraulics Technology Division
Hydrologic Engineering Center
Davis, California

Steve Fitzgerald, P.E.
Chief Engineer
Harris County Flood Control District
Houston, Texas

David Moser, Ph.D.
Chief Economist
U.S. Army Corps of Engineers,
Institute for Water Resources
Alexandria, Virginia

Patrick Canning, Ph.D.
Senior Economist
Economic Research Service
U.S. Department of Agriculture
Washington, D.C.

Jerry Foster, P.E.
Headquarters, U.S. Army Corps of Engineers
Washington, D.C.

Bruce Muller, P.E.
Chief, Dam Safety
U.S. Bureau of Reclamation
Denver, Colorado


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

# Executive Summary

## Introduction

This report, Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System, is a draft of the final report in a series concerning the in-depth analysis of the New Orleans and Southeast Louisiana Hurricane Protection System conducted by the Interagency Performance Evaluation Task Force (IPET). The IPET was established by the Chief of Engineers to determine the facts concerning the performance of the Hurricane Protection System in New Orleans and Southeast Louisiana during Hurricane Katrina. This report provides a comprehensive description of the IPET activities and the findings and lessons learned from those activities. The frequent professional interaction and review comments provided by the American Society of Civil Engineers (ASCE) External Review Panel and the strategic oversight of the National Research Council (NRC) Committee on New Orleans Regional Hurricane Protection Projects have made substantial contributions to the conduct of the analysis and development of the results described in this report. This volume, Volume I, Executive Summary and Overview, provides an executive summary of the findings and lessons learned and an overview of the IPET efforts described in more detail in Volumes II–IX.

The draft final report provides a detailed documentation of a broad, multi-disciplinary analysis of the hurricane protection system and its performance during Hurricane Katrina. Since the system is only designed to manage flooding in the metro-New Orleans basin, wind-based consequences and all direct consequences exterior to the system are excluded from this report. This report is being provided as a draft, offering provisional final results for the entire spectrum of the work accomplished with the exception of the risk and reliability assessment which is undergoing validation and peer review. Some of this work will continue to be reviewed and validated after the release of this draft. This includes final reviews by the ASCE External Review Panel and the NRC Committee on New Orleans Regional Hurricane Protection Projects. The results of those reviews will be incorporated into the draft prior to final publication, which is expected to be in September 2006. As such, the information provided in this draft report should be considered as provisional and subject to revision. This report and all other IPET-produced documents are available on the IPET Web site, *https://IPET.wes.army.mil*.

The key objective of the IPET is to understand the behavior of the New Orleans Hurricane Protection System in response to Hurricane Katrina and assist in the application of that knowledge to the reconstitution of a more resilient and capable system. As such, the IPET analysis is geared toward determining why certain sections and structures breached and why others did not, using that understanding to assess the integrity of the remaining portions of the system, and providing an analytical and knowledge base to assist in designing more resilient protection measures. IPET is also conducting a risk and reliability assessment of the entire system to aid in understanding the levels of protection that will exist for the future. This methodology will support the Louisiana Comprehensive Protection and Restoration Study. To do this, the IPET Teams have conducted an integrated set of analyses designed to provide a balanced assessment of the performance of all aspects of the physical system. The IPET is not examining organizational and jurisdictional issues that impact the effectiveness of the physical


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

system. These issues are being examined by the Hurricane Katrina Decision Chronology Study being conducted by a separate group of investigators.

The architecture of this report is aligned with the five major questions that comprise the IPET mission. Those questions involve:

- The System: What were the pre-Katrina characteristics of the hurricane protection system (HPS) components; how did they compare to the original design intent?
- The Storm: What was the surge and wave environment created by Katrina and the forces incident on the levees and floodwalls?
- The Performance: How did the levees and floodwalls perform, and what insights can be gained for the effective repair of the system, and what is the residual capability of the undamaged portions? This also involved understanding the performance of the interior drainage and pump stations and their role in flooding and un-watering of the area.
- The Consequences: What were the societal-related consequences of the flooding from Katrina to include economic, life and safety, environmental, and historical and cultural losses?
- The Risk and Reliability: What was the risk and reliability of the hurricane protection system prior to Katrina, and what will it be following the planned repairs and improvements (1 June 2006).

All of these efforts are underpinned by the establishment of accurate elevations for geodetic reference points throughout the region and re-establishing the relationship of local mean sea level to the geodetic datum.

## Findings

The IPET findings are presented in three tiers: the first two presented in Volume I and the third in the individual volumes addressing major topical areas of analysis. The first tier is the overarching findings that represent a synthesis of the component analyses. The second tier, presented in Volume I as a synopsis of principal findings, is a synthesis of the findings from the component analyses of the hurricane protection system. The detailed findings are presented in Volumes II–VIII. A unique aspect of the IPET work is that the results are in many cases, already "in the ground" in the form of the repairs accomplished. They are also incorporated into the planning and design processes that are the basis for continued work to recover to authorized levels and for completion of the system. The analytical tools and information bases will be transitioned to the Louisiana Comprehensive Protection and Restoration Study, to develop effective approaches for higher levels of protection.


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

## Overarching Findings

The System did not perform as a system: the hurricane protection in New Orleans and Southeast Louisiana was a system in name only. Flood protection systems are an example of a series system—if a single levee or floodwall fails, the entire area is impacted. It is important that all components have a common capability based on the character of the hazard they face. Such systems also need redundancy, an ability for a second tier of protection to help compensate for the failure of the first tier. Pumping may be the sole example of some form of redundancy; however, the pumping stations are not designed to operate in major hurricane conditions. The system's performance was compromised by the incompleteness of the system, the inconsistency in levels of protection, and the lack of redundancy. Incomplete sections of the system resulted in sections with lower protective elevations or transitions between types and levels of protection that were weak spots. Inconsistent levels of protection were caused by differences in the quality of materials used in levees, differences in the conservativeness of floodwall designs, and variations in structure protective elevations due to subsidence and construction below the design intent due to error in interpretation of datums. The presence of closure gates such as those for the CSX railroad that must function as a part of the system, but are separately controlled, add to the inherent risk in the system. Redundancy was simply not included. Continuity of pumping could have significantly reduced at least the duration of flooding and in some areas the extent. Armoring the back sides and crests of levees and the protected side of floodwalls would have added significant redundancy and reduced breaching. Surge gates at the mouths of the outfall canals are an excellent example of providing redundancy. The combination of the surge protection for the canals and resilient levee-floodwall systems will dramatically reduce risk in Orleans East Bank.

The storm exceeded design criteria, but the performance was less than the design intent: sections of the hurricane protection system were in many ways overwhelmed by the conditions created by Hurricane Katrina. This is particularly true for the sections of the Gulf Intracoastal Waterway (GIWW) along New Orleans East, and the levees in St. Bernard and Plaquemine Parishes where the combination of record high surge and long period waves exceeded the design conditions and devastated the levees. This devastation, however, was aided by the presence of incomplete protection, lower than authorized structures, and levee sections with erodible materials. While overtopping and extensive flooding from Katrina were inevitable, a complete system at authorized elevations would have reduced the losses incurred. The designs were developed to deal with a specific hazard level, the Standard Project Hurricane as defined in 1965; however, little consideration was given to the performance of the system if the design event or system requirements were exceeded.

Within two of the three outfall canals in Orleans Parish, and at one site within the Inner Harbor Navigation Canal (IHNC), foundation failures occurred prior to water levels reaching the design levels of protection, causing breaching and subsequent massive flooding and extensive losses. These failures were all associated with I-wall structures and a common failure mode involving the formation of a gap on the canal side of the floodwall that precipitated and accelerated the failure in the foundation materials. The designs for these structures were marginal with respect to practice and the uncertainty inherent in the variable geological conditions and the hurricane hazard for the area. The duration of flooding could have been

reduced if the pumping capability had been able to continue, but the pumping systems were not designed to operate in severe hurricane conditions.

Two other sites within the IHNC experienced I-wall breaches due to overtopping and scour behind the walls which reduced the stability of the structures. These breaches added to the flooding in Orleans (East Bank) and the Lower Ninth Ward. The storm surge levels in the IHNC exceeded the design levels, and lower structure elevations, reduced over 2 ft by 35 years of subsidence, contributed to the amount of overtopping that occurred. Reduced protection elevations at transitions between structure types and incomplete sections of the system similarly reduced protection levels and increased flooding. Another site on the west side of the IHNC breached from overtopping and scour of a levee. The elevation of the levee was lower than adjacent areas, which added to its vulnerability.

The flooding and the consequences of the flooding were pervasive, but also concentrated. Consequences of the flooding and the associated losses were greater than any previous disaster in New Orleans and, in themselves, create a formidable barrier to recovery. Loss of life was concentrated by age, with more than 75 percent of deaths being people over the age of 60. Loss of life also correlated to elevation, in terms of depth of flooding, especially with regard to the poor, elderly and disabled, the groups least likely to be able to evacuate without assistance.

The majority, approximately two-thirds by volume, of the flooding and half of the economic losses can be attributed to water flowing through breaches in floodwalls and levees. Losses and in many respects recovery can also be directly correlated to depth of flooding and thus to elevation. In some areas flooded by Katrina, where water depths were small, recovery has been almost complete. In areas where water depths were greater, little recovery or reinvestment has taken place.

Another concentration of consequences is in the nature of the losses. Twenty five percent of residential property values were destroyed by Katrina and this loss represents 78 percent of all direct property damages. Non-residential properties suffered a 12 percent loss in total value or half the rate of residential. Clearly residential areas were more prone to flooding.

The repaired sections of the hurricane protection system are likely to be the strongest parts of the systems until the remaining sections can be similarly upgraded and completed. Since there are many such areas where the protection levels will be the same as before Katrina, the New Orleans metropolitan area remains vulnerable to any storm creating surge and wave conditions that rival those from Katrina.

## Synopsis of Principal Findings

### Geodetic Vertical and Water Level Datum (Volume II)

The variable and considerable subsidence in the New Orleans area was reflected in the performance of the system in Katrina in two ways. First, the magnitude of the subsidence and adjustments to the datums were not fully considered in the design and construction of the Hurricane Protection System. Spatial and temporal variations of 0.2 to 3 ft were found between


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

the geodetic datums and water level reference datums. Flood control structures in the region were authorized and designed relative to a water level datum (mean sea level), but constructed relative to a geodetic vertical datum incorrectly assumed to be equivalent to the water level datum. This resulted, in the case of the outfall canals, in structures built approximately 1 to 2 ft below the intended elevation. In at least one case, the Corps made a deliberate decision not to re-examine elevations of existing project structures after datum adjustments were made. Second, updating of the reference elevation points for the region, although underway, was not completed and left decision makers without an accurate understanding of the actual elevations of the hurricane protection. The IHNC structures, for example, are more than 2 ft below their intended design elevations, mostly from subsidence over the 35-year life of the project.

### Hurricane Protection System (Volume III)

There was no evidence of government or contractor negligence or malfeasance. With the exceptions noted below, the system was generally built as designed, and design approaches were consistent with local practice. However, several factors described below significantly impacted the system's performance during Katrina. Sections of the system were built below specified design elevations due to the use of an inaccurate relationship between the geodetic datum and mean sea level. While varying across the system, this elevation difference can be as much as 1 to 2 ft. Foundation soil strengths were derived from relatively widely spaced borings and at times using average values that may not capture the high variability inherent in this type of geology. The decision to use uniform soil shear strengths, based on the greater strengths of the soils under the center line of the 17th Street Canal levee, resulted in an overestimation of the subsurface strength at the levee toe. Coupled with the use of average values obtained from widely spaced samples in a geology with highly variable conditions, the structure was left with a marginal factor of safety. This same assumption was not made in other sections of the system where more conservative strength values were used.

The original design criteria developed through use of the Standard Project Hurricane (SPH) in 1965 and used for the outfall canals in the late 1980s, was not representative of the hurricane hazard at the time of the design. While updates in original 1959 definition of the SPH for the New Orleans area were made by the National Oceanographic and Atmospheric Administration (NOAA) in 1979, the Corps chose to continue to use the 1965 and 1966 original definitions developed for the Lake Pontchartrain and Vicinity and New Orleans to Venice Projects.

The hurricane protection in New Orleans was designed and developed in a piecemeal fashion, resulting in inconsistent levels of protection. Four slightly different SPH's were used, and the designs for specific structures were influenced by the local conditions. For example, the levee and I-wall system designed for the Orleans Canal was more conservative than that for the 17th Street Canal. The Orleans levee was broader and the I-wall freeboard less (height above the levee crest). Soil strength assumptions were also more conservative, using the weaker values at the toe instead of the stronger values under the centerline as assumed for the 17th Street levees.

Sections that are not completed represent anomalously low areas, more vulnerable to overtopping and failure. The majority of the pump stations are not designed to provide capability


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

during large storms. Levee materials ranged from highly resistant to scour to poorly resistant, resulting in large variations in the protection levels afforded nearby areas. Other factors such as the CSX closure gate not functioning and the maintained condition of the levees were additional negative factors in the performance of the system. While the presence of trees and other features on the levees were not obvious causes of breaching, it is possible that they were enablers in the overall breaching process.

## Storm (Volume IV)

Hurricane Katrina generated water levels that for much of the system significantly exceeded the design criteria. Katrina surge levels were substantially higher, up to 5 or 6 ft, than the design levels for all areas along the eastern and southern portions of the hurricane protection system, and were roughly equivalent along the south shore of Lake Pontchartrain. Katrina-generated wave heights were approximately equal to the design criteria with the exception of Plaquemines Parish where Katrina-generated waves were significantly higher. Wave periods, however, especially along New Orleans East, St. Bernard, and Plaquemine Parishes, were approximately three times that estimated for the design criteria. The waves impacting the levees were long period ocean storm waves that cause much more runup and overtopping than shorter period waves.

Detailed hydrodynamic analyses showed that dynamic forces were a significant portion (20 to 30 percent) of the total forces experienced by many of the levees and floodwalls. The dynamic forces considered in the original design were significantly less. For example, the IHNC design assumed 1-ft waves, while at least 4-ft waves were experienced during Katrina.

Overtopping by waves generated very high velocities over the crest and back sides of the levees, leading to a high potential for scour and erosion. Velocities from 10 to 15 ft/sec were calculated for the back sides of the levees along St. Bernard Parish, while the front sides of the levees experienced velocities of about one-third of those on the back side. Since erosion potential is related to the cube of velocities, the erosion potential on the back side of the levees was up to 10 times greater. The exception was in the east/west-trending leg of the GIWW near the I-10 bridge, where wave energy and currents were almost parallel to the orientation of the levees and while overtopping occurred, the back side velocities were not severe. Examination of the levees that failed due to erosion determined that all were caused by erosion of the crest and back face.

The southeast trending leg of the Mississippi River Gulf Outlet (MRGO) had little influence on the water levels in the IHNC during Katrina. The relative size of the channel with respect to the very large flow area available when the marsh areas have been inundated by surge, make the amount of water conveyed through the channel a relatively small part of the total. During Katrina, MRGO was far from the 'hurricane highway' moniker with which it has been branded. Model results show that this is the case for very large surge generating storms in this area. This finding agrees with those of an independent study conducted for the State of Louisiana.


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

## Performance (Volumes V and VI)

Of the 50 major breaches experienced by the hurricane protection system during Katrina, all but four were due to overtopping and erosion. For floodwalls, the overtopping caused erosion behind the walls that eventually caused instability and wall failure. For levees, the scour eroded the back sides and tops of the levees due to high velocities of the overtopping waves in areas of erosion-susceptible soils creating breaching. The value of added erosion resistance was clear, an attribute that could also be provided by measures such as armoring. Areas with high quality levee materials performed reasonably well in the face of water conditions that exceeded their design criteria. Structures at authorized design elevations would have reduced the amount of overtopping. There was no evidence of systemic breaching caused by erosion on face or water sides of the levees exposed to surge and wave action.

Four breaches, all in the outfall canals and IHNC and all involving I-walls, occurred before water levels reached the top of the floodwalls. All were caused by foundation failures induced by the formation of a gap along the canal side of the floodwall. All of these structures were built over a layer of marsh sediments, in two cases underlain by clays and in the other two underlain by relict beach sand deposits. The subsurface conditions dictated the specific mechanics that, coupled with the high hydrostatic pressures introduced to depth by the gap along the face of the sheet pile, led to instability and failure. The sites underlain by sand experienced significant seepage and in one case a massive piping of subsurface sand from under the levee to the protected side, undermining the floodwall. The formation of the gap and the associated hydrostatic pressures introduced at depth resulted in a significant reduction in the factor of safety of the structure. This failure mechanism, in particular the gap formation, was not considered in the original design of these structures.

Transitions between types and levels of protection and between protection structures and other features created vulnerabilities to erosion and breaching and reduced the effectiveness of the protection. Some of the transitions are associated with changes in the organization responsible for the structures, some are due to incompletion of the authorized construction, and others are associated with necessary penetrations through the levee/floodwall system.

In spite of being subjected to design-exceeding conditions and forces, many sections of the hurricane protection system performed well. These tended to be sections with materials resistant to erosion and more conservative designs.

Flooding from Katrina covered approximately 80 percent of the New Orleans metropolitan area. Approximately two-thirds of that flooding can be attributed to water flowing through breaches. The one-third due to overtopping and the very large amount of rainfall would itself have caused a significant level of interior flooding.

The three foundation failures associated with flooding in Orleans East Bank were responsible for approximately 70 percent of the flooding in that area. The remainder was due to the heavy rainfall (up to 14 in. in 24 hr) and some overtopping-induced breaching along the west side of the IHNC.


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

Because of inoperability, pump stations played no significant role in the reduction in flooding during Katrina. Sixteen percent of the total pumping capacity was operating during the storm, equivalent to approximately 18000 cfs. The distribution of operating pumps across four parishes, however, reduced the impact of the pumping. Their inoperability, due to a combination of the necessary evacuation of operators, loss of power, loss of cooling water, and flooding, impacted the ability to un-water the city after the storm. Temporary pumps were useful after Katrina, but provided only a small fraction of the capacity needed. Reverse flow through some pumps added to the flooding in at least one parish. While methods are available to prevent reverse flow, they are dependent on human implementation and electrical power.

## Consequences (Volume VII)

The most serious direct impact of Katrina was the high number of deaths. While large numbers of people were able to evacuate, the groups least likely to be able to do so on their own, the poor, elderly, and disabled, were hardest hit. This emphasizes the critical need for additional capabilities in this area. The depth of flooding was high correlated to land elevation, and the areas with the lowest elevations were largely residential. This places the residential population who cannot readily evacuate at the greatest risk.

Katrina caused direct property losses (excluding Plaquemines Parish) of over $20 billion, approximately 78 percent ($16 billion) of which was attributed to residential losses. The next largest component was the 11.5 percent ($2.4 billion) attributed to commercial losses. There was an additional $6.0 to $6.7 billion in losses attributed to public infrastructure, including the hurricane protection system itself. The most significant infrastructure impact was incurred by the hurricane protection system (1.8 to 2.08 billion) followed by roadway networks and assets of the regional electrical distribution\transmission grid. Together, the damages to these categories of infrastructure totaled approximately $2.0 billion. This estimate is followed by damages to public transit assets of approximately $690 to $730 million followed by damages to rail lines, airport facilities, gas and water distribution, telecommunications assets, and assets for waterborne transportation totaling an additional $1.7 to $1.9 billion. Approximately half of the direct economic losses, excluding public and utilities infrastructure, can be associated with breaching of levees and floodwalls. The remaining losses alone, attributable to rainfall and overtopping, constitute the largest losses experienced in any disaster in the New Orleans vicinity.

Combined with the significant and far-reaching impact of Hurricane Katrina regarding initial displacement of population, workforce, and businesses, the impacts to infrastructure and affiliated public welfare and services will contribute to slowed phasing of recovery with regard to return of populace and business activities. Orleans Parish alone is estimated to have lost over 60 percent of its population and St. Bernard Parish nearly 80 percent. On the other hand, St. Charles and Tammany Parishes have increased in population since before the storm.

In terms of the social consequences of the Katrina event specifically, the social organization of the community and region has been compromised by the mass exodus of the population, the structural damage, and the demands to respond and rebuild. The flooding caused a breakdown in New Orleans' social structure, a loss of cultural heritage, and dramatically altered the physical,


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

economic, political, social, and psychological character of the area. These impacts are unprecedented in their social consequence and unparalleled in the modern era of the United States. The flooding disproportionately impacted the poor, the elderly, and the disabled.

The performance of the levees protecting New Orleans obviously is a key to its social, cultural, and historic conditions. The immediate physical damage made large portions of the city uninhabitable, with thousands of residential, commercial, and public structures destroyed. Basic infrastructure facilities, such as power, water, sewer, and natural gas lines, were made inoperable and continued to be out of service for months after the event. Many victims not only lost their homes, but also their schools, health care, places of worship, places of trade, and jobs. The forced relocations disrupted family and friend networks. As a result, the event not only had an immediate impact on the well being of the population of those living and working in the metropolitan area, but also resulted in basic changes in the social organization of all aspects of that population.

The available information indicates that if environmental harm has come from the Katrina flooding of Greater New Orleans, it was associated with past regional land and water development. Like many other cities, the soils and sediments of land and waters in New Orleans and other delta urban areas are contaminated with metals and organics at concentrations that often exceed health standards in areas of most dense development. The flooding of greater New Orleans removed some contamination from greater New Orleans and transported it to Lake Pontchartrain and Violet Marsh with pumped flood-water where it added a small increment to estuarine sediments. The IPET analysis did not look at local redistribution of contaminants within individual drainage basins. Loss of wetlands regionally appears to fit a pattern of loss associated with past regional development as well. Overall, any sustained environmental loss from flooding and flood management is indicated to be very small in the context of long-term impacts from development in the region.

### Risk and Reliability (Volume VIII)

The findings for the risk and reliability assessment will be provided upon completion of the ongoing validation of the methodology and products as recommended by the ASCE External Review Panel.

## Lessons Learned

Lessons learned are presented in three tiers in compliance with the presentation of findings. Tier one, overarching lessons learned, represents an integration of the major principal lessons learned that are presented here in Volume I. Volumes II to VIII provide a more detailed discussion of lessons learned relevant to the individual topics addressed in each volume.


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

## Overarching Lessons Learned

The IPET analysis provides broad insights into the many aspects of the New Orleans and vicinity hurricane protection system and why the system performed as it did during Hurricane Katrina. Integration of a number of these principal lessons learned provides some strategic insights for the future relevant to the continued reconstitution of protection in Southeast Louisiana and for hurricane and flood protection projects in general. These insights are presented here as overarching lessons learned.

**Resilience:** It is clear that a resilient hurricane protection system can provide enormous advantages. Resilience in this case refers to the ability to withstand, without catastrophic failure, forces and conditions beyond those intended or estimated in the design. For our purposes, resilience refers to the ability to withstand higher than designed water levels and overtopping without breaching. As demonstrated in this analysis of Katrina, approximately two-thirds of flooding and losses were the result of breaching, i.e., the significant loss of protective elevation in structures. While overtopping alone from Katrina would have created dramatic flooding and losses, the difference is staggering in many regards. Reductions in losses of life, property, and infrastructure; associated reductions in the displacement of individuals, families, and the workforce, coupled with reduced disruption to businesses and social and cultural networks and institutions, would have a dramatic impact on the ability of a community and region to recover. Added to this is the savings of the time and funding needed to rebuild the protection system itself, which would accelerate the pace of recovery. Resilience is not a national priority in the development of hurricane protection systems, and was not an element in the New Orleans Hurricane Protection System design. While resilience here is referring to the performance of the physical system, there is also a need for resilience in managing consequences. This falls squarely in the domain of emergency preparedness and response.

It is important to view resilience as time-dependent, given changes in requirements for protection (i.e., changes in potential consequence) or changes in the hazard (climate dynamics or changes in the nature of the protection system and subsidence). Resilience must be part of the adaptive nature of a system and be reviewed frequently as a fundamental character of the design and capacity of the system. Three main principles are suggested:

- Designs conservative enough to appropriately account for the unknown and flexible enough to be augmented as hazards or requirements change.
- Performance redundancy such as armoring to prevent scour from overtopping that leads to failure and breaching.
- Integrated systems approach to protection, from design, construction, operation, maintenance, and emergency operations perspectives. Pumping resilience as a component of the system is one example.

**Systems Performance:** Planning and design methodologies need to allow for an examination of system-wide performance. It is obvious from the IPET analysis that the piecemeal development of the New Orleans Hurricane Protection System provided a system in name only. This is especially true of the sections that have not been completed, transitions


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

between types of protection that differ in capability (thereby representing weak points), and differences in the relative levels of reliability that generate areas with greater vulnerability to failure. The systems approach should have a time dimension to allow consideration of the potential changes in requirements or conditions over the life of the project and to examine approaches to build in adaptive features and capabilities. Subsidence, changing population demographics, and the changing patterns of hurricane intensity and frequency are obvious examples of the time-dependent challenges hurricane protection systems face. All components that contribute to the performance of the overall system must be treated as an integral part of the system. Pump stations are one example in New Orleans. For any given drainage basin, the protection is only as robust as the weakest component of the system protecting that area and how effectively the various components that are interdependent operate together.

**Risk and Reliability:** A risk-based planning and design approach would provide a more viable capability to inform decisions on complex infrastructure such as hurricane protection systems. The traditional approach, as used for the New Orleans protection measures, is component-performance-based, uses standards to define performance, and relies on factors of safety to deal with uncertainty. It is difficult to examine the integrated performance of multiple components, and standards are usually limited to past experience. Risk-based planning is systems-based, requiring that the entire system be described in consistent terms and explicitly including uncertainty. Component performance is related to system performance as well as the consequences of that performance.

The risk-based approach is well suited for consideration of a variety of measures of merit. Factors such as loss of life, environmental losses, and cultural consequences can be included in decision making without reducing everything to one measure such as dollars. As applied for the IPET assessment, it allows aggregation and de-aggregation of information to address issues at different scales, providing a useful tool for collaborative planning between responsible agencies at different levels. It also allows for a more comprehensive consideration of hazards. Instead of a single definition derived from limited historical data, a joint probability approach can consider events that reflect historical information as well as a wide variety of possible events, providing a more robust basis for considering the spectrum of hurricanes that may occur. Most importantly, Risk and Reliability allows decision makers to understand the relative levels of vulnerability that specific areas face, the nature of the consequences (e.g., loss of life, economic loss or environmental loss), and to understand the source of the vulnerability. As such, it is an excellent tool for understanding the effectiveness of alternative approaches to reduce risk, which can be managed by changing the performance of the protection system or changing the nature or degree of related consequences.

**Knowledge, Technology and Expertise:** The history of the planning, design, and performance of the Hurricane Protection System in New Orleans points out a dilemma. While new pieces of knowledge were available over time that were relevant to the ultimate performance of the I-walls on the outfall canals, the pieces were not put together to solve the puzzle of the failure mechanism that occurred. The Corps' own testing of sheetpile floodwalls (E99 Sheet Pile Wall Field Test Report, Technical Report 1, Lower Mississippi Valley Division, June 1988) in the mid 1980s was not directed at the global stability of I-walls, but with hindsight, some of the behavior observed was indicative of the wall deflections that could lead to


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

a gap forming between the pool side soil and the wall. Similarly, late in the 1990s, research published in part by the Waterways Experiment Station (Soil Structure Interaction Effects in Floodwalls. *Electronic Journal of Geotechnical Engineering*, Vol. 2, 1997) discussed the need to include hydrostatic water pressures with regard to a gap forming between the pool side soil and wall in the numerical modeling of sheetpile floodwalls. Work, not directly related to levee or floodwalls, in England discussed the deflection and hydrostatic water pressure problem for earth retaining walls. How do these puzzle pieces get placed together to create knowledge for designers and how do designers and reviewers get access to this information? How does the research or testing community become aware of applications, perhaps different from their original purpose, for their new knowledge?

Part of the solution to this dilemma relates to the amount of overall effort and resources put into the search for new knowledge and capabilities to deliberately update design criteria and planning capabilities. Awareness and capability are gained best when there is both technology push (research creating new knowledge and capabilities) and requirements pull (designers/constructors seeking and pulling information from the research and professional communities). The solution is not more research or more outreach alone, it is the ability of the design/construction and research communities to work together in an environment enabling collaboration and experimentation with new knowledge and approaches to old and new problems. There has been a distinct loss in energy and resources expended in this area, particularly in the domain of hurricane and flood protection and specifically in the geotechnical fields that are at the heart of the levee and floodwall performance issues in Katrina. The focus on "standards" may in fact also deter this process. Standards imply stability and constancy, when in fact the concept of "guidelines" may be more appropriate, allowing and encouraging customization and adaptation as new knowledge emerges. In either case, standards and/or guidelines need to be refreshed at a greater and greater frequency as the generation of new knowledge continues to accelerate.

The other dimension to this issue is expertise. As technology accelerates and engineering practice evolves at an increasing pace, it becomes more difficult to maintain the level of technical expertise necessary to cope with the ever more complex issues faced in water resources. This is true for the government and the private sectors. Government agencies are especially challenged in an era of outsourcing and competition for experienced professionals. Significant measures are needed to re-emphasize technical expertise and renewal of that expertise as water resources practice evolves. These measures must be part of the culture of organizations and cover the entire profession to ensure that the total team addressing priority issues such as hurricane protection are working from the latest knowledge and professional practice. The Corps should be a leader in this area.

## Synopsis of Principal Lessons Learned

The principal lessons learned from the primary areas of analyses are presented below by major topical area. These lessons learned are discussed in more detail in the individual volumes cited that provide the full details of the IPET work in each area.


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

**Geodetic Vertical and Water Level Datums (Volume II).** All hurricane and flood control protection structures should be designed, constructed, and maintained relative to an up-to-date local sea level reference datum. Areas experiencing variable subsidence, such as New Orleans, are likely to have systematic datum and elevation accuracy issues that need frequent attention. It is important to have appropriate monitoring stations (for tide and subsidence) in place and associated up-to-date guidelines for the application of this information to existing and new projects. In subsidence-prone areas, designs should consider multiple elevation increases over the life cycle of the structure. The relatively recent advent of LIDAR systems will contribute to updating elevations over large areas such as New Orleans.

**The Hurricane Protection System (Volume III).** Design methods and designs need frequent review to determine whether they represent best practice and knowledge. Designs in coastal hurricane projects need to include the concepts of resilience, adaptation, and redundancy to accommodate unanticipated conditions or structural behaviors. Design should be based on a system-wide understanding of the processes affecting the system and the interaction and interdependencies of the system components. This is especially true for the characterization of the hazard where modern probabilistic methods should be used.

**The Storm (Volume IV).** Meteorological designations such as the Saffir-Simpson scale by themselves are not adequate to characterize the distributed surge and wave conditions that a hurricane protection system will face. Sophisticated modeling using physics-based codes with high spatial resolution is necessary to depict the highly variable hydrodynamic environments created by large storms. Similarly, the traditional methods of assessing the frequency of occurrence of hurricanes, dependent primarily on historical data, are too simplistic to capture important characteristics of the hurricane hazard such as time- and space-dependent storm intensity and track patterns.

The SPH process is outdated. More comprehensive probabilistic methods that consider a broader variety of storm characteristics and storm generated conditions should be used as a basis for planning and design.

**The Performance (Volumes V and VI).** The design approaches taken for the outfall canals were not conservative enough to deal with the unknowns. Floodwall design methods need to consider a broader spectrum of possible behaviors, and resilience should be considered as a fundamental performance characteristic. Research is needed to understand the full performance limits of structures and to discover new approaches for creating adaptive designs. Design methods should be clearly based on physical behavior of engineering components and systems and should be reviewed periodically to determine if they represent the latest knowledge, practice, and technology. Similarly, existing projects should be periodically reviewed to ensure that their original design has not been compromised by changing hazard or changing knowledge base.

Planning methods should facilitate examination of system-wide performance. In addition, hurricane protection systems should be deliberately designed and built as integrated systems to enhance reliability and provide consistency in levels of protection. Integration of armoring is especially important to provide resilience to erosion. Components such as the interior drainage and pumping need to be an integral part of the system because of the important role they can


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

play in limiting the amount and duration of flooding. Resilience in pumping capacity is especially important.

**The Consequences (Volume VII).** Losses from a hurricane event causing water levels that exceed design criteria can be expected to be significant, but can be much less if the hurricane protection system has a high level of resilience. While the reduction in direct losses can be substantial and readily estimated, it is the more difficult to quantify reduction in the indirect economic and cultural losses that may be most relevant to the ability of the affected area to rapidly recover. In addition, the perceived character and expected performance of the hurricane protection system itself is a significant factor in the choices people will make with respect to re-population and re-investment.

If there is one lesson learned from the Consequence analysis, it is the direct correlation of losses with elevation, or lack thereof. Damages and loss of life were both directly tied to depth of flooding, which in turn is inversely tied to the elevation of the location or sub-basin. Areas with lower elevations experienced the most severe losses and will continue to harbor the highest probabilities of experiencing flooding into the future.

A broad and systems-based planning capability can increase the effectiveness of integrating evacuation, recovery, and reconstruction aspects into the hurricane protection system. In particular, a risk-based approach can provide an effective means to examine approaches to manage both the probability of an adverse event and the exposure to losses as well as the consequences. Spatial analysis of consequences and the ability to relate consequences to physical performance are powerful tools for making difficult decisions concerning hurricane protection.

**Risk and Reliability (Volume VIII).** Risk and Reliability lessons learned will be incorporated into the report after completion of the ongoing validation of the risk methodology and risk products as recommended by the ASCE External Review Panel.

# Overview

## Introduction

Last year the world watched Hurricanes Katrina, Rita, and Wilma devastate the Gulf Coast. The Corps of Engineers, in conjunction with other federal, state, and local partners, mounted an unprecedented, multi-faceted effort to assist in the recovery and rebuilding of the areas affected by these massive storms. The devastation from Hurricane Katrina in New Orleans and vicinity was particularly unprecedented. Because of the extent of the damage to the hurricane protection system itself and the consequences of the subsequent flooding it was imperative to understand what happened and why. Only through this knowledge could the levees and floodwalls be repaired and rebuilt to provide more effective protection in the future. This report provides a detailed accounting of the IPET work to determine why the hurricane protection measures performed as they did and how to provide more effective protection for the future. The area of principal study is shown in Figure 1 and represents the bulk of New Orleans and Southeast Louisiana. This overview includes a brief historical perspective of the evolution of hurricane


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

protection in the New Orleans region, a descriptive synopsis of what happened during Katrina through the eyes of the analyses accomplished, a brief description of IPET, and a synopsis of the organization and content of this report.




Figure 1. Principal area of analysis

## Historical Perspective

Located in the low-lying Mississippi River delta in Louisiana, large portions of the city of New Orleans lie near or below sea level, a fact that has posed complex flood management problems since the city's founding in 1718. Historically, the greatest natural threat posed to


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

residents and property in the New Orleans, Louisiana, area has been from hurricane-induced storm surges, waves, and rainfall, especially those associated with Hurricane Betsy in 1965, Camille in 1969, and Lili in 2002. Although some hurricane protection had been provided to a few areas of New Orleans, it was not until Hurricane Betsy struck the city, killing 75 people and causing substantial damage and loss of property, that a comprehensive hurricane protection plan was initiated. Over time, three hurricane protection projects have been designed and partially constructed in New Orleans and the Southeast Louisiana region: Lake Pontchartrain and Vicinity, the West Bank project, and the New Orleans to Venice project. The Lake Pontchartrain and Vicinity project is used here to illustrate the events that preceded Hurricane Katrina.

Congress first authorized the Lake Pontchartrain and Vicinity hurricane protection under the Flood Control Act of 1965. The project was intended to protect areas around the lake (in the parishes of Orleans, Jefferson, St. Bernard, and St. Charles) from flooding caused by a storm surge or rainfall associated with a hurricane that would be roughly the same as what is today classified as a fast-moving "Category 3" hurricane. The basis for this was the standard project hurricane (SPH) developed by the Corps with the assistance of the U.S. Weather Bureau (now the National Weather Service). The model (assumed at that time to represent a storm that would occur once in 200-300 years) was intended to represent the most severe meteorological conditions considered reasonably characteristic for that region: winds up to 111-113 miles per hour and that can be expected to cause some structural damage from winds and flooding near the coast from the storm surge and inland from rains. Although federally authorized, the project was to be a joint federal, state, and local effort, with the federal government paying 70 percent of the costs and the state and local interests paying 30 percent. The Corps of Engineers was assigned responsibility for project design and construction, and the local interests were responsible for maintenance of the levees and flood controls.

During the first 17 years of construction of what has become known as the "barrier plan," project delays and cost increases occurred as a result of technical issues, environmental concerns, legal challenges, and local opposition to various aspects of the project. The barrier plan included a series of levees along the lakefront, concrete floodwalls along the IHNC, and control structures, including barriers and flood control gates located at the Rigolets and Chef Menteur Pass areas. These structures were intended to prevent storm surges from entering Lake Pontchartrain and overflowing the levees along the lakefront. A paradox of these massive levees is that in keeping water from the city, they also prevent Mississippi River sediment--which has historically been important in replenishing deltaic land surfaces--from spreading across the region. As a result of this and other activities such as pumping of groundwater, many areas of the city have been slowly subsiding, which has further exacerbated flood risks.

A December 1977 court decision enjoined the Corps from constructing the barrier complexes and certain other parts of the project until a revised environmental impact statement was prepared and accepted. After the court order, the Corps changed course and recommended abandoning the barrier plan and shifting to what became known as the "higher level plan" originally considered in the early 1960s. Local sponsors executed new agreements to ensure their share of the non-federal contribution to the revised project. Even before construction began on the barrier plan, design changes to raise the levees along the three main drainage canals that drain water from New Orleans into Lake Pontchartrain were incorporated to protect against


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.

storm surges from the lake. The construction of higher levees has long been an option for reducing risks, but they are expensive to build, require the acquisition of additional lands, and may entail negative aesthetic and environmental consequences.

As of May 2005, the Lake Pontchartrain and Vicinity project included about 125 miles of levees, major floodwalls, flood-proofed bridges, and a mitigation dike on the lake's west shore. Progress on the project varied by area: 90 percent complete in Orleans Parish, 70 percent complete in Jefferson Parish, 90 percent complete in the Chalmette area, and 60 percent complete in St. Charles Parish. The estimated completion date for the entire project was 2015. In recent years, questions were raised about the ability of the project to withstand hurricanes with intensities greater than those assumed for the original design. In 2002, a pre-feasibility study on whether to strengthen hurricane protection along the Louisiana coast was completed. A full feasibility study was estimated to take 5 years to complete.

### Katrina

The hurricane protection system, outlined on the map in Figure 2, includes approximately 350 miles of protective structures, 56 miles of which are floodwalls. The majority of the floodwalls are I-walls with some sections of T-walls and a small amount of L-walls. Figure 3 provides a schematic of the basic geometry of these structures. The elevation of the current hurricane protection structures are significantly below the originally authorized heights in part from errors in initial constructed elevations and in part from rapid subsidence. Figure 4 provides a general map of the New Orleans metropolitan area and the features of the hurricane protection system that were factors in the system performance during Katrina.


This is a preliminary report subject to revision; it does not contain final conclusions of the United States Army Corps of Engineers.