Westlaw.



2006 WL 896695 (F.D.C.H.)

Federal Document Clearing House
Copyright (c) 2006 CQ Transcriptions, LLC

Verbatim Transcript
April 05, 2006

Senate
Appropriations Committee, Energy and Water Development Subcommittee
Committee Hearing

U.S. Senator Pete V. Domenici (R-NM) Holds a Hearing on Fiscal Year 2007 Appropriations for the Army Corps of Engineers

U.S. SENATE COMMITTEE ON APPROPRIATIONS: SUBCOMMITTEE ON ENERGY AND WATER DEVELOPMENT HOLDS A HEARINGS ON FISCAL YEAR 2007 APPROPRIATIONS FOR THE ARMY CORPS OF ENGINEERS
APRIL 5, 2006
SPEAKERS:
U.S. SENATOR PETE V. DOMENICI (R-NM)
CHAIRMAN
U.S. SENATOR THAD COCHRAN (R-MS)
U.S. SENATOR MITCH MCCONNELL (R-KY)
U.S. SENATOR ROBERT F. BENNETT (R-UT)
U.S. SENATOR CONRAD BURNS (R-MT)
U.S. SENATOR LARRY CRAIG (R-ID)
U.S. SENATOR CHRISTOPHER BOND (R-MO)
U.S. SENATOR KAY BAILEY HUTCHISON (R-TX)
U.S. SENATOR WAYNE ALLARD (R-CO)
U.S. SENATOR HARRY REID (D-NV)
RANKING MEMBER
U.S. SENATOR ROBERT C. BYRD (D-WV)
U.S. SENATOR PATTY MURRAY (D-WA)
U.S. SENATOR DIANNE FEINSTEIN (D-CA)
U.S. SENATOR BYRON DORGAN (D-ND)
U.S. SENATOR TIM JOHNSON (D-SD)
U.S. SENATOR DANIEL K. INOUYE (D-HI)
U.S. SENATOR MARY L. LANDRIEU (D-LA)
WITNESSES:
JOHN PAUL WOODLEY,
ASSISTANT SECRETARY OF THE ARMY FOR CIVIL WORKS
LIEUTENANT GENERAL CARL STROCK,
U.S. ARMY CORPS OF ENGINEERS,
CHIEF OF ENGINEERS
DOMENICI: Hearing will please come to order. Because of schedule problems, we're going to let some senators speak out of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
G

2006 WL 896695 (F.D.C.H.)

order.
Senator Bond would like to make an opening statement at this point.
I yield to you, Senator.
BOND: Mr. Chairman, I thank you very much for your kind courtesies.
And Mr. Woodley, we've had long discussions about the need for locks on the Mississippi and Illinois rivers, and one of these days, I hope we will have an authorization coming out of our Environment and Public Works Committee which will allow this committee to do the vitally important work it should do in funding our vitally-needed nation's infrastructure.
I have here in my hand an article from the Wall Street Journal which I would share with you and those with whom you discuss. It's called, "As Utilities Seek More Coal, Railroads Struggle to Deliver." It reports that their shipping fees are going up a reported 20 percent to 50 percent. The Department of Transportation predicts that commercial shipping volume over the next 20 years will increase by 70 percent.
Most people, at least outside Washington, recognize that bulk commercial freight cannot be e-mailed, so transportation capacity in an issue that will demand leadership, and the sooner the better.
Last month, Secretary Johanns of the Department of Agriculture, Deputy Connor, and chief economist Dr. Keith Collins testified before the Appropriations Committee.
Mr. Woodley, if you and your team are not routinely in touch with Dr. Collins, I would be very disappointed. Dr. Collins has been chief economist or in that office serving at least four or five presidents. He testified again that any 50-year study is highly speculative, noting that even the 10-year forecasts USDA does are speculative, and that 10 years is heroic enough.
However, he is clear that they do not see stalled or dwindling or flat export activity through the Gulf. In fact, he said they see a substantial increase. In testimony previously, he said 40 percent to 45 percent in corn alone, and he sees a good long-term market for grains and oil seeds in the world, and he noted that having efficient infrastructure will help make that possible.
And as we all know, the demand for agricultural goods, one item transported on the rivers, depends upon transportation. And in good years, ag exports exceed imports by $30 billion, bringing great economic boost to the bread basket of America, as well as helping our balance of payments.
Secretary Johanns agreed firmly that the existing lock system built 70 years ago has proved an important and wise investment, and that should be obvious, even to the fiercest opponents of commercial shipping.
Mr. Woodley, with help of my able staff, I want to introduce you to Major Charles L. Hall (ph), Rock Island engineer from 1927 to 1930. He advised President Hoover and Congress in 1929 that the proposed system, the one which currently exists on the Mississippi River, was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

not economically feasible, was economically inadvisable, and argued that "limited barge traffic did not indicate that a viable barge industry would develop," closed quotes.

Fortunately, President Hoover and the Congress ignored that advice, and President Hoover said, "Modernization would put the rivers back as great arteries of commerce after a half century of paralysis," closed quotes.

Now, at 80 million tons moved annually and two-thirds of our exported grain moving through that system, it is clear that the Congress and President Hoover were wise to ignore the expert advice of Major Hall.

I suspect and fear that the major may have a grandchild working dutifully somewhere, maybe at the Office of Management and Budget.

So I ask that you let history help inform your future decisions, and that you consider that we must not only try to predict the future, but shape the future. In some cases, opinions of experts deserve to be very strongly considered just before they are very thoroughly rejected.

And I believe that some 80 members of the Senate believe that we should pass a Water Resources Development Act, which will enable my good friend, the outstanding chairman, to act appropriately in this subcommittee.

And I thank you, Mr. Chairman, for your comments.

DOMENICI: Well, I thank you for your comments.

And I just want to ask you since you are one of the proponents, and quite properly and appropriately, of the water bill -- in two minutes -- what's holding it up?

BOND: Initially, there were objections from the Office of Management and Budget. We had an opportunity to go above their heads to policy-makers who have a broader perspective. And they agreed that Office of Management and Budget would not threaten a veto.

Currently, there are, as I said, 80 signatures on a letter to the Republican and Democratic leaders saying that we need to move the bill. There are still holds in the Senate from people who want us to go back to the horse and buggy days and rely on overcrowded railroads and tremendously crowded highways to ship, not only grain to the export market, but the tremendous amount of commercial commodities...

DOMENICI: And those are senators.

BOND: Those are senators.

DOMENICI: We don't know who they are at this point, and you can't get them released and we're stuck.

BOND: We intend to do everything we can and ask the leaders to call for a vote, if the holds are not relieved, and not pay attention to the holds. And we hope that the Office of Management and Budget will not follow Major Hall (ph) and have a last-minute conversion to their opposition.

DOMENICI: All right.

BOND: Thank you, sir.

DOMENICI: Having said that, the Democrats are present. When I opened they were not. I apologize for that.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

It was only three minutes, Senator, and then you came.
I'm not going to have any opening statements. I think we're going to run out of time.
Any opening statements to start on your side? I knew Senator Bond had to say something or else we'd have a...
DORGAN (?): Did he talk about the Missouri River Management?
If so, I'll have an opening statement. If not, I won't.
DOMENICI: No.
(LAUGHTER)
But I knew if I didn't let him speak about what he wanted to, we'd have problems, so I let that happen.
How about over here [****]?
ALLARD: Mr. Chairman, I have a very brief statement.
DOMENICI: Let's do it.
ALLARD: OK.
Mr. Chairman, first of all, I want to thank you for holding the hearing.
The Army Corps of Engineers does a great deal for the country, as well as for Colorado.
But I must express my disappointment with the fact that funding to complete the Fountain Creek Watershed Study was not included in the president's proposed budget again this year. The study was originally contracted at $2.9 million with a 50 percent federal, 50 percent local funding split.
The locals have long ago put in over $1.4 million, but the federal government has not lived up to its side of the bargain. In what should be the final year of the study, it mystifies me why the Corps did not place enough value in the study to include it in the budget request, but I'll have questions on that later on, Mr. Chairman.
And thank you for your tolerance.
DOMENICI: Thank you very much.
On the Democrat side, Senator Mary Landrieu.
LANDRIEU: Mr. Chairman, I have a statement for the record.
But I do want to say that I'll come back after the vote, because I have a series of questions that really do need answers today based on the situation that we're facing in the Gulf Coast, and some charts I want to share with you, Mr. Chairman, and the committee about the backlog of current projects.
DOMENICI: OK.
Senator Craig?
CRAIG: Mr. Chairman, I'll ask unanimous consent that my full statement be a part of the record, but I want to recognize when a job well done is well done and completed.
And I want to thank the Corps for their completing of the Channel Improvement Project on the Snake River between Idaho and Washington. Critical importance to the aid of transportation in that region. I want to thank you for the work done.
Thank you, Mr. Chairman.
DOMENICI: Thank you. Your statement is made a part of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

record.
Senator?
MURRAY: Yes, Mr. Chairman, I just wanted to welcome Secretary Woodley and General Strock. Thank you for your testifying today.
I think that what happened in the last few months in Senator Landrieu's state and elsewhere, it really showed all of us how important the work is you do and how important it is that we maintain that.
And I want to compliment you for the three district offices that operate in my state. We have a really varied landscape when it comes to Corps projects. We've got hydroelectric flood control, navigation, irrigation, and the Army Corps work is really essential to our economy and to our ability to maintain the critical infrastructure in our communities.
We have the Portland district that has maintained the Columbia River dredging and the jetties, repairs to the jetties, critical for safety. Seattle District is working on some really complex flooding issues, and the Walla Walla District is providing some really important engineering expertise for us for the waste treatment plants out of Hanford.
So I want to compliment you on that work.
But I just want to say -- I have another hearing, but I want to say publicly I am deeply concerned about investment to our infrastructure, to the Corps. We have got to do better than what we have been presented, because we have to continue, as I think the senator from Louisiana well knows, to maintain the critical infrastructure we have and to make the important investments in our nation's future.
So I will join with all of you in working toward that direction.
Thank you.
DOMENICI: Very well. Thank you.
Well, I have a long analytical statement then, that wouldn't help here. The atmosphere's been so nice that it would make things look very, very bad.
(LAUGHTER)
Just suffice it to say that I think the way you handled the budgeting is a mess, and I don't think that you can expect us to do it the way you recommended.
You're short of money, and we know that. The president didn't put in as much as we need, but the way you went around, went about trying to make the money work, in my opinion, has made matters worse.
So don't look for us -- for it coming out the way you recommended.
It's going to come out but with no damage, we hope.
Having said that, we're ready for you all to speak, and I gather that you want to do it in the normal order -- is that correct -- where you want the Honorable Paul Woodley to speak first and then the general; is that what we want to do?
All right, Mr. Secretary, if you would proceed. Make your statement brief. It'll be made part of the record.
General, we look forward to hearing from you next. Make your

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

statement long.
(LAUGHTER)
It'll be made a part of the record also.
Mr. Woodley, please proceed.
WOODLEY: Thank you, Mr. Chairman.
I appreciate the opportunity to testify today and ask that the full statement be put in the record.
Our '07 budget includes about $4.7 billion, a 5 percent increase from last year. We provided a five-year budget plan along with the other budget justification materials, including three potential five-year funding scenarios for planning purposes and analytical purposes.
The budget includes an increase of about $280 million for construction projects compared to the fiscal year 2006 budget. The funding is allocated according to guidelines that emphasize economic returns, reduction of risk to human life and ecosystem restoration benefits.
Mr. Chairman, the budget provides $173 million to the Corp's regulatory program to protect wetlands and other waters of the United States. This represents a $15 million increase compared to fiscal year 2006 appropriations, and a 20 percent increase in budgeted funding for the regulatory program over the last three years.
The funding will be used to reduce permit processing times, improve aquatic resource protection through monitoring and compliance activities, and advance watershed approaches to permitting.
The budget also reassigns about $340 million of work in existing projects from the construction account to the operation and maintenance account. This reassignment improves accountability and oversight, reflects the full cost of operation and maintenance, and supports an integrated funding strategy for existing projects.
Now, the operation and maintenance budget has been revamped and is presented by major river basin and mission areas. This lays the groundwork for improved management of appropriated funds and more strategic formulation of future budgets.
The budget includes increased funding for preparedness, response and recovery activities related to flood and coastal storm emergencies.
The budget does not include funding for recovery from last year's hurricanes, since supplemental appropriations are being sought to provide that funding.
In summary, Mr. Chairman, the budget in the five-year plan incorporates performance budgeting principles, allocate funding to activities with the highest returns and advance important national objectives.
Thank you very much.
DOMENICI: Thank you very much.
General?
STROCK: Yes, Mr. Chairman and members of the committee, I'm honored to be testifying before you today with the Honorable John Paul Woodley on the president's fiscal year 2007 budget for the Army Civil Works Program. And if I may, I would like to briefly summarize the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

key points of my testimony and include my complete statement for the record.
DOMENICI: Please do, and that will be done.
STROCK: Good, sir.
This budget is a performance-based budget that reflects the realities of the national budget, supporting the nation's recent natural disasters and the global war on terror. This budget focuses construction on funding of 63 projects that will provide the highest returns on the nation's investment, including 11 dam safety projects.
Funds will be used for critical water resources infrastructure that improves the quality of our citizens' lives and provides a foundation for national economic growth and development. The budget incorporates performance-based metrics for continued efficient operation of the nation's waterborne navigation, flood control, and other water resource management infrastructure, fair regulation of wetlands, and restoration of important environmental resources.
There are six national priority construction projects funded in the construction program. They are the New York/New Jersey Harbor Deepening Project, the Oakland Harbor Deepening Project, construction of Olmstead locks and dam in Illinois and Kentucky, the Florida Everglades and south Florida ecosystem, the side channels of the upper Mississippi River system, and Sims Bayou in Houston, Texas.
And two others, the Missouri River Restoration and the Columbia River Restoration, both funded in the operations and maintenance account.
This budget also provides the quality of recreation services through stronger partnerships and modernization. The budget provides approximately $65.3 million to complete 14 projects, including one dam safety project in 2007.
As part of a comprehensive strategy to reduce the construction backlog, the FY '07 budget funds projects that provide the highest returns and are consistent with current policies. In all, 91 projects are funded so that we can provide benefits to the nation sooner.
The FY '07 budget includes $2.258 billion for the operations and maintenance program, and I can assure you that I will continue to do all that I can to make these programs as cost effective and efficient as possible.
Domestically, more than 8,000 volunteers from around the nation have deployed to help citizens and communities on the Gulf Coast in the aftermath of hurricanes Katrina, Rita and Wilma.
Even now, more than six months after Hurricane Katrina, 2,000 USACE volunteers continue to execute our FEMA-assigned disaster recovery missions along the Gulf Coast, and to accomplish the critical restoration work of the New Orleans area levee system.
Internationally, the U.S. Army Corps of Engineers remains committed to the monumental task of helping rebuild the infrastructure and economies of Iraq and Afghanistan, and more than 1,700 USACE volunteers have deployed to Iraq since 2003.
They continue to make progress toward this nation's goals of restoring the security and quality of life for all Iraqis and Afghans,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

as they pursue democracy and freedom.
The Corps' Gulf Regional Division has overseen the installation of 3,000 reconstruction projects and the completion of more than 2,100. These projects make a difference in the everyday lives of the Iraqi people and are visible signs of progress.
Water resources management infrastructure has improved the quality of our citizens' lives and supported the economic growth and development of this country. Our systems of navigation, flood and storm damage reduction projects and efforts to restore aquatic ecosystems contribute to our national welfare.
In closing, the Corps is committed to selflessly serving the nation, and I truly appreciate your continued support in this end.
Thank you, Mr. Chairman and members of the committee. This concludes my statement.
DOMENICI: Thank you very much.
Now I want to make a little announcement, which I think we all know up here, but let's make sure you know out there.
The majority leader has indicated to us Republicans that at 3:15 he would like all Republicans present on the floor of the Senate. He's going to address the issue that's before the Senate. And we will try to be there. That's not mandatory for you all.
And so...
(UNKNOWN): (OFF-MIKE) advisable or?
DOMENICI: It's whatever you would do.
What I would suggest, if you have no desire to go down and be part of that, I'm willing to say you proceed, if you'd be careful, do things right. And I'm sure you will.
Now we're going to, with your permission, use the time between now and 3:15, without yielding to you all and then give it to you. Everything will turn off. When we give it over to you, it will turn off 15 minutes after you take over, it will turn off everything, so you'll have 15 minutes also.
I'm kidding you.
(LAUGHTER)
OK. The two senators on this side, you want to split a little time and leave me a little at the end?
ALLARD: I don't think I'll take too long.
DOMENICI: Please proceed, Senator?
ALLARD: I want to get back to this Fountain Creek Watershed Study in Colorado. How much has been expended by the federal government to conduct that study to date?
STROCK: Sir, we have spent $65,000 through FY '03.
ALLARD: Not anywhere near a match of 50 percent, what local governments have spent. Is that correct?
STROCK: Yes, sir.
ALLARD: Please share with me how you set priorities for the budget, and why the funding for Fountain Creek Study wasn't included this time around.
WOODLEY: Yes.
Senator, in general, the priorities within the general

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

investigations account were set in accordance with the same priorities that are used with respect to the construction account on the concept that the one would lead into the other.

But this year, our general investigations allocation was very severely constrained because -- largely devoted to two very large efforts that we're undertaking, one with respect to the Louisiana coastal area restoration study, and the other is a $20 million request for a nationwide study and inventory of flood control structures, in particular levees.

And so that put enormous constraints and very, very many, very worthy studies were not able to be included in this year's budget request.

ALLARD: Is that the same problems we're running into with the tamarisk removals? There's tamarisk removal projects, I think, all over the West. It's a water drinking tree.

WOODLEY: Yes, sir, I'm very familiar...

(CROSSTALK)

ALLARD: Do you have any plans to conduct any more of those removal projects in the West?

WOODLEY: I would have to get back to you on that.

I would tell you that I would advocate for that. That is very important. And, indeed, the chairman and I have visited the Boski (ph) in his home state, in which a great part of our effort that's ongoing on that watershed at Albuquerque is to remove the tamarisk saltcedar. It is something we're finding all over our properties, and I think I would advocate for a concerted national effort to rid...

(CROSSTALK)

ALLARD: I think that's going along the Rio Grande in New Mexico. We've got the Rio Grande in Colorado. We also have the Arkansas River in Colorado. So I'm particularly interested in you responding as far as Colorado projects in the West. I'd like to get that information when you get a chance.

WOODLEY: Absolutely.

Yes, sir, I will get back to you on that.

ALLARD: Very good.

And then I'll stop right there, Mr. Chairman, so you and the other member...

(CROSSTALK)

STROCK: Senator, if I could quickly amend my answer to you.

The $65,000 I cited was through '03, but since that time, in '04 and '05, we've had a total of $937,000 against the project. And in '06, $125,000 for a total of $1.32 million, which is matched by the state and that's where we are now.

ALLARD: OK. I appreciate that. Thank you.

DOMENICI: General, I'm going to talk about Katrina a little bit.

I'm sure that the distinguished senator from Louisiana is going to follow up on a lot of this, but I want to go through as much as I can, and what I don't get through I'm going to submit for you to answer.

First of all, General, can you give us a quick status update on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

the current rebuilding efforts?
STROCK: Yes, sir.
Currently our main target is by 1 June of this year to have the entire system restored and repaired to where it was when Katrina hit, and we are on target to do that, sir.
DOMENICI: I've been told that the United States Geologic Survey says that the storm surge from Hurricane Katrina is the greatest recorded storm surge to ever hit the United States. Can you confirm this? This was, in fact, a large hurricane that struck, contrary to what may have been said. And is what I have just said true?
STROCK: Sir, I can't personally confirm that.
I've heard that cited, but I haven't heard that directly from the USGS, but I do understand that is the case.
I know that it's such a large system, storm surge that it destroyed most of the gauges that would tell us what actually occurred.
DOMENICI: So do you think the USGS can confirm this, or do you think they cannot, what I've just said?
STROCK: I'm sure they can. Yes, sir.
I have absolute confidence in the USGS.
DOMENICI: If we want that, we should get it from them?
STROCK: Yes, sir.
DOMENICI: Along with everyone else, I've read articles from various experts about the levee failures in New Orleans. Most of those experts have indicated that the Corps was aware of potential problems with the levees as designed and constructed.
Further, there has been considerable comment that the levees should have withstood the effects of Katrina.
General, I need to know from you, what is the Corps' response?
Is there any fire to go with all this smoke? OR is this speculation from self-described experts without access to real concrete data?
STROCK: Sir, that's a tough one to answer.
I think that if you look at the history of these projects, the Lake Pontchartrain Study, which is the project which actually failed during the event, was authorized in 1965. So it has been literally generations of people involved in this, and to say that at some point in this there may have been some concerns expressed about adequacy of designs and so forth, I really don't know.
I can tell you that, as an institution, we were not aware of any particularly hazardous situations. Each time we're confronted with that, we do look into that and ensure that we did not have previous knowledge of any potential vulnerabilities in the system.
DOMENICI: Can you give us, for the record, a brief overview of the findings from the Interagency Performance Evaluation Team to date?
STROCK: Yes, sir.
For the record or here, sir?
DOMENICI: Right.
STROCK: Here.
Sir, I'd be happy to expand on the record, but I can tell you that we have gotten to the point now where the IPET has reached some

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

conclusions about the performance of the system.
Specifically, in the 17th Street Canal area, we have now concluded that we did have a problem with the design of the structures there -- something we had hoped would not be the case, but now must confront that as a reality. That finding is being reviewed by the American Society of Civil Engineers, and we expect their response to that soon.
So that is one of the most significant findings to date.
Other findings that the IPET has arrived at have to do with the storm surge and the effect of the Mississippi River to Gulf outlet, MRGO. And the conclusion on that is that it does contribute, to some degree, in storm surge in the inner harbor, but to a very small degree. Point two tenths of a foot is being attributed to MRGO and I think that's an important aspect to consider in the future.
But, sir, the most dramatic conclusion is that, yes, we had a design problem, and that there may be other elements in the system designed along that way that need to be addressed.
DOMENICI: As I understand the current situation concerning the levee rebuilding, funding provided through enacted supplemental appropriations will complete the levee system as currently authorized. This includes rebuilding levees to the authorized level of protection, as well as repairing non-federal levees and pump stations.
This system was not completed before Katrina. Is that correct?
STROCK: Sir, the system was not completed before Katrina.
There are several projects involved in this, about six in all.
Our estimate is that we have sufficient monies to complete those systems by 1 September of '07 and with the third supplemental to provide some enhancements like those you discussed.
I must caveat somewhat, though, sir, because the IPET results call into question the flood walls that we're using and we may have to replace some of the flood wall sections.
Replacement of flood walls is not currently in our current estimates, with some small exceptions in the inner harbor area, so there may be an additional requirement to rebuild flood walls as we get into this.
But generally speaking, we feel like we have sufficient funding.
DOMENICI: I am not going to have time to go through this very difficult and bothersome issue of the $6 billion authorization that has been alluded to by Director Powell and what should be done with it.
Suffice it to say that I will submit to you four questions regarding that whole situation. Would you answer them as soon as you can?
STROCK: Yes, sir.
DOMENICI: And then I have a number of questions on continuing contracts and reprogramming, which were very difficult for us to handle in this budget. We had a very hard time as we tried to put it together. And I'll submit those to you and you can answer them as soon as possible.
STROCK: Yes, sir.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

DOMENICI: Now, having done that, I'm going to yield the gavel to you, Senator, and you do it as you see fit between the two of you, and we may return and we may not.
But would you close it if we don't?
DORGAN (?): Yes.
Senator Landrieu, what'd you want to say?
LANDRIEU: Before Senator Domenici leaves, I just want to thank him for his focus on this Katrina, Gulf Coast issue. And he's really been focused, as is his staff, on trying to come up with solutions, as well as suggestions.
So thank you, Senator.
And I'll have some others to follow up on.
DOMENICI: I mean, these questions I'm asking have to come out and we have to decide how to fix this. And it's very difficult (OFF-MIKE) but it's very, very much the order of the day for us. What we spent, why we spent, what we didn't spend. So we need to work together on it.
And, General and Mr. Secretary, thank you.
WOODLEY: Sure.
DOMENICI: (OFF-MIKE) in particular I thank you for the [****] funding. Since you funded it, I'm not going to ask you whether you can say it or not. Normally I try to find out if you can pronounce it, but if you can put the money in, I don't care whether you can pronounce it or not.
Thank you very much.
STROCK: Thank you, sir.
DORGAN: Senator Domenici, thank you very much.
And we will ask our questions and then adjourn the hearing after we've done some legislative business.
(LAUGHTER)
Anyway, we appreciate the courtesy of Senator Domenici.
Let me ask a couple of questions, and state first that at the moment the Red River is running north. It is flooding, well above flood stage at Wahpeton. Crested now, we believe, yesterday in Fargo. It is now being steered through the city of Grand Forks.
This budget request, the final $12 million for the flood control project in Grand Forks, we appreciate that. We spent a lot of money on flood control projects up and down the Red River.
That is, I think, a success story for the Corps of Engineers and we appreciate very much the work the Corps has done, and believe that this is the last contingent of money that is required to complete the Grand Forks Flood Control Project. So I want to say especially in areas where we have seen really excellent work by the Corps that we appreciate that.
And because we're experiencing this flood, I think it's the third highest in history, these crests. Not so far from the 1997 crests in which the entire city of Grand Forks was evacuated. It's a pretty aggressive flooding.
Let me ask General Strock and Secretary Woodley about a parochial issue, but nonetheless an important one: the Fort Stevenson Marina

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

Project at Fort Stevenson in North Dakota.
The Corps of Engineers built a marina at Fort Stevens, and in one half of the years you've not been able to see the water from the marina, so it's been unusable. I've been up there many times.
We finally created a circumstance where the Corps said they will move over, it's about one mile, and do a deeper water marina. It is not something that would break the bank, but the Corps made a commitment to do that, and they were going to reprogram funds to do it. And now I think there is a question of whether the Corps is prepared and willing to proceed.
Can you tell me what the current thinking of the Corps is and what your commitment is?
STROCK: Sir, what I do have on that is that we estimate it's about an $11 million requirement to accomplish the moving of the marina, and yes, water is down as it is throughout the northern reservoirs.
In terms of -- and I would assume, since we've identified the cost associated, we feel like we can do it, but we simply don't have the money to do that now.
DORGAN: When Mr. Rob Bining (ph) was making the commitment on behalf of the Corps, he talked about using reprogrammed funds.
STROCK: Yes, sir.
DORGAN: And it actually wasn't $11 million. Then, the cost was around $5 million or $6 million to do this. I don't know how the engineers have gotten this to an $11 million project.
But the problem is, these folks have a marina that's unusable.
It's the Corps' marina. The regulation of the water -- instead of retaining water in the upper reservoirs, we've been flushing it out so that my friend from Missouri can run his barges down south.
And so folks who want to use a marina at Fort Stevenson don't have a marina to use. And moving a very short distance would give them a deep-water marina and it wouldn't cost a great deal. The Corps of Engineers actually built the first one. We've not been able to use it every other year. So seems to me the Corps has a responsibility to provide the money to move this.
STROCK: Sir, I can certainly provide you a better-informed answer for the record on why the cost has shifted.
If we're relying on reprogramming, I think you understand the limits on reprogramming right now that have been placed on the Corps.
It's very difficult to find both sources and then get approval of moving money. That may be a factor in not being able to move ahead on this.
And sir, we certainly recognize the challenges of the drought.
It has been going on for many, many years, and we are trying to operate the system in accordance with a master manual, which has been recently revised and approved. And we do know that it does cause problems for everyone in the system, not just the up-river states, but the down river as well.
DORGAN: Well, General, I'm going to submit a list of questions about this, but I do think the Corps has a responsibility at Fort

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

Stevenson, and I don't know how you meet it.
We have a presidential budget now that cuts a half a billion dollars.
I know you're getting some emergency funding. But in terms of regular funding, a cut of a half a billion dollars when you have unmet needs, you have commitments that have been made that are not now, apparently, going to be kept, I mean, that's a pretty unsatisfactory response to tell to the folks up in the northern part of the reservoir.
The upstream benefits of tourism, recreation, fishing are 10 times the size of the downstream benefits of barging and yet we continue to see that water rush out of those gates headed downstream.
So you and I have more to talk about, I think, as well as the secretary, about how we meet the responsibility to the people who have been told by the Corps that the Corps would move that Fort Stevenson marina.
General, let me talk about a subject that you're not going to want to talk about at all, but I've tried to do this by submitting questions last year. I've tried to do this by letter to you and I have never gotten a satisfactory answer, and that's the Bunnatine Greenhouse issue and the RIO contracts.
I have, as a result of magazine reports of what has happened at the Corps of Engineers, I have held Policy Committee hearings. Ms. Greenhouse has testified. She has been demoted, I expect, mostly for that testimony, or probably for other reasons. But she has been demoted. And she has said that -- let me read her quotes. "I can unequivocally state that the abuse related to the contracts awarded to KBR, a subsidiary of Halliburton, represents the most blatant improper contract abuse I have witnessed during the course of my professional career."
It takes a lot of guts for somebody to say that. She was given excellent recommendations all along the way during her career, remarkable public servant. People outside of your agency who know about contractors tell me that she's a first-rate contract official in the Corps of Engineers, and for this candor, she has lost her job, been demoted.
I know there's legal issues going on in the Pentagon. You probably can't respond to the legal issues. But you could respond at least by letter to me, and you could respond to the questions that I propounded last year during the hearing about what's going on here.
I assume that you will probably want to say that she is wrong, there are no contracting abuses. I assume also that the inspector general's looking into all of this.
What's been appearing in the popular literature, magazines and others, about this situation is deeply troubling to me. The RIO contract, the LOGCAP contracting, substantial evidence of abuse, waste, and even fraud in sole-source no-bid contracts in Iraq.
I have tried, both in letters and in submitted questions, to get candid responses from you and have been unsuccessful. Can you tell me why?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

STROCK: Sir, first of all, I need to make sure that we have responded in a timely way to your questions, and I'll have to go back and look at those responses.
There are limits to what we can talk about in this, and one of the most important aspects of this entire thing -- and this may sound somewhat contradictory to the situation you just laid out -- is that we have an obligation to respect the rights of the individuals and privacy of the individuals here.
So my ability to talk about specific reasons for actions we took is very, very limited, and therefore I must simply say that we have a process that is very important to us. We followed the appropriate process in disposition of Ms. Greenhouse's case. And I think that has been reviewed on multiple times.
DORGAN: If Ms. Greenhouse would waive those provisions, if she would waive that and allow you to say whatever you wish, would you be willing to do that?
STROCK: If that is possible, sir, and it was done in the right kind of way and I was clear to do that, yes, sir, absolutely, I'd be happy to do that.
But it is all about protecting her privacy.
And, sir, in terms of the allegations, I can talk about those a bit. I was personally involved in many of those decisions and can look you right in the eye and can say that we followed the rules that were in existence at the time to make all those calls.
The Government Accountability Office has reviewed the award of those contracts and has found that they were done in a proper fashion.
The Army inspector general has also conducted an investigation, DOD inspector general has also conducted investigations. And to date we have not had any indication that things were not done properly in the award of those contracts.
There have been many questions about the actual delivery of products and services under those contracts, and in most cases, I think, the government has shown to act in a reasonable and appropriate manner in adjudicating claims paid and all that sort of thing.
So this entire thing has been looked at in many, many ways and many times, and so far the results are that we did things in the proper way.
DORGAN: Well, General, I also have looked at some of them and had whistle blowers come and testify.
STROCK: Yes, sir.
DORGAN: And it contradicts that answer.
Food service, water quality. I'll give you an example. I don't know whether you had the water quality contracts on the bases. Was that yours?
STROCK: Sir, I did not.
This particular contractor has a number of contracts. One of them is the LOGCAP contract, which is managed by the Army Materiel Command, which provides for sustainment on military bases.
Our contracts had to do with the reconstruction of the oil industry. And so the food and water issues that you cite were not part

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

of our contracts.
DORGAN: These were the RIO contracts?
STROCK: [****] RIO.
DORGAN: Well, just observe in the LOGCAP contracts, both the Department of Defense and Halliburton have been dishonest publicly about that. We now have internal documents from Halliburton that show that the responses by DOD and Halliburton were not honest.
STROCK: I can't speak to that, sir.
DORGAN: My understanding from the inspector general on the issues surrounding the allegations Ms. Greenhouse made is that there has been a referral to the Department of Justice for a criminal investigation. Is that not accurate?
STROCK: Sir, I don't know that.
I know that there are a number of proceedings related to her case that are going on right now, and I'm involved in some of those, but I don't know if they've risen to the level of Department of Justice.
DORGAN: I believe the inspector general has told us that in a letter.
My point is not to badger you about this, except that there are questions that demand answers. The American people demand answers. We're spending an enormous amount of money on these projects, contracts, RIO contracts, LOGCAP projects, feeding troops, providing water to troops, equipment to troops, oil.
I mean, and the fact is, there's a substantial amount of evidence that there has been dramatic waste and abuse and, in my judgment, fraud.
STROCK: Yes, sir.
DORGAN: The Custer Battles issue comes to mind.
I'm not going to lay all this on your shoulders, but I'm telling you, it makes me sick when you take a look at what's going on, and the waste of money, and nobody seems to care very much.
All I'm asking is that with respect to those issues under your jurisdiction that you respond fully to the questions we're asking.
And if you can't answer, I'll ask Ms. Greenhouse if she will provide a waiver so that you can give us all the information.
And, you know, I know that you're going to leave this room and mutter things I probably shouldn't say out loud under your breath, because this isn't what you want to hear at this hearing.
STROCK: Not at all. Not at all.
I share the same concerns you do. We have to treat people in the right ways, and I think we've done that. So no, sir, I'm not going to mutter anything on the way out.
DORGAN: One other question. The person that has been noticed in at least one publication to replace Ms. Greenhouse, it appears to me, has no contracting experience.
STROCK: Sir, her replacement is Ms. Sandra Reilly (ph), who's come to us after about 40 years of government experience. She did serve as the head of contracting agency, which is the same level of responsibility that I have within the Corps of Engineers and she managed all the affairs for the Department of the Army and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

Pentagon related to that.
It is true that she is not an acquisition certified professional under the Defense Acquisition Improvement Workforce Act, but she has been given a waiver for some of the criteria, and she has gone to school and is currently being brought up to speed on what it is she needs to know as a contracting official.
She is really coming to us as a change agent, sir, which she has a reputation for in the Army, and she brings us leadership. It's part of the Army's intent that, like our general officers that can serve in many capacities, our senior civilians are expected to be true corporate leaders as well, and don't necessarily need the specific experience and credentials of a particular area of the government that they're working -- that they have oversight for.
DORGAN: General, you know, with due respect, that seems illogical to me, to have to bring her up to speed with respect to knowledge.
My colleague here from Louisiana has just experienced FEMA -- seven of the top 11 positions in FEMA were staffed by cronies, I'm sure who had good management experience but didn't know a thing about emergency response. So you put cronies in positions for emergency response, they didn't know how to respond in emergency.
I'm just making a point that Ms. Greenhouse, fairly or unfairly -- I guess, ultimately the facts will judge this -- lost her job, was demoted for speaking out about what she perceived to be abuses. She regularly had excellent recommendations, excellent performance evaluations year by year by year. Has now been demoted and has now been replaced by someone who has no experience or no substantial knowledge in contracting. That just seems unbelievable to me.
STROCK: Yes, sir.
I would not characterize no experience, no substantial knowledge, but she is not certified as an acquisition professional at this point. That's true.
DORGAN: Well, we have more to exchange on that, and I will do that by letter, General Strock.
STROCK: Yes, sir.
DORGAN: I hope and expect that we want the same thing. We want accountability. We want facts that speak for themselves.
Let me close, then, on a positive note so that I can tell you again.
We have -- we're a semi-arid state. North Dakota would hold 10 Massachusetts in land mass. We're a big, big state. And 642,000 people spread out. We got a big Missouri River running in one part of it, and we got a Red River running north.
We have a lot of water issues. We've got a flood in Devil's Lake that came and stayed, and it's a huge problem. We've got the need to move water from western North Dakota to replenish the Red in times when it doesn't have enough water. At the moment, it's busting out of its banks and flooding in three large communities.
So having watched the Corps of Engineers in 1997 in action, I can tell you that the performance of the Corps to do well is critical to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

our surviving during floods and surviving during droughts. And, you know, I have not talked at great length about the management of the Missouri River today, but that also is a significant part of our angst.

But you have men and women working for the Corps of Engineers that work day and night at times when we're in crisis, and I hope you and the secretary will communicate to them our appreciation for that. I know they're doing that now up and down the entire Red River Valley, and we want you to tell them thank you on behalf of a grateful citizenry.

STROCK: Sir, thank you.

DORGAN: Senator Landrieu?

LANDRIEU: Thank you, Senator Dorgan.

Mr. Secretary and General Strock and others, I want to begin by acknowledging that you all have been down to Louisiana and Mississippi and the Gulf Coast many times since Katrina and Rita and the multiple levee breaks that ensued, and you have sent extra support and been attentive to our requests.

So I say that just to acknowledge that, in my view, you personally have done what you can.

But my questions will be about the constraints that you're operating under, which I think are very serious, and actually, in fact, put the nation at risk.

And I want to start with you, Secretary Woodley, if I could.

Could you, just for the record before this Appropriations Committee that has the task of funding critical civil works projects for energy and water for the country, say again clearly, for the record, what we are going to be able to fund this year and what we're not, based on what is the backlog of authorizations?

And if you don't have that, I think General Strock or others might.

What is our current backlog of authorized, critical projects that is not going to get funded based on the budget that you all have submitted?

WOODLEY: Well, Senator, I want to preface what I say.

I think I understand what you mean by the backlog. It's a sort of a pejorative term for these that I try to avoid, because I regard those projects not as being projects in some kind of backlog, but rather as being opportunities that exist for investment on the part of the nation in water resource development.

LANDRIEU: That's fine.

And what are the opportunities that we're not funding?

WOODLEY: I believe that we have something in excess of 400 different projects across the country that are eligible for Corps funding, and of those, I believe that about 90 to 100 are actually receiving funding in the president's request.

LANDRIEU: Would the number about $44 billion be about accurate, $44 billion of opportunities that are not funded?

WOODLEY: That might.

Of course, that would not be in any given year. That would be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

the total build-out for the entire amount.
LANDRIEU: That is correct.
WOODLEY: I can't confirm the number.
(CROSSTALK)
LANDRIEU: Well, let me then try.
I'm going to say a number and if you all disagree with me for the record, then you all can get back in writing. But basically our records reflect, my reflects that we have about $44 billion in -- let's use your word -- opportunity to protect Americans from flooding, to promote navigation and economic development, and to protect wetlands, coastal restoration, et al., as described in the charge.
And the way that I look at it, and many members of Congress, is we're about $42 billion short, because in this budget we have approximately $1.5 billion for new construction, then X few billion for operations and maintenance.
But I want to focus on -- because all the hearings are -- as you testified, we have 5 percent more money than last year. Since the last year number is irrelevant to the people that I represent, 1,200 of whom who have lost their lives because it was too low, 5 percent more doesn't have any relevance to me or to the people I represent or to the Gulf Coast.
So I'm going to try to focus us on what the real, pending crisis is, and that is, is that this budget is so far short of where this nation needs to be in investments and civil works, it's almost, in my view, not worth discussing.
And for the record, I want to be clear that there's 44 --before we pass the next water (ph) bill, which 88 of us have signed on to get passed, which will add another -- how much -- $10 billion to $13 billion in new authorized projects, which everyone is clambering for -- we have $44 billion worth of projects that don't have a penny allocated to them in this budget.
Now, that's the first point.
The second point I want to make is, I want to show you all a chart of why this is significant for the country. I'm going to provide this to the members. This is a chart that I got from the National Civil Works -- American Civil Works Society. You can see it goes back to 1929. This is 2004.
This is where the levees broke in New Orleans -- the bottom of this long, dangerous, nonsensical, irrational, irresponsible funding level. This is where they broke. You can see what happened in the early part of the century, and even just going back as recently as -- this is a percentage of GDP.
This is the investment gap in America today, just on civil works. But it's not just civil works. It's all water projects, all flood control projects in the country, and this is a disgrace. This budget is a disgrace because of that.
And the paragraph that introduces this budget, I'd like to read, is an insult to me and the people that I represent. "The fiscal year 2007 civil works budget is a performance-based budget which reflects a focus on the projects and activities that provide the highest net

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

economic and environmental returns on the nation's investment, or address significant risks to human safety."
That is an insult to the people I represent, because it's a lie, because it does not.
Now, let me ask you this question: When the Corps conducts a feasibility study on hurricane protection projects, does the current law direct you or indicate to you that you have to conduct that feasibility study for life and property, or is it just for property?
Do you take human life into your calculations?
Technically, do you, General Strock? Really it's to the engineers. Go ahead.
STROCK: Not per se, ma'am.
We do not take that in as a factor.
We use sort of a surrogate for that, which we do consider economic development, and typically where there's economic development, there are people, so the main driver is economics and trade-offs there.
LANDRIEU: And I just want to call to the attention of this committee that that's something that we are going to have to take a look at.
STROCK: Yes, ma'am.
LANDRIEU: Because this comment about human life, human safety, is a stretch based on the fact that it's just extrapolated from economic data.
So some of us are looking very closely at asking for human life to be a calculation in these studies, because it may have a direct impact, then, on whether some of this gets built or not.
But that's why I take issue with this, because it's not included right now -- I know that for a fact -- in your assumptions.
STROCK: Ma'am, if I could just modify a bit.
That is not our traditional method of valuing human life and human lives exposed, but this year we do have a criteria in the budget that, for a given likelihood of occurrence for a certain amount of flows for the density of populations, we do consider projects as a high-risk project.
It has to have warning time, people in the floodplain, potential death, to flooding and velocities. So this year, in looking at high-risk projects that should be supported, we have taken that into account.
LANDRIEU: OK.
Well, I appreciate you taking that extra step, because in the current laws, which we're going to recommend be changed, that has not been in the past calculations. And besides the numbers being low, that's also a critical component, with populations moving closer and closer to water, whether they be coast or along great rivers or lakes, et cetera, it becomes a real serious issue that makes these numbers, that are pretty devastating, even worse.
STROCK: Yes, ma'am.
LANDRIEU: Let me ask for some clarification on the $6 billion, and whoever can answer this the best.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

Last week, our administration received what I consider a bombshell of an additional $6 billion that is needed to meet the current authorization levels, or the current safety levels, or the certification, if you could explain which of those it is.
How did you arrive at that figure, and do you think it is accurate for southeast Louisiana?
And I don't know who wants to take that.
Maybe General Strock, you conducted the...
WOODLEY: Actually, Senator, that figure had to do with the question of -- that was raised to the Corps at the local level, at the district, making assumptions with respect to the base-flood elevation that may eventually be determined by the FEMA for the new flood maps.
And the question there was, Can you give us a rough order of magnitude very swiftly arrived at, estimate of what the outside cost to raise those levees by a certain amount might be?
And the only thing I can tell you is that we've answered that question. Those figures are being refined...
(CROSSTALK)
LANDRIEU: Just a minute.
You're saying that FEMA requested that information of you all?
WOODLEY: Yes, ma'am.
LANDRIEU: FEMA requested that information.
How long did they give you to -- when did they request it? When you say you hurriedly put it together...
(CROSSTALK)
WOODLEY: I don't recall...
(CROSSTALK)
LANDRIEU: ... General, in two weeks or three weeks or five weeks?
WOODLEY: I would say perhaps even less than that. I'm not exactly sure of the precise chronology.
It was a very swift question. It was based on, as far as I understand it...
(CROSSTALK)
LANDRIEU: Did you take more than 48 hours to put it together? General? Try to testify.
How long did it take you to put that together? And is it accurate?
(CROSSTALK)
STROCK: ... about the process here.
Mr. Woodley cited the base-flood elevations, which determine the 100-year floodplain that's identified by FEMA. We participate and support FEMA with hydrologic studies to determine just what that floodplain should look like.
So we are supporting the agency of FEMA in making that determination.
We all recognize that after a storm of the magnitude of Katrina, that it would impact the base-flood elevations that we applied post-Katrina, because Katrina is such a massive storm that it really influenced the record which is used to determine that.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

It was about the November timeframe, I think, when we concluded what those base-flood elevations should be, and in fact, we've issued those advisory notices in all the counties and parishes along the coast that were impacted, except for the four in the New Orleans area. And we did not, at that time, go forward, because the initial feeling was that it was such a high elevation that it would make a dramatic impact.

So what we asked is that we could delay the issue of those base-flood elevations until we had time to really do some more refined analysis, and then also to consider the impacts.

And in the process, we determined that, given the base-flood elevations that we arrived at, we could not certify most of the levee system around New Orleans to a 100-year level.

It was not an important question on the Gulf Coast, in Mississippi because there are no levees to certify. It is what it is. But when you're behind a levee, if you can certify the levee to 100 years, essentially takes out the people and infrastructure behind that levee, it takes them out of the floodplain. So our ability to certify levees was then an important question.

As we did that analysis, we determined that in most cases, we could not certify the levees to 100-year protection levels, which essentially puts everybody in the floodplain and they act like the levee is not even there, so it has tremendous implications.

And as a result of that, we were asked what it would cost to raise the existing project to a 100-year level and the number that Chairman Powell put out last week was a preliminary estimate, which we are continuing to refine. And I think that you'll see, at such point as a decision's been made on this, that you'll see that estimate should come down somewhat.

LANDRIEU: OK.

And I accept that, and I know that this number can be refined. We're actually hoping that it's refined.

STROCK: Yes, ma'am.

LANDRIEU: It's hard to get any money around here, let alone $6 billion, so we're hoping it can be refined.

But I just want to press this for just a minute. You said one-in-a-100-year flood. Would that roughly equate to Category 2, 3, 4, or 5, roughly? I know they don't match up, but if you had to chart it, what would it be?

STROCK: I can't answer that.

I'm not sure there's a direct correlation between the floodplain and the categorization of storms.

What that tells you is in that area that there's a 1 percent chance in a 100-year period that you will see that area inundated.

LANDRIEU: What do we have now in the other parts of the city? Is that the same 1 percent in 100 years?

STROCK: Ma'am, well, first of all, I think 70 percent or 80 percent of the city is already in the floodplain. This just adds more to that.

LANDRIEU: That's not what I'm asking, what's in the floodplain.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

I'm trying to establish, so I can compare apples to apples. The $6 billion that you've recommended, which will be refined, let's just say it's refined to $4.5 billion, OK? That number, whatever it ends up being is going to build Category 2, 3, 4, or 5 levees around the areas that you've proposed? Just roughly, there's no way for you to say whether they're 2s, 3s, 4s, or 5s?

STROCK: I can't -- I truly cannot answer that.

I think that we were wrong in trying to describe these systems in terms of the category storms they protect against. That's been one of the challenges throughout.

We simply don't build to categories...

(CROSSTALK)

LANDRIEU: OK.

It may not be the accurate way, but I can tell you one of the things that I'm going to press very hard, as a senator, is to have some way.

STROCK: Yes, ma'am.

LANDRIEU: Doesn't have to be a Category 1 through 5. Doesn't have to be 100 to 10,000.

But I have to have some way to explain to people that the levees are either going to be either one foot, four feet, five feet to protect them [****]. So I suggest if you don't like the way we're doing it, General, we have to come up with a way that's clear to people, that's transparent, that everybody understands.

Like, this is a dollar bill. You know what a dollar bill is.

This is a $10 bill. This is a $100 bill. We can't give you a $100 bill. We're giving you a $1 bill. People are clear. We need that.

So it doesn't matter to me.

So I'm going to leave that there, but I have to come back to this question.

But let me try, without having the benefit of any levels or any storms, just say, ask you this way. Whenever we get this dollar amount --let me just put it this way. If we don't get this dollar amount that will be refined, what happens to those areas and four parishes? They either have to build up to about what height, or what? You didn't release the heights. I'm not asking you to, but the general height. Is it 13 feet or 20 feet or 25 feet?

STROCK: I'd have to get back with you, ma'am.

It varies by where you are in the city, each element...

LANDRIEU: Could you give just a range of those four parishes that you all looked at?

I know you have it in your data. You had to have it.

(CROSSTALK)

STROCK: Yes.

Early on I think in the November timeframe it was about 17 feet, something like that.

The challenge here, ma'am, is that if the levees are not certified to 100-year level, then FEMA acts as if they're not there at all. And the fact is, there are levees providing protection, and you're not going to be fully inundated, because there are levees

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

there.
What we're trying to do to articulate the level of risk is to show levels of inundation in a Katrina-like event that would occur on 1 June of '06 when we complete our current work, what we would see in 1 September of '07. And then if we certify the 100-year, and we build the levees to that, what people could expect in different parts of the area in terms of depth of water. That's how I think is the best way to articulate the risk associated with this.
LANDRIEU: Well, that may make sense to you, General, but we're struggling with trying to make that sense to 3 million people that live in south Louisiana and just need to know whether the hurricane is going to be at a Category 3, 4, or 5, or some equivalent of that, and whether it will work or not.
But I'm going to leave the testimony at, you're refining the number. It's a real need for these four parishes. And you have not requested it in the budget.
STROCK: That is correct.
LANDRIEU: Mr. Secretary, can I ask you, does the president have any intention of requesting this or what do you think the status of that is?
WOODLEY: I believe that, that is a decision that has not yet been made by the president.
LANDRIEU: So we still can remain hopeful that perhaps it might be forthcoming. I'll just remain hopeful today.
WOODLEY: Yes, ma'am.
LANDRIEU: OK.
Is there anything that you all -- I just wanted to ask, I have 100 questions I could ask, but I wanted to try to hone in on the $6 billion on the study and on the general lack of funding, which I will conclude by saying that, because of that chart, I would suggest that Katrina and Rita have, I hope, ripped away the curtain of complacency; that we have had a false sense of security in this country about the investments that we're making -- they are not adequate.
And if we don't find another whole paradigm, we just cannot -- not only protect the people along the Gulf Coast, but we are investing so little of our gross national product in what I would think are essential, essential civil works projects for not just trade and commerce, but for human safety and human life.
And the safety and protection of billions of dollars of investments that we have made all along the coast and all along the great river systems, and all along the great lake systems of America are at great risk because this line is about off the chart.
I mean, you can't get much lower than, you know, than where it is. You literally can't go any lower on the chart. You'd be off the page, down to zero.
Would you hold it up again, [****]? I mean, there's nowhere down to go. And it represents less than, I think, one-tenth percent of what we spent in 1929 or '30 and one-sixth of what we spent in the 1970s.
And this is what our delegation, just in conclusion, has been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

looking at -- this precipitous fall-off and thinking, we have a coast that has to be saved, wetlands that are washing away at an alarming rate, levee systems that are underfunded and underdesigned, and systems that have to give, you know, added money.

And so we've got to change this, and we've recommended for us, a solution is getting off-shore oil and gas revenue to start investing in the Gulf. We've even recommended sharing that with the other states to help them. Of course, we've been rebuked. You know, we can't do that.

So now we're down to just trying to find, for Louisiana, Mississippi, Alabama and Texas, a new source of funding to help get these essential civil works projects up.

So as I said, this is where the levees broke. It's just a matter of time until they break again some other place, because we're not investing nearly the money that we need to.

And in all fairness to this administration that I've been very critical of, this did not start with the current administration. It's been going on quite a long time.

But I would say, in one final thing, the reason I am remaining somewhat critical is in these years we didn't always have surpluses, but when we had surpluses we chose to do something else with them, and funding and civil works wasn't one of them.

So we have a lot of work to do on this budget.

Senator Domenici's been very, very kind to let us go on, but the $6 billion issue has to get resolved, the way we define levee protection. You all pick away, tell us what to do so people understand it.

And then the overall, you know, budget number for this budget is something we're going to have to work on.

Do you all want to add anything before we conclude?

STROCK: Ma'am, the only thing I would add there is, one of the ways that we can get at the business of articulating risk is using the monies that you gave us in the third supplemental to create a national levee inventory and database, and this budget also requests additional funds for that.

That will allow us to capture all the levees in this country from private through federal, and then to build a model that will allow us to articulate risk and reliability associated with those, and that will really frame the problem and the potential for investment, and help us set priorities. So I think that's a wonderful step that needs to be done.

LANDRIEU: I thank you, General, for raising that.

I wanted to get a status report. I'll just ask you to submit it in writing, not to take anymore time.

But I'm glad we were able to get that study in for the nation, because then you're given an opportunity to present to the Congress the real needs. And then it's up to Congress to decide, and this administration are we just going to not fulfill our responsibilities, pretend like it's not a real risk, hope we don't get anymore hurricanes, pray no river goes over its boundaries?

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 896695 (F.D.C.H.)

I mean, this truly is a nation at risk, right here at home. And I know we have risk around the world, and I'm cognizant of what we're doing in Iraq, but I hope that this study -- and you should be finished with that when? I think it was a June?

STROCK: There's a preliminary.

LANDRIEU: Preliminary in June.

STROCK: In August.

LANDRIEU: In August. Preliminary in June and then a final in August.

That will help us. That will be very helpful to the country.

Our situation is more urgent, as you know, because hurricane season starts in two months. But we'll continue to work.

STROCK: Where the New Orleans levees are concerned, we are doing a study now for those areas that were not obviously impacted to make sure that they're still structurally intact, and that'll be done certainly in June.

The preliminary work on the levee inventory will be in August, not the final report.

LANDRIEU: OK.

Anything else, Mr. Secretary?

WOODLEY: Thank you, Senator.

It's been a real privilege to work with you and the rest of the Louisiana delegation on these important response issues, and we appreciate your continued support for the agency and we assure you that we take your views very, very seriously.

LANDRIEU: Well, I appreciate that.

You've worked very closely with our delegation, but this is just not -- this current system doesn't work, didn't work for us, doesn't work for anyone. We've got to have some serious change.

Thank you so much and the meeting is adjourned.

END

U.S. SENATOR PETE V. DOMENICI (R-NM)

Chairman

Washington, D.C.

2006 WL 896695 (F.D.C.H.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.