


Figure 13. Southeast Louisiana modeled peak wave period corresponding to the maximum wave height (periods in seconds).

It is instructive to examine the surge and wave environment created by Katrina with respect to that assumed from the SPH from which the existing structures were designed. Figure 14 presents a simple comparison of the surge generated by Katrina with that used for the HPS design. Much more detailed information is available in Volume V of this report. Note that the surge in Lake Pontchartrain was roughly the same as the design levels assumed for the HPS. On the east side of New Orleans, Katrina generated surges were significantly greater than the design criteria, ranging from 17 to 20 ft compared to the 12 to 14 ft assumed in the design.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure 14. Comparison of general surge levels assumed in the SPH design (D) and estimated from Katrina (K). See Volume IV for more detailed information.

Figure 15 compares the wave conditions assumed for the SPH design and those estimated from Katrina. With the exception of Plaquemines Parish, Katrina generated wave heights were not much different from the design assumptions. In Plaquemines Parish, Katrina did generate significantly higher waves. Wave periods were a different story. In Pontchartrain, the period of Katrina-generated waves was similar to the design assumptions, in the 6- to 7-second range. Along the St. Bernard and Plaquemines Levees, however, Katrina generated 14- to 16-second period waves, approximately three times the design wave periods. This is very significant in that the longer period waves were largely generated in the Gulf and propagated in to shore and have much greater potential for runup and overtopping of HPS structures.



This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure 15. General comparison of wave height and period assumed in HPS design (D) and estimated from Katrina (K). See Volume IV for more detailed information.

## The Performance (for more information see Volumes V and VI)

Figure 16 shows the locations of the most severe damage to the HPS. Over 220 miles of the protective structures were damaged by Katrina-generated surge and waves, as well as 34 of 71 pumping stations. Approximately 41 miles of structures were judged to be severely damaged. Initially there were a total of 50 major breaches identified, areas where the structures failed, causing a dramatic reduction in protective elevation and losing the ability to prevent the inflow of external water. Of the 50 major breaches, four were caused by foundation-induced failures and the remainder from a combination of overtopping and scour. Three of the four foundation breaches occurred in the outfall canals and one in the IHNC. I-wall structures were particularly vulnerable as were levee sections created from hydraulic fill, and transitions where either elevation or strength differences occurred from changes in structure type or capability. Transitions between types of flood protection structures were also vulnerable, especially where the transition included a significant change in elevation between the structures. Detailed maps of the distribution of the major breaches are provided in Appendix I-8 along with a table documenting their characteristics and including the repair actions taken for a majority of the major breaches. The maps and table in Appendix I-8 list only 29 breaches. The differential from the original 50 is caused by aggregation of some of the breaches that were adjacent or related to each other for the purposes of repair and rebuilding.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 16. Locations (in red) of severe damage to hurricane protection structures resulting from Katrina.

The storm surge and waves first attacked the Plaquemines Levees well before Katrina's landfall, causing significant overtopping and erosion before dawn. The MRGO Levees were soon hit with similar conditions and eventually both Plaquemines and St. Bernard Levees would be overtopped by both high surge and high, long-period waves. The persistent east to west winds had also built up a significant surge level at the convergence of the GIWW and the IHNC. Wind-generated waves reached at least 4 ft in the IHNC, contributing to very high water and dynamic loading on structures. The surge and waves had a devastating effect on the sections of the levees along the GIWW (Figure 17) and MRGO (Figure 18) that were constructed with materials dredged from the adjacent channels using hydraulic fill. Even though the levees were capped with clay, they were no match for the energetic environment they experienced. The overtopping waves created very high water velocities down the back sides of the levees, reaching 10 to 15 ft/sec. These velocities were two to three times those experienced on the water side of the levees (4 to 6 ft/sec). The potential for erosion being related to the cube of velocity, it is no wonder that the back sides of the levees, especially where they were comprised of erodible materials, were scoured away leading to, in many cases, complete breaching. Figure 19 shows the close correlation between the degree of breaching from overtopping and erosion and the types of materials. In this example for New Orleans East, the correspondence of breaching and hydraulic fill constructed levees is obvious.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure 17. Example of levee along New Orleans East, GIWW, breaching from overtopping and scour of erodible materials.



Figure 18. Example of levee breach along MRGO from overtopping and scour of erodible materials.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 19a. Character of levee materials, New Orleans East and northern St. Bernard. This slide is incomplete for St. Bernard and shows only the hydraulic fill section along the MRGO.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 19b. Distribution of levee breaching, New Orleans East and northern St. Bernard.

Early in the morning, around 0500 hr, CDT, a section of I-wall along the Lower Ninth Ward breached. Underlain by the same marsh deposits and clay as the 17th Street Canal, the rising water and waves caused the wall to deflect enough to open a crack that created a direct avenue for high water pressures to reach the foundation. The weak clays underneath, now only reacting with the mass of soil on the protected side of the levee, could not withstand the force and displaced backward, a process that would repeat itself on the 17th Street Canal. The water levels in the IHNC were approximately 9.5 to10.5 ft when the foundation failure occurred. At the 17th Street Canal, failure began with apparent displacement of a wall panel at about 0630 hr and ended with a full breach by 0900 hr. At about 0630 hr, the water level was estimated to have been 7 to 8 ft, and possibly 1 to 2 ft higher at the time of the catastrophic breach created by displacement of a levee section. No overtopping had occurred and the design water elevations had not been reached at either location, at the time of levee displacement. This process is depicted in Figure 20 and was confirmed by field investigations of the failure plane and site conditions, separate stability analyses conducted by Virginia Tech and ERDC, and physical testing by independent centrifuge tests at RPI and ERDC.




Figure 20. Depiction of failure mechanism for 17th Street and IHNC foundation failures. A crack forming along the front of the I-wall introduced high forces down the face of the sheet pile, resulting in lateral movement of the floodwall along a shear plane in the weak clay foundation.

At around 0700-0800 hours, not long after the 17th Street Canal breach started, the south breach on the London Avenue Canal was initiating. As in the case of the 17th Street Canal and IHNC failures, water elevations below the design levels caused a crack to form on the water side of the floodwall and allowed high pressures to be introduced directly into the foundation materials of the levee, this time relic beach sand. The porous sand quickly conveyed the pressure under the levee and caused significant uplift on the protected side. It also is likely that significant subsurface erosion occurred under the levee and caused a blowout on the protected side through which much sand and water flowed, decreasing the support for the levee and floodwall and causing a narrow failure. The north breach on the London Avenue Canal suffered a similar fate around the same time, 0700-0730 hr. This breach was much wider and involved less erosion, failure being caused by a loss of stability from the uplift. Water levels in the London Avenue Canal reached about 9 ft, below the design levels and well below the height of the I-walls. Figure 21 depicts the breaching mechanisms for the London Avenue breach sites. This finding was arrived at through detailed field investigations, independent seepage and stability analyses by Virginia Tech and ERDC teams and separate centrifuge modeling by RPI and ERDC.

Ironically, the Orleans Canal, geographically located between the 17th Street and London Avenue Canals, and having similar geological conditions, did not suffer failure, even though water levels there reached over 10 ft. The geology at the north end of the Orleans Canal is similar to 17th Street conditions (peat underlain by clay) and the south end is similar to London


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

Avenue subsurface conditions Peat underlain by relic beach sands). The design of the levees and I-walls for the Orleans Canal was more conservative than for the other canals with a broader and stronger levee section and less I-wall height above the levee crest. Soil strength assumptions were also more conservative than for the structures along the 17th Street Canal. This knowledge was an important component of the development of criteria for evaluating the integrity of the sections of the HPS that were not severely damaged. Combined with the knowledge of the failure modes for the I-walls and levees, a series of remedial actions were developed that could be used to at least temporarily strengthen sections of the HPS that were deemed least able to withstand a large storm. This led to a large scale examination of the HPS by the New Orleans District to identify areas needing remedial action prior to the 2006 hurricane season.




Figure 21. Depiction of London Avenue Canal north and south breaches caused by deflection of the I-wall and high uplift pressures introduced through the underlying porous sands, confirmed in centrifuge testing.

During mid-morning, the I-walls along the IHNC were overtopped and erosion behind the wall reduced their stability, causing three separate sections to fail. The top photograph in Figure 22 shows a section of I-wall along the IHNC collapsed after overtopping created a scour trench behind it and reduced its stability. The bottom photograph shows an adjacent section of I-wall where the scour trench formed but the wall did not fail. Water levels reached over 14 ft in the IHNC. There was also a levee failure along the west side of the IHNC that caused additional flooding into the Upper Ninth Ward. There were no T-wall failures with the exception of a small section in southern Plaquemines Parish.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

The flooding resulting from the overtopping and breaching was catastrophic. Figure 23 shows the extent and depth of flooding for the New Orleans metropolitan area where almost 80 percent was inundated. Pumping stations were for the most part not operating due to prior evacuation of operators, loss of power, or loss of clean cooling water for the pumps. An evaluation of the pumping performance as a percentage of the total capacity is given in Figure 24. The pump stations in New Orleans were simply not designed to operate during major storms. A few stations, notably in Orleans Parish, may have continued to operate if the flooding had not been so extensive. Had the pumps been able to operate, the extent of flooding may not have been impacted greatly, but the duration of flooding could have been significantly reduced. Using temporary pumps and slowly bringing the permanent pumps on line after Katrina required 53 days to unwater the city.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure 22. Example of breach along IHNC (east side) from overtopping and scour (top) and scour behind adjacent section that did not fail (bottom).




Figure 23. Map of maximum depths of flooding from Katrina. Greatest depths of flooding exceed 15 feet.




Figure 24. Example of pumping performance during Katrina.

Scenarios run for the hypothetical situation of no levee or floodwall breaching, and assuming full pumping capacity, demonstrated that rainfall and overtopping would have caused extensive flooding, but that flooding in some areas may have been as little as one-third of that experienced during Katrina with breaching and little pumping. Figure 25 is one example of that analysis for Orleans East. The total volume of flooding would have been approximately one-third of that experienced in Katrina if only overtopping and rainfall had contributed water to the protected area. Overtopping was extensive, but would have only occurred for a matter of hours. Breaching allowed water to enter the protected areas for days until the external water levels returned to lower levels and the breaches could be temporarily closed.

## The Consequences (for more information see Volume VII)

The consequences of the flooding were enormous, dwarfing the losses from previous disasters. Figure 26 shows residential direct property losses. Approximately 78 percent of the direct property losses from flooding were experienced by residential property. This is in part due to their location in some of the lowest elevations of the city. Figure 27 shows the distribution, by census block, of the percentage of the direct property losses (loss/value) that occurred in the


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

New Orleans metropolitan area. This graphic correlates primarily to elevation (depth of flooding) and concentration of assets. When coupled with the approximately $4.5 billion to $5.6 billion in public infrastructure damages, the total direct property losses for New Orleans alone reach nearly $25 billion. In contrast, Figure 28 shows the hypothetical percentage loss for the scenario of having no breaching (just overtopping) and full pumping capacity. While the pumping assumption of this scenario is not realistic for the time of Katrina, when added to the relationship shown in Figure 25, it is a testimony to the value of having a resilient HPS.



Figure 25. Comparison of flooding from Katrina (left) to hypothetical condition of no breaching and full pumping capacity (right) for Orleans East Bank.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 26. Distribution of Katrina-generated residential direct property damages by census block. Damages in thousands of dollars.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 27. Distribution, by census block, of property damage (damage/value) from Katrina.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 28. Hypothetical percent property damage (damage/value) for scenario of no breaching and full pumping capacity

Loss of life in the Gulf region was staggering, with almost 1,600 fatalities accounted for and another 400 missing and presumed dead. The New Orleans metropolitan area suffered over 727 storm-related deaths as of February 2006 analysis. Only 2 percent of the total fatalities in Louisiana were external to metropolitan New Orleans. The majority of deaths in Orleans Parish were caused by drowning and pre-existing medical conditions. The deaths in St. Bernard Parish were primarily attributed to drowning. Loss of life was highly correlated with evacuation. Of those who remained, the elderly were particularly vulnerable with three of every four persons who died being over 60 years old. In fact, the flooding in general was disproportionately cruel to the poor, the elderly, and the disabled, groups least likely to be able to care for themselves. Figure 29 summarizes the demographics of the fatalities.

A loss of life model, LIFESim, was adapted to estimate flood-related mortality associated with the New Orleans area. LIFESim, originally developed under the sponsorship of the Corps of Engineers, the Bureau of Reclamation, and the Australian National Committee on Large Dams, is a spatially distributed dynamic simulation model. It is used to estimate the exposure of the


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

population to various flooding conditions which is input to a Monte Carlo uncertainty model to estimate expected loss of life. The modeling, described in detail in Volume VII, was used to estimate loss of life for post-Katrina conditions.

| Race | Female | Male | Grand Total |
|---|---|---|---|
| African American | 44.6% | 62.1% | 53.4% |
| Caucasian | 51.0% | 35.4% | 43.2% |
| Hispanic | 3.0% | 1.6% | 2.3% |
| Other | 1.4% | 0.8% | 1.1% |

| Age | Percent |
|---|---|
| 0 to 5 | 0.3% |
| 6 to 10 | 0.1% |
| 11 to 15 | 0.3% |
| 16 to 20 | 0.7% |
| 21 to 30 | 1.1% |
| 31 to 40 | 3.0% |
| 41 to 50 | 8.9% |
| 51 to 60 | 13.9% |
| 61 to 75 | 23.7% |
| >75 | 48.0% |

Source: Vital Statistics of All Bodies at St. Gabriel Morgue, 16 Feb 2006
http://www.dhh.louisiana.gov/offices/publications/pubs-192/Deceased%20Victims_2-16-2006_information.pdf

Figure 29. Summary of fatality data for New Orleans.

The flooding and resultant prolonged loss of services caused what became more of a migration than an evacuation, casting long shadows on the region's ability to recover. Only 8 of 73 neighborhoods did not flood, while 34 were completely inundated. Residential property losses were a staggering 78 percent of the total. Commercial property losses were approximately 11 percent of the total, while industrial losses were under 2 percent. Clearly, the people of New Orleans suffered the most direct losses, and these losses represent perhaps the greatest challenge to recovery, not just in terms of property damages. The extensive flooding caused a breakdown in the area's social and cultural structure, significantly complicating recovery and redevelopment. Critical social institutions such as schools and hospitals have been very slow to reopen.

Figure 30 shows an example of the pre-Katrina and post-Katrina (1 June 2006) direct economic damage - elevation relationships developed for each subbasin. Similar relationships were developed for elevation and loss-of-life using Katrina data and for selected future scenarios using the LifeSim model. Together these relationships provide a fundamental input to the risk and reliability analysis. The dramatic change in the curves from pre-Katrina to post-Katrina conditions represents the change in the value of the property from losses due to Katrina. Even if the probability of flooding remained the same, the risk (product of probability of flooding at a given level and level of consequences) for this subbasin would be decreased because of the reduced exposure for economic loss.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

There were numerous media reports of widespread water contamination in and around New Orleans following Katrina. Samples from bottom sediments in Lake Pontchartrain and the Violet Marsh in St. Bernard Parish as well as numerical modeling of surface water contaminant transport did not support these reports. The three-dimensional hydrodynamic model CH3D and the three-dimensional water quality model CE-QUAL-ICM were used to model contaminant concentrations for a period of 90 days after Katrina. The RECOVERY model was used to simulate contaminant concentrations in the Violet Marsh area. Figure 31 shows the results of one of the modeling efforts, in this case to examine maximum surface water concentrations of arsenic (As) in Lake Pontchartrain. All of these investigations, which included other contaminants such as lead, benzo(a)pyrene, DDE, and coliform bacteria, showed that the floodwater contaminant impacts on the region were marginal and, typically, did not exceed EPA standards. While there were localized contamination events, in general the New Orleans area seems to have escaped widespread pollutant contamination.

Along with the impact of waves, the impact of saltwater flooding of wetlands and marshes was significant and represents the most serious environmental damage sustained from Katrina. The U.S. Geological Survey estimated that approximately 118 square miles of wetland habitat was lost from the combined effects of Hurricanes Katrina and Rita. This is approximately four times the average annual loss of about 30 square miles measured since the 1930s. Hurricane Katrina caused extensive freshwater fish and oyster kills, especially along the north coast of Lake Pontchartrain, but had no identified direct impact on marine fish.

Katrina is truly a disaster from which this nation must seek and apply lessons learned to prevent reoccurrence. Part of the solution is understanding the distributed residual risk for the area. This requires a comprehensive risk and reliability analysis of the entire HPS.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 30. Comparison of flood damage – water level (in feet) relationships for pre- and post-Katrina scenarios for Orleans subbasin 5. LC and UC represent the lower and upper confidence limits of the data.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.