


Figure 31. Maximum arsenic (As) water surface concentrations (milligrams per liter total) in Lake Pontchartrain after Katrina.

## The Risk (for more information see Volume VIII)

The risk prior to Katrina was significant, in part because New Orleans is mostly below sea level, in part because the HPS had not been completed, in part because it had not been tested, and in part because portions were just not up to the test. The gap component of the foundation failure mechanisms was not considered in the design of those structures and they had never experienced water levels above approximately 5 ft (compared to 7 to10 ft in the outfall canals and over 14 ft in IHNC during Katrina). Levee sections created with hydraulic fill and capped with a relatively thin clay layer had never experienced design water levels, not to mention severe overtopping. Both components of risk were significant. The probability of a failure of floodwalls and some sections of levees was high, and there was a great potential for serious consequences because of the large population and extensive property being protected by the structures.

The repairs since Katrina have been formidable, and those sections of the system are no doubt the strongest. The temporary gates at the outfall canals will dramatically reduce the forces that the floodwalls along the canal experience. Replacing I-wall sections with stronger and higher T-wall sections along the IHNC will also significantly reduce risk, as will adding armor behind floodwall sections deemed vulnerable to overtopping and erosion. Rebuilding levee sections higher and with high quality clay soils will dramatically increase their resilience to overtopping. The areas with incomplete or legacy structures represent the greatest risk until additional measures can be taken to raise and strengthen them.

Given the difficulty in achieving and maintaining an equal level of protection around the entire system, some areas will continue to harbor the greatest risk — those having elevations the most below sea level, those with the highest subsidence rates and those directly exposed to the


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

full surge and wave environments that large storms can create. Given overtopping, water will first inundate the lowest areas. Coupled with rainfall, the performance (and therefore resilience) of the pumping stations will become the first line of defense. Given breaching, most likely where surge and wave environments can be most severe, the lowest areas again will flood first and flood the most. The other major risk factor is consequences, the lives and property exposed to flooding and loss. As such, areas with the highest population densities are going to have higher risk than less populated areas, given similar levels of reliability.

This risk assessment does not require the sophisticated model developed by the IPET, and it points out that there are rules of thumb that cannot be avoided. A risk model, however, gives planners and the public a common framework for quantifying their relative levels of vulnerability and understanding its source. That is a reasonable way to begin the process of reducing risk where it is most practical and will provide the most significant benefits.

The IPET comprehensive risk assessment was ongoing at the time of the release of this volume. The information in this section will be amended to reflect the final risk analysis results upon finalization of that work and its review by the NRC Committee and ASCE ERP.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

# Principal Findings and Lessons Learned

This section presents the principal findings and lessons learned from the IPET efforts. The information here represents a big-picture perspective of an extensive amount of work and does not attempt to include detail or supporting technical data or arguments. More detailed findings and lessons learned are provided in each volume of the IPET report along with extensive supporting information on the analyses upon which they were based.

## Principal Findings

### The System (see Volumes II and III)

**Impact of Datum Misinterpretation:** Spatial and temporal variations of 0.2 to 3 ft were found between the geodetic datum (land elevation reference) and local mean sea level (water level reference datum, LMSL). Some flood control structures in the region were authorized and designed relative to a water level datum (mean sea level), but constructed relative to the geodetic vertical datum incorrectly assumed to be equivalent to the water level datum. This resulted, in the case of the outfall canals, in structures built approximately 1 to 2 ft below the intended elevation. Updating of the reference elevation points for the region, although underway, was not completed. The use of out-of-date reference elevation points left decision makers without an accurate understanding of the actual elevations of the hurricane protection structures.

**Impact of Subsidence:** The variable and considerable subsidence in the New Orleans area was reflected in the performance of the system in Katrina. It was well known that the New Orleans area experiences significant subsidence, and structures such as levees had some increases in their initial design elevations as compensation. The amount of elevation loss for critical hurricane protection structures was not well quantified prior to Katrina. The IHNC structures, for example, are more than 2 ft below their intended design elevations, mostly from subsidence over the 35-year life of the project. This resulted in a significant loss of protection capability in areas such as the IHNC. The lack of knowledge of accurate elevations was directly tied to the incomplete update of the geodetic reference datum and LMSL.

**The hurricane protection system consists predominantly of levees and levees with cantilevered I-type floodwalls.** In locations where the right of way did not permit these options and at gated closure structures, there are segments of T-walls. T-walls are inverted "T" shaped concrete structures supported on pre-cast prestressed concrete or steel H-piles. As with I-walls, a continuous steel sheet-pile wall is embedded in the bottom of the above ground concrete wall to reduce seepage under the structure. The vast majority of the total miles of structures were conventional levees, the majority of floodwalls were I-wall structures with selected areas, specifically at transitions to major structures such as pumping plants and gated structures, having T-walls.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

**All of the structures are constructed on weak and compressible soils.** Stability and settlement of structures are generally critical design issues. The geology of the area was relatively well known and borings taken were reasonably adequate for characterizing the variety of conditions in the area, but the spacing could miss local anomalies in soil type and strength. See Appendix I-5 and Volume V for more details on the geology of the area and its impact on performance.

**The majority of the structures in the HPS were generally built as designed, and design approaches were consistent with local practice.** A number of samples were taken of materials used in the construction of the structures, particularly concrete from the floodwalls and steel from sheet piles. These samples were tested by independent laboratories and all test results conformed to accepted standards. Sheet-pile lengths were confirmed by physically pulling them from the ground.

**The levee and I-wall structure designs along the 17th Street and London Avenue Outfall Canals and for a portion of the Inner Harbor Navigation Canal (IHNC) were inadequate.** Several factors significantly impacted the performance of these structures during Katrina. The 17th Street Canal structures had the most significant issues. First, the foundation soil strengths were derived from widely spaced borings and at times using average values that do not capture the high variability inherent in this type of geology. Second, an assumption of uniform shear strengths for soils, based on the greater strengths under the centerline of the levee, beneath the 17th Street Canal levee and floodwall resulted in an overestimation of the subsurface strength at the levee toe. Third, the shear strength of the clay soils under the 17th Street Canal levee and floodwall assumed for design were higher than warranted from the measured data available at the time. These same soil strength assumptions were not made in other sections of the system where more conservative strength values were used.

**The levee and I-wall designs for the outfall canals and IHNC did not consider deflection of the I-wall to the extent that hydrostatic pressure would reach to the base of the sheet piles.** This deflection and pressure basically split the levee into two pieces resulting in the protected side attempting to resist the forces for which the entire structure was designed. This played a major role in all four of the I-wall foundation failures. At London Avenue, the deflections provided a direct pathway for the high hydrostatic pressures for the elevated flood waters in the canals to enter the underlying porous relic beach sands and rapidly propagate to the back side of the levee. The pressure caused massive subsurface erosion of the sand under the levee as well as uplift on the protected half of the levee reducing its ability to resist the forces placed on the floodwall and sheet pile. This resulted in failure of the levee-floodwall system.

**The original design criteria developed through use of the Standard Project Hurricane (SPH) in 1965 and used for the outfall canals in the late 1980s, was not representative of the hurricane hazard at the time of the design.** The Standard Project Hurricane is defined as a hypothetical hurricane intended to represent the most severe combination of hurricane parameters that is reasonably characteristic of a specified region, excluding extremely rare combinations. In 1979 the National Oceanic and Atmospheric Administration (NOAA), updated the SPH definition by increasing the maximum sustained wind speed to 115 mph from the original 100 mph. The Corps chose to continue to use the original SPH definition developed for


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

the Lake Pontchartrain and Vicinity Project for use on the outfall canals. The 1979 definition of the SPH was used for design of the West Bank and Vicinity protective structures.

**The system did not perform as a system.** The hurricane protection in New Orleans was designed and developed in a piecemeal fashion, resulting in inconsistent levels of protection. In addition to the use of different SPHs for individual projects, the designs for specific structures were influenced by the local conditions. For example, the levee and I-wall system designed for the Orleans Canal was more conservative than that for the 17th Street Canal. The Orleans Levee was broader and the I-wall freeboard (height above the levee crest) less. Soil strength assumptions were also more conservative, using the weaker values at the toe instead of the stronger values under the centerline as assumed for the 17th Street Levees.

**Levee and I-walls were designed to provide protection up to the estimated water elevations for the SPH. They were not designed to withstand overtopping.** There was no armoring or uniform use of erosion resistant soils in the levee sections. Levee materials ranged from highly resistant to scour to poorly resistant, resulting in significant variations in the protection levels afforded nearby areas. Similarly, I-walls were not protected against erosion if overtopping occurred. Given overtopping, evacuation was the only alternative to reduce exposure to flooding.

**The system was not scheduled for completion until 2015.** Sections that are not completed represent anomalously low areas, often accompanied by transitions from one type of structure to another. These ended up being weak spots, more vulnerable to overtopping and then erosion.

**The majority of the pump stations are not part of the HPS and were not designed to provide capability during large storms.** Most pump operators are routinely evacuated prior to hurricanes striking the area because of a lack of a safe haven to ride out the storm. Many of the larger pumping stations have mechanisms to prevent backflow through the pumps if they are not being operated. In some cases these require manual activation.

## The Storm (See Volume IV)

**Katrina generated a storm surge and wave environment unparalleled in the history of New Orleans.** Hurricane Katrina was a very large Category 3 storm when it passed the New Orleans area on the morning of August 29th. Twenty-four hours earlier this storm had been the largest Category 5 and most intense (in terms of central pressure) storm on record within the northern Gulf of Mexico. During Katrina, at a location due east of the Mississippi River delta and just offshore in deep water, NOAA Buoy 42040 recorded the highest significant wave height ever measured in the Gulf of Mexico (55 ft). That observation matched the largest significant wave height ever recorded by a sensor within NOAA's buoy network, in any ocean. The large size of Katrina throughout its history, combined with the extreme waves generated during its most intense phase, enabled this storm to produce the largest storm surges that have ever been observed within the Gulf of Mexico (up to 28 feet in Mississippi), as determined from analyses of historical records.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

**Hurricane Katrina generated water levels that for much of the system significantly exceeded the design criteria.** Katrina surge levels were up to 20 ft along the east side of the HPS, substantially higher, up to 5 or 6 ft, than the design levels for all areas along the eastern and southern portions of the HPS. The surge levels were roughly equivalent to design criteria along the southern shore of Lake Pontchartrain. Katrina-generated wave heights were approximately equal to the design criteria with the exception of Plaquemines Parish where Katrina-generated waves were significantly higher. Wave periods, however, especially along New Orleans East, St. Bernard, and Plaquemine Parishes, were approximately three times that estimated for the design criteria. The waves impacting the levees were 15- to 16-second-long period ocean storm waves that caused much more runup and overtopping than shorter period waves.

**Local wave generation can contribute significantly to wave conditions within outfall and navigation canals in the New Orleans area.** Local wave generation in the outfall canals during Katrina generated higher wave conditions over much of the length of the canal than were associated with the waves entering the canals from primary generation areas (either Lake Pontchartrain or the Gulf of Mexico). In the most extreme case examined here, wave heights of over 4 ft were generated within the GIWW/MRGO canal entering the IHNC from the east. The IHNC design assumed 1-ft waves. Detailed hydrodynamic analyses showed that dynamic forces were a significant portion (20 to 30 percent) of the total forces experienced by many of the levees and floodwalls. The dynamic forces considered in the original design were significantly less.

**Overtopping by waves generated very high velocities over the crest and back sides of the levees, leading to a high potential for scour and erosion.** Velocities from 10 to 15 ft/sec were calculated for the back sides of the levees along St. Bernard Parish, while the front sides of the levees experienced velocities of about one-third of those on the back side. Since erosion potential is related to the cube of velocities, the erosion potential on the back side of the levees was up to 27 times greater. The exception was in the east/west-trending leg of the GIWW near the I-10 Bridge, where wave energy and currents were almost parallel to the orientation of the levees and while overtopping occurred, the back side velocities were not severe. Examination of these levees that failed due to erosion determined that all failures were caused by erosion of the crest and back face.

**The southeast trending leg of the Mississippi River Gulf Outlet (MRGO) had little influence on the water levels in the IHNC during Katrina.** The relative size of the channel with respect to the very large flow area available when the marsh areas have been inundated by surge, make the amount of water conveyed through the channel a relatively small part of the total. During Katrina, MRGO was far from the "hurricane highway" moniker with which it has been branded. Model results show that this is the case for very large surge-generating storms in this area. This finding agrees with those of an independent study conducted for the State of Louisiana.

**There was no evidence of significantly reduced surge levels and wave heights in areas adjacent to wetlands and marshes.** Surge elevations and wave energy along the HPS were impacted mostly by the relative orientation of structures with respect to the direction of the wind


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

and oncoming surge and wave energy. For example, areas on the south side of St. Bernard Parish were sheltered from the dominant east to west movement of wind and water, resulting in reduced storm water levels and less damage. It is likely that the presence of marshes had an impact on surge and wave conditions during the earlier parts of the storm, but the massive size of the storm and propagation of surge and waves ahead of landfall had inundated the surrounding marshes with significant water long before the peak of the storm hit. The exact impact of marshes on surge and waves remains unquantified.

**Measurements of temporal variation in wave and water level conditions, and wind, through the peak of the storm were extremely scarce. Of the few sensors deployed in the high impact zone, nearly all were damaged or malfunctioned.** None of the self-recording instruments that were in place to record water levels successfully captured water level changes through the peak of the storm in the high impact zone. All malfunctioned prior to the peak.

## The Performance (see Volumes V and VI)

**Of the 50 major breaches experienced by the HPS during Katrina, all but four were due to overtopping and erosion.** For floodwalls, the overtopping caused erosion behind the walls that eventually caused instability and wall failure. For levees, the scour eroded the back sides and tops of the levees due to high velocities of the overtopping waves in areas of erosion-susceptible soils creating breaching. Areas with high quality levee materials performed well in the face of water conditions that exceeded their design criteria. Structures at authorized design elevations would have reduced the amount of overtopping.

**There was no evidence of systemic breaching caused by erosion on face or water sides of the levees exposed to surge and wave action.** The water velocities on the face side were only one-third of those experienced at the crest and back or protected side of the levees. The levees largely performed as designed, withstanding the surge and waves until overtopping, at which time they became highly vulnerable to erosion and breaching, especially those constructed by hydraulic fill.

**Four breaches, all in the outfall canals and IHNC and all involving I-walls, occurred before water levels reached the top of the floodwalls.** All were caused by foundation failures induced by the formation of a gap along the canal side of the floodwall. All of these structures were built over a layer of marsh sediments, in two cases underlain by clays and in the other two underlain by relict beach sand deposits. Along the outfall canals, the subsurface conditions dictated the specific mechanics that, coupled with the high hydrostatic pressures introduced to depth by the gap along the face of the sheet pile, led to instability and failure. The sites underlain by sand experienced significant uplift pressures, seepage and, in one case, a massive piping of subsurface sand from under the levee to the protected side. This action undermined the floodwall.

In the case of the sites underlain by clays, the formation of the gap to the base of the sheet piles introduced high loads along the depth of the wall which could not be resisted by the weak clays. At the IHNC site, the fact that the ground surface elevations beyond the levee toe were


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

significantly below those in the design cross sections contributed to the failure. Soil strength assumptions used in the design of the 17th Street structures were too optimistic. The formation of the gap and the associated hydrostatic pressures introduced at depth, along with effectively splitting the levee into two parts, resulted in a significant reduction in the factor of safety of the structure. This failure mechanism, in particular the gap formation to the bottom of the sheet piles, was not considered in the original design of these structures.

**Three other sites within the IHNC experienced I-wall breaches due to overtopping and scour behind the walls which reduced the stability of the structures.** These breaches added to the flooding in Orleans (East Bank) and the Lower Ninth Ward. The storm surge levels in the IHNC exceeded the design levels, and lower structure elevations, reduced over 2 ft by 35 years of subsidence, contributed to the amount of overtopping that occurred.

**Transitions between types and levels of protection and between protection structures and other features created vulnerabilities to erosion and breaching and reduced the effectiveness of the protection.** Some of the transitions are associated with changes in the organization responsible for the structures, some are due to incompletion of the authorized construction, and others are associated with necessary penetrations through the levee/floodwall system.

**In spite of being subjected to design-exceeding conditions and forces, many sections of the HPS performed well.** These tended to be sections with materials resistant to erosion and more conservative designs. The Orleans Canal levee-floodwalls are similar to those on the 17th Street and London Avenue Canals, yet they did not fail. The northern section of Orleans Canal is underlain by clays similar to the 17th Street breach site and the southern section is underlain by sand similar to the London Avenue breach sites. Investigations showed that the levees were more conservative in design, having broader base and less floodwall freeboard. In addition, more conservative soil strength values were assumed in their design.

**Levee sections constructed from quality clay materials were much less susceptible to erosion from overtopping.** They performed well in spite of being subjected to conditions significantly beyond their design criteria. There was a direct correlation between the character of the levee materials and their performance.

**Flooding from Katrina covered approximately 80 percent of the New Orleans metropolitan area.** For Orleans East and St. Bernard Parishes, approximately two-thirds of the volume of flooding can be attributed to water flowing through breaches. The one-third due to overtopping and the very large amount of rainfall would itself have caused a significant level of interior flooding.

**The three breaches in the outfall canals and I-wall/levee failures along the west side of the IHNC were responsible for approximately 70 percent of the flooding in Orleans East Bank.** The remainder was due to the heavy rainfall (up to 14 in. in 24 hr) and overtopping.

**Because of inoperability, pump stations played no significant role in the reduction in flooding during Katrina.** Sixteen percent of the total pumping capacity was operating during


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

the storm, equivalent to approximately 18,000 cfs. The distribution of operating pumps across four parishes, however, reduced the impact of the pumping. Their inoperability, due to a combination of the necessary evacuation of operators, loss of power, loss of cooling water, and flooding, impacted the ability to unwater the city after the storm. Temporary pumps were useful after Katrina, but provided only a small fraction of the capacity needed. Reverse flow through some pumps added to the flooding in at least one parish. While methods are available to prevent reverse flow, they are dependent on human implementation and electrical power.

**The maintained condition of the levees was an additional negative factor in the performance of the system.** While the presence of trees and other features on the levees could not be directly related to the failures of the outfall canal structures, it is likely that they were enablers in the overall breaching process. The presence of large trees on the levees was particularly troublesome and could easily have accelerated the failure process.

**All features must be included in the performance assessments of a system.** There are other features, such as the CSX railroad closure gate, that are not an integral part of the HPS but are sources of vulnerability and require independent action to manage during a hurricane event.

## The Consequences (See Volume VII)

**Loss of life was concentrated by age, with 70 percent of deaths being people over the age of 70.** There were 727 fatalities in the five parishes examined. The poor were disproportionately affected. Loss of life also correlated to elevation, in terms of depth of flooding, especially with regard to the poor, elderly, and disabled, the groups least likely to be able to evacuate without assistance.

**Katrina caused direct property losses (excluding Plaquemines Parish) of over $20 billion, approximately 78 percent ($16 billion) of which was attributed to residential losses.** The next largest component was the 11.5 percent ($2.4 billion) attributed to commercial losses. There was an additional $7.0 billion in losses attributed to public infrastructure, including the HPS itself. The most significant infrastructure impact was incurred by the HPS ($2.0 billion) followed by roadway networks and assets of the regional electrical distribution\transmission grid. Together, the damages to these categories of infrastructure totaled approximately $2.0 billion. This estimate is followed by damages to public transit assets of approximately $700 million, followed by damages to rail lines, airport facilities, gas and water distribution, telecommunications assets, and assets for waterborne transportation totaling an additional $1.7 to $1.9 billion.

**Approximately half of the direct economic losses, excluding public and utilities infrastructure, can be associated with breaching of levees and floodwalls.** The remaining losses alone, attributable to rainfall and overtopping, constitute the largest losses experienced in any disaster in the New Orleans vicinity. Losses and, in many respects, recovery can also be directly correlated to depth of flooding and thus to elevation. In some areas flooded by Katrina, where water depths were small, recovery has been almost complete. In areas where water depths were greater, little recovery or reinvestment has taken place.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

**Combined with the significant and far-reaching impact of Hurricane Katrina regarding initial displacement of population, workforce, and businesses, the impacts to infrastructure and affiliated public welfare and services will contribute to slowed phasing of recovery with regard to return of populace and business activities.** Orleans Parish alone is estimated to have lost over 60 percent of its population and St. Bernard Parish nearly 80 percent. On the other hand, St. Charles and Tammany Parishes have increased in population since before the storm.

**In terms of the social consequences of the Katrina event specifically, the social organization of the community and region has been compromised by the mass exodus of the population, the structural damage, and the demands to respond and rebuild.** The flooding caused a breakdown in New Orleans' social structure, a loss of cultural heritage, and dramatically altered the physical, economic, political, social, and psychological character of the area. These impacts are unprecedented in their social consequence and unparalleled in the modern era of the United States. The flooding disproportionately impacted the poor, the elderly, and the disabled.

**The performance of the levees protecting New Orleans is a key to its social, cultural, and historic conditions.** The immediate physical damage made large portions of the city uninhabitable, with thousands of residential, commercial, and public structures destroyed. Basic infrastructure facilities, such as power, water, sewer, and natural gas lines, were made inoperable and continued to be out of service for months after the event. Many victims not only lost their homes, but also their schools, health care, places of worship, places of trade, and jobs. The forced relocations disrupted family and friend networks. As a result, the event not only had an immediate impact on the well-being of the population of those living and working in the metropolitan area, but also resulted in basic changes in the social organization of all aspects of that population.

The available information indicates that if environmental harm has come from the Katrina flooding of greater New Orleans, it was associated with past regional land and water development. Like many other cities, the soils and sediments of land and waters in New Orleans and other delta urban areas are contaminated with metals and organics at concentrations that often exceed health standards in areas of most dense development. The flooding of greater New Orleans removed some contamination from greater New Orleans and transported it to Lake Pontchartrain and Violet Marsh with pumped floodwater where it added a small increment to estuarine sediments. The IPET analysis did not look at local redistribution of contaminants within individual drainage basins. Katrina and Rita resulted in the loss of approximately 300 square kilometers of wetlands and marshes, all independent of the performance of the levees and floodwalls. Loss of wetlands regionally appears to fit a pattern of loss associated with past regional development as well. Overall, any sustained environmental loss from flooding and flood management is indicated to be very small in the context of long-term impacts from development in the region.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

### The Risk (See Volume VIII)

**Risk assessment provides a viable means to understand the relative vulnerability of protected areas.** The combination of the likelihood of storm water levels (surge and waves), the likelihood of structural failure at different water levels and dynamic loadings, the likelihood of flooding based on the expected performance of the system, and the consequences of that flooding provides a comprehensive information set on residual risk. This information defines the relative vulnerability of each area as well as the sources of that vulnerability.

**Performing a meaningful risk assessment requires an accurate inventory and characterization of all components of the HPS.** This includes the information and assumptions used in the design, the physical properties including accurate dimensions and elevations, materials and strengths, and maintained condition. This is a substantial task but provides a foundation for true system-wide analysis.

**The effectiveness of the protection system depends on human factors as well as engineered systems.** These factors, such as timely gate closures, operating gates, and pumping station operability, must be included in the overall assessment to reach accurate conclusions.

**It is critical to estimate the inherent uncertainty in the individual components of the risk assessment and in the final risk products.** Risk assessment combines a variety of data types and incorporates numerous models. Each of these has an inherent degree of uncertainty, in their values, in the ability of the models to replicate the processes they represent, and in the end products themselves. The level of uncertainty must be estimated and incorporated in an overall uncertainty analysis to understand the variance associated with the risk assessment results. This provides some measure of the confidence one can have in using the risk data.

## Principal Lessons Learned

The principal lessons learned from the IPET analyses are presented below by mission question. Detailed lessons learned are provided in Volumes II to VIII. In addition to the lessons learned that relate directly to the mission questions, there was a cross cutting topic, knowledge and expertise, that warranted discussion and is presented at the end of this section of the report.

### The System (see Volumes II and III)

**Correct elevations and reference datum are essential.** All hurricane and flood control protection structures should be designed, constructed, and maintained relative to an up-to-date local sea level reference datum. Areas experiencing variable subsidence, such as New Orleans, are likely to have systematic datum and elevation accuracy issues that need frequent attention. It is important to have appropriate monitoring stations (for tide and subsidence) in place and associated up-to-date guidelines for the application of this information to existing and new projects. In subsidence-prone areas, designs should consider multiple elevation increases over the life cycle of the structure.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

**Systems planning and design methods are needed.** Planning and design methodologies need to allow for examination of system-wide performance. It is obvious from the IPET analysis that the piecemeal development of the New Orleans Hurricane Protection System provided a system in name only. This is especially true of the sections that have not been completed, transitions between types of protection that differ in capability (thereby representing weak points), and differences in the relative levels of reliability that created areas with greater likelihood of failure. The system-based approach should have a time dimension to allow consideration of the potential changes in requirements or conditions over the life of the project and to examine approaches to build in adaptive features and capabilities. Subsidence, changing population demographics, and the changing patterns of hurricane intensity and frequency are obvious examples of the time-dependent challenges hurricane protection systems face. All components that contribute to the performance of the overall system must be treated as an integral part of the system. Pump stations are one example in New Orleans. For any given drainage basin, the protection is only as robust as the weakest component of the system protecting that area and how effectively the various components that are interdependent operate together.

**Frequent update to guidance and review of projects is critical.** Design methods and designs need frequent review to determine whether they represent best practice and knowledge. Designs in coastal flood damage reduction projects need to include the concepts of resilience, adaptation, and redundancy to accommodate unanticipated conditions or structural behaviors. Design should be based on a system-wide understanding of the processes affecting the system and the interaction and interdependencies of the system components. This is especially true for the characterization of the hazard where modern probabilistic methods should be used.

**The SPH process is outdated.** More comprehensive probabilistic methods that consider a broader variety of storm characteristics and storm generated conditions should be used as a basis for planning and design. The Joint Probability Method – Optimized Sampling approach described in Volume VIII is recommended as a technically credible approach.

## The Storm (see Volume IV)

**Surge and waves are the hazard, not the storm.** Meteorological designations such as the Saffir-Simpson scale by themselves are not adequate to characterize the distributed surge and wave conditions that a HPS will face. Katrina, a Category 3 storm at landfall, generated surges of 24 to 26 ft at Biloxi, MS. In the vicinity of Biloxi, the surge produced by Camille was 15.8 ft, the highest surge that had ever been recorded at that location prior to Katrina. In other words, Katrina (a Category 3 storm at landfall) generated substantially higher surges than Camille (a Category 5 storm at landfall) in the area where they both made a direct hit.

**Sophisticated modeling using physics-based codes with high spatial resolution and accurate windfield input is necessary to depict the variable hydrodynamic environments created by large storms.** Similarly, the traditional methods of assessing the frequency of occurrence of hurricanes, dependent primarily on historical data, are too simplistic to capture important characteristics of the hurricane hazard such as time- and space-dependent storm


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

intensity and track patterns. The wave and storm surge modeling (using the Corps' WAM, STWAVE, and ADCIRC prediction models) provided considerable insight into how water surrounding such a complex physical system responds to an equally complex hurricane wind system. The hurricane protection system in Southeast Louisiana is very long and expansive, having a highly irregular layout. These factors coupled with a translating counter-clockwise rotating wind field about the center of a hurricane produced a complicated pattern of wave and storm surge development and evolution. Propagation of an evolving storm surge wave influences the water depth, which in turn exerts strong influence on the local wave field. The wave field is not only a function of what is locally generated by the wind. It is also heavily influenced by wave conditions generated by the hurricane while it was still well off the coast. Those waves propagated into the region well ahead of the storm's arrival.

**Current models have uncertain accuracy in treating the effects of wetland and marsh environments on storm surge and waves.** Sensitivity tests showed that wave and surge model computations are somewhat sensitive to the methods used to characterize frictional resistance of wetlands and to the values of frictional resistance assigned to different types of wetland landscape. Results showed that storm surge is reduced in some areas, whereas it is increased in others. Likewise, wave height is reduced in some areas and increased in others. Wave height increases are primarily due to the fact that increased water depths associated with increases in storm surge enable larger local wave heights to be sustained.

**Resolution of wave setup is a critical element in the estimation of design levels of levees in this area.** Hurricane Katrina produced extremely energetic wave conditions along the entire coast of Louisiana. Significant offshore wave heights along the Southeast Louisiana coast ranged from 55 ft due east from the tip of the Mississippi River delta to 20 to 25 ft just north of the Chandeleur Island chain, with peak wave periods of approximately 15 to 16 sec. Considerable wave breaking took place seaward of the Chandeleur Islands. High resolution (as fine as 300 ft) was added to the ADCIRC grid mesh to resolve areas of intense wave breaking along the barrier islands, the periphery of the coastal wetlands fronting Southeast Louisiana, and along the periphery of Lake Pontchartrain. The STWAVE model was run at fine resolution. The high resolution adopted and the use of coupled wave and surge models were able to capture the contribution of wave setup to storm surge away from coastal structures, a contribution of up to 2.5 ft depending on location. But even though the ADCIRC model contained contributions of both direct forcing and wave-related radiation stresses in its estimates of storm surge heights, local wave setup not resolved by the ADCIRC grid contributed 1.5 to 2 ft of additional setup along exposed levees in St. Bernard Parish, Plaquemines Parish, and New Orleans East, as well as along the south shore of Lake Pontchartrain. This additional setup contribution was estimated using Boussinesq wave modeling applied with much higher resolution.

**Only 10 to 15 percent of high-water marks were considered to be reliable measures of peak storm water level.** Of the many hundreds of high-water marks collected in Louisiana and Mississippi, a relatively small percentage of high-water marks were rated to be reliable measures of storm surge (the peak still water level that was experienced during the storm). The most reliable marks were those measured in the interior of structures on walls, in places where oscillatory wave motions were minimized.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

## The Performance (See Volume V and VI)

**Designs need to better consider unknowns.** The design approaches taken for the outfall canals were not conservative enough to deal with the unknowns, in this case the excessive floodwall deflection not considered in the design. Floodwall design methods need to consider a broader spectrum of possible behaviors, and resilience to overtopping should be considered as a fundamental performance characteristic. Research is needed to understand the full performance limits of structures and to discover new approaches for creating adaptive designs. The unanticipated failure mode defined for the I-walls from this analysis does not represent the only possible failure mode for these structures. Numerous other modes were considered in their design, and other yet undefined modes are likely to occur at some point in the future. Designers need to consider a broad range of failure modes, including some approaches beyond traditional or standard practice.

**Design methods and assumptions need continuous review and update.** Design methods should be clearly based on physical behavior of engineering components and systems and should be reviewed periodically to determine if they represent the latest knowledge, practice, and technology. Similarly, existing projects should be periodically reviewed to ensure that their original design has not been compromised by changing hazard or changing knowledge base.

**Planning methods should facilitate examination of system-wide performance.** In addition, hurricane protection systems should be deliberately designed and built as integrated systems to enhance reliability and provide consistency in levels of protection. Components such as the interior drainage and pumping need to be an integral part of the system because of the important role they can play in limiting the amount and duration of flooding. Resilience in pumping capacity is especially important.

**Resilience to catastrophic breaching can provide huge benefits in reduced loss of life and property.** It is clear that a resilient HPS can provide enormous advantages. Resilience, in this case, refers to the ability to withstand, without catastrophic failure, forces and conditions beyond those intended or assumed in the design. For our purposes, resilience refers to the ability to withstand higher than designed water levels and overtopping without breaching. As demonstrated in this analysis of Katrina, approximately two-thirds of flooding and half of the losses were the result of breaching, i.e., the significant loss of protective elevation in structures. While overtopping alone from Katrina would have created dramatic flooding and losses, the difference is staggering in many regards. Reductions in losses of life, property, and infrastructure; associated reductions in the displacement of individuals, families, and the workforce, coupled with reduced disruption to businesses and social and cultural networks and institutions, would have a dramatic impact on the ability of a community and region to recover. Added to this is the savings of the time and funding needed to rebuild the protection system itself, which would accelerate the pace of recovery. Resilience is not a national priority in the development of hurricane protection systems, and resilience was not an element in the New Orleans HPS design.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

## The Consequences (See Volume VII)

**Losses and recovery are flood depth dependent.** Losses from a hurricane event creating water levels that exceed design criteria can be expected to be significant, but could be much less if the HPS can withstand overtopping without catastrophic breaching. While the reduction in direct property losses can be substantial and readily estimated (over $10 billion for Katrina), it is the more difficult to quantify reduction in the indirect economic and cultural losses that may be most relevant to the ability of the affected area to recover. In addition, the perceived character and expected performance of the HPS itself is a significant factor in the choices people will make with respect to re-population and re-investment.

Damages and loss of life were both directly tied to depth of flooding, which in turn is inversely tied to the elevation of the location or subbasin. Areas with lower elevations experienced the most severe losses and, all else being equal, will harbor the highest probabilities of experiencing flooding into the future.

**System-based planning should include all aspects of hurricane response.** A broad and system-based planning capability can increase the effectiveness of integrating evacuation, recovery, and reconstruction aspects into the HPS. In particular, a risk-based approach can provide an effective means to examine approaches to manage both the probability of an adverse event and the exposure to losses as well as the consequences. Spatial analysis of consequences and the ability to relate consequences to physical performance are powerful tools for making difficult decisions concerning hurricane protection.

## The Risk (See Volume VIII)

The comprehensive risk assessment was ongoing at the time of the release of this edition of Volume I. The following are insights gained in the development and execution of the risk assessment. More specific results and lessons learned will be provided in an amended version of this Volume and a completed Volume VIII when the risk results have been validated and published.

**Risk supports system-wide planning.** A risk-based planning and design approach would provide a more viable capability to inform decisions on complex infrastructure such as hurricane protection systems. The traditional approach, as used for the New Orleans protection measures, is component-performance-based, uses standards to define performance, and relies on factors of safety to deal with uncertainty. It is difficult to examine the integrated performance of multiple components, and standards are usually limited to past experience. Risk-based planning is system-based, requiring that the entire system be described in consistent terms and explicitly including uncertainty. Component performance is related to system performance as well as the consequences of that performance.

**Risk expands the criteria for decision making.** The risk-based approach is well suited for consideration of a variety of measures of merit. Factors such as loss of life, environmental losses, and cultural consequences can be included in decision making without reducing everything to one measure such as dollars. As applied for the IPET assessment, it allows aggregation and de-


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

aggregation of information to address issues at different scales, providing a useful tool for collaborative planning between responsible agencies at different levels. It also allows for a more comprehensive consideration of hazards. Instead of a single definition derived from limited historical data, a joint probability approach can consider events that reflect historical information as well as a variety of possible events, providing a more robust basis for considering the spectrum of hurricanes that may occur. Most importantly, risk and reliability allows decision makers to understand the relative levels of vulnerability that specific areas face, the nature of the consequences (e.g., loss of life, economic loss, or environmental loss), and to understand the source of the vulnerability. As such, it is an excellent tool for understanding the effectiveness of alternative approaches to reduce risk, which can be managed by changing the performance of the protection system or changing the nature or degree of related consequences.

**Traditional methods of hurricane frequency analysis are not adequate to describe the hurricane hazard for risk assessment.** Risk assessment requires a stage (water level)-frequency of occurrence (or exceedence) relationship for a multitude of locations around the HPS, the number depending on the variation of the surge and wave conditions. The SPH, or any design hurricane, is only a single representative storm, having a certain combination of characteristics, with an estimated frequency of occurrence; one storm out of a population of hurricanes that are possible, some of which are more severe than the SPH. Relatively little information regarding risk is available from this treatment of the storm threat. Considering a larger set of historical storms, such as in a strict application of the Empirical Simulation Technique, is an improvement; but it also limits consideration of what might occur in terms of combinations of hurricane characteristics to what has occurred. Using the Empirical Simulation Technique with track variations of historical storms adds some hypothetical storms to the historical record, but also adds the challenge of assigning frequencies to these storms. The Joint Probability Method – Optimal Sampling, coupled with high-resolution surge and wave models, was deemed the most rigorous and tractable means to characterize the hurricane hazard for the New Orleans risk assessment. It most thoroughly considers the spectrum of hurricanes that might occur. The period of record from 1950 to the present was defined as the most accurate interval for assessing hurricane characteristics. One will always be limited to a degree by the length of the historical record.

## Knowledge and Expertise

**Awareness and exploitation of emerging knowledge are critical.** The history of the planning, design, and performance of the HPS in New Orleans points out a dilemma. While new pieces of knowledge were available over time that were relevant to the ultimate performance of the I-walls on the outfall canals, the pieces were not put together to solve the puzzle of the failure mechanism that occurred. The Corps' own testing of sheet-pile stability (E-99) in the mid 1980s was not directed at the behavior of I-walls, but with hindsight, some of the behavior observed was indicative of the deflection of a structure that designers essentially assume to be rigid. Similarly, late in the 1980s, research papers published in part through the Corps laboratories discussed the high hydrostatic pressure issue with regard to a gap forming in conjunction with sheet-pile structures. Work, not directly related to levee or floodwalls, in England discussed the deflection and hydrostatic pressure problem for retaining walls. How do


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.