these puzzle parts get pieced together to create knowledge for designers and how do designers and reviewers get access to this information? How does the research or testing community become aware of applications, perhaps different from their original purpose, for their new knowledge?

**Constant renewal of planning and design criteria and guidance are critical.** Part of the solution to this dilemma relates to the amount of overall effort and resources put into the search for new knowledge and capabilities to deliberately update design criteria and planning capabilities. Awareness and capability are gained best when there is both technology push (research creating new knowledge and capabilities) and requirements pull (designers/constructors seeking and pulling information from the research and professional communities). The solution is not more research or more outreach alone, it is the ability of the design/construction and research communities to work together in an environment enabling collaboration and experimentation with new knowledge and approaches to old and new problems. There has been a distinct loss in energy and resources expended in this area, particularly in the domain of hurricane and flood protection and specifically in the geotechnical fields that are at the heart of the levee and floodwall performance issues in Katrina. The focus on standards may, in fact, also deter this process. Standards imply stability and constancy, when in fact the concept of guidelines may be more appropriate, allowing and encouraging customization and adaptation as new knowledge emerges. In either case, standards and/or guidelines need to be refreshed at a greater frequency as the generation of new knowledge continues to accelerate.

**Maintaining expertise is critical.** The other dimension to this issue is expertise. As technology accelerates and engineering practice evolves at an increasing pace, it becomes more difficult to maintain the level of technical expertise necessary to cope with the ever more complex issues faced in water resources. This is true for the government and the private sectors. Government agencies are especially challenged in an era of outsourcing and competition for experienced professionals. Significant measures are needed to reemphasize technical expertise and renew that expertise as water resources practice evolves. These measures must be part of the culture of organizations and cover the entire profession to ensure that the total team addressing priority issues such as hurricane protection are working from the latest knowledge and professional practice.

## Other Studies

There were a number of other studies conducted within the time frame of the IPET activities. Perhaps the most publicly recognized of these are the efforts of the Independent Levee Investigative Team led by the University of California at Berkeley (UCB) and Team Louisiana led by the Louisiana State University (LSU). It was important to have multiple teams examining the post Katrina situation in New Orleans. Given the very short time frame for effecting repairs and the huge task of rebuilding both the hurricane flood risk reduction system and New Orleans, multiple perspectives and analyses were a significant benefit.

These efforts differed dramatically in their scope, resources and levels of effort The IPET was comprised of over 150 experts and another 150 support personnel with resources exceeding


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

$22 M and direct access to the unique experimental facilities of the Engineer R&D Center as well as those of the 8 major government agencies, 23 private sector firms and 25 universities that composed the task force. In addition, the IPET efforts have been continuously peer reviewed by the ASCE External Review Panel and strategically reviewed by the NRC Committee on New Orleans Regional Hurricane Protection Projects. Team Louisiana and the UCB Teams were much smaller in all dimensions and did not have the benefit of real time or strategic peer review. While the IPET effort was highly focused on in-depth analyses of the engineering and system wide performance issues, the UCB effort was divided between work on the engineering aspects and some on the organizational and human factors. Team Louisiana also examined a broad spectrum of topics but in less detail. To date there has not been a formal report published by Team Louisiana, however, some of their information was incorporated into the UCB report.

Following release of the IPET Draft Final Report on 1 June, 2006, review comments were provided by the ASCE External Review Panel and the NRC Committee on New Orleans Regional Hurricane Protection Projects. In an endeavor to respond to their feedback and to ensure that the IPET Final Report contained the best information possible, IPET teams reviewed in some detail the work of the other studies. The objective was to incorporate as appropriate any information that would enhance the value of final IPET findings, lessons learned and analytical processes documented in the report. It was also important to provide feedback to engineers and organizations engaged in planning, design and construction of flood risk reduction structures in New Orleans and elsewhere. There were a number of issues that have been published by the media as well as the study reports that deserve some specific mention here. Specific findings and more detailed evaluation of analyses and data are provided in the other IPET report Volumes, particularly in Volume V.

There were two areas that constitute the major differences in the findings of the three efforts. The first deals with the failure modes of the floodwalls. While there was agreement by all that excessive deflection of the floodwall structures was a major component of the failure mode for the I-walls along the outfall canals, the study teams hypothesized somewhat different failure modes for the 17th Street breach site and for one site on the Inner Harbor Navigation Canal. This is significant for the future planning and design of these structures as well as understanding appropriate remedial measures to strengthen existing structures. For the 17th Street site, both approaches consider weak subsurface soils as the other major culprit in the failure mode. They differ in which subsurface layer was the failure plane. IPET analysis, based on numerical modeling by two independent teams, physical modeling by two independent centrifuge teams and site geotechnical investigations that included excavating the actual failure plane with a backhoe, placed the failure plane in the weak clay layer underlying the persistent layer of peat in the region. The UCB Team, based on small diameter Shelby tube soil samples and limited numerical analyses, hypothesized a thin slippery layer within the peat layer (overlying the weak clay) as the slip plane. IPET has not been able detect a widespread thin (inch or less in thickness) layer within the peat layer, in spite of having physically harvested large volumes of peat for use in centrifuge testing and acquisition of significant additional subsurface soils data.

IPET has proposed that the failure mode for the southern (IHNC) breach adjacent to the Lower 9th Ward, was similar to that experienced at the 17th Street breach, deflection of the wall and failure within the underlying weak clay layer, with additional influence of the local


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

topography. The elevation of the land on the protected side of the floodwall was significantly less than shown in the original design documents which would have decreased the ability of the levee to withstand the high forces it experienced. The UCB analysis focused on seepage as an issue at this site. Since the geology of the site is similar to that at the 17th street breach, with weak clay under the pervasive peat layer, it is difficult to find evidence of major seepage through the clay or the peat. UCB assumptions for permeability of the peat were far higher than any measured for the actual materials or published values for similar materials. While these values of permeability would indicate seepage, IPET has found no justification for these assumptions and no physical evidence of seepage being a systemic performance issue at this site.

The second area of significant difference dealt with the performance of the levees, specifically along the Mississippi River Gulf Outlet (MRGO). The UCB report and numerous media accounts attribute to these teams, hypothesized that these levees "crumbled" prior to water levels reaching the crest of the levees. There was also stipulation of wave action causing high pore pressures within the levee materials leading to deterioration by slumping and seepage induced erosion. An analytical basis for these hypotheses has not been presented to date.

It is true that the relatively permeable and erodible materials of the levees constructed by hydraulic fill did contribute to their ultimate breaching. However, analysis and field observations demonstrate that the UCB/LSU hypothesis was not the systemic process leading to breaching. IPET analysis of this phenomena included regional analysis of the surge and wave hydrographs along the levee sections, detailed modeling of wave action and currents in proximity to the levees and analysis of erosion process for the materials comprising the levees.. The IPET analysis and physical evidence at the sites show that the systemic issue for levee performance was overtopping and the subsequent erosion from waves and ultimately surge. Where waves were incident perpendicular to the levees, the overtopping waves created velocities on the protected side of the levees up to three times those experienced on the front (water) exposed sides. This created a potential for erosion 27 times more severe on the crest and protected sides of the levees. In addition, claims of wave action increasing pore pressures within the relatively permeable materials of the interior of the levees leading to seepage induced erosion do not stand the 'test of time'. The permeability of the materials was not sufficient to allow this process to take place in the time frame of the exposure to high waves and surge.

For levee sections that experienced waves traveling more aligned with their orientation, velocities on the protected sides were significantly lower and significantly less erosion occurred.

There are meaningful lessons learned in the above examples. In an environment as complex and heterogeneous as this, there are many possible failure modes. It is critical to consider them all in any analysis, planning or design activity. To do so requires detailed and comprehensive information and analyses with cross checks from independent sources, not always feasible when resources and time are limited. It is particularly important to determine if an anomaly observed locally is just that or a component of a widespread characteristic that represents a systemic performance issue.

Another major lesson learned is that it is not likely that all possible failure modes have been identified or observed for structures in complex geological environments such as in New

Orleans. The engineering community should continuously seek additional insights on potential performance for wide ranges of conditions and incorporate as often as possible potential non-traditional behavior modes in their analyses.

# Appendix 1
# IPET Leadership, Affiliations, and Organizations

| Task Force | Leader |
|---|---|
| Project Director | **Dr. Lewis E. Link** – University of Maryland |
| Technical Director | **Dr. John Jaeger** – U.S. Army Corps of Engineers, Huntington District |
| Project Manager | **Jeremy Stevenson** – U.S. Army Corps of Engineers, Huntington District |

| Team | Leaders |
|---|---|
| Data Collection and Management – Perishable Data, Systems Data, and Information Management | **Dr. Reed Mosher** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Geotechnical and Structures Laboratory<br>**Denise Martin** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Information Technology Laboratory |
| Geodetic Vertical and Water Level Datum Assessment | **James K. Garster** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Topographic Engineering Center<br>**David B. Zilkowski** – National Oceanic and Atmospheric Administration, National Geodetic Survey |
| Hurricane Surge and Wave Analysis | **Bruce Ebersole** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Coastal and Hydraulics Laboratory<br>**Dr. Joannes Westerink** – University of Notre Dame |
| Hydrodynamic Forces Analysis | **Dr. Donald Resio** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Coastal and Hydraulics Laboratory<br>**Dr. Bob Dean** – University of Florida |


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

| | |
|---|---|
| Geotechnical Structure Performance Analysis | **Dr. Michael Sharp** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Geotechnical and Structures Laboratory<br>**Dr. Scott Steedman** – Steedman and Associates, Ltd., United Kingdom |
| Floodwall and Levee Performance Analysis | **Dr. Reed Mosher** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Geotechnical and Structures Laboratory<br>**Dr. Michael Duncan** – Virginia Polytechnic Institute and State University |
| Pumping Station Performance Analysis | **Brian Moentenich** – U.S. Army Corps of Engineers, Portland District<br>**Bob Howard** – South Florida Water Management District |
| Interior Drainage/Flooding Analysis | **Jeff Harris** – U.S. Army Corps of Engineers, Hydrologic Engineering Center, Hydrology and Hydraulics Technology Division<br>**Steve Fitzgerald** – Harris County, Texas, Flood Control District |
| Consequence Analysis | **Dr. Dave Moser** – U.S. Army Corps of Engineers, Institute for Water Resources<br>**Dr. Patrick Canning** – U.S. Department of Agriculture, Economic Research Service |
| Risk and Reliability Analysis | **Jerry Foster** – Headquarters, U.S. Army Corps of Engineers<br>**Bruce Muller** – U.S. Bureau of Reclamation |

## Organization

The IPET teams are composed of individuals from a wide variety of organizations, bringing together a unique diversity and depth of knowledge and experience. These organizations are listed below.

### Government Agencies

Federal Emergency Management Agency, Department of Homeland Security

Harris County, Texas, Flood Control District

Metropolitan Water Reclamation District of Greater Chicago

National Institute for Science and Technology

National Oceanic and Atmospheric Administration, Atlantic Oceanographic and Meteorological Laboratory, Hurricane Research Division

National Oceanic and Atmospheric Administration, Center for Operational Oceanographic Products and Services

National Oceanic and Atmospheric Administration, National Geodetic Survey

South Florida Water Management District

United States Army Corps of Engineers

United States Bureau of Reclamation

United States Department of Agriculture, Economic Research Service

United States Geological Survey

### Academia

Alfred University, New York

Georgia Institute of Technology

Johns Hopkins University

Louisiana State University

Massachusetts Institute of Technology, Department of Urban Studies and Planning

Michigan State University

Oklahoma State University

Pennsylvania State University

Rensselaer Polytechnic Institute

Stanford University

Texas A&M University

University of California

University of Delaware


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

University of Florida

University of Illinois

University of Maryland

University of Miami, National Oceanic and Atmospheric Administration Cooperative Institute for Marine and Atmospheric Studies

University of Missouri

University of New Orleans

University of North Carolina

University of Notre Dame

University of South Carolina

University of Texas

Utah State University

Virginia Polytechnic Institute and State University (Virginia Tech)

## Private Industry

3001, Inc.

Abt Associates, Inc.

Ayres Associates

Beta Testing & Inspection, LLC

Burns, Cooley, Dennis

CH2M Hill

CTE/AECOM

Environ International Corporation, CA

Gannett-Fleming, Inc.

GeoComp Corporation

GeoDelft

Geomatrix Consultants, Inc.

Michael Baker Corporation

Oceanweather, Inc.

RAC Engineering

Science Applications International Corporation (SAIC) at NOAA/NCEP

SpecPro, Inc.

Steedman & Associates, Ltd.

Surfbreak Engineering

Taylor Engineering

URS Corporation

Victor Parr, Consultant

Watershed Concepts

# Appendix 2
# American Society of Civil Engineers External Review Panel Members

| Name | Organization |
| --- | --- |
| Christine F. Andersen | City of Long Beach California |
| Jurjen Battjes | Delft University of Technology |
| David E. Daniel | University of Texas at Dallas |
| Billy Edge | Texas A&M University |
| William Espey | Espey Consultants, Inc. |
| Robert B. Gilbert | University of Texas at Austin |
| Thomas L. Jackson | DMJM Harris |
| David Kennedy | California Department of Water Resources |
| Dennis S. Mileti | University of Colorado (retired) |
| James K. Mitchell | Virginia Polytechnic Institute and State University (Virginia Tech) |
| Peter Nicholson | University of Hawaii |
| Clifford A. Pugh | U.S. Bureau of Reclamation |
| George Tamaro | Mueser Rutledge Consulting Engineers |
| Robert Traver | Villanova University |
| Lawrence H. Roth | American Society of Civil Engineers |
| John E. Durrant | American Society of Civil Engineers |

# Appendix 3
# National Research Council Committee Members

| Name | Organization |
| --- | --- |
| G. Wayne Clough | Georgia Institute of Technology |
| Rick A. Luettich | University of North Carolina |
| Frederic Raichlen | California Institute of Technology |
| Rafael L. Bras | Massachusetts Institute of Technology |
| Peter Marshall | Burns & Roe Services |
| Y. Peter Sheng | University of Florida |
| John T. Christian | Consulting Engineer |
| David H. Moreau | University of North Carolina |
| Robert H. Weisberg | University of South Florida |
| Jos Dijkman | Delft Hydraulics |
| Thomas D. O'Rourke | Cornell University |
| Andrew J. Whittle | Massachusetts Institute of Technology |
| Robin L. Dillon-Merrill | Georgetown University |
| Risa I. Palm | Louisiana State University |
| Delon Hampton | Delon Hampton & Associates |
| Kenneth W. Potter | University of Wisconsin |
| Jeffrey W. Jacobs | National Research Council |

# Appendix 4
# Task Force Guardian Input

IPET Products Provided to Task Force Guardian (TFG) and Task Force Hope (TFH)

*a.* **Data Repository – 25 October 2005.** The IPET Data Repository was established as an entry point for collecting information pertaining to the New Orleans and Southeast Louisiana Hurricane Protection Projects that needs to be validated as factual. This repository supports both the IPET and TFH/TFG efforts by providing a database where information can be reviewed for accuracy and quality prior to posting the information on the IPET public website.

*b.* **Establishment of the IPET Public Website – 2 November 2005.** The IPET public website was established as a way to be fully transparent in effectively sharing factual information pertaining to the New Orleans and Southeast Louisiana Hurricane Protection Projects. The website provides a way to proactively communicate information that might otherwise require the public and TFG to process Freedom of Information Act requests.

*c.* **Establishment of On-Line Team Workspace using Groove – 22 September 2005.** To enable IPET, ERP, and members of TFH/TFG with on-line workspaces to communicate and share information virtually, Groove software and technical support was provided by IPET. Through these virtual workspaces information can be effectively and efficiently shared. Groove is a primary tool used to bring the IPET, ERP, and TFH/TFG teams together in sharing knowledge and information required to accomplish their missions.

*d.* **Integration of the IPET Public Website and the TFH/TFG Electronic Bid Solicitation Websites – 15 November 2005.** As a way to more effectively enable public benefit from the historic and performance-related information on the IPET public website and the reconstruction plans and specifications on the TFH/TFG electronic bid solicitation website, electronic linkage was provided to facilitate integration of the two sites.

*e.* **"Summary of Field Observations Relevant to Flood Protection in New Orleans, LA" – 5 December 2005.** This IPET review provided Task Force Guardian with a simple statement of concurrence or nonconcurrence from the IPET floodwall and levee sub-team and additional relevant discussion for each of the major findings in the ASCE/NSF report's chapter eight, "Summary of Observations and Findings." The additional discussion relates to the analysis being conducted by the IPET or others that would assist in applying the ASCE/NSF findings to the reconstruction of hurricane protection in New Orleans.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

*f.* **"Preliminary Wave and Water Level Results for Hurricane Katrina" – 23 November 2005.** This IPET report to TFH/TFG included observations from the IPET surge and wave sub team from a field trip and overflight of New Orleans and Southeast Louisiana.

*g.* **"Summary of IPET Numerical Model of Hurricane Katrina Surge and Wave Plans, Approach and Methods" – 19 December 2005.** This PowerPoint presentation by the IPET surge and wave sub team provided TFH/TFG with an update on wave and water level results for Hurricane Katrina. Wave and water level results from fast-track simulations of upper Category 3 type storms on various storm tracks and a Standard Project Hurricane event were also provided.

*h.* **Review of Proposal to Float In and Sink a Barge to Close Canals by June 2006 – 28 December 2005.** The proposal included the use of existing large ship tunnel thrusters mounted on a barge with huge pumping capacities. Review determined that the closure plan does not have enough pumping capacity to match existing pumps during a hurricane.

*i.* **Technical Support to TFG on the Analysis and Design of the Reconstruction Plans and Specifications for the Breaches – Completed June 2006.** Technical support was provided to TFG on an as-needed basis. As a minimum, monthly face-to-face meetings took place in New Orleans. This support included geotechnical and structural consultations. These discussions also included reviews of plans and specifications for reconstruction features such as T-walls, L-walls, I-walls, levees, and foundation investigations.

*j.* **Evaluation of Existing and As-Built Conditions at Canals – Completed June 2006.** This evaluation included concrete and steel material properties for reinforcement and sheet piles on the I-walls, as-built length of sheet piles, surveys, and foundation material properties and boring logs.

*k.* **Life-cycle Documentation of the Hurricane Protection System – Completed October 2006.** This documentation included a review of the design, construction, and operation and maintenance of the hurricane system.

*l.* **Verification of Current and Reconstructed Floodwall Elevations – November 2005.** Established a tidal gauge in November 2005 at the 17th Street Canal to monitor current sea level relationships to the newest NAVD88 datum epoch (2004.65). Verified floodwall elevations on Lakefront outfall canals and IHNC relative to this latest tidal and vertical epoch.

*m.* **LIDAR Ground Truthing – Completed November 2006.** Ground-truthing surveys were performed throughout the region to calibrate various LIDAR-based elevation models used by Task Force Guardian.

*n.* **Densification of Control Benchmarks – 31 December 2005.** IPET has established approximately 75 vertical benchmarks throughout the region. These control points were being used for Task Force Guardian construction activities.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

*o.* **Establishment of GIS Team – 2 February 2006.** The GIS Team was established to maximize the effectiveness and efficiency of the GIS resources within IPET, Task Force Guardian, Task Force Hope, and the New Orleans District. The GIS Team consists of members from each of the four teams and provides a way to integrate efforts and share information pertaining to the HPS. The GIS Team will also provide for a way to assure a smooth transition of IPET-generated GIS information to the New Orleans District upon disbanding of IPET once its performance evaluation is completed. Significant IPET data sets shared with TFG in January and February 2006 include the digital elevation models, vertical datum survey data, geotechnical data, and photographs.

*p.* **Insight into Probable Cause of Breaching at 17th Street Canal – Continuous ending March 2006.** Information was shared with TFG on the probable cause of breaching at the 17th Street Canal. Recommendations were provided on considering the formation of a gap at the base of cantilever I-walls and shear strength variations between the centerline and inboard toe of levees used in combination with I-walls.

*q.* **Storm Surge and Wave Analysis Results for Katrina and Historical Storms – December 2005.** Information pertaining to modeled Katrina storm surge and wave heights and periods for various locations along the HPS was provided to TFG. In addition, modeled surge and wave results from other historical storms were also provided.

*r.* **Review Comments on Canal Closure Structures – December 2005 and January 2006.** IPET review comments for the outfall canal closure structures were provided to aid in development of high quality Plans and Specifications for the closure structures.

*s.* **Provided Comments in IPET Report 2 Regarding Comparison of Hurricane Katrina Wave and Period Conditions with Design Values – March 2006.** Design wave conditions, particularly wave period, should be reevaluated for the east-facing levees in East Orleans, St. Bernard, and Plaquemines Parishes.

*t.* **Closure Structures Modeling – January – February 2006.** IPET members at the New Orleans District performed modeling analysis of the closure structures on 17th Street, Orleans, and London Avenue Canals.

*u.* **Closure Structures Interim Operations Plan – March 2006 – Completed November 2006.** IPET members reviewed and commented on operations of the gates and pumps. This included criteria for closing and opening, and coordination with local jurisdictions.

*v.* **MRGO White Paper – March 2006.** Input on analysis of MRGO effect on storm propagation into metropolitan New Orleans and vicinity.

*w.* **ITR on Heat Straightening Repairs at Empire Floodgate.** IPET team members visited the Empire Floodgate and reviewed the proposed repair plan, approving of the corrective action plan and making further clarifying recommendations. IPET suggested requiring in the specifications that the project supervisor be an experienced heat straightener possibly


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

added to section 5 of the specifications and that NDT be performed prior to and following the heat straightening. The initial NDT would benefit general initial assessment of the floodgate and provide a baseline in the event you get an inexperienced contractor that does more harm than good. TFG will know if heat straightening caused cracking if you have a baseline. TFG may want to consider the simultaneous application of V-heat on both sides of the flange—considering its thickness; this could be added in section 3.5 of Avent's specifications. IPET believes section 3.5.3 pertains to simultaneous V-heats on the same side of the flange.

# Appendix 5
# Regional Geology and History

## Introduction

A review of the geology and geologic history of coastal Louisiana is presented to establish the general framework for the soils and stratigraphy beneath the New Orleans levee failures. Geologic processes active during the past 5,000 years directly relate to the development of the land mass upon which the New Orleans area is situated, and the resulting stratigraphy beneath the levee failures at the 17th Street, London Avenue, and Inner Harbor Navigation Canals. Failures of six I-wall reaches and one earthen levee occurred at these three canals. These canals were responsible for the extensive flooding in the New Orleans metropolitan area following Hurricane Katrina. Levees in the IHNC area were mainly overtopped by storm surge during Hurricane Katrina, while levees at the 17th Street and London Avenue Canals were not overtopped, but failed at water levels below their design height. Geologists working in support of USACE flood control projects in the Lower Mississippi Valley (LMV) have typically classified the geology beneath structures and levees according to specific depositional environments. These lithostratigraphic units are associated with diagnostic fluvial and deltaic processes, and they are classified according to soil texture, sedimentary structures, organic content, fossils, and associated engineering properties. USACE geologists has been involved with studies of the New Orleans area geology since the 1940s and have applied an engineering geology classification to the underlying stratigraphy (Fisk 1944; Schultz and Kolb 1954; Kolb and Van Lopik 1958, 1965; Kolb 1962; Montgomery 1974; Kolb, Smith, and Silva 1975; Britsch and Dunbar 1990; Saucier 1994; Dunbar et al. 1994, 1995; Dunbar, Torrey, and Wakeley 1999).

## Physiography and Setting

The city of New Orleans is situated in Jefferson and Orleans Parishes along the eastern edge of the Mississippi River's deltaic plain. Broad natural levees associated with the Mississippi River, Bayou des Familles, and Bayou Metairie are the most prominent physiographic features in the area (Figure 5-1). Surface elevations are generally near sea level and range from approximately 15 ft above sea level along the crests of the Mississippi River levees to below sea level over much of the area north of the river. Increased urban reclamation of low-lying areas occurred after World War II by draining the cypress swamps that were present north of the city to meet the demands for expansion and population growth. A map of the greater New Orleans area from 1849 is presented in Figure 5-2, showing the extensive swamps and major physiographic features north of the river, before the advent of the twentieth century urbanization. Continuous pumping of surface and ground water drainage to support residential development has contributed to the desiccation of these swamp and marsh soils, and has lowered the ground surface to below sea level for a significant portion of the city. Levees that encircle the city and


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

continuous pumping of surface water are required to keep the sea from reclaiming the "Crescent City." Sea level rise of approximately of 1 to 3 ft during the next century due to global warming will provide even greater challenges to local, state, and federal officials and engineers tasked with protecting this historic American city, and other cities along our nation's coasts.




Figure 5-1. General map of the New Orleans area geology showing the limits of the different surface depositional environments (Saucier 1994). Map symbols are as follows: H = Holocene, d = deltaic, i = interdistributary, s = inland swamp, nl = natural levee, pm1 = point bar (most recent meander belt), B = St. Bernard distributary channel. Bayous Metarie, Gentilly, and Des Familles are abandoned St. Bernard distributaries.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 5-2. New Orleans area map from 1849 showing the locations of the Bayous Metairie and Gentilly distributary channel, the cypress swamps north of the city, and locations of 17th Street, London North, and South Canal breaches (marked by red squares, beginning from left to right and going clockwise). Bayous Metairie and Gentilly merge into the Bayou Sauvage distributary channel east of the New Orleans area. From Work Projects Administration (1937).

## Geologic History

A geologic history has been developed for the Mississippi River's deltaic plain based upon thousands of engineering borings drilled during the past 50 years, thousands of radiocarbon age dates determined from organic deltaic sediments, and numerous geologic studies conducted in this region (Kolb and Van Lopik 1958a, 1958b, 1965; Kolb 1962; Kolb, Smith, and Silva 1975; Kolb and Saucier 1982; Frazier 1967; Saucier 1963, 1994; May et al. 1984; Britsch and Dunbar 1990; Dunbar et al. 1994, 1995). More than 10,000 borings have been drilled in the greater New Orleans area during the past 50 years in support of foundations for the many engineered structures. Boring data identifies a complex geology that is related to the different course shifts by the Mississippi River and formation of its deltas during Holocene time (Figure 5-3). Continental glaciers covered much of North America 15,000 years before the present, with sea

level approximately 350 ft below the present level and the Gulf shoreline significantly farther seaward than its present location (Kolb, Smith, and Silva 1975). The ancestral Mississippi River and its tributaries were entrenched into the underlying Pleistocene surface below Baton Rouge, and they had developed a broad drainage basin, approximately 25 miles wide, with the axis of this entrenchment in the vicinity of Houma, approximately 45 miles southwest of New Orleans. Global warming and glacial melting caused eustatic sea-level rise, which stabilized between 4,000 to 6,000 years ago, and was 10 to 15 ft lower than the present level (Figure 5-4).




Figure 5-3a. Holocene deltas of the Mississippi River (after Fraizer (1967)).


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 5-3b. Chronology of major Holocene distributary channels (after Fraizer (1967)).


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.