IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHEILA NICHOLSON, and<br>SHELLEY NICHOLSON, and<br>RICHARD HIRSTSUS<br><br>Plaintiffs,<br>v.<br><br>UNITED STATES OF AMERICA<br><br>Defendant | ) | No. 05-1259L<br><br>Hon. Lawrence M. Baskir |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE A MEMORANDUM IN RESPONSE TO DEFENDANT'S REPLY MEMORANDUM TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**COME NOW**, Plaintiffs, Sheila Nicholson, Shelley Nicholson and Richard Hirstsus, who, for the reasons set forth in the attached Memorandum respectfully move this Court for an order allowing Plaintiffs to file a sur-reply memorandum to respond and clarify some of the issues raised by Defendant's Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment.

**Respectfully submitted,**

**LOWE, STEIN, HOFFMAN, ALLWEISS & HAUVER, L.L.P.**

**BY:** ______________________________

**MITCHELL J. HOFFMAN (6896)**
**MICHAEL R. ALLWEISS (2425)**
**JEFFREY M. HOFFMAN (29253)**
**701 Poydras Street, Suite 3600**
**New Orleans, Louisiana 70139-7735**
**Telephone: (504) 581-2450**
**Attorneys for Plaintiffs**

## TABLE OF CONTENTS


I. PLAINTIFFS HAVE ALLEGED CLAIMS THAT ARE COMPENSABLE UNDER THE FIFTH AMENDMENT . . . . pp. 1, 2

A. PLAINTIFFS HAVE SUPPLIED FACTS THAT GIVE RISE TO A FIFTH AMENDMENT TAKINGS CLAIM . . . . pp. 2-4

B. GOVERNMENTAL INTERFERENCE WAS SUBSTANTIAL . . . . pp. 5-7

II. PLAINTIFFS' CAUSATION FACTOR IS SOUND . . . . pp.7-11

A. PLAINTIFFS HAVE MET THE BURDEN OF PROOF AS TO EACH ELEMENT OF THE CLAIM . . . . pp. 11-13

B. PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT . . . . pp.13, 14

III. CONCLUSION . . . . pp .14, 15

# TABLE OF AUTHORITIES

## CASES

ARREOLA V. COUNTY OF MONTEREY,
99 CAL.APP.4TH, 722, 742, 122 CAL RPTR.2D 38 (CAL.APP. 6 DIST., 2002) . . . . . . . . . . . P. 5

B AMUSEMENT COMPANY V. UNITED STATES,
148 Ct. Cl. 337, 180 F.Supp. 386, 389 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 6

BERENHOLZ V. UNITED STATES,
1 CL. CT. 620, 626 (CL. CT. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PP. 7,8,9

BUNCH V. COACHELLA VALLEY WATER DIST.,
15 Cal.4th 432, 935 P.2d 796 (Cal.,1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 3

COLLIER V. CITY OF OAK GROVE
S.W.3d —, 2007 WL 1185982 (Mo.App. W.D., April 24, 2007) (No.65335) . . . . . . . . . P. 3

COLUMBIA BASIN ORCHARD V. UNITED STATES,
132 F. SUPP. 707, 709 (CT. CL. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 6

COTTON LAND CO. V. UNITED STATES,
75 F. SUPP. 232 (CT. CL. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PP. 7,8

EYHERABIDE V. UNITED STATES,
170. Ct. Cl. 598, 345 F.2d 565, 569 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PP. 5,6

HARRIS COUNTY FLOOD CONTROL DIST. V. ADAM,
56 S.W.3d 665, 670 (Tex.App.-Houston [14 Dist.](August 16, 2001) . . . . . . . . . . . . . . . P. 4

MODEN V. UNITED STATES,
404 F.3D 1335, 1339 (FED. CIR. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PP.1,8

NORTH COUNTIES HYRDO ELECTRIC CO. V. UNITED STATES,
138 Ct. Cl. 380, 151 F.Supp. 322 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 6

PUMPELLY V. GREEN BAY CO.
80 U.S. 166 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 9

RIDGE LINE, INC. V. UNITED STATES,
346 F.3D 1346, 1352 (FED. CIR. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PP.1,2,5

SANGUINETTI V. UNITED STATES,
264 U.S. 146 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 6

SOUTH FLORIDA GROWERS ASS'N V. U.S. DEPT. OF AGRICULTURE,
554 F. SUPP. 633 (S.D. FLA. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 8

TEEGARDEN V. UNITED STATES,
42 FED. CL. 252, 256 (FED. CL. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 4

TOMMASEO V. UNITED STATES,
75 FED.C. 799 (CT. CL. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .PP. 1,2

TRI-STATE MATERIALS CORP. V. UNITED STATES,
550 F.2D 1, 4-5 (CT. CL. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . PP. 7,8

WILFONG V. UNITED STATES,
480 F.2D 1326, 1329 (CT. CL. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 6

YEE V. CITY OF SAULSILITO,
141 CAL.APP3.D 917, 920, 190 CAL RPTR. 595(1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . P.3

**OTHER AUTHORITIES**

9 PATRICK J. ROHAN & MELVIN A. RESKIN, NICHOLS ON EMINENT DOMAIN § 34.03[1] (3D ED. 1980 & SUPP. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 1

VAN ALSTYNE,* * 54 INVERSE CONDEMNATION: UNINTENDED PHYSICAL DAMAGE (1969) 20 HASINGS L.J. 431 489-490 (VAN ALSTYNE). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . P. 3

## EXHIBITS

| EXHIBIT LETTER | DOCUMENT NAME |
| --- | --- |
| | ***Exhibits A - H previously filed with the court**<br>**Exhibits I - J attached herein** |
| A | United States Army Corps of Engineers Draft Final Report of the Interagency Performance Evaluation Task Force |
| B | National Hurricane Center, Tropical Cyclone Report, Hurricane Katrina (Dec. 20, 2005) |
| C | Independent Levee Investigation Team Report |
| D | USCOE Project Fact Sheet |
| E | Times-picayune, at A01, December 30, 2005 |
| F | Reflections of Dr. Robert G. Bea |
| G | Statement of Lieutenant General Carl Strock, Chief of Engineers, U.S. Army Corps of Engineers |
| H *in Globo* | Affidavits of Plaintiffs |
| I (pp.21-63) | United States Army Corps of Engineers Draft, Final Report of the Interagency Performance Evaluation Task Force ( March 26, 2007) |
| J (pp.164-175) | Ivor Li, van Heerden, Ph.D. and G. Paul Kemp, Ph.D., LSU Hurricane Center, Louisiana State University, Baton Rouge, LA 70803, The failure of The New Orleans Levee System During Hurricane Katrina and the Pathway Forwards ("Team Louisiana") |
| K (pp. 176-179) | Schleifstein, Mark, Corps team Blames Poor Levees, Times-Picayune, March 27, 2007 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHEILA NICHOLSON, AND<br>SHELLEY NICHOLSON, AND<br>RICHARD HIRSTSUS | ) | |
| Plaintiffs, | ) | No. 05-1259L |
| v. | ) | Hon. Lawrence M. Baskir |
| UNITED STATES OF AMERICA | ) | |
| Defendant | ) | |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT'S REPLY MEMORANDUM TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

This Memorandum is submitted by Plaintiffs, Sheila Nicholson, Shelley Nicholson and Richard Hirstsus, in response to the Defendant's Reply Memorandum and in further support of Plaintiffs' Motion for Partial Summary Judgment:

## I. PLAINTIFFS HAVE ALLEGED CLAIMS THAT ARE COMPENSABLE UNDER THE FIFTH AMENDMENT

Although the Government argues that Plaintiffs' sole remedy lies in tort, the Court of Federal Claims is authorized to exercise jurisdiction over takings claims, which often involve elements of tort. See, e.g., Moden v. United States, 404 F.3d 1335, 1339 (Fed. Cir. 2005); Ridge Line, Inc., 346 F.3d 1346, 1355 (Fed. Cir. 2003)(citing 9 Patrick J. Rohan & Melvin A. Reskin, Nichols on Eminent Domain § 34.03[1] (3d ed. 1980 & Supp. 2002)). This Court held recently in Tommaseo v. United States, "[w]hen the government challenges this Court's jurisdiction over a Plaintiffs' inverse condemnation claim, arguing that it is merely a tort and therefore outside this courts jurisdiction, the Federal Circuit requires that the trial court conduct a two-part inquiry to determine whether the alleged inverse condemnation claim is subject to the requirements of the Just Compensation Clause and within the

court's jurisdiction." 75 Fed.Cl. 799, 804 (Fed. Cl. 2007) (citing Ridge Line v. United States, 346 F.3d at 1355).

Moreover, Ridge Line requires a two prong inquiry and since the two prong inquiry is fact based, the issue of compensability under the Fifth Amendment is generally conducted after discovery. See Tommaseo, 75 Fed.Cl. 799, 804 (Ct. Cl. 2007). "A determination of whether a taking [is] compensable under the Fifth Amendment . . . is a question of law based on factual underpinnings." Ridge Line, Inc., 346 F.3d at 1352. Plaintiffs reiterate the position that they have presented sufficient summary judgment evidence to support their Motion for Partial Summary Judgment. Should this Court disagree, Plaintiffs again request an opportunity to conduct discovery.

## A. PLAINTIFFS' HAVE SUPPLIED FACTS THAT GIVE RISE TO A FIFTH AMENDMENT TAKINGS CLAIM

The Government asserts that if Plaintiffs' claims lie solely in alleged failures and omissions by the Government to adequately provide full protection from hurricane damages, there is no "affirmative action" which creates a basis for a claim under the Fifth Amendment. The Government's spin on this issue misses the point. Plaintiffs do not allege the design failure failed to provide full protection from Hurricane Katrina. Plaintiffs do allege that the Government was bound with a duty to design and construct floodwalls to provide protection for what is commonly known as a Category 3 hurricane. Plaintiffs have alleged that "[a]s a result of the flooding in New Orleans, due to the defective design and construction of the flood walls, the property values of the class representatives and all members of the class have been severely impacted." Complaint at ¶¶ 12. It was the act of creating flood walls, at the direction of Congress, which is the basis for this inverse condemnation claim.

"The fundamental justification for inverse liability is that the government, acting in furtherance of public objectives, is taking a calculated risk that private property may be damaged." Arreola v. County of Monterey, 99 Cal.App.4th 722, 742, 122 Cal.Rptr.2d 38 (Cal.App. 6 Dist., 2002) (quoting

Yee v. Sausalito, (1983) 141 Cal.App.3d 917, 920, 190 Cal.Rptr. 595). The rationale is that if an entity has "made the deliberate calculated decision to proceed with a course of conduct, in spite of a known risk, just compensation will be owed." Arreola, 99 Cal.App.4th 722 at 742 (quoting Van Alstyne,**54 *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 489-490 (Van Alstyne).

The Government denies an "affirmative action" by the United States yet simultaneously argues the "affirmative action taken by the United States Army Corps of Engineers (the "Corps") was designed to, and intended to, provide a certain level of protection from hurricane effects." See Defendant's Reply Memorandum at p. 8. The Government's inconsistency in positions demonstrates its consistently flawed and contradictory analysis. Furthermore, the evidence is clear that it was this act of "providing a certain level of protection from hurricane effects" that caused Plaintiffs' damages.

Although this case is not a failure to act claim, similar factual issues under State Court claims bear consideration by this Court. Additionally, this Court should consider the Corps' statutorily required but failed hurricane protection, as an affirmative act that supports a claim for inverse condemnation purposes. See Collier v. City of Oak Grove, where the Court held "the failure of the city to repair its sewer, despite its knowledge of the defects . . . constituted an affirmative act, for purposes of inverse condemnation." S.W.3d —, 2007 WL 1185982 (Mo.App. W.D.). (The defendant was aware of the defects and deliberately chose not to address the cracks and deformations in the sewer, that choice constituted an affirmative act.). It is a general legal proposition that "that when a public entity's design, construction, or maintenance of a flood control project poses an unreasonable risk of harm to property historically subject to flooding and causes substantial damage to it, the property owners may recover damages for inverse condemnation" Bunch v. Coachella Valley Water Dist.15 Cal.4th 432, 935 P.2d 796 (Cal.,1997). "When a water project fails, as this one did, causing flood damage, the issue is whether

the system's design, construction, and maintenance were reasonable." Id. (citing Belair v. Riverside County Flood Control Dist. 47 Cal.3d 550, 253 Cal.Rptr. 693, 764 P.2d 1070 (1988) ). "An invasion is considered intentional rather than negligent when the [State] acts for the purpose of causing the invasion or *knows that it is substantially certain* to result from its conduct." Harris County Flood Control Dist. v. Adam, 56 S.W.3d 665, 670 (Tex.App.-Houston [14 Dist.](August 16, 2001)) (emphasis added) (citing City of Houston v. Renault, Inc., 431 S.W.2d 322, 325 (Tex.1968)).

As in this case, the Government in the cases cited above, made affirmative decisions and took a course of action based upon those decisions. Those governmental actions, caused damage directly to Plaintiffs that resulted in a taking under the Fifth Amendment. Although the Government is likely to cite Teegarden v. United States, for the proposition that the Government's failure to act cannot give rise to an inverse condemnation claim. 42 Fed. Cl. 252, 256 (Fed. Cl. 1998). Teegarden, however, is distinguishable. In Teegarden, the fire was an isolated incident, the Government did not have any prior knowledge that a specific fire protection plan in place would likely cause significant damage to the Plaintiffs, the Government did not refuse to provide fire prevention, nor did the Government provide substandard fire protection. Id. The property belonging to the Plaintiffs in Teegarden, had simply been given a lower priority than "lands containing summer home development and high-value timber lands." Id. at 256. It was a choice of prioritizing and limited resources, not a choice to simply ignore a fire protection plan the Government knew to be substandard. See Id.

The Government asserts that the Corps' failure to act cannot support a claim for inverse condemnation, this Court should give due consideration to the similarity in issues that have arisen in the State court system and should deny Defendant's Motion for Summary Judgment and grant Plaintiffs' Motion for Partial Summary Judgment.

**B. GOVERNMENTAL INTERFERENCE WAS SUBSTANTIAL**

The second prong of the Ridge Line inquiry requires consideration of the "nature and magnitude of the government action." Ridge Line, Inc., 346 F.3d at 1356. That is,

> [e]ven where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, *or at least preempt the owners* [sic] *right to enjoy his property for an extended period of time*, rather than merely inflict an injury that reduces its value.

Id. (emphasis added). The Government wants this court to believe that Plaintiffs cannot satisfy the second prong of the Ridge Line test. The evidence, however, shows otherwise.

The Government's action need only interfere with, or disturb, Plaintiffs' rights; the government does not need to "actually appropriate title and use the land." Berenholz v. United States, 1 Cl. Ct. 620, 626 (Cl. Ct. 1982). Importantly, "a taking may be supported where a government activity or project 'which is permanent in nature imposes on private property certain consequences which are themselves permanent, and . . . that their recurrence is inevitable even if only intermittent.'" Id. (citing Wilfong V. United States, 480 F.2d 1326, 1329 (Ct. Cl. 1973)). The Corps' defectively designed floodwalls, that resulted from a federally authorized project, imposed consequences that have preempted Plaintiffs' right to the enjoyment of their property "for an extended period of time," which will continue at least as long as the floodwalls remain in their defective condition. Ridge Line, Inc., 346 F.3d at 1356.

Although the Government admits that "[P]laintiffs have suffered 'permanent damage' to their property," they opine that [P]laintiffs may not recover compensation for "one or two floods." (quoting Eyherabide v. United States, 170. Ct. Cl. 598, 345 F.2d 565, 569 (1965)). See Defendant's Reply Memorandum at p. 12. Moreover, even though the Government's actions in Eyherbide were extreme; this Court found that all incidents on Plaintiffs' land were directly attributable to the Government and were the direct cause of Plaintiffs' inability to obtain occupants, and that the Government was

responsible for the foreseeable consequences. 170 Ct. Cl. 598, 345 F.2d 565, 570 (1965). Though the court in Eyherbide cited additional cases as "isolated invasions" which would deny claims under inverse condemnation, the cases cited specifically note that the Plaintiffs could either not prove causation, or that the flooding would "recur." See North Counties Hyrdo Electric Co. v. United States, 138 Ct. Cl. 380, 151 F.Supp. 322 (1957); See also B Amusement Company v. United States, 148 Ct. Cl. 337, 180 F.Supp. 386, 389 (1960).

The Government further argues incorrectly that because Plaintiffs cannot "establish that the flooding of their properties will inevitably recur, their claim must fail." See Defendant's Reply Memorandum at p. 14. Importantly, however, "a taking may be supported where a Government activity or project 'which is permanent in nature imposes on private property certain consequences which are themselves permanent, and . . . that their recurrence is inevitable even if only intermittent.'" Berenholz, 1 Cl. Ct. at 626 (Cl. Ct. 1982). (citing Wilfong v. United States, 480 F.2d 1326, 1329 (Ct. Cl. 1973)). The Corps' defectively designed floodwalls are permanent in nature, resulted from a federally authorized project, imposed consequences that have preempted Plaintiffs' right to the enjoyment of their property "for an extended period of time," and will continue so long as the floodwalls are in their defective condition. Id.

Most importantly, though, the predecessor to this court recognized "takings" within the meaning of the Fifth Amendment in certain flooding cases. The Plaintiffs, in those cases, had to show the flooding resulted from the government's activity. See Berenholz, 1 Cl. Ct. at 630 (citing Sanguinetti v. United states, 264 U.S. 146 (1924)). The intent to appropriate "may be implied where the overflow of water is the 'direct, natural or probable result of an authorized activity.'" Berenholz, 1 Cl. Ct. at 628 (quoting Columbia basin orchard, 132 F.supp. at 709).

Here, Plaintiffs have shown the flooding in this case resulted from the direct, natural, or

probable result of the Corps' activity. The Corps built defective floodwalls, had knowledge of the defective floodwall designs, and knowledge of the probable impending disaster and failed to remedy those known defects. Plaintiffs claim that the immediate results of the breach – flooding and destruction of over eighty percent of the City of New Orleans – created far greater implications for property values. The Corps' faulty designs, unless remedied, present a permanent problem. In effect, the breaches and subsequent flooding merely raised awareness of the inherent flaws of the floodwalls, and illustrated the inevitable danger present with living on these properties. The logical result is property devaluation and the preemption of the right to enjoyment. See IPET 2007 at p. I-56 (p.21), attached at Plaintiffs' Exhibit I.

As early as 1985, the Corps knew what the results would be in the event of a significant hurricane. By its own admission, it could foresee the likely destruction in the event of levee breaches. IPET Final Report at p. I-39 (p.74), attached as Plaintiffs' Exhibit A. The Corps' defective design and construction resulted in flooding and damage to Plaintiffs' property and to the property of all putative class members and amounts to a "taking" within the meaning of the Fifth Amendment.

The Government's actions and the foreseeable result of those actions combined to illuminate the serious safety hazard still burdening Plaintiffs' property. Plaintiffs' claims demonstrate the substantial interference by the Corps and therefore, Defendant's Motion for Summary Judgement should be denied and Plaintiffs' Motion for Partial Summary Judgment granted.

## II. CAUSATION

The Government asserts that the fact pattern in Cotton Land v. United States, 109 Ct. Cl. 816, 75 F.Supp. 232 (1948), demonstrates why Plaintiffs' causation argument does not fit into the classic takings realm. "Proof of causation", however, only requires that a plaintiff prove a "but for" relationship between the harm caused and the government act. See Tri-State Materials Corp., 550 F.2d

1, 5 (Ct. Cl. 1977). When the Government places property in jeopardy, the government can be liable for a "taking," even if another event causes the actual harm. See South Florida Growers Ass'n v. U.S. Dept. of Agriculture, 554 F. Supp. 633 (S.D. Fla. 1982).

As in Cotton Land, here, the damage to Plaintiffs' property was the direct, natural, and probable result of the defective floodwalls designed by the Corps. In Cotton Land Co., this Court found a Fifth Amendment taking where the flooding "did not occur directly from erection of the dam, but rather through a chain of events occurring in a natural order, but originally set in motion by the erection of the dam." Moden, 404 F.3d at 1343 (discussing Cotton Land Co.). This Court noted that "the flooding of the land was foreseeable" and was the "'actual and natural consequence of the Government's act.'" Cotton Land Co., 75 F. Supp. at 235. In addition, Tri-State Materials Corp. v. United States illustrates that if the effects result from the Government's action, even where the flood waters were *not* controlled by the Government, a Fifth Amendment taking may be found. See Tri-State Materials Corp. v. United States, 550 F.2d 1, 4-5 (Ct. Cl. 1977).

The Government asserts that no claim lies since it had no control over the "winds and storm surges propagated by Hurricane Katrina. See Defendant's reply Memorandum at p.9. However, that is not the question before this court. Further, the argument is misleading in light of the fact that it was not winds and storm surges that caused Plaintiffs' damages. As the IPET report illustrates, the flooding that caused the damages was due to the failure of the floodwalls, not the wind and storm surges as the Government asserts. See IPET 2007 at I-52 (p.82), attached as Plaintiffs' Exhibit I; See also IPET Final Report at p. I-7 (p. 42), attached as Plaintiffs' Exhibit A; See also The Failure of New Orleans Levee System During Hurricane Katrina and the Pathway Forwards, Van Heerden, Ph.D , and Kemp, Paul G., LSU Hurricane Center, Louisiana State University (hereinafter Team Louisiana) at p. 7 (p.170), attached as Plaintiffs' Exhibit J.

Additionally, Plaintiffs can show the property damage, and diminution in property values resulted from the succession of events which initiated from the systemic "organizational and institutional failures that are primarily focused in the Corps of Engineers." See Reflections of Dr. Robert G. Bea at p. 5 (p. 149), attached as Plaintiffs' Exhibit F (hereinafter "Reflections"). The defectively designed floodwalls – a design for which the Corps is responsible – caused the massive property damage here. That is, if the Corps had designed the floodwalls consistent with the Corps' statutory obligation, the flooding in New Orleans would have been "one third of that experienced in Katrina," even accounting for overtopping and rainfall. See IPET 2007 at p. I-51 (p.81), attached as Plaintiffs' Exhibit I; See also IPET Final Report at p. I-7 (p. 42), attached as Plaintiffs' Exhibit A. The Corps admits that "[a]pproximately two-thirds of that flooding [could] be attributed to water flowing through breaches" and that "[t]he three foundation failures associated with flooding in Orleans East Bank were responsible for seventy percent of the flooding in that area." See Id. Even assuming *arguendo,* that Hurricane Katrina acted as a precipitating concurrent cause, the overwhelming majority of flooding in New Orleans resulted from human irresponsibility - the Corps failure to properly undertake its duties. Even if the Corps did not *intend* this result, the actual physical invasion effectively destroyed and impaired the usefulness of Plaintiffs' property, and, therefore, "is a taking, within the meaning of the Constitution." Pumpelly v. Green Bay Company, 80 U.S. 166, 181 (1871) (a dam was built causing eventual flooding onto Plaintiffs' land, the Court held that where real estate is actually invaded by "superinduced additions of water. . . so as to effectively destroy or impair its usefulness, it is a taking within the meaning of the constitution."). The Corps' actions caused Plaintiffs' harm. But for the defective floodwalls, Plaintiffs would not have felt Hurricane Katrina's injurious effects. See Affidavits of the Plaintiffs attached hereto as Exhibit H *in globo.* The Government's IPET reports confirm that approximately 70 percent of the damage to New Orleans occurred as a result of the breach of levee floodwalls and that the direct property losses for New Orleans alone reach nearly $25 billion,

an amount that seems far below the actual damage sustained by the putative class in this case. See IPET 2007 at I-52 (p.82) attached as Plaintiffs' Exhibit I; See also IPET Final Report at p. I-7 (p. 42), attached as Plaintiffs' Exhibit A.

A review of the map of New Orleans clearly shows that overtopping only caused damage east of the Inner Harbor Navigation Canal ("IHNC" or commonly referred to as the "Industrial Canal"). Perhaps members of the IHNC will be isolated into a subclass at the time of class certification. The burden may be somewhat difficult for those members.

The Government maintains that Hurricane Katrina "was an extraordinary storm event causing a flood." Defendant's Reply Memorandum at p. 16. This rhetoric is simply a "red herring" designed to distract this Court from the pertinent analysis before it. The issue is *not* whether *Hurricane Katrina* was foreseeable. Instead, the issues for this Court to consider are: (1) whether the Corps could foresee that the floodwalls would breach under conditions they were designed to withstand; and (2) whether the Corps could foresee that, in the event of such a breach, Plaintiffs' property would be inundated and devalued by the absence of secure protection.

Moreover, the evidence overwhelmingly illustrates the Corps knew, i.e. *could and should foresee*, that in the event of a major hurricane, the floodwalls would fail, resulting in catastrophic human suffering, loss of life, and property loss. This was the direct, natural, and probable result of the defective design. The 1985 test indicated that floodwalls would fail at eight feet of water, below design standards. See ILIT Report at p. 12-14-12-15 (p.126-127), attached as Plaintiffs' Exhibit C. Despite that, the 17th Street Canal failed at seven (7) feet of water and the London Avenue Canal contained water levels up to eight (8) feet. See IPET Final Report at p. I-39 (p.74), attached as Plaintiffs' Exhibit A. The Corps admitted that "[t]he probability of a failure of floodwalls and some sections of levees were high, *and there was a great potential for serious consequences because of the large population*

*and extensive property being protected by the structures*." See Id. (emphasis added). Five years later the Corps had yet another opportunity to evaluate its designs when confronted, by the Vicksburg office, with evidence that the floodwalls could fail. See Bob Marshall, "Corps never pursued design doubts," Times-Picayune, at A01, December 30, 2005, attached as Plaintiffs' Exhibit E. The Corps simply refused to change these designs. Id. This result was neither unpredictable nor unforeseeable. An extraordinary storm was not the cause of this result; instead, Plaintiffs' damage resulted from a design failure the Corps discovered in 1985, and was again brought to its attention in 1990 – a failure the Corps could foresee having grave consequences. These results should have been, and indeed *were*, foreseeable to the Corps, and any other objective observer.

The Government continues its attempt to blame the flooding that occurred after Hurricane Katrina on everything but the failed floodwalls. See Defendant's Reply Memorandum at p. 16-17. Although the winds, the rainfall, and the storm surge that followed and accompanied Hurricane Katrina may have contributed to the volume of water, the indisputable fact remains that but for the defective floodwalls, 70 percent of the damage could have been avoided. See IPET 2007 at I-52 (p.81) attached as Plaintiff's Exhibit I; See also IPET Final Report at p. I-7 (p. 42), attached as Plaintiffs' Exhibit A. As mentioned above, most of the 30 percent was localized part of the IHNC.

## A. PLAINTIFFS HAVE MET THE BURDEN OF PROOF

The Government argues Plaintiffs' have failed to meet their burden of proof. Plaintiffs disagree. The Government asserts that the following are factual disputes: 1) the word "weak" was used as a descriptor in Plaintiffs' moving papers, 2) a factual omission occurred because Plaintiffs' moving papers did not state that rainfall "was to become at least 20 percent of the total volume of water that flooded the New Orleans Metropolitan area", 3) Plaintiffs' used quotes taken out of context "in an attempt to create an issue over the construction of the levees at issue", and 4) the Government is

puzzled by Plaintiffs' assertion that the defense is attempting to avoid responsibility by "foisting it onto third-party contractors who worked for the Corps floodwall project." See Government's Reply Memorandum pp. 16-18. These red herring arguments, however, do nothing to support the Government's claim that Plaintiffs have not met their burden of proof.

Whether or not the Government disagrees with Plaintiffs' language, it in no way negates the fact that it was the Corps who was charged with the design and construction of the floodwalls. It does not negate the fact that the Corps foresaw the consequences of its actions, nor does it change the fact that the damage caused by the Government's acts, have preempted the Plaintiffs' right to enjoy their property for an extended period of time.

The Government argues that the IPET report concludes that rainfall was to become twenty percent of the total volume of water that flooded New Orleans. However, it does not alter the fact that the Corps admits that "[a]pproximately two-thirds of that flooding [could] be attributed to water flowing through breaches" and that "[t]he three foundation failures associated with flooding in Orleans East Bank were responsible for seventy percent of the flooding in that area." See IPET 2007 at I-51 (p.81), attached as Plaintiffs' Exhibit I; See also IPET Final Report at p. I-7 (p. 42), attached as Plaintiffs' Exhibit A. Thus, if the Corps had designed the floodwalls consistent with the Corps' statutory obligation, the flooding in New Orleans would have been "one third of that experienced in Katrina," even accounting for overtopping and rainfall. See IPET 2007 at p. I-51 (p.81), attached as Plaintiffs' Exhibit I; See also IPET Final Report at p. I-7 (p. 42), attached as Plaintiffs' Exhibit A. The Government's argument also contradicts its assertion that there are no genuine issues of material fact for this court to consider and fails to acknowledge the Corps own conclusions that 70 percent of the damage was due to the breach in the floodwalls. See IPET 2007 at I-52 (p.82) attached as Plaintiffs' Exhibit I; See also IPET Final Report at p. I-7 (p. 42), attached as Plaintiffs' Exhibit A.

The Government argues that the Corps did not construct the "earthen" levees and there is no dispute over the construction of the levees. See Government's Reply Memorandum at pp. 18-19. This argument is absurd. It appears that the Government is attempting to make a distinction between the earthen levees and the floodwalls to avoid culpability for the failure in the Hurricane Protection System. In its attempt, the Government has provided no information to this court that would negate the evidence provided by Plaintiffs, and the Corp, that "[t]he Corps of Engineers was assigned the responsibility for the design and construction" of the floodwalls. See IPET 2007 at p. I-27 (p.57) attached as Plaintiffs' Exhibit I; See also IPET Final Report at p. I-16 (p. 51).

Moreover, the Government's further insinuation that the Government is not attempting to avoid blame or to place the blame on third parties is simply false, especially given the fact that the Government continues to argue that it was someone else who built the "earthen" levees. See Government's Motion for Summary Judgment at p. 4, 9,10. It is apparent that Plaintiffs have met their burden of proof by demonstrating that the Corps acted in designing faulty floodwalls, it had knowledge that the floodwalls were faulty, and was aware of and foresaw the disastrous consequences of a floodwall failure. See Team Louisiana at p. 3 (p.166), attached as Plaintiffs' Exhibit J. Moreover, it was the breach in those floodwalls that caused over 70 percent of the flood damage to Plaintiffs and the putative class.

## B. PLAINTIFFS' CROSS MOTION FOR SUMMARY JUDGMENT

The Government argues the submissions filed by Plaintiffs fail to raise a factual dispute because the submissions consist of opinions unsupported by any factual evidence or they contain assertions by the property owners that have not been shown to be within their competence. See Defendant's Reply Memorandum, pp. 19-20. Plaintiffs' Exhibit I, IPET 2007, contains the findings of the Corps, as well as statements of representatives of the Corps. Additionally, most of the citations of

factual authority contained in this memorandum are gleaned from the IPET report. Those are the Corps' words. The Corps' attorney's words may conflict with these opinions, however, that does not negate nor reduce the significance of the Corps' opinions. The Corps' opinions are incongruous with the Government's legal position, and wholly consistent with Plaintiffs'. Consequently, this court must deny the Government's Motion for Summary Judgement and grant Plaintiffs' Motion for Partial Summary Judgement.

## C. CONCLUSION

The Government has attempted to lay the entire blame for Plaintiffs' damages on Hurricane Katrina. The Government, however, is unable to hide the evidence of faulty design which caused permanent damage to every piece of property in the City of New Orleans. These were man-made failures that could have been prevented. Furthermore, it is clear from the Corps own reports, that but for the defectively designed floodwalls, the City of New Orleans would have sustained only a fraction of the damage sustained. At least 80 percent of the flood damage was a direct result of the failure of the floodwalls, designed and constructed by the Corps, by instruction from Congress.

The Government has raised no new issues of material fact in its reply memorandum and simply reargues the points from its Motion for Summary Judgment. Plaintiffs, therefore, respectfully submit that the Government's actions resulted in a "taking" within the meaning of the Fifth Amendment, which entitles Plaintiffs to compensation. Plaintiffs respectfully request that this Court deny Defendant's Motion for Summary Judgment and grant their Motion for Partial Summary Judgment declaring that a compensable 5th Amendment "taking" occurred. All other issues should be reserved for future consideration and determination.

**Respectfully submitted,**

**LOWE, STEIN, HOFFMAN,**
**ALLWEISS & HAUVER, L.L.P.**

**BY:** ______________________________

**MITCHELL J. HOFFMAN (6896)**
**MICHAEL R. ALLWEISS (2425)**
**JEFFREY M. HOFFMAN (29253)**
**701 Poydras Street, Suite 3600**
**New Orleans, Louisiana 70139-7735**
**Telephone: (504) 581-2450**
**Attorneys For Plaintiffs**

**CERTIFICATE OF SERVICE**

I certify that I have on this 22 day of May, 2007, served a copy of the foregoing pleading on counsel for all parties to this proceeding by facsimile transmission, hand delivery, or by United States mail, properly addressed, and first class postage prepaid.

______________________________
**MITCHELL J. HOFFMAN**