and the distribution of that water through the interior drainage system, is all included in the computation of extent and depth of flooding with time. The most significant uncertainties in this process are related to timing. This includes the time history of the breach formation, the time history of the water elevations that supplied the water that overtopped structures or flowed through the breaches, and the time history of pump station activities and the timing of rainfall in each sub-basin.

**The Consequences:** Consequences of flooding were characterized for both property and loss of life. The estimates of property damages are based on the type of property, the estimated value of the property, and estimates of the degree of damage/loss as a function of depth of flooding. The fundamental distribution and character of property values were derived from available government data bases that provided information to census block resolution. These data may not be current for all properties. Similarly, the value of properties was taken from tax and other associated data bases that have a time stamp and may not be current for all properties. The depth-damage relationships were derived from previous work accomplished by the Corps of Engineers and others and while representative of pre-Katrina conditions, may not accurately represent all individual properties. Depth-damage relationships for possible future scenarios were developed by making educated assumptions concerning the types of re-development that could occur and the expected values of those properties.

Loss of life information was developed using best available information by Parish and, if possible, by sub-basin. Since data of the location of individual fatalities was not available, it was not possible to provide distributed fatality information beyond political boundaries. While representative of the losses in each area, there are still questions concerning the actual total number of fatalities. Loss of life – flood depth relationships developed for use in the risk assessment are based on the LifeSim model which makes specific assumptions concerning evacuation, the ability of individuals by age to seek safety, and how these factors vary with different depths of flooding. Uncertainty was computed for both the property damage – depth of flooding relationships and the loss of life - depth of flooding relationships. There is significantly more uncertainty in the loss of life relationships than in the property loss relationships.

Across all of the consequence analyses, there was a significant effort spent on developing predictive relationships, but the ability to predict the relationship between environmental consequences and flooding is not fully developed and limits the ability to estimate long-term losses or impacts. Similarly, social and cultural scientists have no tools for predicting the impact of flooding different from what actually occurred. The discipline can document what occurred but cannot predict for different events. This is a significant source of uncertainty for both environmental and social sciences components of the IPET analyses.

**The Risk:** Risk assessment inherently characterizes the level of uncertainty in each step of the process. The hazard definition component involves defining the probability of experiencing surge and wave conditions for a range of potential hurricanes at various locations around the region. Primary sources of uncertainty in this step include the randomness of the hurricane parameters that model wind field time histories for hypothetical hurricanes, the ability of the surge and wave computer models to accurately translate wind fields into surge and wave


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

conditions, and the ability to assign appropriate probabilities to the specific events and the water conditions they generate.

The reliability component of risk assessment is based on a definition of the probable performance of individual structures or reaches (uniform sections) of a particular structure type for different water levels and conditions. These relationships, known as fragility curves, include a characterization of the uncertainty in that performance relationship. If all failure modes, or other aspects of performance, are not adequately represented, the resulting estimates of performance of the structures will introduce more uncertainty into the estimates of extent and depth of flooding that result from this analysis.

Uncertainty in the ability of the risk model to accurately predict the frequencies of flooding must also be estimated. The model must predict elevations and frequencies of flooding for hypothetical hurricanes for which there are no data to measure the accuracy of the predictions. Since the only historical experience available with sufficient data to test the risk model is Katrina, uncertainty in the risk model must be estimated conservatively.

The estimates of extent and depth of flooding are coupled with the last major component, the consequence analysis. Using the property and life relationships described earlier, the probability of experiencing flooding in a given area is combined with the likely economic or life losses for that location to generate information of the probable losses that would be experienced. This step is obviously dependent on the precision of the flooding estimates and the inherent variability in the loss relationships.

During the process of developing the risk assessment, the major information bases and methods being used have been examined for their sensitivity to quality of input data, the inherent uncertainty in model outputs, and the cumulative uncertainty in the final risk information. This uncertainty information will be published along with the risk products to document the relevance of the products and inform users.

## Hurricane Katrina and Its Impact

In 2005 the world watched Hurricanes Katrina, Rita, and Wilma devastate portions of the Gulf Coast of Louisiana and Mississippi. The Corps of Engineers, in conjunction with other federal, state, and local partners, mounted an unprecedented, multi-faceted effort to assist in the recovery and rebuilding of the areas affected by these massive storms. The devastation from Hurricane Katrina in New Orleans and vicinity was particularly unprecedented. Because of the extent of the damage to the HPS itself and the consequences of the subsequent flooding, it was imperative to understand what happened and why. Only through this knowledge could the levees and floodwalls be repaired and rebuilt to provide more effective protection in the future. This report provides a detailed accounting of the IPET work to determine why the hurricane protection measures performed as they did and how to provide more effective protection for the future. The area of principal study is shown in Figure 1 and represents the bulk of New Orleans and Southeast Louisiana. This overview includes a brief historical perspective of hurricane protection in New Orleans, a description of the IPET organization and its activities, and an


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

overview of what happened during Katrina in the context of the five IPET mission questions and the analyses accomplished to answer those questions.




Figure 1. Principal area of analysis.

## Historical Perspective

**Geologic History and Setting:** The following is a brief overview of the geologic setting in New Orleans and its influence on the HPS. A more detailed summary of the geologic history of the New Orleans region and the implications of the geologic conditions on the HPS is provided

in Appendix I-5. There is also significant discussion of geologic issues on the HPS in Volume III and extensive information on geology presented in Volume V.

The geologic history of the New Orleans area significantly influences the engineering properties of the foundation soils beneath the levees. Geologic and engineering data gathered from the different levee failures identify a spatially complex geomorphic landscape, caused by Holocene sea level rise, development of different Mississippi River delta lobes, and the distributary channels associated with delta development. Overlying the Pleistocene surface beneath the New Orleans area are predominantly fine-grained, shallow water depositional environments and related sediments associated with bay sound (or estuarine), nearshore-gulf, sandy beach, lacustrine, interdistributary, and paludal (marsh and swamp) environments. These environments define the New Orleans area history during the Holocene, and comprise the levee foundation for the different failure areas. A relict barrier beach ridge is present in the subsurface along the southern shore of Lake Pontchartrain. This relict beach blocked the filling of the lake with fluvial-deltaic sediments, impacted the supply and texture of sediment being deposited by advancing distributary channels, and influenced the engineering properties of these soils. Marsh and swamp soils beneath the failure area at the 17th Street Canal are much thicker than those beneath the London Avenue Canal because of the influence of the beach complex, and are thickest in the Inner Harbor Navigation Canal area.

Additionally, man's activities in New Orleans during historic time contributed to the spatial complexity of this area and affected the engineering properties of the foundation soils. Man's activities included construction of drainage and navigation canals, pumping groundwater drainage, hydraulic filling of the Lake Pontchartrain lake front, and construction of levees to prevent the river from flooding low-lying areas. Man's activities, combined with the geologic setting and subsidence in this region are responsible for the unique landscape that created the New Orleans area. Historic settlement and subsidence in the New Orleans area has been most severe on the back barrier side of the relic Pine Island Beach (along the south shore of Lake Pontchartrain).

Subsidence did not contribute materially to the foundation failures of the I-wall/levee structures on the outfall canals. However, subsidence has impacted the datum of many of the benchmarks in the city upon which engineering decisions and design were based and affected levee and floodwall height and the level of flood protection. This did influence the amount of overtopping that occurred, which contributed to erosion behind floodwalls and on the back sides of levees that eventually led to their breaching.

**Geographic History and Setting:** Located in the low-lying Mississippi River delta in Louisiana, large portions of New Orleans lie near or below sea level, which has posed complex flood management problems since the city's founding in 1718. Historically, the greatest natural threat posed to residents and property in the New Orleans area has been from hurricane-induced storm surges, waves, and rainfall. Until the early twentieth century, construction was largely limited to the slightly higher ground along old natural river levees and bayous, since much of the rest of the land was low, swampy, and subject to frequent flooding. In 1899, the Sewerage and Water Board of New Orleans was created; it remains responsible for draining the city. The topography of New Orleans makes drainage a major challenge, with the same natural and


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

artificial levees designed to keep water out having the unintended effect of confining rainwater and sewage in the city. This led to perhaps one of the most sophisticated and comprehensive drainage systems in the world.

The drainage system created by the Sewerage and Water Board allowed the city to expand outward from the higher ground close to the river into the lower elevations towards and near Lake Pontchartrain. The development of these areas in the early 1900s caused the water table to drop dramatically, which in turn enabled development of additional new neighborhoods such as Lakeview. In addition to the lakeside portions of the city, development in the other areas surrounding the metropolitan area led to a seven-fold total increase in urban acreage during the twentieth century.

The Sewerage and Water Board today drains over 61,000 acres in New Orleans and neighboring Jefferson Parish of almost 13 billion cu ft (cubic feet) of water per year. The drainage system includes 90 miles of covered canals, 82 miles of open canals, and a multitude of pumping stations. However, pumping of groundwater from underneath the city has accelerated the subsidence that the area was already prone to because of its natural alluvial floodplain geology. The subsidence increases the flood risk, should the levees be breached or precipitation exceed pumping capacity, because the New Orleans bowl is becoming deeper as time and subsidence progress.

The geographic location of New Orleans makes the city particularly vulnerable to hurricanes. Fortunately, New Orleans has been impacted by only a few large storms. New Orleans was hit by major storms in the 1909 and 1915 Atlantic hurricane seasons. Much of the city flooded in September 1947 due to the Fort Lauderdale Hurricane. The next major threat came in the 1960s with Hurricanes Betsy and Camille.

In 1965 the city was severely damaged by Hurricane Betsy. The catastrophic flooding of the city's Lower 9th Ward, 75 fatalities and substantial loss of property, made Betsy the nation's first billion dollar storm. Although Camille came close to New Orleans, it had much more impact in Mississippi and caused relatively minor damage in New Orleans proper. There has not been severe flooding in New Orleans from a hurricane since Betsy. The city did experience severe flooding May 8, 1995, when heavy rains suddenly dumped over 12 in. (inches) of water on New Orleans in a short time period, overwhelming the pumps. Betsy was the stimulus for the Flood Control Act of 1965 which was the initial authorization for the HPS in place today.

**Hurricane Protection System History:** Over time, three hurricane protection projects have been designed and partially constructed in New Orleans and the Southeast Louisiana region: Lake Pontchartrain and Vicinity Project, the West Bank and Vicinity Project, and the New Orleans to Venice Project. The Lake Pontchartrain and Vicinity Hurricane Project is discussed in more detail below because of its central role in Hurricane Katrina. All of these projects are discussed in detail in Volume III of this report.

The Lake Pontchartrain and Vicinity Hurricane Project was intended to protect areas around the lake (in Orleans, Jefferson, St. Bernard, and St. Charles Parishes) from flooding caused by a storm surge or rainfall associated with a hurricane that would be roughly the same as what is

today classified by the Saffir-Simpson Scale as a fast-moving Category 3 hurricane. The basis for this was the SPH developed for the Corps by the Weather Bureau (now the National Weather Service). The SPH is a steady-state storm based on an analysis of meteorological parameters of past large hurricanes. The assumption of steady-state precludes the consideration of some of the dynamic behaviors we now know characterize hurricanes such as decreasing in intensity and increasing in diameter as they approach shore. It also precludes consideration of the dramatic impact of large storms in generating surge and waves long before they reach landfall. For the initial definition of the SPH used in design of the New Orleans hurricane protection structures, hurricanes were considered that occurred during the period 1900 to 1956. Central Pressure Index (CPI) was the primary intensity criterion and the 1-percent recurrence CPI (100-year) was chosen for the initial SPH definition. When the additional consideration of the likelihood of a storm of that size hitting the area near New Orleans is added, it was estimated to be equivalent a 200- to 300-year recurrence event. The SPH was intended to represent the most severe meteorological conditions considered "reasonably characteristic" for the region. A maximum wind speed was also associated with the SPH; for Lake Pontchartrain and Vicinity, it was assumed to be 100 miles per hour.

Following Hurricane Betsy in 1965, the wind speed criterion was revised but all other characteristics remained the same. The 1965 version of the SPH was used for the design of both the Lake Pontchartrain and Vicinity and New Orleans to Venice Projects. In 1979, NOAA issued a report that significantly revised the SPH criteria, and this became the basis for the design of the West Bank and Vicinity Project. All activities with respect to the Lake Pontchartrain and Vicinity continued to use the original SPH criteria through the time of Hurricane Katrina.

Although federally authorized, the Lake Pontchartrain and Vicinity Project was to be a joint federal, state, and local effort, with the federal government paying 70 percent of the costs and the state and local interests paying 30 percent. The local interests included the State of Louisiana Department of Transportation and Development, the Sewerage and Water Board, and the local levee boards. The Corps of Engineers was assigned responsibility for project design and construction, and the local interests were responsible for operation and maintenance of the levees and flood control structures. This was one of the first major cost-sharing projects for the Corps of Engineers.

During the first 17 years of the project, it was focused on what has become known as the "barrier plan." The barrier plan included a series of levees along the lake front, concrete floodwalls along the IHNC, and a variety of control structures, including barriers and flood control gates located at The Rigolets and Chef Menteur Pass areas that connect Lake Pontchartrain to Lake Borgne. These structures were intended to prevent storm surges from entering Lake Pontchartrain and overflowing the levees along the lake front. A number of project delays and cost increases occurred as a result of technical issues, environmental concerns, legal challenges, and local opposition to various aspects of the project.

A December 1977 court decision enjoined the Corps from constructing the barrier complexes and certain other parts of the project until a revised environmental impact statement was prepared and accepted. The Corps conducted a "Re-Evaluation Study," published in 1984, in response to the court order and examined the feasibility of providing protection mostly by means


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

of raising and strengthening levees and floodwalls. The exact treatment of the outfall canals was not resolved. Based on this study, the Corps recommended shifting to the "high level plan" originally considered in the early 1960s. Follow-on efforts examined the use of butterfly surge gates and pump stations at the lake ends of the canals and the use of parallel protection levees and floodwalls along the length of the canals as the sole protection measure. The Energy and Water Development Act of 1992 mandated the use of parallel protection and set the stage for the construction of the levee and I-wall structures that were in place prior to Katrina. Note that the original authorization for protection occurred in 1965 time frame and the final resolution of how to provide protection for a large portion of the metropolitan area of New Orleans was not determined until 1992, over a quarter of a century later.

The construction of the HPS was accomplished in many separate steps over a long period of time. The first major structures constructed were the levee and floodwall structures within the IHNC (late 1960s and early 1970s). The levees and structures along the east side of St. Bernard Parish from Bayou Bienvenue to Bayou Dupre were built in the same time frame with periodic enhancements. The initial levee lifts were placed by hydraulic fill from 1967 to 1970, and subsequent lifts were added from 1972 to 1987. Sheet-pile closures at bayous and pipelines were placed in 1992. Construction of the floodwalls along the outfall canals occurred from 1993 to 1999. There were 10 flood-proof bridges and 4 fronting protections (associated with pump plants along the canals) also included in the effort. At the time of Katrina, nine of the bridges had been constructed. The fronting protection for the London Avenue (number 4) and 17th Street (number 6) pump stations were completed prior to Katrina. The protection for Pump Station No. 7 on Orleans Canal and Pump Station No. 3 on London Avenue Canal remained to be done. The lack of the fronting protection for Pump Station No. 7 left a section of legacy wall significantly lower than the adjacent floodwalls, providing a route for water to enter the city without overtopping adjacent floodwalls. This omission left a weak link which compromised the local level of flood protection. Ironically, work on this area was terminated due to lack of funding.

Some components of the system were not scheduled to be completed until 2015, primarily the West Bank and Vicinity Project. At no time has the entire New Orleans and Vicinity area had a reasonably uniform level of protection around its perimeter. At no time has any individual parish or basin had the full authorized protection planned for in 1965.

As of May 2005, the Lake Pontchartrain and Vicinity Project included about 125 miles of levees, major floodwalls, flood-proofed bridges, and a mitigation dike on the lake's west shore. Progress on the project varied by area: 90 percent complete in Orleans Parish, 70 percent complete in Jefferson Parish, 90 percent complete in the Chalmette area, and 60 percent complete in St. Charles Parish. In 2002, a pre-feasibility study on whether to strengthen hurricane protection along the Louisiana coast was completed. A full feasibility study was estimated to take 5 years to complete. A major Emergency Response Exercise in July 2004 used the hypothetical Hurricane Pam to examine the ramifications of a storm much like Katrina. The results projected losses in excess of what happened in Katrina, including massive overtopping and breaching of levees.

The history of this HPS has been one of continuous incompleteness. This situation was a product of the overall water resources development process, the magnitude of the investments


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

needed to accomplish such projects, the piecemeal allocation of resources, the time and complex processes required to resolve differences in local and federal priorities, and the traditional step-by-step construction process for structures such as levees in subsidence-prone areas such as New Orleans. The affordability of protection appeared to be a major issue between local and federal authorities.

## The System (for more information see Volumes II and III)

The HPS, outlined on the map in Figure 2, includes approximately 350 miles of protective structures, 56 miles of which are floodwalls. The majority of the floodwalls are I-walls with small sections of T-walls and a very small number of L-walls, basically similar to T-walls with a horizontal component on only one side at the base. Detailed maps showing the location of specific types of structures and their relationships to other features such as pump stations and closures are provided in Volume III and Volume VIII of this report. Figure 3 provides a schematic of the basic geometry of these structures. Figure 4 provides a general map of the New Orleans metropolitan area and the features of the HPS that were factors in the system performance during Katrina. Maps showing the detailed distribution of types of structures are provided in Appendix I-6.




Figure 2. Outline of the New Orleans and Southeast Louisiana Hurricane Protection System.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 3. General schematic of major hurricane protection structures used in New Orleans and Vicinity.

The design criteria for these structures was based on the maximum water elevations expected from the SPH as previously described for each project. This amounted to, based on the 1900 to 1956 hurricane record, a 100-year level of severity storm that, considering the geometry of the Gulf, has a likelihood of 1:200 to 1:300 of hitting the area of New Orleans each year, hence a 200- to 300-year protection. The hurricane hazard of today, described in more detail in Volume VIII, is quite different and presents a much more severe challenge to the HPS. The dynamic aspects of hurricane behavior can not readily be factored into the SPH for New Orleans. In fact, the SPH concept is no longer considered state-of-the-art for defining the hazard and should not be used in future projects.

Another aspect of the HPS is that the designs constructed, with the exception of the few sections constructed with T-walls, did not include protection against overtopping. The structures were, in effect, designed to perform at water elevations up to overtopping, but not beyond. This is not atypical in flood protection measures, where cost justification is a primary decision factor. To gain protection from overtopping would have required such measures as armoring the back sides of levees and floodwalls or using more expensive T-walls in place of I-walls to prevent erosion. Some sections of levees were constructed with higher quality (from an erosion perspective) materials than others, basically clays hauled in versus lower quality soils dredged (the method termed hydraulic fill) from adjacent areas (as along the MRGO).

Along the outfall canals, I-walls were added to existing levees to gain higher protective elevations. Structures along the 17th Street and London Avenue Canals were designed with less conservative assumptions than those for the Orleans Canal. Soil strengths assumed for the clay layer underlying the 17th Street Canal were higher than warranted given the measurements


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

available. For all of the canals, the design analysis used acceptable but dated approaches for stability analysis and a factor of safety of 1.3. Failure modes examined were traditional for the time but did not explore other possibilities. The design for the Orleans Canal structures was more conservative than those for the 17th Street and London Avenue Canals. The levee section was wider and the freeboard of the exposed floodwall less. Orleans Canal had fewer real estate access restrictions, being adjacent to open public land. In the end, all of these differences played a large role in the ultimate performance of the structures during Katrina.




Figure 4. Map showing detailed geometry and features of the New Orleans metropolitan area.

It is important to note the complexity of the HPS. Besides the structures considered part of the hurricane protection projects cited above, other features such as the main-line levees of the Mississippi River, levees and walls that form the outer periphery of the HPS, pump stations, bridges, navigation structures, and drainage and control structures are all factors in the ultimate ability to protect New Orleans from flooding. Some of these structures are not part of the HPS and fall under different jurisdictions making their management during a flood more complicated.

The elevations of the current hurricane protection structures are significantly below the originally authorized heights in part from errors in initial constructed elevations, in part from rapid subsidence, and in part from sections where the authorized hurricane protection structures


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

are not yet in place. Figures 5 and 6 generally depict the degree to which structure elevations just prior to Katrina deviated from the authorized levels. Note that sections designated in red, being greater than 2 ft below the authorized level, can be from any one or some combination of the factors identified above. Substantial subsidence has occurred along the IHNC. The floodwalls along the outfall canals were constructed to elevations nearly 2 ft below the original intent because of errors in relating the local geodetic datum to the water level datum. Significant lengths of structures on the West Bank are incomplete as are small sections in metropolitan New Orleans such as the fronting protection at Pump Station No. 7 at the head of the Orleans Canal.

The repair process substantially changed the elevations of a number of sections of the HPS. Appendix I-7 provides maps comparing post-repair elevations of the HPS structures to authorized elevations. These maps are derived from the work of a number of contractors who conducted detailed examinations of the condition of the levee and floodwalls to determine the integrity of the system post-Katrina and identify any additional work needed to make the system ready for future hurricane seasons. The review processes were based on the criteria developed by the IPET analyses of sites that experienced breaching and those that did not.




Figure 5. Map comparing pre-Katrina HPS structure elevations to authorized elevations, New Orleans metropolitan area and West Bank. Data derived from IPET risk assessment data base.




Figure 6. Map showing comparison of Pre-Katrina HPS structure elevations with authorized elevations for Plaquemines Parish. Data derived from IPET risk assessment data base.

## The Storm (for more information see Volume IV)

The path followed by Hurricane Katrina, shown in Figure 7, caused severe surge and wave conditions on the east side of the HPS, from Lake Pontchartrain to southern Plaquemines Parish. Katrina struck early on the morning of 29 August 2005, after building up water levels to the east of New Orleans for several days. Katrina was a Category 5 storm with up to 139-knot (160-mph) sustained surface winds until it was approximately 170 miles from landfall. When it reached landfall at Buras, LA, around 0610 hr (6:10 a.m. Central Daylight Time, CDT) or 1110 Coordinated Universal Time, UTC), surface wind speeds were at about 100 knots (115 mph), but the long path through the Gulf, and its intensity and size, had built up record levels of surge and waves, larger than any previous storm to strike the area, or the North American continent.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 7. Hurricane Katrina path and intensity history. (intensity defined based on flight-level wind speeds, as opposed to surface winds).

Katrina (a Category 3 storm at landfall) generated substantially higher surges than Camille (a Category 5 storm at landfall) in the area where they both made a direct hit. Whereas the Saffir-Simpson scale is a good predictor of wind levels and damage from hurricanes, it is not a particularly good predictor of the surge and wave generation potential for these storms. Surge and wave levels are particularly sensitive to the path the storm takes, the geometry of the coastline and the continental shelf, and the offshore character of the storm. Hurricane Katrina had much greater wave and storm surge generation potential than the SPH storms used to design the HPS.

Katrina swept through the New Orleans area rapidly, making a second landfall at Pearl River, MS, around 0945 hr (9:45 a.m. CDT (1445 UTC)) with surface wind speeds around 100 knots (115 mph). With it came record rainfall as shown in Figure 8. Over a 24-hr period, sections of New Orleans near the intersection of Lake Pontchartrain and the IHNC received over 14 in. of rainfall. The previous record was from Hurricane Betsy which dumped up to 7 in. in the same time frame. This rainfall was to become at least 20 percent of the total volume of water that

flooded the New Orleans metropolitan area. The east and south facing levees of New Orleans East, St. Bernard and Plaquemines Parishes absorbed the brunt of the storm, experiencing surge and waves significantly beyond their design levels. Overtopping was common and, depending on location, persisted for hours.




Figure 8. Hurricane Katrina rainfall totals.




Figure 9. Maximum computed storm surge levels using the ADCIRC model, Mississippi to Louisiana region, water levels in feet NAVD88 (2004.65).

Literally all of the gauging instruments to measure water conditions were destroyed by Katrina. Other than high-water marks, and the devastation, there were few measurements to confirm the actual water level time-histories resulting from the storm. The IPET used the ADCIRC model with a very high-resolution computational grid to model the storm and predict the time-history of the surge levels that occurred at different locations around the region. Figure 9 shows the maximum surge levels predicted for Katrina. The high water marks were used to confirm the accuracy of the model results, and in most cases they agree to within a foot or two. Surge levels ranged from about 10 to 12 ft along the south shore of Lake Pontchartrain to 20 ft along the Plaquemines Levees. Even enclosed areas such as the IHNC experienced water levels above 14 ft, not including waves.

Winds from Katrina generated a record-wave environment. Again, the lack of measurements caused the IPET to model the wind-generated waves to determine the conditions created by the storm. IPET used a nested approach that used the WAM model to generate wind-wave fields for the entire Gulf, and STWAVE to model nearshore waves in and around New Orleans. The


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

resulting wave heights and wave periods are shown in Figures 10 to 13. They demonstrate that the Katrina-generated wave environment was severe. The most significant finding was that the waves along the GIWW, St. Bernard, MRGO, and Plaquemines Levees were ocean-generated waves, with wave period in the 15 to 16-second range, much more capable of overtopping structures than the design-assumed wind waves with periods of 5 to 6 seconds.




Figure 10. Lake Pontchartrain maximum modeled significant wave height and corresponding mean direction (wave heights in feet).


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 11. Lake Pontchartrain modeled peak wave period corresponding to the maximum wave height (periods in seconds).




Figure 12. Southeast Louisiana maximum modeled wave height and corresponding mean direction (wave heights in feet).


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 13. Southeast Louisiana modeled peak wave period corresponding to the maximum wave height (periods in seconds).

It is instructive to examine the surge and wave environment created by Katrina with respect to that assumed from the SPH from which the existing structures were designed. Figure 14 presents a simple comparison of the surge generated by Katrina with that used for the HPS design. Much more detailed information is available in Volume V of this report. Note that the surge in Lake Pontchartrain was roughly the same as the design levels assumed for the HPS. On the east side of New Orleans, Katrina generated surges were significantly greater than the design criteria, ranging from 17 to 20 ft compared to the 12 to 14 ft assumed in the design.




Figure 14. Comparison of general surge levels assumed in the SPH design (D) and estimated from Katrina (K). See Volume IV for more detailed information.

Figure 15 compares the wave conditions assumed for the SPH design and those estimated from Katrina. With the exception of Plaquemines Parish, Katrina generated wave heights were not much different from the design assumptions. In Plaquemines Parish, Katrina did generate significantly higher waves. Wave periods were a different story. In Pontchartrain, the period of Katrina-generated waves was similar to the design assumptions, in the 6- to 7-second range. Along the St. Bernard and Plaquemines Levees, however, Katrina generated 14- to 16-second period waves, approximately three times the design wave periods. This is very significant in that the longer period waves were largely generated in the Gulf and propagated in to shore and have much greater potential for runup and overtopping of HPS structures.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 15. General comparison of wave height and period assumed in HPS design (D) and estimated from Katrina (K). See Volume IV for more detailed information.

## The Performance (for more information see Volumes V and VI)

Figure 16 shows the locations of the most severe damage to the HPS. Over 220 miles of the protective structures were damaged by Katrina-generated surge and waves, as well as 34 of 71 pumping stations. Approximately 41 miles of structures were judged to be severely damaged. Initially there were a total of 50 major breaches identified, areas where the structures failed, causing a dramatic reduction in protective elevation and losing the ability to prevent the inflow of external water. Of the 50 major breaches, four were caused by foundation-induced failures and the remainder from a combination of overtopping and scour. Three of the four foundation breaches occurred in the outfall canals and one in the IHNC. I-wall structures were particularly vulnerable as were levee sections created from hydraulic fill, and transitions where either elevation or strength differences occurred from changes in structure type or capability. Transitions between types of flood protection structures were also vulnerable, especially where the transition included a significant change in elevation between the structures. Detailed maps of the distribution of the major breaches are provided in Appendix I-8 along with a table documenting their characteristics and including the repair actions taken for a majority of the major breaches. The maps and table in Appendix I-8 list only 29 breaches. The differential from the original 50 is caused by aggregation of some of the breaches that were adjacent or related to each other for the purposes of repair and rebuilding.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.