


Figure 16. Locations (in red) of severe damage to hurricane protection structures resulting from Katrina.

The storm surge and waves first attacked the Plaquemines Levees well before Katrina's landfall, causing significant overtopping and erosion before dawn. The MRGO Levees were soon hit with similar conditions and eventually both Plaquemines and St. Bernard Levees would be overtopped by both high surge and high, long-period waves. The persistent east to west winds had also built up a significant surge level at the convergence of the GIWW and the IHNC. Wind-generated waves reached at least 4 ft in the IHNC, contributing to very high water and dynamic loading on structures. The surge and waves had a devastating effect on the sections of the levees along the GIWW (Figure 17) and MRGO (Figure 18) that were constructed with materials dredged from the adjacent channels using hydraulic fill. Even though the levees were capped with clay, they were no match for the energetic environment they experienced. The overtopping waves created very high water velocities down the back sides of the levees, reaching 10 to 15 ft/sec. These velocities were two to three times those experienced on the water side of the levees (4 to 6 ft/sec). The potential for erosion being related to the cube of velocity, it is no wonder that the back sides of the levees, especially where they were comprised of erodible materials, were scoured away leading to, in many cases, complete breaching. Figure 19 shows the close correlation between the degree of breaching from overtopping and erosion and the types of materials. In this example for New Orleans East, the correspondence of breaching and hydraulic fill constructed levees is obvious.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure 17. Example of levee along New Orleans East, GIWW, breaching from overtopping and scour of erodible materials.



Figure 18. Example of levee breach along MRGO from overtopping and scour of erodible materials.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 19a. Character of levee materials, New Orleans East and northern St. Bernard. This slide is incomplete for St. Bernard and shows only the hydraulic fill section along the MRGO.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 19b. Distribution of levee breaching, New Orleans East and northern St. Bernard.

Early in the morning, around 0500 hr, CDT, a section of I-wall along the Lower Ninth Ward breached. Underlain by the same marsh deposits and clay as the 17th Street Canal, the rising water and waves caused the wall to deflect enough to open a crack that created a direct avenue for high water pressures to reach the foundation. The weak clays underneath, now only reacting with the mass of soil on the protected side of the levee, could not withstand the force and displaced backward, a process that would repeat itself on the 17th Street Canal. The water levels in the IHNC were approximately 9.5 to10.5 ft when the foundation failure occurred. At the 17th Street Canal, failure began with apparent displacement of a wall panel at about 0630 hr and ended with a full breach by 0900 hr. At about 0630 hr, the water level was estimated to have been 7 to 8 ft, and possibly 1 to 2 ft higher at the time of the catastrophic breach created by displacement of a levee section. No overtopping had occurred and the design water elevations had not been reached at either location, at the time of levee displacement. This process is depicted in Figure 20 and was confirmed by field investigations of the failure plane and site conditions, separate stability analyses conducted by Virginia Tech and ERDC, and physical testing by independent centrifuge tests at RPI and ERDC.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 20. Depiction of failure mechanism for 17th Street and IHNC foundation failures. A crack forming along the front of the I-wall introduced high forces down the face of the sheet pile, resulting in lateral movement of the floodwall along a shear plane in the weak clay foundation.

At around 0700-0800 hours, not long after the 17th Street Canal breach started, the south breach on the London Avenue Canal was initiating. As in the case of the 17th Street Canal and IHNC failures, water elevations below the design levels caused a crack to form on the water side of the floodwall and allowed high pressures to be introduced directly into the foundation materials of the levee, this time relic beach sand. The porous sand quickly conveyed the pressure under the levee and caused significant uplift on the protected side. It also is likely that significant subsurface erosion occurred under the levee and caused a blowout on the protected side through which much sand and water flowed, decreasing the support for the levee and floodwall and causing a narrow failure. The north breach on the London Avenue Canal suffered a similar fate around the same time, 0700-0730 hr. This breach was much wider and involved less erosion, failure being caused by a loss of stability from the uplift. Water levels in the London Avenue Canal reached about 9 ft, below the design levels and well below the height of the I-walls. Figure 21 depicts the breaching mechanisms for the London Avenue breach sites. This finding was arrived at through detailed field investigations, independent seepage and stability analyses by Virginia Tech and ERDC teams and separate centrifuge modeling by RPI and ERDC.

Ironically, the Orleans Canal, geographically located between the 17th Street and London Avenue Canals, and having similar geological conditions, did not suffer failure, even though water levels there reached over 10 ft. The geology at the north end of the Orleans Canal is similar to 17th Street conditions (peat underlain by clay) and the south end is similar to London


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

Avenue subsurface conditions Peat underlain by relic beach sands). The design of the levees and I-walls for the Orleans Canal was more conservative than for the other canals with a broader and stronger levee section and less I-wall height above the levee crest. Soil strength assumptions were also more conservative than for the structures along the 17th Street Canal. This knowledge was an important component of the development of criteria for evaluating the integrity of the sections of the HPS that were not severely damaged. Combined with the knowledge of the failure modes for the I-walls and levees, a series of remedial actions were developed that could be used to at least temporarily strengthen sections of the HPS that were deemed least able to withstand a large storm. This led to a large scale examination of the HPS by the New Orleans District to identify areas needing remedial action prior to the 2006 hurricane season.




Figure 21. Depiction of London Avenue Canal north and south breaches caused by deflection of the I-wall and high uplift pressures introduced through the underlying porous sands, confirmed in centrifuge testing.

During mid-morning, the I-walls along the IHNC were overtopped and erosion behind the wall reduced their stability, causing three separate sections to fail. The top photograph in Figure 22 shows a section of I-wall along the IHNC collapsed after overtopping created a scour trench behind it and reduced its stability. The bottom photograph shows an adjacent section of I-wall where the scour trench formed but the wall did not fail. Water levels reached over 14 ft in the IHNC. There was also a levee failure along the west side of the IHNC that caused additional flooding into the Upper Ninth Ward. There were no T-wall failures with the exception of a small section in southern Plaquemines Parish.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

The flooding resulting from the overtopping and breaching was catastrophic. Figure 23 shows the extent and depth of flooding for the New Orleans metropolitan area where almost 80 percent was inundated. Pumping stations were for the most part not operating due to prior evacuation of operators, loss of power, or loss of clean cooling water for the pumps. An evaluation of the pumping performance as a percentage of the total capacity is given in Figure 24. The pump stations in New Orleans were simply not designed to operate during major storms. A few stations, notably in Orleans Parish, may have continued to operate if the flooding had not been so extensive. Had the pumps been able to operate, the extent of flooding may not have been impacted greatly, but the duration of flooding could have been significantly reduced. Using temporary pumps and slowly bringing the permanent pumps on line after Katrina required 53 days to unwater the city.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.



Figure 22. Example of breach along IHNC (east side) from overtopping and scour (top) and scour behind adjacent section that did not fail (bottom).


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 23. Map of maximum depths of flooding from Katrina. Greatest depths of flooding exceed 15 feet.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 24. Example of pumping performance during Katrina.

Scenarios run for the hypothetical situation of no levee or floodwall breaching, and assuming full pumping capacity, demonstrated that rainfall and overtopping would have caused extensive flooding, but that flooding in some areas may have been as little as one-third of that experienced during Katrina with breaching and little pumping. Figure 25 is one example of that analysis for Orleans East. The total volume of flooding would have been approximately one-third of that experienced in Katrina if only overtopping and rainfall had contributed water to the protected area. Overtopping was extensive, but would have only occurred for a matter of hours. Breaching allowed water to enter the protected areas for days until the external water levels returned to lower levels and the breaches could be temporarily closed.

## The Consequences (for more information see Volume VII)

The consequences of the flooding were enormous, dwarfing the losses from previous disasters. Figure 26 shows residential direct property losses. Approximately 78 percent of the direct property losses from flooding were experienced by residential property. This is in part due to their location in some of the lowest elevations of the city. Figure 27 shows the distribution, by census block, of the percentage of the direct property losses (loss/value) that occurred in the


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

New Orleans metropolitan area. This graphic correlates primarily to elevation (depth of flooding) and concentration of assets. When coupled with the approximately $4.5 billion to $5.6 billion in public infrastructure damages, the total direct property losses for New Orleans alone reach nearly $25 billion. In contrast, Figure 28 shows the hypothetical percentage loss for the scenario of having no breaching (just overtopping) and full pumping capacity. While the pumping assumption of this scenario is not realistic for the time of Katrina, when added to the relationship shown in Figure 25, it is a testimony to the value of having a resilient HPS.



Figure 25. Comparison of flooding from Katrina (left) to hypothetical condition of no breaching and full pumping capacity (right) for Orleans East Bank.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 26. Distribution of Katrina-generated residential direct property damages by census block. Damages in thousands of dollars.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 27. Distribution, by census block, of property damage (damage/value) from Katrina.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 28. Hypothetical percent property damage (damage/value) for scenario of no breaching and full pumping capacity

Loss of life in the Gulf region was staggering, with almost 1,600 fatalities accounted for and another 400 missing and presumed dead. The New Orleans metropolitan area suffered over 727 storm-related deaths as of February 2006 analysis. Only 2 percent of the total fatalities in Louisiana were external to metropolitan New Orleans. The majority of deaths in Orleans Parish were caused by drowning and pre-existing medical conditions. The deaths in St. Bernard Parish were primarily attributed to drowning. Loss of life was highly correlated with evacuation. Of those who remained, the elderly were particularly vulnerable with three of every four persons who died being over 60 years old. In fact, the flooding in general was disproportionately cruel to the poor, the elderly, and the disabled, groups least likely to be able to care for themselves. Figure 29 summarizes the demographics of the fatalities.

A loss of life model, LIFESim, was adapted to estimate flood-related mortality associated with the New Orleans area. LIFESim, originally developed under the sponsorship of the Corps of Engineers, the Bureau of Reclamation, and the Australian National Committee on Large Dams, is a spatially distributed dynamic simulation model. It is used to estimate the exposure of the


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

population to various flooding conditions which is input to a Monte Carlo uncertainty model to estimate expected loss of life. The modeling, described in detail in Volume VII, was used to estimate loss of life for post-Katrina conditions.

| Race | Female | Male | Grand Total |
|---|---|---|---|
| African American | 44.6% | 62.1% | 53.4% |
| Caucasian | 51.0% | 35.4% | 43.2% |
| Hispanic | 3.0% | 1.6% | 2.3% |
| Other | 1.4% | 0.8% | 1.1% |

| Age | Percent |
|---|---|
| 0 to 5 | 0.3% |
| 6 to 10 | 0.1% |
| 11 to 15 | 0.3% |
| 16 to 20 | 0.7% |
| 21 to 30 | 1.1% |
| 31 to 40 | 3.0% |
| 41 to 50 | 8.9% |
| 51 to 60 | 13.9% |
| 61 to 75 | 23.7% |
| >75 | 48.0% |

Source: Vital Statistics of All Bodies at St. Gabriel Morgue, 16 Feb 2006
*http://www.dhh.louisiana.gov/offices/publications/pubs-192/Deceased%20Victims_2-16-2006_information.pdf*

Figure 29. Summary of fatality data for New Orleans.

The flooding and resultant prolonged loss of services caused what became more of a migration than an evacuation, casting long shadows on the region's ability to recover. Only 8 of 73 neighborhoods did not flood, while 34 were completely inundated. Residential property losses were a staggering 78 percent of the total. Commercial property losses were approximately 11 percent of the total, while industrial losses were under 2 percent. Clearly, the people of New Orleans suffered the most direct losses, and these losses represent perhaps the greatest challenge to recovery, not just in terms of property damages. The extensive flooding caused a breakdown in the area's social and cultural structure, significantly complicating recovery and redevelopment. Critical social institutions such as schools and hospitals have been very slow to reopen.

Figure 30 shows an example of the pre-Katrina and post-Katrina (1 June 2006) direct economic damage - elevation relationships developed for each subbasin. Similar relationships were developed for elevation and loss-of-life using Katrina data and for selected future scenarios using the LifeSim model. Together these relationships provide a fundamental input to the risk and reliability analysis. The dramatic change in the curves from pre-Katrina to post-Katrina conditions represents the change in the value of the property from losses due to Katrina. Even if the probability of flooding remained the same, the risk (product of probability of flooding at a given level and level of consequences) for this subbasin would be decreased because of the reduced exposure for economic loss.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

There were numerous media reports of widespread water contamination in and around New Orleans following Katrina. Samples from bottom sediments in Lake Pontchartrain and the Violet Marsh in St. Bernard Parish as well as numerical modeling of surface water contaminant transport did not support these reports. The three-dimensional hydrodynamic model CH3D and the three-dimensional water quality model CE-QUAL-ICM were used to model contaminant concentrations for a period of 90 days after Katrina. The RECOVERY model was used to simulate contaminant concentrations in the Violet Marsh area. Figure 31 shows the results of one of the modeling efforts, in this case to examine maximum surface water concentrations of arsenic (As) in Lake Pontchartrain. All of these investigations, which included other contaminants such as lead, benzo(a)pyrene, DDE, and coliform bacteria, showed that the floodwater contaminant impacts on the region were marginal and, typically, did not exceed EPA standards. While there were localized contamination events, in general the New Orleans area seems to have escaped widespread pollutant contamination.

Along with the impact of waves, the impact of saltwater flooding of wetlands and marshes was significant and represents the most serious environmental damage sustained from Katrina. The U.S. Geological Survey estimated that approximately 118 square miles of wetland habitat was lost from the combined effects of Hurricanes Katrina and Rita. This is approximately four times the average annual loss of about 30 square miles measured since the 1930s. Hurricane Katrina caused extensive freshwater fish and oyster kills, especially along the north coast of Lake Pontchartrain, but had no identified direct impact on marine fish.

Katrina is truly a disaster from which this nation must seek and apply lessons learned to prevent reoccurrence. Part of the solution is understanding the distributed residual risk for the area. This requires a comprehensive risk and reliability analysis of the entire HPS.




Figure 30. Comparison of flood damage – water level (in feet) relationships for pre- and post-Katrina scenarios for Orleans subbasin 5. LC and UC represent the lower and upper confidence limits of the data.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.




Figure 31. Maximum arsenic (As) water surface concentrations (milligrams per liter total) in Lake Pontchartrain after Katrina.

## The Risk (for more information see Volume VIII)

The risk prior to Katrina was significant, in part because New Orleans is mostly below sea level, in part because the HPS had not been completed, in part because it had not been tested, and in part because portions were just not up to the test. The gap component of the foundation failure mechanisms was not considered in the design of those structures and they had never experienced water levels above approximately 5 ft (compared to 7 to10 ft in the outfall canals and over 14 ft in IHNC during Katrina). Levee sections created with hydraulic fill and capped with a relatively thin clay layer had never experienced design water levels, not to mention severe overtopping. Both components of risk were significant. The probability of a failure of floodwalls and some sections of levees was high, and there was a great potential for serious consequences because of the large population and extensive property being protected by the structures.

The repairs since Katrina have been formidable, and those sections of the system are no doubt the strongest. The temporary gates at the outfall canals will dramatically reduce the forces that the floodwalls along the canal experience. Replacing I-wall sections with stronger and higher T-wall sections along the IHNC will also significantly reduce risk, as will adding armor behind floodwall sections deemed vulnerable to overtopping and erosion. Rebuilding levee sections higher and with high quality clay soils will dramatically increase their resilience to overtopping. The areas with incomplete or legacy structures represent the greatest risk until additional measures can be taken to raise and strengthen them.

Given the difficulty in achieving and maintaining an equal level of protection around the entire system, some areas will continue to harbor the greatest risk — those having elevations the most below sea level, those with the highest subsidence rates and those directly exposed to the


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

full surge and wave environments that large storms can create. Given overtopping, water will first inundate the lowest areas. Coupled with rainfall, the performance (and therefore resilience) of the pumping stations will become the first line of defense. Given breaching, most likely where surge and wave environments can be most severe, the lowest areas again will flood first and flood the most. The other major risk factor is consequences, the lives and property exposed to flooding and loss. As such, areas with the highest population densities are going to have higher risk than less populated areas, given similar levels of reliability.

This risk assessment does not require the sophisticated model developed by the IPET, and it points out that there are rules of thumb that cannot be avoided. A risk model, however, gives planners and the public a common framework for quantifying their relative levels of vulnerability and understanding its source. That is a reasonable way to begin the process of reducing risk where it is most practical and will provide the most significant benefits.

The IPET comprehensive risk assessment was ongoing at the time of the release of this volume. The information in this section will be amended to reflect the final risk analysis results upon finalization of that work and its review by the NRC Committee and ASCE ERP.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

# Principal Findings and Lessons Learned

This section presents the principal findings and lessons learned from the IPET efforts. The information here represents a big-picture perspective of an extensive amount of work and does not attempt to include detail or supporting technical data or arguments. More detailed findings and lessons learned are provided in each volume of the IPET report along with extensive supporting information on the analyses upon which they were based.

## Principal Findings

### The System (see Volumes II and III)

**Impact of Datum Misinterpretation:** Spatial and temporal variations of 0.2 to 3 ft were found between the geodetic datum (land elevation reference) and local mean sea level (water level reference datum, LMSL). Some flood control structures in the region were authorized and designed relative to a water level datum (mean sea level), but constructed relative to the geodetic vertical datum incorrectly assumed to be equivalent to the water level datum. This resulted, in the case of the outfall canals, in structures built approximately 1 to 2 ft below the intended elevation. Updating of the reference elevation points for the region, although underway, was not completed. The use of out-of-date reference elevation points left decision makers without an accurate understanding of the actual elevations of the hurricane protection structures.

**Impact of Subsidence:** The variable and considerable subsidence in the New Orleans area was reflected in the performance of the system in Katrina. It was well known that the New Orleans area experiences significant subsidence, and structures such as levees had some increases in their initial design elevations as compensation. The amount of elevation loss for critical hurricane protection structures was not well quantified prior to Katrina. The IHNC structures, for example, are more than 2 ft below their intended design elevations, mostly from subsidence over the 35-year life of the project. This resulted in a significant loss of protection capability in areas such as the IHNC. The lack of knowledge of accurate elevations was directly tied to the incomplete update of the geodetic reference datum and LMSL.

**The hurricane protection system consists predominantly of levees and levees with cantilevered I-type floodwalls.** In locations where the right of way did not permit these options and at gated closure structures, there are segments of T-walls. T-walls are inverted "T" shaped concrete structures supported on pre-cast prestressed concrete or steel H-piles. As with I-walls, a continuous steel sheet-pile wall is embedded in the bottom of the above ground concrete wall to reduce seepage under the structure. The vast majority of the total miles of structures were conventional levees, the majority of floodwalls were I-wall structures with selected areas, specifically at transitions to major structures such as pumping plants and gated structures, having T-walls.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

**All of the structures are constructed on weak and compressible soils.** Stability and settlement of structures are generally critical design issues. The geology of the area was relatively well known and borings taken were reasonably adequate for characterizing the variety of conditions in the area, but the spacing could miss local anomalies in soil type and strength. See Appendix I-5 and Volume V for more details on the geology of the area and its impact on performance.

**The majority of the structures in the HPS were generally built as designed, and design approaches were consistent with local practice.** A number of samples were taken of materials used in the construction of the structures, particularly concrete from the floodwalls and steel from sheet piles. These samples were tested by independent laboratories and all test results conformed to accepted standards. Sheet-pile lengths were confirmed by physically pulling them from the ground.

**The levee and I-wall structure designs along the 17th Street and London Avenue Outfall Canals and for a portion of the Inner Harbor Navigation Canal (IHNC) were inadequate.** Several factors significantly impacted the performance of these structures during Katrina. The 17th Street Canal structures had the most significant issues. First, the foundation soil strengths were derived from widely spaced borings and at times using average values that do not capture the high variability inherent in this type of geology. Second, an assumption of uniform shear strengths for soils, based on the greater strengths under the centerline of the levee, beneath the 17th Street Canal levee and floodwall resulted in an overestimation of the subsurface strength at the levee toe. Third, the shear strength of the clay soils under the 17th Street Canal levee and floodwall assumed for design were higher than warranted from the measured data available at the time. These same soil strength assumptions were not made in other sections of the system where more conservative strength values were used.

**The levee and I-wall designs for the outfall canals and IHNC did not consider deflection of the I-wall to the extent that hydrostatic pressure would reach to the base of the sheet piles.** This deflection and pressure basically split the levee into two pieces resulting in the protected side attempting to resist the forces for which the entire structure was designed. This played a major role in all four of the I-wall foundation failures. At London Avenue, the deflections provided a direct pathway for the high hydrostatic pressures for the elevated flood waters in the canals to enter the underlying porous relic beach sands and rapidly propagate to the back side of the levee. The pressure caused massive subsurface erosion of the sand under the levee as well as uplift on the protected half of the levee reducing its ability to resist the forces placed on the floodwall and sheet pile. This resulted in failure of the levee-floodwall system.

**The original design criteria developed through use of the Standard Project Hurricane (SPH) in 1965 and used for the outfall canals in the late 1980s, was not representative of the hurricane hazard at the time of the design.** The Standard Project Hurricane is defined as a hypothetical hurricane intended to represent the most severe combination of hurricane parameters that is reasonably characteristic of a specified region, excluding extremely rare combinations. In 1979 the National Oceanic and Atmospheric Administration (NOAA), updated the SPH definition by increasing the maximum sustained wind speed to 115 mph from the original 100 mph. The Corps chose to continue to use the original SPH definition developed for


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

the Lake Pontchartrain and Vicinity Project for use on the outfall canals. The 1979 definition of the SPH was used for design of the West Bank and Vicinity protective structures.

**The system did not perform as a system.** The hurricane protection in New Orleans was designed and developed in a piecemeal fashion, resulting in inconsistent levels of protection. In addition to the use of different SPHs for individual projects, the designs for specific structures were influenced by the local conditions. For example, the levee and I-wall system designed for the Orleans Canal was more conservative than that for the 17th Street Canal. The Orleans Levee was broader and the I-wall freeboard (height above the levee crest) less. Soil strength assumptions were also more conservative, using the weaker values at the toe instead of the stronger values under the centerline as assumed for the 17th Street Levees.

**Levee and I-walls were designed to provide protection up to the estimated water elevations for the SPH. They were not designed to withstand overtopping.** There was no armoring or uniform use of erosion resistant soils in the levee sections. Levee materials ranged from highly resistant to scour to poorly resistant, resulting in significant variations in the protection levels afforded nearby areas. Similarly, I-walls were not protected against erosion if overtopping occurred. Given overtopping, evacuation was the only alternative to reduce exposure to flooding.

**The system was not scheduled for completion until 2015.** Sections that are not completed represent anomalously low areas, often accompanied by transitions from one type of structure to another. These ended up being weak spots, more vulnerable to overtopping and then erosion.

**The majority of the pump stations are not part of the HPS and were not designed to provide capability during large storms**. Most pump operators are routinely evacuated prior to hurricanes striking the area because of a lack of a safe haven to ride out the storm. Many of the larger pumping stations have mechanisms to prevent backflow through the pumps if they are not being operated. In some cases these require manual activation.

## The Storm (See Volume IV)

**Katrina generated a storm surge and wave environment unparalleled in the history of New Orleans.** Hurricane Katrina was a very large Category 3 storm when it passed the New Orleans area on the morning of August 29th. Twenty-four hours earlier this storm had been the largest Category 5 and most intense (in terms of central pressure) storm on record within the northern Gulf of Mexico. During Katrina, at a location due east of the Mississippi River delta and just offshore in deep water, NOAA Buoy 42040 recorded the highest significant wave height ever measured in the Gulf of Mexico (55 ft). That observation matched the largest significant wave height ever recorded by a sensor within NOAA's buoy network, in any ocean. The large size of Katrina throughout its history, combined with the extreme waves generated during its most intense phase, enabled this storm to produce the largest storm surges that have ever been observed within the Gulf of Mexico (up to 28 feet in Mississippi), as determined from analyses of historical records.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

**Hurricane Katrina generated water levels that for much of the system significantly exceeded the design criteria**. Katrina surge levels were up to 20 ft along the east side of the HPS, substantially higher, up to 5 or 6 ft, than the design levels for all areas along the eastern and southern portions of the HPS. The surge levels were roughly equivalent to design criteria along the southern shore of Lake Pontchartrain. Katrina-generated wave heights were approximately equal to the design criteria with the exception of Plaquemines Parish where Katrina-generated waves were significantly higher. Wave periods, however, especially along New Orleans East, St. Bernard, and Plaquemine Parishes, were approximately three times that estimated for the design criteria. The waves impacting the levees were 15- to 16-second-long period ocean storm waves that caused much more runup and overtopping than shorter period waves.

**Local wave generation can contribute significantly to wave conditions within outfall and navigation canals in the New Orleans area.** Local wave generation in the outfall canals during Katrina generated higher wave conditions over much of the length of the canal than were associated with the waves entering the canals from primary generation areas (either Lake Pontchartrain or the Gulf of Mexico). In the most extreme case examined here, wave heights of over 4 ft were generated within the GIWW/MRGO canal entering the IHNC from the east. The IHNC design assumed 1-ft waves. Detailed hydrodynamic analyses showed that dynamic forces were a significant portion (20 to 30 percent) of the total forces experienced by many of the levees and floodwalls. The dynamic forces considered in the original design were significantly less.

**Overtopping by waves generated very high velocities over the crest and back sides of the levees, leading to a high potential for scour and erosion.** Velocities from 10 to 15 ft/sec were calculated for the back sides of the levees along St. Bernard Parish, while the front sides of the levees experienced velocities of about one-third of those on the back side. Since erosion potential is related to the cube of velocities, the erosion potential on the back side of the levees was up to 27 times greater. The exception was in the east/west-trending leg of the GIWW near the I-10 Bridge, where wave energy and currents were almost parallel to the orientation of the levees and while overtopping occurred, the back side velocities were not severe. Examination of these levees that failed due to erosion determined that all failures were caused by erosion of the crest and back face.

**The southeast trending leg of the Mississippi River Gulf Outlet (MRGO) had little influence on the water levels in the IHNC during Katrina.** The relative size of the channel with respect to the very large flow area available when the marsh areas have been inundated by surge, make the amount of water conveyed through the channel a relatively small part of the total. During Katrina, MRGO was far from the "hurricane highway" moniker with which it has been branded. Model results show that this is the case for very large surge-generating storms in this area. This finding agrees with those of an independent study conducted for the State of Louisiana.

**There was no evidence of significantly reduced surge levels and wave heights in areas adjacent to wetlands and marshes.** Surge elevations and wave energy along the HPS were impacted mostly by the relative orientation of structures with respect to the direction of the wind


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

and oncoming surge and wave energy. For example, areas on the south side of St. Bernard Parish were sheltered from the dominant east to west movement of wind and water, resulting in reduced storm water levels and less damage. It is likely that the presence of marshes had an impact on surge and wave conditions during the earlier parts of the storm, but the massive size of the storm and propagation of surge and waves ahead of landfall had inundated the surrounding marshes with significant water long before the peak of the storm hit. The exact impact of marshes on surge and waves remains unquantified.

**Measurements of temporal variation in wave and water level conditions, and wind, through the peak of the storm were extremely scarce. Of the few sensors deployed in the high impact zone, nearly all were damaged or malfunctioned.** None of the self-recording instruments that were in place to record water levels successfully captured water level changes through the peak of the storm in the high impact zone. All malfunctioned prior to the peak.

## The Performance (see Volumes V and VI)

**Of the 50 major breaches experienced by the HPS during Katrina, all but four were due to overtopping and erosion**. For floodwalls, the overtopping caused erosion behind the walls that eventually caused instability and wall failure. For levees, the scour eroded the back sides and tops of the levees due to high velocities of the overtopping waves in areas of erosion-susceptible soils creating breaching. Areas with high quality levee materials performed well in the face of water conditions that exceeded their design criteria. Structures at authorized design elevations would have reduced the amount of overtopping.

**There was no evidence of systemic breaching caused by erosion on face or water sides of the levees exposed to surge and wave action.** The water velocities on the face side were only one-third of those experienced at the crest and back or protected side of the levees. The levees largely performed as designed, withstanding the surge and waves until overtopping, at which time they became highly vulnerable to erosion and breaching, especially those constructed by hydraulic fill.

**Four breaches, all in the outfall canals and IHNC and all involving I-walls, occurred before water levels reached the top of the floodwalls.** All were caused by foundation failures induced by the formation of a gap along the canal side of the floodwall. All of these structures were built over a layer of marsh sediments, in two cases underlain by clays and in the other two underlain by relict beach sand deposits. Along the outfall canals, the subsurface conditions dictated the specific mechanics that, coupled with the high hydrostatic pressures introduced to depth by the gap along the face of the sheet pile, led to instability and failure. The sites underlain by sand experienced significant uplift pressures, seepage and, in one case, a massive piping of subsurface sand from under the levee to the protected side. This action undermined the floodwall.

In the case of the sites underlain by clays, the formation of the gap to the base of the sheet piles introduced high loads along the depth of the wall which could not be resisted by the weak clays. At the IHNC site, the fact that the ground surface elevations beyond the levee toe were


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.