significantly below those in the design cross sections contributed to the failure. Soil strength assumptions used in the design of the 17th Street structures were too optimistic. The formation of the gap and the associated hydrostatic pressures introduced at depth, along with effectively splitting the levee into two parts, resulted in a significant reduction in the factor of safety of the structure. This failure mechanism, in particular the gap formation to the bottom of the sheet piles, was not considered in the original design of these structures.

**Three other sites within the IHNC experienced I-wall breaches due to overtopping and scour behind the walls which reduced the stability of the structures.** These breaches added to the flooding in Orleans (East Bank) and the Lower Ninth Ward. The storm surge levels in the IHNC exceeded the design levels, and lower structure elevations, reduced over 2 ft by 35 years of subsidence, contributed to the amount of overtopping that occurred.

**Transitions between types and levels of protection and between protection structures and other features created vulnerabilities to erosion and breaching and reduced the effectiveness of the protection.** Some of the transitions are associated with changes in the organization responsible for the structures, some are due to incompletion of the authorized construction, and others are associated with necessary penetrations through the levee/floodwall system.

**In spite of being subjected to design-exceeding conditions and forces, many sections of the HPS performed well.** These tended to be sections with materials resistant to erosion and more conservative designs. The Orleans Canal levee-floodwalls are similar to those on the 17th Street and London Avenue Canals, yet they did not fail. The northern section of Orleans Canal is underlain by clays similar to the 17th Street breach site and the southern section is underlain by sand similar to the London Avenue breach sites. Investigations showed that the levees were more conservative in design, having broader base and less floodwall freeboard. In addition, more conservative soil strength values were assumed in their design.

**Levee sections constructed from quality clay materials were much less susceptible to erosion from overtopping.** They performed well in spite of being subjected to conditions significantly beyond their design criteria. There was a direct correlation between the character of the levee materials and their performance.

**Flooding from Katrina covered approximately 80 percent of the New Orleans metropolitan area.** For Orleans East and St. Bernard Parishes, approximately two-thirds of the volume of flooding can be attributed to water flowing through breaches. The one-third due to overtopping and the very large amount of rainfall would itself have caused a significant level of interior flooding.

**The three breaches in the outfall canals and I-wall/levee failures along the west side of the IHNC were responsible for approximately 70 percent of the flooding in Orleans East Bank.** The remainder was due to the heavy rainfall (up to 14 in. in 24 hr) and overtopping.

**Because of inoperability, pump stations played no significant role in the reduction in flooding during Katrina.** Sixteen percent of the total pumping capacity was operating during


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

the storm, equivalent to approximately 18,000 cfs. The distribution of operating pumps across four parishes, however, reduced the impact of the pumping. Their inoperability, due to a combination of the necessary evacuation of operators, loss of power, loss of cooling water, and flooding, impacted the ability to unwater the city after the storm. Temporary pumps were useful after Katrina, but provided only a small fraction of the capacity needed. Reverse flow through some pumps added to the flooding in at least one parish. While methods are available to prevent reverse flow, they are dependent on human implementation and electrical power.

**The maintained condition of the levees was an additional negative factor in the performance of the system.** While the presence of trees and other features on the levees could not be directly related to the failures of the outfall canal structures, it is likely that they were enablers in the overall breaching process. The presence of large trees **on the levees** was particularly troublesome and could easily have accelerated the failure process.

**All features must be included in the performance assessments of a system.** There are other features, such as the CSX railroad closure gate, that are not an integral part of the HPS but are sources of vulnerability and require independent action to manage during a hurricane event.

## The Consequences (See Volume VII)

**Loss of life was concentrated by age, with 70 percent of deaths being people over the age of 70.** There were 727 fatalities in the five parishes examined. The poor were disproportionately affected. Loss of life also correlated to elevation, in terms of depth of flooding, especially with regard to the poor, elderly, and disabled, the groups least likely to be able to evacuate without assistance.

**Katrina caused direct property losses (excluding Plaquemines Parish) of over $20 billion, approximately 78 percent ($16 billion) of which was attributed to residential losses.** The next largest component was the 11.5 percent ($2.4 billion) attributed to commercial losses. There was an additional $7.0 billion in losses attributed to public infrastructure, including the HPS itself. The most significant infrastructure impact was incurred by the HPS ($2.0 billion) followed by roadway networks and assets of the regional electrical distribution\transmission grid. Together, the damages to these categories of infrastructure totaled approximately $2.0 billion. This estimate is followed by damages to public transit assets of approximately $700 million, followed by damages to rail lines, airport facilities, gas and water distribution, telecommunications assets, and assets for waterborne transportation totaling an additional $1.7 to $1.9 billion.

**Approximately half of the direct economic losses, excluding public and utilities infrastructure, can be associated with breaching of levees and floodwalls.** The remaining losses alone, attributable to rainfall and overtopping, constitute the largest losses experienced in any disaster in the New Orleans vicinity. Losses and, in many respects, recovery can also be directly correlated to depth of flooding and thus to elevation. In some areas flooded by Katrina, where water depths were small, recovery has been almost complete. In areas where water depths were greater, little recovery or reinvestment has taken place.

**Combined with the significant and far-reaching impact of Hurricane Katrina regarding initial displacement of population, workforce, and businesses, the impacts to infrastructure and affiliated public welfare and services will contribute to slowed phasing of recovery with regard to return of populace and business activities.** Orleans Parish alone is estimated to have lost over 60 percent of its population and St. Bernard Parish nearly 80 percent. On the other hand, St. Charles and Tammany Parishes have increased in population since before the storm.

**In terms of the social consequences of the Katrina event specifically, the social organization of the community and region has been compromised by the mass exodus of the population, the structural damage, and the demands to respond and rebuild.** The flooding caused a breakdown in New Orleans' social structure, a loss of cultural heritage, and dramatically altered the physical, economic, political, social, and psychological character of the area. These impacts are unprecedented in their social consequence and unparalleled in the modern era of the United States. The flooding disproportionately impacted the poor, the elderly, and the disabled.

**The performance of the levees protecting New Orleans is a key to its social, cultural, and historic conditions.** The immediate physical damage made large portions of the city uninhabitable, with thousands of residential, commercial, and public structures destroyed. Basic infrastructure facilities, such as power, water, sewer, and natural gas lines, were made inoperable and continued to be out of service for months after the event. Many victims not only lost their homes, but also their schools, health care, places of worship, places of trade, and jobs. The forced relocations disrupted family and friend networks. As a result, the event not only had an immediate impact on the well-being of the population of those living and working in the metropolitan area, but also resulted in basic changes in the social organization of all aspects of that population.

The available information indicates that if environmental harm has come from the Katrina flooding of greater New Orleans, it was associated with past regional land and water development. Like many other cities, the soils and sediments of land and waters in New Orleans and other delta urban areas are contaminated with metals and organics at concentrations that often exceed health standards in areas of most dense development. The flooding of greater New Orleans removed some contamination from greater New Orleans and transported it to Lake Pontchartrain and Violet Marsh with pumped floodwater where it added a small increment to estuarine sediments. The IPET analysis did not look at local redistribution of contaminants within individual drainage basins. Katrina and Rita resulted in the loss of approximately 300 square kilometers of wetlands and marshes, all independent of the performance of the levees and floodwalls. Loss of wetlands regionally appears to fit a pattern of loss associated with past regional development as well. Overall, any sustained environmental loss from flooding and flood management is indicated to be very small in the context of long-term impacts from development in the region.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

### The Risk (See Volume VIII)

**Risk assessment provides a viable means to understand the relative vulnerability of protected areas.** The combination of the likelihood of storm water levels (surge and waves), the likelihood of structural failure at different water levels and dynamic loadings, the likelihood of flooding based on the expected performance of the system, and the consequences of that flooding provides a comprehensive information set on residual risk. This information defines the relative vulnerability of each area as well as the sources of that vulnerability.

**Performing a meaningful risk assessment requires an accurate inventory and characterization of all components of the HPS.** This includes the information and assumptions used in the design, the physical properties including accurate dimensions and elevations, materials and strengths, and maintained condition. This is a substantial task but provides a foundation for true system-wide analysis.

**The effectiveness of the protection system depends on human factors as well as engineered systems.** These factors, such as timely gate closures, operating gates, and pumping station operability, must be included in the overall assessment to reach accurate conclusions.

**It is critical to estimate the inherent uncertainty in the individual components of the risk assessment and in the final risk products.** Risk assessment combines a variety of data types and incorporates numerous models. Each of these has an inherent degree of uncertainty, in their values, in the ability of the models to replicate the processes they represent, and in the end products themselves. The level of uncertainty must be estimated and incorporated in an overall uncertainty analysis to understand the variance associated with the risk assessment results. This provides some measure of the confidence one can have in using the risk data.

## Principal Lessons Learned

The principal lessons learned from the IPET analyses are presented below by mission question. Detailed lessons learned are provided in Volumes II to VIII. In addition to the lessons learned that relate directly to the mission questions, there was a cross cutting topic, knowledge and expertise, that warranted discussion and is presented at the end of this section of the report.

### The System (see Volumes II and III)

**Correct elevations and reference datum are essential.** All hurricane and flood control protection structures should be designed, constructed, and maintained relative to an up-to-date local sea level reference datum. Areas experiencing variable subsidence, such as New Orleans, are likely to have systematic datum and elevation accuracy issues that need frequent attention. It is important to have appropriate monitoring stations (for tide and subsidence) in place and associated up-to-date guidelines for the application of this information to existing and new projects. In subsidence-prone areas, designs should consider multiple elevation increases over the life cycle of the structure.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

**Systems planning and design methods are needed.** Planning and design methodologies need to allow for examination of system-wide performance. It is obvious from the IPET analysis that the piecemeal development of the New Orleans Hurricane Protection System provided a system in name only. This is especially true of the sections that have not been completed, transitions between types of protection that differ in capability (thereby representing weak points), and differences in the relative levels of reliability that created areas with greater likelihood of failure. The system-based approach should have a time dimension to allow consideration of the potential changes in requirements or conditions over the life of the project and to examine approaches to build in adaptive features and capabilities. Subsidence, changing population demographics, and the changing patterns of hurricane intensity and frequency are obvious examples of the time-dependent challenges hurricane protection systems face. All components that contribute to the performance of the overall system must be treated as an integral part of the system. Pump stations are one example in New Orleans. For any given drainage basin, the protection is only as robust as the weakest component of the system protecting that area and how effectively the various components that are interdependent operate together.

**Frequent update to guidance and review of projects is critical.** Design methods and designs need frequent review to determine whether they represent best practice and knowledge. Designs in coastal flood damage reduction projects need to include the concepts of resilience, adaptation, and redundancy to accommodate unanticipated conditions or structural behaviors. Design should be based on a system-wide understanding of the processes affecting the system and the interaction and interdependencies of the system components. This is especially true for the characterization of the hazard where modern probabilistic methods should be used.

**The SPH process is outdated.** More comprehensive probabilistic methods that consider a broader variety of storm characteristics and storm generated conditions should be used as a basis for planning and design. The Joint Probability Method – Optimized Sampling approach described in Volume VIII is recommended as a technically credible approach.

## The Storm (see Volume IV)

**Surge and waves are the hazard, not the storm.** Meteorological designations such as the Saffir-Simpson scale by themselves are not adequate to characterize the distributed surge and wave conditions that a HPS will face. Katrina, a Category 3 storm at landfall, generated surges of 24 to 26 ft at Biloxi, MS. In the vicinity of Biloxi, the surge produced by Camille was 15.8 ft, the highest surge that had ever been recorded at that location prior to Katrina. In other words, Katrina (a Category 3 storm at landfall) generated substantially higher surges than Camille (a Category 5 storm at landfall) in the area where they both made a direct hit.

**Sophisticated modeling using physics-based codes with high spatial resolution and accurate windfield input is necessary to depict the variable hydrodynamic environments created by large storms.** Similarly, the traditional methods of assessing the frequency of occurrence of hurricanes, dependent primarily on historical data, are too simplistic to capture important characteristics of the hurricane hazard such as time- and space-dependent storm


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

intensity and track patterns. The wave and storm surge modeling (using the Corps' WAM, STWAVE, and ADCIRC prediction models) provided considerable insight into how water surrounding such a complex physical system responds to an equally complex hurricane wind system. The hurricane protection system in Southeast Louisiana is very long and expansive, having a highly irregular layout. These factors coupled with a translating counter-clockwise rotating wind field about the center of a hurricane produced a complicated pattern of wave and storm surge development and evolution. Propagation of an evolving storm surge wave influences the water depth, which in turn exerts strong influence on the local wave field. The wave field is not only a function of what is locally generated by the wind. It is also heavily influenced by wave conditions generated by the hurricane while it was still well off the coast. Those waves propagated into the region well ahead of the storm's arrival.

**Current models have uncertain accuracy in treating the effects of wetland and marsh environments on storm surge and waves.** Sensitivity tests showed that wave and surge model computations are somewhat sensitive to the methods used to characterize frictional resistance of wetlands and to the values of frictional resistance assigned to different types of wetland landscape. Results showed that storm surge is reduced in some areas, whereas it is increased in others. Likewise, wave height is reduced in some areas and increased in others. Wave height increases are primarily due to the fact that increased water depths associated with increases in storm surge enable larger local wave heights to be sustained.

**Resolution of wave setup is a critical element in the estimation of design levels of levees in this area.** Hurricane Katrina produced extremely energetic wave conditions along the entire coast of Louisiana. Significant offshore wave heights along the Southeast Louisiana coast ranged from 55 ft due east from the tip of the Mississippi River delta to 20 to 25 ft just north of the Chandeleur Island chain, with peak wave periods of approximately 15 to 16 sec. Considerable wave breaking took place seaward of the Chandeleur Islands. High resolution (as fine as 300 ft) was added to the ADCIRC grid mesh to resolve areas of intense wave breaking along the barrier islands, the periphery of the coastal wetlands fronting Southeast Louisiana, and along the periphery of Lake Pontchartrain. The STWAVE model was run at fine resolution. The high resolution adopted and the use of coupled wave and surge models were able to capture the contribution of wave setup to storm surge away from coastal structures, a contribution of up to 2.5 ft depending on location. But even though the ADCIRC model contained contributions of both direct forcing and wave-related radiation stresses in its estimates of storm surge heights, local wave setup not resolved by the ADCIRC grid contributed 1.5 to 2 ft of additional setup along exposed levees in St. Bernard Parish, Plaquemines Parish, and New Orleans East, as well as along the south shore of Lake Pontchartrain. This additional setup contribution was estimated using Boussinesq wave modeling applied with much higher resolution.

**Only 10 to 15 percent of high-water marks were considered to be reliable measures of peak storm water level.** Of the many hundreds of high-water marks collected in Louisiana and Mississippi, a relatively small percentage of high-water marks were rated to be reliable measures of storm surge (the peak still water level that was experienced during the storm). The most reliable marks were those measured in the interior of structures on walls, in places where oscillatory wave motions were minimized.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

## The Performance (See Volume V and VI)

**Designs need to better consider unknowns.** The design approaches taken for the outfall canals were not conservative enough to deal with the unknowns, in this case the excessive floodwall deflection not considered in the design. Floodwall design methods need to consider a broader spectrum of possible behaviors, and resilience to overtopping should be considered as a fundamental performance characteristic. Research is needed to understand the full performance limits of structures and to discover new approaches for creating adaptive designs. The unanticipated failure mode defined for the I-walls from this analysis does not represent the only possible failure mode for these structures. Numerous other modes were considered in their design, and other yet undefined modes are likely to occur at some point in the future. Designers need to consider a broad range of failure modes, including some approaches beyond traditional or standard practice.

**Design methods and assumptions need continuous review and update.** Design methods should be clearly based on physical behavior of engineering components and systems and should be reviewed periodically to determine if they represent the latest knowledge, practice, and technology. Similarly, existing projects should be periodically reviewed to ensure that their original design has not been compromised by changing hazard or changing knowledge base.

**Planning methods should facilitate examination of system-wide performance.** In addition, hurricane protection systems should be deliberately designed and built as integrated systems to enhance reliability and provide consistency in levels of protection. Components such as the interior drainage and pumping need to be an integral part of the system because of the important role they can play in limiting the amount and duration of flooding. Resilience in pumping capacity is especially important.

**Resilience to catastrophic breaching can provide huge benefits in reduced loss of life and property.** It is clear that a resilient HPS can provide enormous advantages. Resilience, in this case, refers to the ability to withstand, without catastrophic failure, forces and conditions beyond those intended or assumed in the design. For our purposes, resilience refers to the ability to withstand higher than designed water levels and overtopping without breaching. As demonstrated in this analysis of Katrina, approximately two-thirds of flooding and half of the losses were the result of breaching, i.e., the significant loss of protective elevation in structures. While overtopping alone from Katrina would have created dramatic flooding and losses, the difference is staggering in many regards. Reductions in losses of life, property, and infrastructure; associated reductions in the displacement of individuals, families, and the workforce, coupled with reduced disruption to businesses and social and cultural networks and institutions, would have a dramatic impact on the ability of a community and region to recover. Added to this is the savings of the time and funding needed to rebuild the protection system itself, which would accelerate the pace of recovery. Resilience is not a national priority in the development of hurricane protection systems, and resilience was not an element in the New Orleans HPS design.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

## The Consequences (See Volume VII)

**Losses and recovery are flood depth dependent.** Losses from a hurricane event creating water levels that exceed design criteria can be expected to be significant, but could be much less if the HPS can withstand overtopping without catastrophic breaching. While the reduction in direct property losses can be substantial and readily estimated (over $10 billion for Katrina), it is the more difficult to quantify reduction in the indirect economic and cultural losses that may be most relevant to the ability of the affected area to recover. In addition, the perceived character and expected performance of the HPS itself is a significant factor in the choices people will make with respect to re-population and re-investment.

Damages and loss of life were both directly tied to depth of flooding, which in turn is inversely tied to the elevation of the location or subbasin. Areas with lower elevations experienced the most severe losses and, all else being equal, will harbor the highest probabilities of experiencing flooding into the future.

**System-based planning should include all aspects of hurricane response.** A broad and system-based planning capability can increase the effectiveness of integrating evacuation, recovery, and reconstruction aspects into the HPS. In particular, a risk-based approach can provide an effective means to examine approaches to manage both the probability of an adverse event and the exposure to losses as well as the consequences. Spatial analysis of consequences and the ability to relate consequences to physical performance are powerful tools for making difficult decisions concerning hurricane protection.

## The Risk (See Volume VIII)

The comprehensive risk assessment was ongoing at the time of the release of this edition of Volume I. The following are insights gained in the development and execution of the risk assessment. More specific results and lessons learned will be provided in an amended version of this Volume and a completed Volume VIII when the risk results have been validated and published.

**Risk supports system-wide planning.** A risk-based planning and design approach would provide a more viable capability to inform decisions on complex infrastructure such as hurricane protection systems. The traditional approach, as used for the New Orleans protection measures, is component-performance-based, uses standards to define performance, and relies on factors of safety to deal with uncertainty. It is difficult to examine the integrated performance of multiple components, and standards are usually limited to past experience. Risk-based planning is system-based, requiring that the entire system be described in consistent terms and explicitly including uncertainty. Component performance is related to system performance as well as the consequences of that performance.

**Risk expands the criteria for decision making.** The risk-based approach is well suited for consideration of a variety of measures of merit. Factors such as loss of life, environmental losses, and cultural consequences can be included in decision making without reducing everything to one measure such as dollars. As applied for the IPET assessment, it allows aggregation and de-


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

aggregation of information to address issues at different scales, providing a useful tool for collaborative planning between responsible agencies at different levels. It also allows for a more comprehensive consideration of hazards. Instead of a single definition derived from limited historical data, a joint probability approach can consider events that reflect historical information as well as a variety of possible events, providing a more robust basis for considering the spectrum of hurricanes that may occur. Most importantly, risk and reliability allows decision makers to understand the relative levels of vulnerability that specific areas face, the nature of the consequences (e.g., loss of life, economic loss, or environmental loss), and to understand the source of the vulnerability. As such, it is an excellent tool for understanding the effectiveness of alternative approaches to reduce risk, which can be managed by changing the performance of the protection system or changing the nature or degree of related consequences.

**Traditional methods of hurricane frequency analysis are not adequate to describe the hurricane hazard for risk assessment.** Risk assessment requires a stage (water level)-frequency of occurrence (or exceedence) relationship for a multitude of locations around the HPS, the number depending on the variation of the surge and wave conditions. The SPH, or any design hurricane, is only a single representative storm, having a certain combination of characteristics, with an estimated frequency of occurrence; one storm out of a population of hurricanes that are possible, some of which are more severe than the SPH. Relatively little information regarding risk is available from this treatment of the storm threat. Considering a larger set of historical storms, such as in a strict application of the Empirical Simulation Technique, is an improvement; but it also limits consideration of what might occur in terms of combinations of hurricane characteristics to what has occurred. Using the Empirical Simulation Technique with track variations of historical storms adds some hypothetical storms to the historical record, but also adds the challenge of assigning frequencies to these storms. The Joint Probability Method – Optimal Sampling, coupled with high-resolution surge and wave models, was deemed the most rigorous and tractable means to characterize the hurricane hazard for the New Orleans risk assessment. It most thoroughly considers the spectrum of hurricanes that might occur. The period of record from 1950 to the present was defined as the most accurate interval for assessing hurricane characteristics. One will always be limited to a degree by the length of the historical record.

## Knowledge and Expertise

**Awareness and exploitation of emerging knowledge are critical.** The history of the planning, design, and performance of the HPS in New Orleans points out a dilemma. While new pieces of knowledge were available over time that were relevant to the ultimate performance of the I-walls on the outfall canals, the pieces were not put together to solve the puzzle of the failure mechanism that occurred. The Corps' own testing of sheet-pile stability (E-99) in the mid 1980s was not directed at the behavior of I-walls, but with hindsight, some of the behavior observed was indicative of the deflection of a structure that designers essentially assume to be rigid. Similarly, late in the 1980s, research papers published in part through the Corps laboratories discussed the high hydrostatic pressure issue with regard to a gap forming in conjunction with sheet-pile structures. Work, not directly related to levee or floodwalls, in England discussed the deflection and hydrostatic pressure problem for retaining walls. How do


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

these puzzle parts get pieced together to create knowledge for designers and how do designers and reviewers get access to this information? How does the research or testing community become aware of applications, perhaps different from their original purpose, for their new knowledge?

**Constant renewal of planning and design criteria and guidance are critical.** Part of the solution to this dilemma relates to the amount of overall effort and resources put into the search for new knowledge and capabilities to deliberately update design criteria and planning capabilities. Awareness and capability are gained best when there is both technology push (research creating new knowledge and capabilities) and requirements pull (designers/constructors seeking and pulling information from the research and professional communities). The solution is not more research or more outreach alone, it is the ability of the design/construction and research communities to work together in an environment enabling collaboration and experimentation with new knowledge and approaches to old and new problems. There has been a distinct loss in energy and resources expended in this area, particularly in the domain of hurricane and flood protection and specifically in the geotechnical fields that are at the heart of the levee and floodwall performance issues in Katrina. The focus on standards may, in fact, also deter this process. Standards imply stability and constancy, when in fact the concept of guidelines may be more appropriate, allowing and encouraging customization and adaptation as new knowledge emerges. In either case, standards and/or guidelines need to be refreshed at a greater frequency as the generation of new knowledge continues to accelerate.

**Maintaining expertise is critical.** The other dimension to this issue is expertise. As technology accelerates and engineering practice evolves at an increasing pace, it becomes more difficult to maintain the level of technical expertise necessary to cope with the ever more complex issues faced in water resources. This is true for the government and the private sectors. Government agencies are especially challenged in an era of outsourcing and competition for experienced professionals. Significant measures are needed to reemphasize technical expertise and renew that expertise as water resources practice evolves. These measures must be part of the culture of organizations and cover the entire profession to ensure that the total team addressing priority issues such as hurricane protection are working from the latest knowledge and professional practice.

## Other Studies

There were a number of other studies conducted within the time frame of the IPET activities. Perhaps the most publicly recognized of these are the efforts of the Independent Levee Investigative Team led by the University of California at Berkeley (UCB) and Team Louisiana led by the Louisiana State University (LSU). It was important to have multiple teams examining the post Katrina situation in New Orleans. Given the very short time frame for effecting repairs and the huge task of rebuilding both the hurricane flood risk reduction system and New Orleans, multiple perspectives and analyses were a significant benefit.

These efforts differed dramatically in their scope, resources and levels of effort The IPET was comprised of over 150 experts and another 150 support personnel with resources exceeding

$22 M and direct access to the unique experimental facilities of the Engineer R&D Center as well as those of the 8 major government agencies, 23 private sector firms and 25 universities that composed the task force. In addition, the IPET efforts have been continuously peer reviewed by the ASCE External Review Panel and strategically reviewed by the NRC Committee on New Orleans Regional Hurricane Protection Projects. Team Louisiana and the UCB Teams were much smaller in all dimensions and did not have the benefit of real time or strategic peer review. While the IPET effort was highly focused on in-depth analyses of the engineering and system wide performance issues, the UCB effort was divided between work on the engineering aspects and some on the organizational and human factors. Team Louisiana also examined a broad spectrum of topics but in less detail. To date there has not been a formal report published by Team Louisiana, however, some of their information was incorporated into the UCB report.

Following release of the IPET Draft Final Report on 1 June, 2006, review comments were provided by the ASCE External Review Panel and the NRC Committee on New Orleans Regional Hurricane Protection Projects. In an endeavor to respond to their feedback and to ensure that the IPET Final Report contained the best information possible, IPET teams reviewed in some detail the work of the other studies. The objective was to incorporate as appropriate any information that would enhance the value of final IPET findings, lessons learned and analytical processes documented in the report. It was also important to provide feedback to engineers and organizations engaged in planning, design and construction of flood risk reduction structures in New Orleans and elsewhere. There were a number of issues that have been published by the media as well as the study reports that deserve some specific mention here. Specific findings and more detailed evaluation of analyses and data are provided in the other IPET report Volumes, particularly in Volume V.

There were two areas that constitute the major differences in the findings of the three efforts. The first deals with the failure modes of the floodwalls. While there was agreement by all that excessive deflection of the floodwall structures was a major component of the failure mode for the I-walls along the outfall canals, the study teams hypothesized somewhat different failure modes for the 17th Street breach site and for one site on the Inner Harbor Navigation Canal. This is significant for the future planning and design of these structures as well as understanding appropriate remedial measures to strengthen existing structures. For the 17th Street site, both approaches consider weak subsurface soils as the other major culprit in the failure mode. They differ in which subsurface layer was the failure plane. IPET analysis, based on numerical modeling by two independent teams, physical modeling by two independent centrifuge teams and site geotechnical investigations that included excavating the actual failure plane with a backhoe, placed the failure plane in the weak clay layer underlying the persistent layer of peat in the region. The UCB Team, based on small diameter Shelby tube soil samples and limited numerical analyses, hypothesized a thin slippery layer within the peat layer (overlying the weak clay) as the slip plane. IPET has not been able detect a widespread thin (inch or less in thickness) layer within the peat layer, in spite of having physically harvested large volumes of peat for use in centrifuge testing and acquisition of significant additional subsurface soils data.

IPET has proposed that the failure mode for the southern (IHNC) breach adjacent to the Lower 9th Ward, was similar to that experienced at the 17th Street breach, deflection of the wall and failure within the underlying weak clay layer, with additional influence of the local


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

topography. The elevation of the land on the protected side of the floodwall was significantly less than shown in the original design documents which would have decreased the ability of the levee to withstand the high forces it experienced. The UCB analysis focused on seepage as an issue at this site. Since the geology of the site is similar to that at the 17th street breach, with weak clay under the pervasive peat layer, it is difficult to find evidence of major seepage through the clay or the peat. UCB assumptions for permeability of the peat were far higher than any measured for the actual materials or published values for similar materials. While these values of permeability would indicate seepage, IPET has found no justification for these assumptions and no physical evidence of seepage being a systemic performance issue at this site.

The second area of significant difference dealt with the performance of the levees, specifically along the Mississippi River Gulf Outlet (MRGO). The UCB report and numerous media accounts attribute to these teams, hypothesized that these levees "crumbled" prior to water levels reaching the crest of the levees. There was also stipulation of wave action causing high pore pressures within the levee materials leading to deterioration by slumping and seepage induced erosion. An analytical basis for these hypotheses has not been presented to date.

It is true that the relatively permeable and erodible materials of the levees constructed by hydraulic fill did contribute to their ultimate breaching. However, analysis and field observations demonstrate that the UCB/LSU hypothesis was not the systemic process leading to breaching. IPET analysis of this phenomena included regional analysis of the surge and wave hydrographs along the levee sections, detailed modeling of wave action and currents in proximity to the levees and analysis of erosion process for the materials comprising the levees.. The IPET analysis and physical evidence at the sites show that the systemic issue for levee performance was overtopping and the subsequent erosion from waves and ultimately surge. Where waves were incident perpendicular to the levees, the overtopping waves created velocities on the protected side of the levees up to three times those experienced on the front (water) exposed sides. This created a potential for erosion 27 times more severe on the crest and protected sides of the levees. In addition, claims of wave action increasing pore pressures within the relatively permeable materials of the interior of the levees leading to seepage induced erosion do not stand the 'test of time'. The permeability of the materials was not sufficient to allow this process to take place in the time frame of the exposure to high waves and surge.

For levee sections that experienced waves traveling more aligned with their orientation, velocities on the protected sides were significantly lower and significantly less erosion occurred.

There are meaningful lessons learned in the above examples. In an environment as complex and heterogeneous as this, there are many possible failure modes. It is critical to consider them all in any analysis, planning or design activity. To do so requires detailed and comprehensive information and analyses with cross checks from independent sources, not always feasible when resources and time are limited. It is particularly important to determine if an anomaly observed locally is just that or a component of a widespread characteristic that represents a systemic performance issue.

Another major lesson learned is that it is not likely that all possible failure modes have been identified or observed for structures in complex geological environments such as in New


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

Orleans. The engineering community should continuously seek additional insights on potential performance for wide ranges of conditions and incorporate as often as possible potential non-traditional behavior modes in their analyses.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

# Appendix 1
# IPET Leadership, Affiliations, and Organizations

| Task Force | Leader |
|---|---|
| Project Director | **Dr. Lewis E. Link** – University of Maryland |
| Technical Director | **Dr. John Jaeger** – U.S. Army Corps of Engineers, Huntington District |
| Project Manager | **Jeremy Stevenson** – U.S. Army Corps of Engineers, Huntington District |

| Team | Leaders |
|---|---|
| Data Collection and Management – Perishable Data, Systems Data, and Information Management | **Dr. Reed Mosher** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Geotechnical and Structures Laboratory<br>**Denise Martin** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Information Technology Laboratory |
| Geodetic Vertical and Water Level Datum Assessment | **James K. Garster** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Topographic Engineering Center<br>**David B. Zilkowski** – National Oceanic and Atmospheric Administration, National Geodetic Survey |
| Hurricane Surge and Wave Analysis | **Bruce Ebersole** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Coastal and Hydraulics Laboratory<br>**Dr. Joannes Westerink** – University of Notre Dame |
| Hydrodynamic Forces Analysis | **Dr. Donald Resio** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Coastal and Hydraulics Laboratory<br>**Dr. Bob Dean** – University of Florida |


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

| | |
|---|---|
| Geotechnical Structure Performance Analysis | **Dr. Michael Sharp** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Geotechnical and Structures Laboratory<br>**Dr. Scott Steedman** – Steedman and Associates, Ltd., United Kingdom |
| Floodwall and Levee Performance Analysis | **Dr. Reed Mosher** – U.S. Army Corps of Engineers, Engineer Research and Development Center, Geotechnical and Structures Laboratory<br>**Dr. Michael Duncan** – Virginia Polytechnic Institute and State University |
| Pumping Station Performance Analysis | **Brian Moentenich** – U.S. Army Corps of Engineers, Portland District<br>**Bob Howard** – South Florida Water Management District |
| Interior Drainage/Flooding Analysis | **Jeff Harris** – U.S. Army Corps of Engineers, Hydrologic Engineering Center, Hydrology and Hydraulics Technology Division<br>**Steve Fitzgerald** – Harris County, Texas, Flood Control District |
| Consequence Analysis | **Dr. Dave Moser** – U.S. Army Corps of Engineers, Institute for Water Resources<br>**Dr. Patrick Canning** – U.S. Department of Agriculture, Economic Research Service |
| Risk and Reliability Analysis | **Jerry Foster** – Headquarters, U.S. Army Corps of Engineers<br>**Bruce Muller** – U.S. Bureau of Reclamation |

## Organization

The IPET teams are composed of individuals from a wide variety of organizations, bringing together a unique diversity and depth of knowledge and experience. These organizations are listed below.

### Government Agencies

Federal Emergency Management Agency, Department of Homeland Security

Harris County, Texas, Flood Control District

Metropolitan Water Reclamation District of Greater Chicago

National Institute for Science and Technology

National Oceanic and Atmospheric Administration, Atlantic Oceanographic and Meteorological Laboratory, Hurricane Research Division

National Oceanic and Atmospheric Administration, Center for Operational Oceanographic Products and Services

National Oceanic and Atmospheric Administration, National Geodetic Survey

South Florida Water Management District

United States Army Corps of Engineers

United States Bureau of Reclamation

United States Department of Agriculture, Economic Research Service

United States Geological Survey

### Academia

Alfred University, New York

Georgia Institute of Technology

Johns Hopkins University

Louisiana State University

Massachusetts Institute of Technology, Department of Urban Studies and Planning

Michigan State University

Oklahoma State University

Pennsylvania State University

Rensselaer Polytechnic Institute

Stanford University

Texas A&M University

University of California

University of Delaware

University of Florida

University of Illinois

University of Maryland

University of Miami, National Oceanic and Atmospheric Administration Cooperative Institute for Marine and Atmospheric Studies

University of Missouri

University of New Orleans

University of North Carolina

University of Notre Dame

University of South Carolina

University of Texas

Utah State University

Virginia Polytechnic Institute and State University (Virginia Tech)

## Private Industry

3001, Inc.

Abt Associates, Inc.

Ayres Associates

Beta Testing & Inspection, LLC

Burns, Cooley, Dennis

CH2M Hill

CTE/AECOM

Environ International Corporation, CA

Gannett-Fleming, Inc.

GeoComp Corporation

GeoDelft

Geomatrix Consultants, Inc.

Michael Baker Corporation

Oceanweather, Inc.

RAC Engineering

Science Applications International Corporation (SAIC) at NOAA/NCEP

SpecPro, Inc.

Steedman & Associates, Ltd.

Surfbreak Engineering


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

Taylor Engineering

URS Corporation

Victor Parr, Consultant

Watershed Concepts

# Appendix 2
# American Society of Civil Engineers External Review Panel Members

| Name | Organization |
| --- | --- |
| Christine F. Andersen | City of Long Beach California |
| Jurjen Battjes | Delft University of Technology |
| David E. Daniel | University of Texas at Dallas |
| Billy Edge | Texas A&M University |
| William Espey | Espey Consultants, Inc. |
| Robert B. Gilbert | University of Texas at Austin |
| Thomas L. Jackson | DMJM Harris |
| David Kennedy | California Department of Water Resources |
| Dennis S. Mileti | University of Colorado (retired) |
| James K. Mitchell | Virginia Polytechnic Institute and State University (Virginia Tech) |
| Peter Nicholson | University of Hawaii |
| Clifford A. Pugh | U.S. Bureau of Reclamation |
| George Tamaro | Mueser Rutledge Consulting Engineers |
| Robert Traver | Villanova University |
| Lawrence H. Roth | American Society of Civil Engineers |
| John E. Durrant | American Society of Civil Engineers |

# Appendix 3
# National Research Council Committee Members

| Name | Organization |
| --- | --- |
| G. Wayne Clough | Georgia Institute of Technology |
| Rick A. Luettich | University of North Carolina |
| Frederic Raichlen | California Institute of Technology |
| Rafael L. Bras | Massachusetts Institute of Technology |
| Peter Marshall | Burns & Roe Services |
| Y. Peter Sheng | University of Florida |
| John T. Christian | Consulting Engineer |
| David H. Moreau | University of North Carolina |
| Robert H. Weisberg | University of South Florida |
| Jos Dijkman | Delft Hydraulics |
| Thomas D. O'Rourke | Cornell University |
| Andrew J. Whittle | Massachusetts Institute of Technology |
| Robin L. Dillon-Merrill | Georgetown University |
| Risa I. Palm | Louisiana State University |
| Delon Hampton | Delon Hampton & Associates |
| Kenneth W. Potter | University of Wisconsin |
| Jeffrey W. Jacobs | National Research Council |


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

# Appendix 4
# Task Force Guardian Input

IPET Products Provided to Task Force Guardian (TFG) and Task Force Hope (TFH)

*a.* **Data Repository – 25 October 2005.** The IPET Data Repository was established as an entry point for collecting information pertaining to the New Orleans and Southeast Louisiana Hurricane Protection Projects that needs to be validated as factual. This repository supports both the IPET and TFH/TFG efforts by providing a database where information can be reviewed for accuracy and quality prior to posting the information on the IPET public website.

*b.* **Establishment of the IPET Public Website – 2 November 2005.** The IPET public website was established as a way to be fully transparent in effectively sharing factual information pertaining to the New Orleans and Southeast Louisiana Hurricane Protection Projects. The website provides a way to proactively communicate information that might otherwise require the public and TFG to process Freedom of Information Act requests.

*c.* **Establishment of On-Line Team Workspace using Groove – 22 September 2005.** To enable IPET, ERP, and members of TFH/TFG with on-line workspaces to communicate and share information virtually, Groove software and technical support was provided by IPET. Through these virtual workspaces information can be effectively and efficiently shared. Groove is a primary tool used to bring the IPET, ERP, and TFH/TFG teams together in sharing knowledge and information required to accomplish their missions.

*d.* **Integration of the IPET Public Website and the TFH/TFG Electronic Bid Solicitation Websites – 15 November 2005.** As a way to more effectively enable public benefit from the historic and performance-related information on the IPET public website and the reconstruction plans and specifications on the TFH/TFG electronic bid solicitation website, electronic linkage was provided to facilitate integration of the two sites.

*e.* **"Summary of Field Observations Relevant to Flood Protection in New Orleans, LA" – 5 December 2005.** This IPET review provided Task Force Guardian with a simple statement of concurrence or nonconcurrence from the IPET floodwall and levee sub-team and additional relevant discussion for each of the major findings in the ASCE/NSF report's chapter eight, "Summary of Observations and Findings." The additional discussion relates to the analysis being conducted by the IPET or others that would assist in applying the ASCE/NSF findings to the reconstruction of hurricane protection in New Orleans.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

*f.* **"Preliminary Wave and Water Level Results for Hurricane Katrina" – 23 November 2005.** This IPET report to TFH/TFG included observations from the IPET surge and wave sub team from a field trip and overflight of New Orleans and Southeast Louisiana.

*g.* **"Summary of IPET Numerical Model of Hurricane Katrina Surge and Wave Plans, Approach and Methods" – 19 December 2005.** This PowerPoint presentation by the IPET surge and wave sub team provided TFH/TFG with an update on wave and water level results for Hurricane Katrina. Wave and water level results from fast-track simulations of upper Category 3 type storms on various storm tracks and a Standard Project Hurricane event were also provided.

*h.* **Review of Proposal to Float In and Sink a Barge to Close Canals by June 2006 – 28 December 2005.** The proposal included the use of existing large ship tunnel thrusters mounted on a barge with huge pumping capacities. Review determined that the closure plan does not have enough pumping capacity to match existing pumps during a hurricane.

*i.* **Technical Support to TFG on the Analysis and Design of the Reconstruction Plans and Specifications for the Breaches – Completed June 2006.** Technical support was provided to TFG on an as-needed basis. As a minimum, monthly face-to-face meetings took place in New Orleans. This support included geotechnical and structural consultations. These discussions also included reviews of plans and specifications for reconstruction features such as T-walls, L-walls, I-walls, levees, and foundation investigations.

*j.* **Evaluation of Existing and As-Built Conditions at Canals – Completed June 2006.** This evaluation included concrete and steel material properties for reinforcement and sheet piles on the I-walls, as-built length of sheet piles, surveys, and foundation material properties and boring logs.

*k.* **Life-cycle Documentation of the Hurricane Protection System – Completed October 2006.** This documentation included a review of the design, construction, and operation and maintenance of the hurricane system.

*l.* **Verification of Current and Reconstructed Floodwall Elevations – November 2005.** Established a tidal gauge in November 2005 at the 17th Street Canal to monitor current sea level relationships to the newest NAVD88 datum epoch (2004.65). Verified floodwall elevations on Lakefront outfall canals and IHNC relative to this latest tidal and vertical epoch.

*m.* **LIDAR Ground Truthing – Completed November 2006.** Ground-truthing surveys were performed throughout the region to calibrate various LIDAR-based elevation models used by Task Force Guardian.

*n.* **Densification of Control Benchmarks – 31 December 2005.** IPET has established approximately 75 vertical benchmarks throughout the region. These control points were being used for Task Force Guardian construction activities.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

o. **Establishment of GIS Team – 2 February 2006.** The GIS Team was established to maximize the effectiveness and efficiency of the GIS resources within IPET, Task Force Guardian, Task Force Hope, and the New Orleans District. The GIS Team consists of members from each of the four teams and provides a way to integrate efforts and share information pertaining to the HPS. The GIS Team will also provide for a way to assure a smooth transition of IPET-generated GIS information to the New Orleans District upon disbanding of IPET once its performance evaluation is completed. Significant IPET data sets shared with TFG in January and February 2006 include the digital elevation models, vertical datum survey data, geotechnical data, and photographs.

p. **Insight into Probable Cause of Breaching at 17th Street Canal – Continuous ending March 2006.** Information was shared with TFG on the probable cause of breaching at the 17th Street Canal. Recommendations were provided on considering the formation of a gap at the base of cantilever I-walls and shear strength variations between the centerline and inboard toe of levees used in combination with I-walls.

q. **Storm Surge and Wave Analysis Results for Katrina and Historical Storms – December 2005.** Information pertaining to modeled Katrina storm surge and wave heights and periods for various locations along the HPS was provided to TFG. In addition, modeled surge and wave results from other historical storms were also provided.

r. **Review Comments on Canal Closure Structures – December 2005 and January 2006.** IPET review comments for the outfall canal closure structures were provided to aid in development of high quality Plans and Specifications for the closure structures.

s. **Provided Comments in IPET Report 2 Regarding Comparison of Hurricane Katrina Wave and Period Conditions with Design Values – March 2006.** Design wave conditions, particularly wave period, should be reevaluated for the east-facing levees in East Orleans, St. Bernard, and Plaquemines Parishes.

t. **Closure Structures Modeling – January – February 2006.** IPET members at the New Orleans District performed modeling analysis of the closure structures on 17th Street, Orleans, and London Avenue Canals.

u. **Closure Structures Interim Operations Plan – March 2006 – Completed November 2006.** IPET members reviewed and commented on operations of the gates and pumps. This included criteria for closing and opening, and coordination with local jurisdictions.

v. **MRGO White Paper – March 2006.** Input on analysis of MRGO effect on storm propagation into metropolitan New Orleans and vicinity.

w. **ITR on Heat Straightening Repairs at Empire Floodgate.** IPET team members visited the Empire Floodgate and reviewed the proposed repair plan, approving of the corrective action plan and making further clarifying recommendations. IPET suggested requiring in the specifications that the project supervisor be an experienced heat straightener possibly


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

added to section 5 of the specifications and that NDT be performed prior to and following the heat straightening. The initial NDT would benefit general initial assessment of the floodgate and provide a baseline in the event you get an inexperienced contractor that does more harm than good. TFG will know if heat straightening caused cracking if you have a baseline. TFG may want to consider the simultaneous application of V-heat on both sides of the flange—considering its thickness; this could be added in section 3.5 of Avent's specifications. IPET believes section 3.5.3 pertains to simultaneous V-heats on the same side of the flange.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.