# THE FAILURE OF THE NEW ORELANS LEVEE SYSTEM DURING HURRICANE KATRINA AND THE PATHWAY FORWARDS

Ivor Ll. van Heerden, Ph.D. and G. Paul Kemp, Ph.D.
LSU Hurricane Center
Louisiana State University, Baton Rouge, La 70803

## Introduction

Louisiana State University (LSU) was commissioned in October, 2005 by the Louisiana Department of Transportation and Development (LDOTD) to assemble a team of Louisiana-based academic and private sector experts to "collect forensic data related to the failure of the levee systems around greater New Orleans" that occurred during passage of Hurricane Katrina on the morning of 29 August 2005. This group, later known as 'Team Louisiana,' was to focus on the hurricane protection system (HPS) designed and constructed over a 40-year period by the U.S. Army Corps of Engineers (USACE) for the East Bank of the Greater New Orleans area (GNO), including New Orleans East and St. Bernard Parish. This paper builds on the Team Louisiana report (van Heerden etal, in press).

One way to view the Katrina event is as a catastrophic natural disaster, and with respect to the magnitude of the storm surge, it was. This approach tends, however, to minimize the engineering contribution to the direct or indirect loss of as many as 1,500 Louisiana residents (including the 130 still missing as of December 2006, most considered swept away and drowned). Over 100,000 families were rendered homeless, making the destruction of New Orleans the worst from that perspective since the record Mississippi River flood of 1927. The response of the Nation to that natural disaster, even though it cost far fewer human lives, came in the form of an unprecedented engineering program to ensure that the flooding of the Lower Mississippi Valley would never happen again. The federal HPS that was authorized in 1965 to protect New Orleans, following Hurricane Betsy, had the same goal but was clearly ineffective. It is important to understand why.

From an engineering perspective, forensics science is the study of materials, products, structures or components that do not operate as intended. In the context of the flooding of New Orleans, the purpose is to understand, first, what performance was expected from the GNO HPS and, second, to identify causes of failure as part of an effort to improve future performance.

At the time that Team Louisiana was commissioned, researchers from the LSU Hurricane Center had already fielded a reconnaissance effort that had uncovered apparent discrepancies between what was observed and early USACE statements about the causes of levee and floodwall failures. Following public discussion of these findings, three other investigations were organized by external groups as diverse as the University of California, Berkeley and the American Society of Civil Engineers, as well as by the USACE itself. These investigative teams included few scientists or engineers from Louisiana. Secretary Johnny Bradberry of the LDOTD saw a need for an official state-sponsored initiative to ensure that state and local perspectives were not ignored as the investigations proceeded.

The external study teams, particularly the Independent Levee Investigation Team (ILIT) that grew out of the UC Berkeley initiative, and the Interagency Performance Evaluation Team (IPET) sponsored by the USACE, concluded their work and issued final reports summer 2006. The findings of these investigations differ with respect to some details, but generally concur on the specific mechanisms of most of the foundation-related floodwall failures. It is not surprising, however, that from a local perspective, these external probes appeared to miss some of the context in which the design and construction of the still incomplete federal HPS – originally planned to take 13 years at a total cost of less than $90 million – stretched out over 40 years.

The GNO HPS project employed two generations of USACE employees at an estimated total cost of more than $700 million, while consuming nearly $200 million in locally generated funds. Over this time, the USACE provided local sponsors with many conflicting claims, but few reliable assurances, of the actual level of protection being provided. The cost to repair the GNO HPS to pre-storm condition has being as much in the year following Katrina as was spent in the previous 40 years. The repaired HPS still provides a substantially lower level of protection than was originally authorized in 1965. Given this history, the multi-generational tension between the USACE and those being protected in the GNO is complex and easily misunderstood. It is hoped that this paper will provide some additional local perspective.

Dr. Ivor van Heerden led the Team Louisiana effort aided by three other LSU scientists: Dr Paul Kemp, an oceanographer, Dr Hassan Mashriqui, a hydraulic engineer, and Dr Radhey Sharma, a geotechnical engineer. This group augmented by the addition of three senior engineers from the private sector. These members included two geotechnical engineers, Mr. Billy Prochaska and Dr Louis Capozzoli and a water resources engineer, Mr. Art Theis.

The surge generated by Hurricane Katrina, a Saffir-Simpson Category 3 storm on landfall, is unprecedented in U.S. history. There is a potential for any forensics investigation to convey an apparent omniscience derived from 20:20 hindsight, and to lose sight of key points like this one. Team Louisiana tried to avoid this trap by focusing on what was known at the time the GNO HPS was designed, the analytical tools that were available then, and what tools were used.

On the other hand, engineers – then or now – all work with uncertainty and follow accepted practice to account for unknowns that increase the risk of failure. As one of the senior Team Louisiana geotechnical engineers pointed out, it is the anomalous stratum, rather than the average soils condition, that generally causes foundation failure. Engineers address these uncertainties in levee and floodwall design by adding freeboard to raise crown elevation beyond the minimum specified, by inflating the stress to be resisted by a "factor of safety" sufficient to account for unknowns, and by incorporating redundant measures to limit the effect of the failure of a single component. These are some of the key features that distinguish a safe system from one that is unsafe. Such elements are the focus of this investigation.

**Objectives of the Team Louisiana - Forensic Study**

The following key questions were formulated to guide the forensics investigation.

1. Was the GNO HPS properly conceived to accomplish the 1965 Congressional mandate to protect against the "most severe combination of meteorological conditions reasonably expected?"
2. Were the levels of protection, or crown elevations, specified in designs for HPS elements sufficient to resist overtopping by surge and waves associated with the 100-year Standard Project Hurricane?
3. Did incorrect design assumptions compromise performance? Should these have been detected and corrected by engineers equipped with the tools available at the time?
4. Did the Mississippi River Gulf Outlet (MRGO), a free-flowing, deep-draft navigation canal that pierced the HPS on the eastern side, compromise system performance?
5. Was the system maintained and operated to assure the required level of protection through time? Specifically, how did the 40-year construction schedule impact system performance?

**Results of the Forensic Study**

Question 1. Was the GNO HPS properly conceived to accomplish the 1965 Congressional mandate to protect against the "most severe combination of meteorological conditions reasonably expected?"

Answer 1. No. The initial meteorological and oceanographic analysis based on the 1959 U.S. Weather Bureau 1-in-100 year Standard Project Hurricane (SPH) was known to be obsolete by 1972, just as construction of initial parts of the GNO HPS was getting underway (van Heerden etal, in press). The primary deficiency of the 1959 SPH was in the specification of maximum sustained wind speed, which the National Weather Service (NWS) had increased by 20 percent, from 107 to 129 mph. The steady-state analytical approach used by the USACE to develop surge estimates was as sensitive to the effect of wind velocity as later numerical modeling approaches (i.e. SLOSH or ADCIRC), and should have alerted the USACE to the danger of underestimating wind speed. This analysis provided a design basis for setting the minimum heights above mean sea level for levee and floodwall crowns to resist overtopping by combined SPH waves and surge. A 20 percent underestimate of maximum winds can lead to a 40 percent reduction in the predicted surge elevation. In 1979 the NWS raised the maximum sustained winds to 140 MPH, a category 4 hurricane further exacerbating the surge design deficiencies!

The New Orleans District (NOD) USACE was aware of this deficiency in the original analysis, as is indicted by testimony in 1976 and 1982 General Accounting Office (GAO) reports, but never revised the original SPH-based analysis to reflect the new understanding of the threats, even after being ordered to do so by the Chief of Engineers in 1981 (ER 1110-2-1453 - van Heerden etal, in press). New Orleans residents were not advised that the GNO HPS required significant improvements to meet 1-in-100 year SPH requirements, but, instead, the New Orleans District claimed at times that the GNO HPS would protect against a 1-in-200 to 1-in-300 year hurricane. No basis for this claim has been established, while numerous storms that

have affected the GNO area – before and after the 1965 initiation of the HPS -- were more severe than the 1959 SPH (van Heerden etal, in press).

The NOD missed opportunities to revise the original SPH-based analysis after the NWS revised the SPH in 1972 and 1979, and when the SLOSH (Sea Land and Overwash Surges from Hurricanes – Jelesnianski etal 1992) storm surge model came into use in 1979. SLOSH showed clearly that the GNO HPS, as it was constructed at the time, was vulnerable to overtopping by many possible Category 3 storms. This result was confirmed later by the ADCIRC (ADvanced CIRCulation – Westerink etal 1994) model, as recently as during the 2004 FEMA Hurricane Pam exercise ( http://hurricane.lsu.edu/floodprediction/PAM_Exercise04/). The USACE supported development of both surge models and was aware of GNO HPS vulnerabilities, but appeared to accept the inadequacy of the system with a complacency that undercut efforts to sound alarms and begin pressing for improvement (van Heerden etal, in press).

Question 2. Were the levees and floodwalls at or above crown elevations, specified in designs for HPS elements, sufficient to resist overtopping by surge and waves associated with the Standard Project Hurricane?

Answer 2. No. Floodwall and levee crown elevations were built 1 to 2 ft low because of an erroneous assumption at USACE New Orleans District (NOD) that an elevation of zero referenced to the National Geodetic Vertical Datum of 1929 (NGVD29) was equal to -- and interchangeable with -- local mean sea level (LMSL) (van Heerden etal, in press). LMSL was the relevant datum for superimposition of hurricane surge and wave height from a 1950's era oceanographic analysis. In 1965, zero NGVD29 was between 1.3 and 1.6 feet below LMSL at different parts of the system, and floodwalls and levee crowns were constructed lower by this margin. This mistake was locked in for continuing HPS construction when the NOD adopted a policy in 1985, with the approval of the USACE Lower Mississippi Valley Division (LMVD), to explicitly use the outdated 1965 NGVD29 adjustment for elevation control. As a result, no provision was made to account for the 3 to 4 ft/century subsidence rates characteristic of the GNO area even though this rate was known at the time of authorization. Crown elevation deficiencies ranging up to 5 feet at the time Katrina struck resulted in prolonged overtopping of floodwalls and levees along the Inner Harbor Navigation Canal (IHNC) and to the east in the Lake Borgne funnel that otherwise would have been overtopped only briefly (van Heerden etal, in press). Prolonged overtopping led to catastrophic breaches into the Lower 9th Ward on the east and into Orleans Metro on the west, and contributed to the early failures of levees along the Gulf Intracoastal Waterway (GIWW) and MRGO. Early failure of the MRGO levee allowed the 32,000 acre wetland buffer between MRGO and 40 Arpent back levee to fill and overtop the 40 Arpent back levee while the surge was still rising, and resulted in catastrophic flooding in St. Bernard to an elevation of 11 ft (NAVD88).

Question 3. Did the USACE follow existing engineering practice and USACE guidance for construction of levees and floodwalls? Should issues about levee materials and floodwall designs have been detected and corrected by engineers equipped with the tools available at the time of construction?

Answer 3. No to the first question, and yes to the second. Weak soil strengths or potential for underseepage were evident in strata tested for the USACE during the early 1980s under Orleans Metro drainage canal floodwall levees that failed. The potential consequences of these layers on levee stability were known to practicing engineers at the time but were missed or ignored because of inappropriate averaging of soil strengths on long levee reaches and across layers. Design engineers assumed that consolidation of soils beneath the I-wall levees on the 17th Street Canal would have increased soil strengths over time, but borings and soundings conducted since Katrina show that very soft clays in the failure zone have strengths less than values assigned in 1981. Where Division-level reviewers identified potential problems, they were rebuffed by District personnel citing "professional judgment."

The New Orleans District USACE failed to conduct appropriate analyses of the potential for seepage to compromise levee and floodwall stability where shallow sand deposits occurred beneath the levee, such as at the London Avenue Canal. Design memoranda indicate reliance upon the Lane's Weighted Average Creep method for underseepage analysis. This method was recognized in the profession at the time to be inappropriate for final design in a critical life-support structure. The presence of layered sands and clays should have led to analysis using more rigorous flow net and finite-element techniques in widespread use at the time, and specified in the governing USACE engineering manual for Design and Construction of Levees (EM 1110-2-1913, 1978 ed. - van Heerden etal, in press). Sheetpile supported I-walls that were installed on levees with cross-sections too small to prevent underseepage also did not provide sufficient resistance when fully loaded, no matter what the sheetpile length. There is no evidence that rigorous analysis of uplift pressures was undertaken.

Idealized design templates were applied to long levee and floodwall reaches without adjustment for variable subsoil conditions or for variations in elevation on the protected side. IPET believes that such a mistake caused the levee supporting the I-wall levee to be built too low in the vicinity of the north breach into the Lower 9th Ward. The foundation failed early in the storm sequence at a water elevation well below the design level of protection because of inadequate resistance to overturning.

The New Orleans District USACE did not follow standard engineering practice or Corps guidance when evaluating whether to protect (armor) earthen sea dikes from erosion caused by waves in the funnel area east of the city. Such evaluations should have followed the 1954 TR-4 Shore Protection Planning and Design (Beach Erosion Board) or its successor, the Shore Protection Manual, first published in 1973 (van Heerden etal, in press). Instead of the required analysis, Design Memoranda for the New Orleans East and Chalmette Levees substitute the following disclaimer.

> "Due to the short duration of hurricane flood stages and the resistant nature of clayey soils, no erosion protection is considered necessary on the levee slopes."

These levees were not designed to withstand general overtopping, as was amply demonstrated in Katrina, but were expected to experience overtopping by waves greater than the significant wave provided in the oceanographic analysis. Many miles of the Chalmette and New Orleans East Levees were constructed of shell-rich sands with poor erosion resistance derived from the

hydraulic excavation of the adjacent GIWW and MRGO channels, rather than the hauled clay soils specified for levees protecting urban areas (EM 1110-2-1913, 1978 ed. - (van Heerden etal, in press). Many of these problems could well have been detected if a formal process existed for the state to review the designs and design assumptions.

Question 4. Did the free-flowing, deep-draft navigation canal that pierces the HPS on its eastern side compromise system performance?

Answer 4. Yes. The MRGO and GIWW channels provide efficient conduits to funnel surge into the heart of New Orleans. As a result, surge elevations peaked in Lake Borgne and the IHNC at nearly the same time, and at higher levels relative to levee and floodwall crowns, and earlier than would have been true prior to all of the wetland loss attributed to them. The effect of these federally constructed and operated channels on surge and waves has consistently been underestimated by the USACE from before Hurricane Betsy, right through to the recent IPET report, as has the effect of accelerated wetland loss in the funnel area. One consequence of this institutional "blind spot" was that a hurricane barrier of the type proposed in the original pre-1980s HPS for the other two main passes into Lake Pontchartrain was never included for the MRGO.

The ILIT and IPET have indicated that the original "barrier" approach was a better design than the "high-level," levees-only HPS ultimately adopted twenty years after authorization. But van Heerden etal, in press indicate that disastrous flooding during Katrina from the Lake Borgne funnel and the IHNC would have been exacerbated by the barrier proposed at the Lake Pontchartrain terminus of the IHNC (Seabrook). On the other hand, the Lake Pontchartrain surge along the south shore might have been reduced by up to 2 ft by the barriers that were proposed for the other Lake Pontchartrain passes. This might have been enough to prevent one or more of the failures of the defective Orleans Metro drainage canal floodwalls built in the 1990s, and this would have greatly reduced the severity of prolonged flooding in Orleans Metro. Certainly, the barrier plan would also have reduced surge along the north shore of the Lake, perhaps by as much as 5 feet. Such trade-offs were never rigorously assessed when the decision was made to change the HPS design from partial reliance on tidal barriers to sorely higher perimeter levees in 1985 at a time when surge modeling techniques using SLOSH were available. Again, the level of protection was reduced without informing the population at risk (van Heerden etal, in press).

Question 5. Was the system maintained and operated to assure the required level of protection through time? Specifically, how did the 40-year construction schedule impact system performance?

Answer 5. No. The GNO HPS was managed like a circa 1965 flood control museum. Design assumptions and policy made in 1965 continue to diminish the HPS today. Local sea level has risen 0.4 ft since the 1960s and much of New Orleans has sunk over 1.5 ft in the same period for a combined change of nearly 2 ft relative to sea level, but as IPET (2006, II-78) noted,

> "It was not clear how projected subsidence rates were applied in structural elevation design, if at all. Subsidence was apparently not factored into the design freeboard allowance."

Prudent engineers operating in coastal Louisiana have made allowances for subsidence for a century. The New Orleans District was one of the first agencies to directly map coastal wetland loss in Louisiana, but this ever continuing diminishment of surge protection was never incorporated into design philosophies (May and Britsch 1987). An analysis of all factors affecting levee elevation is required as part of FEMA Levee Elevation and Certification Requirements (44CFR65.10 – van Heerden etal, in press-). It is inexcusable that this was not done for what was the most critical coastal protection project in the country.

Most public works structures would be scheduled for replacement or rehabilitation after 40 years, but planning for a more modern system was put off while the original project fell farther and farther behind. Because the USACE never completed the 1965 project, it could not legally pass responsibility for major maintenance or upgrades to the local sponsors, or initiate a new project to bring protection to a higher standard. Local sponsors kept levees and rights of way mowed, operated drainage structures, commented on USACE design memoranda, and participated in inspections. They were not, however, consulted on design or construction decisions. On the other hand, they were required to pay 30 percent of all costs incurred for a level of protection that appeared on some reaches to diminish over time. When Katrina struck, the crown height on most levee and floodwall reaches was between 1 and 3 ft low relative to current mean sea level, the only datum that is relevant to hurricane waves and surge. On the IHNC and MRGO, every foot of crown deficiency when the surge was above 11 ft meant that overtopping and levee erosion started a half hour earlier. A half-hour in the lifetime of a moving hurricane can mean the difference between success and failure (van Heerden etal, in press).

**Recommendations**

Team Louisiana was not tasked to develop any recommendations resulting from their forensic study, so we have developed the following as an outgrowth of our participation in the Team La effort.

Complete Independent Review of All Levee Systems

- Katrina was a man-made catastrophe triggered by a relatively fast Category 3 hurricane that missed New Orleans. Due to activities of the NOD, the citizens of the state were basically denied the level of protection mandated by Congress in the 1965 Flood Control Act. Independent Review Panels must be formed to assess the integrity and safety of existing levee systems in Louisiana as well as the repairs presently being carried out. An independent review panel also needs to be constituted to review all future Corps of Engineers projects that could possible have an impact on human life, property, or the natural function of ecosystems. Instigation of interactive consultation and review by consulting panels of leading outside experts is common practice in dam engineering. It should be common practice in levee engineering as well, when the levee systems protect significant populations. In addition, it would be wise for local

interests (e.g. the State and/or the City) to mount an additional unbiased expert review panel (again including leading experts) to provide a second check and opinion. The majority of team leaders in IPET are Corps officials and this precludes this group from being an "independent review team."

- The catastrophe could have been avoided with proper oversight of the design process and proper administration of the operations and maintenance of the completed facilities. This includes the continual upgrading of the system as subsidence occurs and inclusion of better methods to calculate the effects of hurricane winds on the development of storm surges. All levees and floodwalls should be re-evaluated to identify those areas where questions may exist with respect to design or construction and undertake a re-evaluation of the adequacy of such flood protection structures.
- Based on the failures studied by Team Louisiana, neither cantilevered sheetpile structures nor "I-walls" in southeastern Louisiana should be certified to sustain hurricane loadings without careful inspection and analysis of the geotechnical data used in the design. All I-walls should be re-evaluated for current design loadings assuming a water filled gap along the flood side of the wall. All levees underlain by soft clay or other such questionable soils should be re-evaluated for current design loadings accounting for reduced shear strength of soils in areas at or beyond the toe of the levee. Any walls found structurally sound should be provided with splash pads to prevent failure under overtopping conditions.
- Many of the "I-wall" type concrete floodwalls are currently being removed and replaced by the more robust "T-wall" type floodwalls (which have additional battered piles to help then resist overturning and lateral displacement.) These T-wall systems will have somewhat increased capacity, but they too will need to be analyzed with regard to this potential failure mode. It cannot simply be assumed that "T-walls" are safe.
- A risk-based approach toward defining the design hurricane conditions is needed. The standard project hurricane needs to be redefined ASAP using principles and practices similar to those used in establishing design criteria for other in frequent but potentially catastrophic natural disasters such as earthquakes and floods. Storm Surge numerical models must be used to fully investigate possible surge conditions under a whole range of storm sizes, forward speeds, angles of approach and so on.

8-29 Commission

- We recommend that the issues raised in the forensics portion of the Team Louisiana and ILIT reports form the basis for an official inquiry into how mistakes with such tragic consequences were made. Such an inquiry would differ substantially from any of the technical investigations that have been concluded, including Team Louisiana.
- All of the existing forensics reports raise technical questions about the way in which the USACE funds, designs and builds projects with critical life-support functions, but do not tell us why decisions were made in the way they were, and therefore cannot build confidence in the USACE going forward.
- A "truth and reconciliation" commission could operate not by branding scapegoats but by encouraging those who have special knowledge of what happened to explain what they know without fear of retribution so that the same mistakes are not made again. The goal

is to allow both those harmed and those who were responsible to move forward with rebuilt respect and trust into a very different future.

Coastal Protection and Restoration Planning

- Based on the failure of the state and/or USACE to produce any meaningful plans now that we are 18 months out from Katrina, a Congressionally mandated independent planning commission should be established to *post haste* to develop a conceptual plan for the long-term protection that includes wetland and barrier island restoration; Dutch-type flood gates and pile-supported barrier structures at key locations; and, an armored barrier levee system that crosses the coast from west to east (van Heerden and Bryan 2006). The concept must be that the barrier levee and gates protect the built environment; the wetlands protect the levees; and the barrier islands protect the wetlands. Another approach to dealing with uncertainties in engineered systems is to incorporate back-up protection, also referred to as redundancy. The GNO HPS is compartmentalized to some degree and does include redundancy in the form of interior levees in Orleans East and St. Bernard that were constructed by state and local authorities. These lower levees were built to separate thousands of acres of undeveloped, tidal marsh buffers on the protected side of the federal levees from developed areas under pump. While they did not prevent catastrophic flooding during the Katrina event, they did play important roles in delaying flooding that deserves additional attention as redesign and reconstruction of the GNO HPS proceeds. Unlike a river flood that may last for months, the challenge presented by a hurricane surge lasts only a matter of hours at any one point. Defense in depth offers a potential to reduce the catastrophic impact of overtopping or breaching at the perimeter.
- There is a need to establish clear lines of responsibility when it comes to the operation and maintenance of the drainage systems and flood control systems. One problem is that the federal projects are never completed, rendering a clean hand-off to local authorities impossible. It is hoped that the consolidated levee boards established by statewide ballot in Louisiana in 2006 will improve coordination.
- One reason for the present confusion is that we have a flood control system, the construction of which never ends and artificial end lines or arbitrary completions manifest themselves.
- All existing federal navigation projects in coastal areas should be evaluated by independent investigators using modern surge and wave modeling techniques to determine the degree to which they continue to compromise existing storm flood protection. This can form the basis for Federal Emergency Management Agency (FEMA) remedial retrofit plans. The MRGO and other channels in the funnel must immediately be fitted with appropriate closure features to ensure that it does not serve again as a conduit for surge and waves to GNO.
- Transparency in dealing with the public is a must. Citizens of New Orleans were never told by governmental authorities just how vulnerable they were to flooding, or the simplifications made in setting designs and design criteria. It is extremely important that all aspects of the levee system, whether existing, the repairs or future projects, be fully communicated to the public. They need to understand their risks for living behind the federal levee system.

Katrina Bill

- The citizens of New Orleans put their trust in the federal levee system. Most heeded evacuation orders and left. However, through no fault of theirs they lost everything - homes, possessions, employment. Many have spent all of their savings to survive since the storm. Katrina catastrophically affected their lives and destroyed a large part of the infrastructure of New Orleans. Additionally, 1500 lost their lives either directly from the flooding or due to the failed response. The federal government needs to compensate all citizens and supply the resources to rebuild New Orleans infrastructure. Louisiana has had federal aid, but no compensation. This is so wrong when the federal system failed so dismally.
- Following on the 8-29 Commission Congress needs to pass a "Katrina Bill" that will ensure that coastal restoration and protection will be fully federally funded, not through add-ons to other bills, and the need for a local cost share should be scrapped. The Mississippi River levees are 100% federal and so should the hurricane levees. Federal actions have contributed substantially to coastal wetland loss.

Other Federal Actions

- The unique blanket immunity that the USACE enjoys in the law from liability for defective design of flood control projects should be re-examined and carefully restricted to ensure lines of corporate and professional responsibility are clear and traceable.
- A reexamination is needed of the conditions under which federal flood control project elements are determined to be "substantially" complete, or ready for local assumption of maintenance and operational responsibilities. Clear, mutually understood criteria and standards should be established for such transfers.

Relationship between Local Sponsors and the Federal Government

- Local sponsors kept levees and rights of way mowed, operated drainage structures, commented on USACE design memoranda, and participated in inspections. They were not, however, consulted on design or construction decisions. On the other hand, they had to pay 30 percent of all costs incurred for a level of protection that appeared on some reaches to diminish over time.
- The one-sided relationship between local sponsors and the USACE on technical management and oversight of cost-shared projects needs to be changed to create an atmosphere in which technical inquiries are encouraged and given respectful treatment outside of a political arena. The USACE was unresponsive to critiques coming in from cost-sharing partners in the limited time they were generally given to rubber stamp USACE design documents, and was often ready to pass incomplete project elements to local authorities without local concurrence. Only by withholding cost-sharing funds could these partners bring attention to technical concerns, and this tended to make every technical issue into a political one.
- All levee certifications necessary for local government participation in the federal Flood Insurance Program should be renewed on 5-year intervals based on data that is stamped by professional engineers and available for public inspection, rather than a simple blanket assertion by the USACE.

A Solution to the Settling of Levee Structures

- Settling of levees and floodwalls is a recognized factor in construction of these features. The fact that settlement occurs means that construction is never over – a project is never complete because even if it is constructed a couple of feet above the required crown elevation, in a decade or two it will be below that 'safe' elevation. So construction will have to restart to again lift the levee or floodwalls above the required elevation. We recommend that the State and USACE adopt a life-cycle approach to comparing alternatives for critical flood control structures that gives more weight to on-time completion and reliability. Because of settlement and subsidence, it is essentially impossible to ever finish construction of gravity supported levees, or floodwalls that depend on levees for support (e.g. I-walls), in the GNO area. Actual crown elevations for these structures describe a trajectory over time between enlargements such that the actual level of protection rarely corresponds to the design level. In the interest of completing projects on a reasonable schedule, the State and USACE should consider using pile-supported protective structures to a much greater degree than in the past even if the first construction cost is much higher. Construction lifts could conceivably be limited with deep pile supported floodwalls and barriers.

## Conclusions

The infrastructure failures observed in the New Orleans Area and described in this Team Louisiana report resulted in the loss of life and major property damage and destruction. These failures were man-made and could have been prevented. A combination of engineering errors and political decisions resulted in a hurricane protection system of lesser quality than promised the citizens of Louisiana in the Design Memos, which serve as a contract between the USACE and the people of Louisiana represented by the various levee boards. Congress and society need to 'step up to the plate' and ensure that Louisiana gets compensated for the federal goverment's failures and that the full extent of the 1965 Flood Control Act is implemented.

## References

Interagency Performance Evaluation Task Force (IPET). 2006.*Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System.* Draft final report of the Interagency Performance Evaluation Task Force, 1 June 2006. U.S. Army Corps of Engineers, Vicksburg, MS.

Jelesnianski, Chester P., Jye Chen and Wilson A. Shaffer, 1992. *SLOSH: Sea, Lake, and Overland Surges from Hurricanes*, NOAA Technical Report NWS 48. National Weather Service, Silver Spring, Maryland, 71 p.

May J. R. and L.D. Britsch, 1987, *Geological Investigation of the Mississippi River Deltaic Plain – Land Loss and land Accretion,* Water Ways Experimental Station Vicksburg, MS 39180.

Seed R.B. et al. (ILIT), Investigation of the Performance of the New Orleans Flood Protection Systems in Hurricane Katrina on August 29, 2005, Draft Final Report, Version 1.2, June 1, 2006 (University of California, Berkeley, CA, 2006).

Van Heerden, I.L. and M. Bryan, 2006. *The Storm - What Went Wrong and Why during Hurricane Katrina - the Inside Story from One Louisiana Scientist* Publ. Penguin/Viking, New York, New York, 308pp.

Van Heerden, I.L., Ph.D. – Lead, G. Paul Kemp, Ph.D., Hassan Mashriqui, Ph.D. & PE, Radhey Sharma, Ph.D., Billy Prochaska, PE, Lou Capozzoli, Ph.D. & PE, Art Theis, PE, Ahmet Binselam, M.S., Kate Streva B.S. and Ezra Boyd, M.S. (in press), *The Failure of the New Orleans Levee System during Hurricane Katrina,* A report prepared by TEAM LOUISIANA for Secretary Johnny Bradberry, Louisiana Department of Transport and Development, Baton Rouge, Louisiana

Westerink, J.J., Luettich, R.A., Jr. and Muccino, J., 1994. *Modeling Tides in the Western North Atlantic Using Unstructured Graded Grids.* Tellus 46a(2):178-199.