IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHEILA NICHOLSON, and<br>SHELLEY NICHOLSON, and<br>RICHARD HIRSTSUS | ) | |
| Plaintiffs, | ) | No. 05-1259L |
| v. | ) | Hon. Lawrence M. Baskir |
| UNITED STATES OF AMERICA | ) | |
| Defendant | ) | |

**EDITED VERSION OF PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT IN ACCORDANCE WITH THE ORDER OF THIS COURT ISSUED MAY 24, 2007**

**MITCHELL J. HOFFMAN (6896)**
**MICHAEL R. ALLWEISS (2425)**
**JEFFREY M. HOFFMAN (29253)**
**701 Poydras Street, Suite 3600**
**New Orleans, Louisiana 70139-7735**
**Telephone: (504) 581-2450**
**Attorneys for Plaintiffs**

## TABLE OF CONTENTS


I. RULE 56 E CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 1,2

II. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 2-7

A. August 29, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 2,3

B. The United States Army Corps of Engineers . . . . . . . . . . . . . . . . . . pp. 3-7

III. LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 7,8,9

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 9-20

A. The Damage to Plaintiffs' Property in this Case was the Direct, Natural and Probable Result of the Defective Floodwalls as Designed by the Corps . . . . . . . . . . . . . . . pp. 9-16

B. Plaintiffs' Property was Damages and Devalued by the Breaches, Which Indicate Faulty Design Throughout the Floodwalls and Inevitable Future Failures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 16-20

V. THERE ARE NO GENUINE ISSUES OF MATERIAL FACT . . . . . . . . pp.20,21

VI. REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . p. 21

VII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 21,22

# TABLE OF AUTHORITIES

## CASES

Banks v. United States,
96 Fed. Cl. 206, 212 (Fed. Cl. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 8

Berenholz v. United States,
1 Cl. Ct. 620, 626 (Cl. Ct. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 16,18,19

Columbia Basin Orchard v. United States,
132 F. Supp. 707, 709 (Ct. Cl. 1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 8,18

Cotton Land Co. v. United States,
75 F. Supp. 232 (Ct. Cl. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 9,10

Edison Sault Elec. Co. v. United States,
552 F.2d 326, 333 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 5

F.E. Grauwiller Transp. Co. v. Gallagher Bros. Sand & Gravel Corp.,
153 F.2d 384 (2d Cir. 1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p.12

Gordon v. Niagara Machine & Tool Works,
574 F.2d 1182, 1191-95 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 12

Hansen v. United States,
65 Fed. Cl. 76 (Fed. Cl. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 8,9

Heer v. South Dakota,
432 N.W.2d 559, 567 (S.D. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 12

Jackson v. Wis. Tel. Co.,
60 N.W. 430, 432 (Wis. 1894) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 12

Moden v. United States,
404 F.3d 1335, 1339 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . pp.8-10,19

Pumpelly v. Green Bay Co.
80 U.S. 166 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 8, 11

Ridge Line, Inc. v. United States,
346 F.3d 1346, 1352 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 7-9,16

Sanguinetti v. United States,
264 U.S. 146 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 18

South Florida Growers Ass'n v. U.S. Dept. of Agriculture,
554 F. Supp. 633 (S.D. Fla. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 10

Teegarden v. United States,
42 Fed. Cl. 252, 256 (Fed. Cl. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . pp. 7,15,16

Tri-State Materials Corp. v. United States,
550 F.2d 1, 4-5 (Ct. Cl. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 10,18

Walker v. Preformed Line Prods. Co.,
600 F. Supp. 280 (W.D. La. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 11

Wash. Metro. Area Transit Auth. v. United States,
54 Fed. Cl. 20, 27 (Fed. Cl. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 17

Wilfong v. United States,
480 F.2d 1326, 1329 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 17


**STATUTES**


33 U.S.C. § 702(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp.17, 18


**OTHER AUTHORITIES**


Flood Control Act of 1965, Pub. L. No. 89-298, § 204, 79 Stat. 1073, 1077 . . . . . . . . . . . p. 4

The Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . pp. 4, 12

9 PATRICK J. ROHAN & MELVIN A. RESKIN, NICHOLS ON EMINENT DOMAIN § 34.03[1] (3d Ed. 1980 & Supp. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p. 8

# EXHIBITS

| EXHIBIT LETTER | DOCUMENT NAME |
| --- | --- |
| A pp.2-7,11,12,14,-15,18-21 | United States Army Corps of Engineers Draft Final Report of the Interagency Performance Evaluation Task Force |
| B p. 3 | National Hurricane Center, Tropical Cyclone Report, Hurricane Katrina (Dec. 20, 2005) |
| C pp. 4-6,12-14 | Independent Levee Investigation Team Report |
| D p. 4 | USCOE Project Fact Sheet |
| E pp. 5,14-15 | TIMES-PICAYUNE, at A01, December 30, 2005 |
| F pp. 10,13 | Reflections of Dr. Robert G. Bea |
| G p. 13 | Statement of Lieutenant General Carl Strock, Chief of Engineers, U.S. Army Corps of Engineers |
| H *in globo* pp. 11 | Affidavits of Plaintiffs |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SHEILA NICHOLSON, and<br>SHELLEY NICHOLSON, and<br>RICHARD HIRSTSUS<br><br>Plaintiffs<br><br>vs.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | ) | NO. 05-1259lL<br><br>Hon. Lawrence M. Baskir |

**EDITED PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

This Memorandum is submitted by Plaintiffs, Sheila Nicholson, Shelley Nicholson and Richard Hirstsus, in Response to the Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Motion for Partial Summary Judgment:

## I. RULE 56 E CONSIDERATIONS

Counsel for the United States and undersigned counsel have an informal understanding and have agreed that in the interest of justice, and containment of unnecessary judicial, legal and expert expenses, that the central issues in this case would be presented to the Court through the Motion for Summary Judgment procedure. Because of that understanding and goal, some of the evidence submitted with United States of America's Motion for Summary Judgment and Plaintiffs' Motion for Partial Summary Judgment might not be presently in sufficient form for a Summary Judgment motion. Plaintiffs suggest that the Government indicate what documentary evidence, if any, needs to be authenticated or somehow made admissible for a judicial

the necessary authentication, and/or verification which might be necessary for admissibility. If the Government does not complain, as we expect it will not, then the evidence should be deemed admissible for evidentiary purposes.

For instance, the statement from Professor Robert Bea of the University of California, Berkley, can be found in writings published by Dr. Bea. No affidavits have been requested from Dr. Bea at this time. Should the Government suggest that the statements from Dr. Bea should be ignored because not in an affidavit form, then again, this Court should grant additional time for counsel to obtain sufficient affidavits. Furthermore, Plaintiffs cite a newspaper article. Discovery would be required to fully develop in appropriate evidentiary form the underlying facts set forth therein. However, if the Government does not suggest the statements are inadmissible, then the additional time would not be required.

## II. FACTUAL BACKGROUND

### A. August 29, 2005

In late August 2005, Hurricane Katrina, then a Category Five hurricane, churned in the Gulf of Mexico. See United States Army Corps of Engineers Draft Final Report of the Interagency Performance Evaluation Task Force at p. I-20 (p.55), attached as Plaintiffs' Exhibit A (hereinafter "IPET Final Report"); see also United States Army Corps of Engineers Draft, Final Report of the Interagency Performance Evaluation Task Force (March 26, 2007) at p. I-32 (p. 62), attached as Plaintiffs' Exhibit I (hereinafter "IPET 2007). Hurricane Katrina made landfall at Buras, Louisiana, and struck New Orleans as a weak Category Three hurricane on August 29, 2005. See IPET Final Report at pp. I-20-21 (pp. 55-56), attached as Plaintiffs' Exhibit A; see also IPET 2007 at pp. I-32-33 (pp. 62-63), attached as Plaintiffs' Exhibit I.

The catastrophe that developed as the storm passed to the east of New Orleans was not the result of wind damage, which "likely remained weaker than Category 3 strength" and probably involved "sustained surface winds of Category 1 or Category 2 strength." See National Hurricane Center, Tropical Cyclone Report, Hurricane Katrina (Dec. 20, 2005) at p. 8 (p. 104), attached as Plaintiffs' Exhibit B. Rather, the overwhelming devastation resulted from faulty human design. In the early morning hours of August 29, 2005, "[f]our I-wall failures" occurred, resulting in breaches and massive inundation throughout the City. See IPET Final Report at p. I-30 (p. 65), attached as Plaintiffs' Exhibit A; see also IPET 2007 at p. I-66 (p. 96), attached as Plaintiffs' Exhibit I. A breach in the Inner Harbor Navigation Canal ("IHNC" or commonly referred to as the "Industrial Canal") resulted in flooding of the Lower Ninth Ward; breaches at the 17th Street and London Avenue Canals flooded other parts of the City. See id. at p. I-30 (p. 65), attached as Plaintiffs' Exhibit A; see also IPET 2007 at p. I-46-47 (p. 76-77), attached as Plaintiffs' Exhibit I. The result: flooding of nearly eighty percent of New Orleans (see id. at I-32 (p.67), attached as Plaintiffs' Exhibit A; see also IPET 2007 at p. I-48 (p. 78), attached as Plaintiffs' Exhibit I), and permanent damage to property in New Orleans (see Defendant's Motion for Summary Judgment at pp. 18) caused by the United States Army Corps of Engineers' ("USCOE" or the "Corps") defectively designed floodwalls. See comments of Lt. General Carl Stock, infra at p. 10 (p.162).

B. The United States Army Corps of Engineers

In a display somewhat symbolic of the documented irresponsible behavior surrounding the events in late August-early September 2005, the United States, representing the Corps, seeks to shirk responsibility for its failed floodwall design. The Government asserts that "the construction of those levees . . . was in many cases undertaken by State and Local agencies, not

by the Corps itself." See Defendant's Motion for Summary Judgment at p. 3. Confident in their claims, the United States goes further and states that, "[a]s a matter of *indisputable* fact, the construction of the levees along the 17th Street, London Avenue, and Inner Harbor Navigation Canal . . . was done by local private and governmental entities . . . and not by the Corps." Id. at pp. 3-4. Fortunately, the Government cannot rewrite history and the indisputable fact of the matter is that the Corps had primary responsibility for construction and design of the floodwalls in question. By its own admission,

> Congress first authorized the Lake Pontchartrain and Vicinity hurricane protection under the Flood Control Act of 1965. The project was intended to protect areas around the lake (in the parishes of Orleans, Jefferson, St. Bernard, and St. Charles) from flooding caused by a storm surge or rainfall associated with a hurricane . . . . *The Corps of Engineers was assigned responsibility for project design and construction* . . . .

See IPET Final Report at p. I-16 (p. 51), attached as Plaintiffs' Exhibit A (emphasis added); see also IPET 2007 at p. I-26 (p. 56), attached as Plaintiffs' Exhibit I; Independent Levee Investigation Team Report at p. 12-5 (p. 117), attached as Plaintiffs' Exhibit C (hereinafter "ILIT Report"); Flood Control Act of 1965, Pub. L. No. 89-298, § 204, 79 Stat. 1073, 1077; see also Defendant's Motion for Summary Judgment at p. 4 (admitting that "[i]t is undisputable that the Corps' involvement on the canals in question was primarily limited to the design and placement of floodwalls on top of some of these already existing levees"). Importantly, the Lake Pontchartrain and Vicinity Hurricane Protection Project, for which the Corps was responsible for design and construction, included "[p]arallel protection (levees, floodwalls, and flood proofed bridges) along three outfall canals (17th Street, Orleans Avenue, and London Avenue)." See USCOE Project Fact Sheet at p. 1 (p. 139), attached as Plaintiffs' Exhibit D. The Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina wrote

that "[a]fter construction [USCOE] turns the levees over to a local sponsor." ILIT Report at p. 12-3 (p. 115), attached as Plaintiffs' Exhibit C. In further support of the notion that the Corps remained responsible for construction, the IPET Final Report notes that a 1977 injunction prevented the Corps from continuing construction on the "barrier project" – a project that included the IHNC – and forced the Corps to adopt alternative plans. See IPET Final Report at p. I-16 (p. 51), attached as Plaintiffs' Exhibit A; see also IPET 2007 at p. I-26-27 (p. 56-57), attached as Plaintiffs' Exhibit I..

Despite this allocation of responsibility, the United States attempts to isolate the Corps from its own actions. In asserting that "[t]he Corps did no such construction for the 17th Street Canal" and that "the levees in question here were built by State and Local entities, not the Corps," the Government seeks to mislead this Court into believing that accountability lies elsewhere. Defendant's Motion for Summary Judgment at pp. 9, 4. The truth of the matter, however, is that regardless of whether the Corps physically constructed the floodwalls or contracted with third-parties, Congress placed the responsibility for *design and construction* squarely with the Corps. Given this responsibility, "Corps officials have said that once they accept outside work, it becomes their own." See Bob Marshall, "Corps never pursued design doubts," TIMES-PICAYUNE, at A01, December 30, 2005, attached as Plaintiffs' Exhibit E (p. 141). In Edison Sault Electric Co. v. United States, this Court's predecessor noted that "where a claim is based upon an act of a third party *not in privity* with the United States, there can be no recovery against the Government." Edison Sault Elec. Co. v. United States, 552 F.2d 326, 333 (Ct. Cl. 1977) (emphasis added). The *argumentum a contrario* is that where privity exists – for example, where the Corps contracts with a third-party to engage in construction – recovery may be had against the Government. Therefore, when the Corps is responsible for the construction

and design, it assumes responsibility for the physical actions of its third party contractors whose work is *directed* by the Corps. If the third party contractors have failed in their performance, that is an issue the Corps can address with those contractors.

In a desperate final effort to shield the Corps, the United States discusses the floodwalls consistency with the standard embodied in the standard project hurricane ("SPH"). See Defendant's Motion for Summary Judgment at p. 9. Plaintiffs argue that the floodwalls were to be capable of withstanding a Category Three hurricane, an argument with which the United States seems to take issue. See id. If one considers in a holistic fashion the various characteristics of the SPH, the result would be a hurricane "roughly the same as what is today classified as a fast-moving 'Category 3' hurricane." See IPET Final Report at p. I-16 (p. 51), attached as Plaintiffs' Exhibit A; see also IPET 2007 at pp. I-25-26 (pp. 55-56), attached as Plaintiffs' Exhibit I. This was exactly what the Lake Pontchartrain and Vicinity Hurricane Protection Project was intended to protect against. See id. However, "the SPH can vary from a Category 2 to a Category 4 storm" depending upon what characteristic is considered. See ILIT Report at p. 12-11 (p. 123), attached as Plaintiffs' Exhibit C. This suggests a level of protection not provided by the floodwalls in this case.

However, Defendant strenuously asserts that "[t]he sheer size and strength of the storm created a storm surge of ten to fourteen feet along the southern shore of Lake Ponchartrain, and into the three canals at issue in this case. This was a storm surge level much higher than the design hurricane." Defendant's Motion for Summary Judgment at p. 5. This assertion is an attempt at sleight of hand. The reality is that only in the IHNC did the water elevation surpass ten feet prior to the breach (10.5 feet and 2 feet below the top of the floodwall). See IPET Final Report at p. I-30 (p. 65), attached as Plaintiffs' Exhibit A; see also IPET 2007 at p. I-45-46 (p.

75-76), attached as Plaintiffs' Exhibit I. In the 17th Street Canal, the water level reached seven feet at the time of breach (several feet below the top of the floodwalls). See id. Similarly, the London Avenue Canal breach occurred before any water overtopped the wall. See id; see also IPET 2007 at p. I-46 (p. 76), attached as Plaintiffs' Exhibit I. The outfall canals here experienced water levels of eight to ten feet, whereas water levels eventually reached fourteen feet in the IHNC. See id. at p. I-39 (p. 74), attached as Plaintiffs' Exhibit A; see also IPET 2007 at pp. I-45-47 (pp. 75-77) attached as Plaintiffs' Exhibit I. What the United States fails to admit, however, is that these breaches occurred *before* water levels rose to those heights. See id. at I-30, I-3 (pp. 65, 38), attached as Plaintiffs' Exhibit A; see also IPET 2007 at pp. I-45-46, I-3 (pp. 75-76, 33), attached as Plaintiffs' Exhibit I. It was the human failure, not the water elevation, that caused these floodwalls to breach.

There is no legitimate dispute that the Corps, despite the Government's fervent declarations to the contrary, was primarily responsible for the design and construction of the floodwalls in this case. The Corps assumed such responsibility, and even if it contracted with third-parties, the Corps retained ultimate responsibility. Thus, there is no *genuine* factual dispute herein and the "taking" of Plaintiffs' property is attributable to the Corps.

## III. LEGAL STANDARD

"A determination of whether a taking [is] compensable under the Fifth Amendment . . . is a question of law based on factual underpinnings." Ridge Line, Inc. v. United States, 346 F.3d 1346, 1352 (Fed. Cir. 2003). Thus, a court should avoid "precipitous grants of summary judgment" when considering an assertion of an unconstitutional taking due to the "fact-intensive" nature of such claims. See Teegarden v. United States, 42 Fed. Cl. 252, 256 (Fed. Cl. 1998).

While the Court of Federal Claims is authorized to exercise jurisdiction over takings claims, these claims often involve elements of tort. See, e.g., Moden v. United States, 404 F.3d 1335, 1339 (Fed. Cir. 2005); Ridge Line, Inc., 346 F.3d at 1355 (citing 9 PATRICK J. ROHAN & MELVIN A. RESKIN, NICHOLS ON EMINENT DOMAIN § 34.03[1] (3d ed. 1980 & Supp. 2002)). In Ridge Line, Inc., the United States Court of Appeals for the Federal Circuit applied a two-pronged test for inverse condemnation cases. Ridge Line, Inc., 346 F.3d at 1355. First, the plaintiff "must establish that treatment under takings law, as opposed to tort law, is appropriate under the circumstances." Id. In distinguishing a takings claim from one sounding in tort, courts must first consider whether the government intended to "invade a protected property interest" *or* whether the "asserted invasion is the '*direct, natural, or probable result of an authorized activity* and not the incidental or consequential injury inflicted by the action.'" Id. (citing Columbia Basin Orchard v. United States, 132 F. Supp. 707, 709 (Ct. Cl. 1955)) (emphasis added). While the former "intent" analysis is subjective, the separate and distinct "direct, natural, or probable result" analysis is objective. See Hansen v. United States, 65 Fed. Cl. 76, 97 (Fed. Cl. 2005).

The first prong requires either "proof of causation" or "proof of intent to invade." Id. at 114 (discussing Columbia Basin Orchard, 132 F. Supp. at 709); see also Banks v. United States, 96 Fed. Cl. 206, 212 (Fed. Cl. 2006). However, where plaintiffs demonstrate proof of causation, a compensable taking exists, even if the government did not intend to invade the property. See Pumpelly v. Green Bay Co., 80 U.S. 166, 177-78 (1871) (holding that inadvertent flooding constituted a taking); Hansen, 65 Fed. Cl. at 114. With respect to "proof of causation," a court "must determine whether the alleged injury was the 'predictable result of the government action.'" Moden, 404 F.3d at 1343.

The second clause of the first prong inherently contains "an inquiry into the 'foreseeability' of damage." However, this inquiry is limited to "whether it was *objectively* foreseeable that the government's actions could have resulted in the alleged harm." Hansen, 65 Fed. Cl. at 97 (emphasis added); *cf.* Moden, 404 F.3d at 1343 (requiring a showing that the resulting injury should have been foreseen). While an injury is not foreseeable where "an intervening cause breaks the chain of causation," this court has before rejected the "'remoteness of cause' defense" where the flooding was foreseeable. Moden, 404 F.3d at 1344 (discussing Cotton Land Co. v. United States, 75 F. Supp. 232 (Ct. Cl. 1948)).

The second prong requires consideration of the "nature and magnitude of the government action." Ridge Line, Inc., 346 F.3d at 1356. That is,

> [e]ven where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, *or at least preempt the owners* [sic] *right to enjoy his property for an extended period of time*, rather than merely inflict an injury that reduces its value.

Id. (emphasis added). The Government would like to have this Court believe that Plaintiffs cannot satisfy these two prongs. The evidence shows otherwise.

## IV. ARGUMENT

### A. The Damage to Plaintiffs' Property in This Case was the Direct, Natural, and Probable Result of the Defective Floodwalls as Designed by the Corps

#### 1. *The Corps' defective design caused Plaintiffs' injury in this case*

The damage to Plaintiffs' property in this case was the direct, natural, and probable result of the defective floodwalls designed by the Corps. In Cotton Land Co., this Court found a Fifth Amendment taking where the flooding "did not occur directly from erection of the dam, but

rather through a chain of events occurring in a natural order, but originally set in motion by the erection of the dam." Moden, 404 F.3d at 1343 (discussing Cotton Land Co.). This Court noted that "the flooding of the land was foreseeable" and was the "'actual and natural consequence of the Government's act.'" Cotton Land Co., 75 F. Supp. at 235. In addition, Tri-State Materials Corp. v. United States illustrates that if the effects result from the Government's action, even where the flood waters were *not* controlled by the government, a Fifth Amendment taking may be found. See Tri-State Materials Corp. v. United States, 550 F.2d 1, 4-5 (Ct. Cl. 1977).

"Proof of causation" only requires a plaintiff to prove a "but for" relationship between the harm caused and the government act. See Tri-State Materials Corp., 550 F.2d at 5. When the government places property in jeopardy, the government can be liable for a "taking" even if some other event causes the actual harm to the plaintiffs. See South Florida Growers Ass'n v. U.S. Dept. of Agriculture, 554 F. Supp. 633 (S.D. Fla. 1982).

The Defendant seeks to make Hurricane Katrina a scapegoat, an approach commonly used by the Corps to avoid responsibility for its mistakes. The United States asserts that Hurricane Katrina was the true cause of this disaster. Defendant's Motion for Summary Judgment at pp. 15-16. This virtual diversion ignores the results of numerous independent assessments. Plaintiffs can show that the property damage and diminution in property values did not result from an "Act of God," as the United States conveniently alleges, but rather from systematic "organizational and institutional failures that are primarily focused in the Corps of Engineers." See Reflections of Dr. Robert G. Bea at p. 5 (p. 149), attached as Plaintiffs' Exhibit F (hereinafter "Reflections"). The defectively designed floodwalls – a design for which the Corps was responsible – caused the massive property damage here. Indeed, it is disingenuous to blame Hurricane Katrina, a force of nature that the Corps designed the floodwalls to protect

against, for exposing those defects. Contrary to the United States' assertion, the damage complained of *was* due to the acts or omissions of the United States. Defendant's Motion for Summary Judgment at pp. 15-16. That is, if the Corps had designed the floodwalls consistent with the Corps' statutory obligation, the flooding in New Orleans would have been substantially less. See IPET Final Report at p. I-7 (p. 42), attached as Plaintiffs' Exhibit A; see also IPET 2007 at p. I-72 (p.102), attached as Plaintiffs' Exhibit I. The Corps admits that "[a]pproximately two-thirds of that flooding [could] be attributed to water flowing through breaches" and that "[t]he three foundation failures associated with flooding in Orleans East Bank were responsible for seventy percent of the flooding in that area." See Id. Even assuming *arguendo* that Hurricane Katrina acted as a precipitating concurrent cause, the overwhelming majority of flooding in New Orleans resulted from human irresponsibility - the failure of the Corps to properly undertake their duties. Even if the Corps did not *intend* this result, the actual physical invasion effectively destroyed and impaired the usefulness of Plaintiffs' property, and "is a taking, within the meaning of the Constitution." Pumpelly, 80 U.S. at 181. The Corps' actions were the cause of Plaintiffs' harm. But for the defective floodwalls, Plaintiffs would not have felt Hurricane Katrina's injurious effects. See Affidavits of the Plaintiffs attached hereto as Exhibit H *in globo*.

2. *The failure of the floodwalls and subsequent property damage was foreseeable to the Corps*

In the same vein, Hurricane Katrina cannot be deemed, as the United States seeks to so characterize, to be an intervening cause that suffices to break the chain of causation. Defendant's Motion for Summary Judgment at p. 17. An intervening cause, if foreseeable, does not relieve a defendant of liability. Walker v. Preformed Line Prods. Co., 600 F. Supp. 280 (W.D. La. 1984)

(citing Gordon v. Niagara Machine & Tool Works, 574 F.2d 1182, 1191-95 (5th Cir. 1978)). Moreover, an "Act of God" may be reasonably foreseeable, see F.E. Grauwiller Transp. Co. v. Gallagher Bros. Sand & Gravel Corp., 153 F.2d 384 (2d Cir. 1946), and a defendant will not be relieved of liability if the "Act of God" was a concurring cause. See, e.g., Heer v. South Dakota, 432 N.W.2d 559, 567 (S.D. 1988); Jackson v. Wis. Tel. Co., 60 N.W. 430, 432 (Wis. 1894).

The United States contends that Hurricane Katrina "was not an ordinary or foreseeable storm." Defendant's Motion for Summary Judgment at p. 17. This rhetoric is a "red herring" designed to distract this Court from the pertinent analysis. The issue is *not* whether *Hurricane Katrina* was foreseeable; rather, the issues for this Court to consider are (1) whether the Corps could foresee that the floodwalls would breach under conditions they were designed to withstand and (2) whether the Corps could foresee that, in the event of such a breach, plaintiffs' property would be inundated and devalued by the absence of secure protection. A reasonable and objective observer knowing the background of the Corps' activities would answer both questions in the affirmative.

The Corps was primarily responsible for the "development of the concepts, design, and construction" of the floodwalls. See ILIT Report at p. 12-3 (p.115), attached as Plaintiffs' Exhibit C; IPET Final Report at I-16 (p.57), attached as Plaintiffs' Exhibit A; IPET 2007 at p. I-26 (p. 56), attached as Plaintiffs' Exhibit I. Indeed, the 2006 Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina, noting this responsibility, stated that the Corps "generally contracts to design and build the levees." See ILIT Report at p. 12-3 (p.115), attached as Plaintiffs' Exhibit C (citing Select Bipartisan Committee to Investigate the Preparation for and Response to Hurricane Katrina (2006)). Dr. Larry Irons, cited by the Independent Levee Investigation Team, averred that "[b]asic flaws in the design of the levee

protection system were first recognized *over two decades ago*." See id. at p. 12-7 (p.119), attached as Plaintiffs' Exhibit C (emphasis added). The Corps knew about the potential for breaches and the threat of overtopping in the event of a Category Three hurricane. See id. Testifying before a U.S. Senate Appropriations subcommittee, Lieutenant General Carl Strock, Chief of Engineers for the Corps, admitted: "Specifically, in the 17th Street Canal area, we have now concluded that we did have a problem with the design of the structures . . . . [T]he most dramatic conclusion is that, yes, we had a design problem . . . ." U.S. Senate Committee on Appropriations: Subcommittee on Energy and Water Development Holds A Hearing on Fiscal Year 2007 Appropriations for the Army Corps of Engineers, 11 (2006) (statement of Lieutenant General Carl Strock, Chief of Engineers, U.S. Army Corps of Engineers), attached as Plaintiffs' Exhibit G. Contrary to the Government's claims, "[t]he occurrence of a hurricane like Katrina was not unexpected in New Orleans . . . . [I]t seems reasonable to assert that Katrina as well as its aftermath was a *predictable* surprise." See ILIT Report at p. 12-10 (p.122), attached as Plaintiffs' Exhibit C. Dr. Robert G. Bea supports the predictability of these breaches: "All of the conditions responsible for these breaches were known and foreseeable in advance of these failures. In this sense, these were 'predictable failures.'" See Reflections at p. 5 (p.149), attached as Plaintiffs' Exhibit F. The ILIT Report corrects the United States Army Corps of Engineers Interagency Performance Evaluation Task Force's conclusion that the failure was "unforeseen and unforeseeable." See ILIT Report at p. 12-14 (p.126), attached as Plaintiffs' Exhibit C. The ILIT Report illustrated that

> [i]n 1985, the New Orleans district of the Corps of Engineers conducted a full scale instrumented lateral load test of a 200-feet long sheet pile flood wall in the Atchafalaya basin. This particular location . . . was chosen because of the close correlation of the soil conditions in the New Orleans area with those at the test location . .

> . *Test data from the highly instrumented sheet pile wall and adjacent supporting soils indicated a gapping behavior.* . . . The test was designed to take an eight foot height of water . . . . But, the wall was already in a failure condition . . . when the water level reached only 8 feet instead of the calculated 10 feet.

Id. at pp. 12-14-12-15 (p.126-127), attached as Plaintiffs' Exhibit C (internal citations omitted and emphasis added). Although suggestions were made for alleviating the problem, "[t]hese developments in technology inexplicably were *not* reflected in the design guidelines used." See id. at p. 12-15 (p.127), attached as Plaintiffs' Exhibit C (emphasis in original).

This was not the only notice the Corps received of a design problem. In 1990, the Vicksburg, Mississippi office discovered critical engineering mistakes regarding the assessment of soil strengths at the 17th Street Canal during a review and thereafter directed the local Corps office to alter the designs accordingly. See Bob Marshall, "Corps never pursued design doubts," TIMES-PICAYUNE, at A01, December 30, 2005, attached as Plaintiffs' Exhibit E. Rather than heeding the second warning, a chief engineer in New Orleans refused to modify the designs on the grounds of "engineering judgment." Id. Unfortunately, this decision was not questioned. Id.

The preliminary evidence overwhelmingly illustrates that the Corps knew, i.e. *could and should foresee*, that in the event of a major hurricane, the levees would fail, resulting in catastrophic human suffering, loss of life and property loss. This was the direct, natural, and probable result of the defective design. The 1985 test indicated that floodwalls would fail at eight feet. See ILIT Report at p. 12-14-12-15 (p.126-127), attached as Plaintiffs' Exhibit C. Yet, the 17th Street Canal failed at seven (7) feet and the London Avenue Canal contained water levels up to eight (8) feet during Hurricane Katrina. See IPET Final Report at p. I-39 (p.74), attached as Plaintiffs' Exhibit A; see also IPET 2007 at pp. I-45-46 (pp. 75-76) (explaining that the "17th Street Canal failed at 7 to 8 ft, and possibly 1 to 2 ft higher" while "water levels in the

London Avenue Canal reached about 9 ft"), attached as Plaintiffs' Exhibit I. The Corps admitted that "[t]he probability of a failure of floodwalls and some sections of levees were high, *and there was a great potential for serious consequences because of the large population and extensive property being protected by the structures*." See id. (emphasis added); see also IPET 2007 at p. I-59 (p. 89) (emphasis added), attached as Plaintiffs' Exhibit I. Five years later the Corps had yet another opportunity to evaluate their designs when confronted by the Vicksburg office with evidence that the floodwalls could fail. See Bob Marshall, "Corps never pursued design doubts," TIMES-PICAYUNE, at A01, December 30, 2005, attached as Plaintiffs' Exhibit E. Again the Corps refused to change these designs. Id. This result was neither unpredictable nor unforeseeable. An extraordinary storm was not the cause of this result; instead, Plaintiffs' damage resulted from a design failure that the Corps discovered in 1985 and was again brought to its attention in 1990 – a failure that the Corps could foresee having grave consequences in the event of a hurricane. These results should have been, and indeed *were*, foreseeable to the Corps and any other objective observer. The evidence dictates overwhelming affirmative answers to the aforementioned issues.

The Government's citation to Teegarden is much ado about nothing. Teegarden involved a formidable forest fire in Utah. Teegarden, 42 Fed. Cl. at 254. The Forest Service removed brush and timber on plaintiff's property in order to protect "higher priorities," including plaintiff's cabin. Id. at 253-54. In denying plaintiff's "taking" claim, this court noted that "plaintiffs cannot escape the incontrovertible fact that the Uinta Flat Fire, not the Forest Service, caused the destruction of plaintiff's property." Id. at 257. The Government here seeks to rely on Teegarden as support for its notion that "damages result[ed] from a random event induced more by an extraordinary natural phenomenon" – Hurricane Katrina – "than by Government

interference." Id. However, Teegarden and Plaintiffs' case herein are factually diverse. The importance of the above statement in Teegarden lies in the phrase "*induced more by*." Id. (emphasis added). In Teegarden, the Government had absolutely nothing to do with the forest fire. Indeed, the only way to factually equate these two cases would be to imagine that the Government, in order to protect against the forest fire, had erected a "fire wall" made of timber. If this were the case, one would have no problem determining that the combination of the forest fire and the Government's actions caused the injury. In Plaintiffs' case, however, the damages were induced equally, *if not more*, by the Government's actions – designing and constructing a faulty flood wall – than by Hurricane Katrina. Had the Government not ignored the defective design and the foreseeable consequences, Hurricane Katrina's damages would have been negligible. Teegarden does not speak to this case because the Corps' knowledge of the design defects made the resulting property loss foreseeable, key factors absent in Teegarden.

B. Plaintiffs' Property was Damaged and Devalued by the Breaches, Which Indicate Faulty Design Throughout the Floodwalls and Inevitable Future Failures

This court in Ridge Line, Inc. noted that "to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners [sic] right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Ridge Line, Inc., 346 F.3d at 1356. The Government's action need only interfere with or disturb plaintiffs' rights; the Government does not need to "actually appropriate title and use the land." Berenholz v. United States, 1 Cl. Ct. 620, 626 (Cl. Ct. 1982). Importantly, "a taking may be supported where a Government activity or project 'which is permanent in nature imposes on private property certain consequences which are themselves permanent, and . . . that their recurrence is inevitable even if only intermittent.'" Id.

(citing Wilfong v. United States, 480 F.2d 1326, 1329 (Ct. Cl. 1973)). The Corps' defectively designed floodwalls, which resulted from a federally authorized project, imposed consequences that have preempted Plaintiffs' right to the enjoyment of their property "for an extended period of time," which will continue so long as the floodwalls are in their defective condition. Id.

Although the Government admits that "Plaintiffs have suffered 'permanent damage' to their property," they aver that Plaintiffs may not recover compensation for floods or flood waters under 33 U.S.C. § 702(c). Defendant's Motion for Summary Judgment at p. 18. Assuming *arguendo* that the Government's argument is accurate, Plaintiffs' claim herein relates not to the initial damages triggered by the resulting flood, but rather, the reduction in property values attributable to the defectiveness of the Corps' flood wall design. This argument is related to the prevailing principle in partial takings. See, e.g., Wash. Metro. Area Transit Auth. v. United States, 54 Fed. Cl. 20, 27 (Fed. Cl. 2002). That is, Plaintiffs claim that the immediate results of the breach – flooding and destruction of over eighty percent of the City of New Orleans – created far greater implications for property values. The Corps' faulty designs, unless remedied, present a permanent problem. In effect, the breaches and subsequent flooding merely raised heightened awareness of the inherent flaws of the floodwalls, and illustrated the calamitous and inevitable danger present with living on these properties. The logical result was property devaluation and the preemption of the right to enjoyment. Plaintiffs cannot acquire the fair value for their properties because of the perceived lack of capable protection provided by the floodwalls. Hurricane Katrina's exposure of the defects attributable to the Corps renders Plaintiffs' property less valuable because little security is provided by the existing floodwalls. This Court has previously noted that "the presence of a safety hazard undoubtedly diminishes" the value of the property. Wash. Metro. Area Transit Auth., 54 Fed. Cl. at 38. The exposed defects indicate to

all willing buyers the sincere safety hazard attached to the property – a hazard whose "recurrence is inevitable even if only intermittent." Tri-State Materials Corp., 550 F.2d at 4-5. The Government's action – the defective design of the floodwalls – was the impetus for the devaluation of Plaintiffs' property and as such constitutes a Fifth Amendment taking. The flood simply acted as an extreme and highly influential public revelation of the latent flaws in the Corps' design.

In addition, Plaintiffs can and should recover for the flood damage in this case. The Government is incorrect in asserting the immunity contained within 33 U.S.C. § 702(c). Section 702(c) shields the United States from liability in certain circumstances for damages caused by floods. See Berenholz, 1 Cl. Ct. at 628 n.1. However, this immunity cannot safeguard the United States in the face of constitutional claims. Thus, "since this case involves a taking, the question of § 702c immunity does not arise." Id.

The predecessor to this Court recognized "takings" within the meaning of the Fifth Amendment in certain flooding cases. The plaintiffs, in these cases, must show that the flooding resulted from the Government's activity. See Berenholz, 1 Cl. Ct. at 630 (citing Sanguinetti v. United States, 264 U.S. 146 (1924)). The intent to appropriate "may be implied where the overflow of water is the 'direct, natural or probable result of an authorized activity.'" Berenholz, 1 Cl. Ct. at 628 (quoting Columbia Basin Orchard, 132 F.Supp. at 709).

Plaintiffs have shown that the flooding in this case resulted from the Corps' defective floodwall design. The damage to Plaintiffs' property was the "direct, natural [and] probable result" of the actions taken by the Corps. Columbia Basin Orchard, 132 F.Supp. at 709. As early as 1985, the Corps knew what the results would be in the event of a significant hurricane. By its own admission, they could foresee the destruction likely in the event of levee breaches. IPET

Final Report at p. I-39 (p.74), attached as Plaintiffs' Exhibit A; see also IPET 2007 at p. I-59 (p. 89), attached as Plaintiffs' Exhibit I. Unlike the circumstances present in Moden, the Government here should have, and arguably did, foresee the disastrous consequences of the faulty floodwalls. See generally Moden, 404 F.3d at 1346 (holding that the plaintiffs failed to introduce evidence indicating that the Government could foresee the release of chemical solvents into the groundwater). Indeed, this case is analogous to Berenholz. See generally Berenholz, 1 Cl. Ct. 620 (holding that the flooding of plaintiffs' land constituted a "taking"). The Corps' defective designs and construction resulted in flooding to Plaintiffs' property and amounts to a "taking" within the meaning of the Fifth Amendment.

The faulty floodwalls and the subsequent inundation following their failure combined to devalue Plaintiffs' property. While this diminution in value is attributable to the public knowledge of the instability of the floodwalls and the images of massive flooding, the "but-for" cause of Plaintiffs' damages herein is the Corps' inadequate engineering designs. The Corps knew for two decades that the floodwalls would not withstand the Category Three hurricane that the floodwalls were legislatively required to withstand. Indeed, the Corps knew, or at the very least should have known, that the floodwalls would "gap" and fail. The rational conclusion attendant to such knowledge was that a breach would not only include massive human loss, but also property loss attributable to flooding *and* property market concerns about obvious safety hazards. Any reasonable person possessing this knowledge could foresee these consequences.

The Government's actions and the foreseeable result of those actions combined to illuminate the serious safety hazard extant in Plaintiffs' property. Plaintiffs' claims seek compensation for the flooding and for the diminution in property value attributable to the Corps' defective design. Therefore, Plaintiffs submit that they should be compensated for their

permanent property loss as it constitutes a "taking" under the Fifth Amendment to the United States Constitution.

## V. <u>THERE ARE NO GENUINE ISSUES OF MATERIAL FACT</u>

While a first reading of the Memorandum in Support of Motion for Summary Judgment filed by the United States of America and a reading of this Opposition Memorandum and Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment might suggest disputed issues of fact, in reality, that is not the case. First, Plaintiffs dispute certain of the factual statements that are included in the United States of America's brief in Support of its Motion for Summary Judgment. The Plaintiffs are not alone. The United States Army Corps of Engineers actually disputes those same factual statements made by its lawyers. For instance, General Strock admitted that a design flaw caused the flooding in New Orleans. The IPET report asserts that approximately 70% of the damage to New Orleans occurred as a result of the breach of levee floodwalls. The 1985 study by the Corps shows foreseeable failure of levees with a water depth of eight (8) feet. The Corps' legal pleadings might suggest otherwise.

The bottom line suggests that standing alone in its presentation of facts is the United States Department of Justice even though its client, the United States Army Corps of Engineers and the United States Government, has determined otherwise.

Thus, when Plaintiffs suggest in their brief that the levee breaches in New Orleans were the foreseeable and predictable result of the Corps of Engineers design failures, that might conflict with the language in the legal pleadings of the United States of America, but is in complete accord with the findings of the United States Army Corps of Engineers IPET report and statements of representatives of the Corps.

Does that create a genuine issue of material fact? No, it resolves any conflict . Most of the citations of factual authority contained in this memorandum are gleaned from the IPET report. Those are the words of the Corps of Engineers. The words of the lawyers from the United States Department of Justice seem to conflict, but which words create issues of fact? Is it the lawyers' spin or is it the United States Army Corps of Engineers determinations, findings and admissions? Plaintiffs suggest that there are no genuine issues of material fact with respect to cause and effect of the levee and floodwall failures in the City of New Orleans. Hurricane Katrina was a major hurricane. It was not a significant rain event and but for the breach of the levees and floodwalls, the devastation would have been avoided and the concomitant fear of future flooding would not exist. Overtopping of levees would have caused some damage to properties in the immediate vicinity of the outflow canals, but the widespread utter devastation would never have occurred had the floodwalls not breached.

The Government admits on page 18 of its Motion for Summary Judgment, that property owners in New Orleans have suffered permanent damage. General Strock admits the damage was caused by design failures under the responsibility of the Corps. The 1985 tests showed the likelihood of levee failures at water levels that were well within the design criterion and the 1990 observation from the Vicksburg office of the Corps of Engineers suggested design failures.

While the Government refuses to acknowledge those facts in its legal pleadings, it does acknowledge those facts when not presented to a Court as legal argument. However, in the event this Court believes that a material factual issue remains, it should not grant either Motion for Summary Judgment, but give guidance to the litigants as to what facts it deems are in dispute and the possible significance of those facts to the ultimate legal decision. Plaintiffs would then be entitled to their day in Court.

## VI. REQUEST FOR ORAL ARGUMENT

Plaintiffs request Oral Argument of this Motion for Partial Summary Judgment. Oral argument provides both sides an opportunity to discuss all of the nuances of the case and to address directly any questions or concerns of the Court. Under the unique circumstances of this case, it is respectfully suggested that the oral argument, if granted, be held in New Orleans after the Court has an opportunity to tour the affected areas. While progress has been made in certain areas of the city, the Court should observe, first hand, the dire situation in which these plaintiffs and all putative class members find themselves. If the Court deems it appropriate, undersigned counsel and counsel for the United States of America will cooperate in scheduling such a tour.

## VII. CONCLUSION

The Government would like to mislead this Court into believing that Hurricane Katrina was the sole cause of Plaintiffs' damages. However, they are unable to hide the crucial evidence. This evidence tells a different story, one of faulty design culminating in human misery, destruction, death and permanent damage to every piece of immovable (real) property in the City of New Orleans. Hurricane Katrina exposed a weakness known to the Corps for over two decades. They could foresee the tragic consequences of these defects and the property losses suffered by Plaintiffs' are attributable to the Corps' actions. But for the defectively designed floodwalls, the City of New Orleans would have stood up to the winds (Cat 2) and rains of Hurricane Katrina with relatively little damage. Certainly roofs were damaged and trees and power lines knocked down. But none of these consequences created the nightmare that New Orleans suffered, continues to suffer and, will in the future, suffer as a result of the Corp's design failures. Thus, Plaintiffs respectfully submit that the Government's actions resulted in a "taking" within the meaning of the Fifth Amendment, which entitles Plaintiffs to compensation, and

Plaintiffs' respectfully request that this Court deny Defendant's Motion for Summary Judgment and grant Plaintiffs' Motion for Partial Summary Judgment declaring that a compensable 5th Amendment "taking" has occurred. All other issues should be reserved for future consideration and determination.

Respectfully submitted,

**LOWE, STEIN, HOFFMAN, ALLWEISS & HAUVER, L.L.P.**

**MITCHELL J. HOFFMAN (6896)**
**MICHAEL R. ALLWEISS (2425)**
**JEFFREY M. HOFFMAN (29253)**
**701 Poydras Street, Suite 3600**
**New Orleans, Louisiana 70139-7735**
**Telephone: (504) 581-2450**
**Facsimile: (504) 581-2461**
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that I have on this 14 day of June, 2007, served a copy of the foregoing pleading on counsel for all parties to this proceeding by facsimile transmission, hand delivery, or by United States mail, properly addressed, and first class postage prepaid.

**MITCHELL J. HOFFMAN**