professionals, including residents of two medical schools, Louisiana State University and Tulane (Thomas 2005). The schools were also devastated, affecting the flow of trainees. As of 22 April 2006, the LSU Schools of Medicine, Allied Health and Nursing were being renovated or environmentally remediated (Kaiser Family Foundation 2006a).

Only two of the eight hospitals in New Orleans were open in the months following the hurricane. In mid-November, they had to serve a day-time population of as many as 150,000 people (Thomas 2005). Of 15 adult acute-care facilities, only 7 remained open, with a third the number of beds (1,750 compared with 5,063) (Barringer 2006). The closure of Charity Hospital also affected access to emergency care, as it was the Level I Trauma Center for the entire Gulf Coast region. The closest other Level I facilities are in Shreveport, LA, Birmingham, AL, and Houston, TX, all over 300 miles away (Kaiser Family Foundation 2006a, Thomas 2005).

Health care providers dispersed throughout the country.

Health care providers were also dispersed throughout the country, including 6,000 physicians from Louisiana and Mississippi, "the largest displacement of doctors in U.S. history" (Adams 2005, 2005). The entire Louisiana State University School of Medicine department of family medicine, which served 10,000 to 15,000 patients, was displaced (Lubell 2005). By mid-November, only 15 percent of physicians had returned to the city, and "nurses are in short supply" (Thomas 2005). By April, health care providers remained so rare that Orleans Parish was declared a Health Professionals Shortage Area, with fewer than one primary care physician per 3,200 residents and less than one psychiatrist for every 21,000 residents (Louisiana Department of Health and Hospitals 2006). In contrast, New Orleans had a very high rate of approximately 9.6 physicians per 3,200 residents in 2001 (more typically presented as 300/100,000) (Kaiser Family Foundation 2006d). Some physicians could not be located to confirm prescriptions.

People with serious or chronic medical conditions fled without, or with inadequate, medical supplies.

Immediately following the hurricane, many people at the New Orleans Convention Center, where as many as 15,000 gathered, had run out of medication within days. They included the elderly, some wheelchair-bound, and children, including two with known seizure disorders and a third with a severe asthma attack (Henderson 2005b). The situation was similar at the Superdome, where people reported not having medication for conditions such as cancer, asthma, and seizure disorder (Associated Press 2005b, Treaster 2005).

CDC surveillance of Mississippi residents immediately following Hurricane Katrina found that medication refills were in high demand, constituting approximately one-third of frequently requested illness-related services at hospital emergency departments and federal Disaster Medical Assistance Team operation sites. The proportion dropped to about 18 percent in the second week (CDC 2006g). In another Mississippi county, surveillance in mid-September showed that, of the 41 percent of homes that were inhabited, 29 percent had a household member with a prescription that would need to be refilled within three days (CDC 2006f). Among former New Orleans residents evacuated to Colorado, the majority of visits to an outpatient medical clinic between 7 and 21 September and 13 percent of emergency room visits between 1 and 23 September were for medication refills (CDC 2006b).


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

Others missed medication because treatments that required a viable health care infrastructure – such as HIV experimental treatment or chemotherapy infusions – were not available (Kalb and Murr 2005). Others simply expected a shorter evacuation period and took an inadequate supply of medication, or ran out during evacuation (Wockner 2006).

Mental health patients who run out of medication risk causing themselves physical harm. They, and older patients, are likely to get confused by not being able to get care at their usual facility. Some refuse care, make themselves vulnerable by, for example, sleeping outside in nothing but a "half-open housecoat," or otherwise descend into psychosis (Lutz 2006).

By October 15, a website containing medical histories and pharmaceutical requirements was on-line, enabling physicians and pharmacists to access information on some people. While this was an important step, the source data covered many states affected by the storm. Additionally, even one million patient records would not include many evacuees (Schneider 2005).

Supply shortages abounded.

The evacuation centers were hard-pressed to provide the necessary medications and medical supplies. In Houston, after a federally deployed Disaster Medical Assistance Team did not deliver supplies as anticipated, a physician "ended up raiding his own hospital's pharmacy to try to get through the night." Private suppliers filled the void. In this case, 20 CVS corporation pharmacists with a "complete mobile operation" arrived to disseminate medications (Spake 2005). The Wal-Mart Corporation and Sam's Club also provided supplies such as food, water, and ice (Shute 2005a).

Medical records and proof of insurance, even of identity, were lost.

Many New Orleans residents evacuated without proof of identity, or lost it during the confusion of the storm and evacuation. Louisiana drivers' licenses were computerized, so people who could provide basic personal information and looked reasonably like the saved image could receive a new license (Sullivan 2005a). However, many people – particularly the young and the poor – did not have licenses in the first place, leaving them without proof of identity and thus exposing them to many health risks. Many shelters required identification, although some relaxed their rules (Sullivan 2005a), and housing is fundamental to health. Similarly, in some cases, proof of identity ensured continuity of coverage. For example, if evacuees claimed that they were on tuberculosis medication, the TB program in that state could confirm this through a special "Katrina TB help desk" in Atlanta. The help desk would facilitate the interjurisdictional transfer form allowing public health authorities in the index state to provide treatment (CDC 2006i).

The 12,849 people (Kaiser Family Foundation 2005a) with HIV/AIDS in Louisiana were also in a disease-specific registry, but have been far harder to locate. Two months after the hurricane, only half had been located (Kalb and Murr 2005). Those who lived in New Orleans may be harder to locate; by late April, the state had "up-to-date information on 2,170 of the 7,432 people with HIV [29 percent] who lived in metro New Orleans before the storm" (Wockner 2006). Anecdotal reports indicate that HIV/AIDS patients did not seek care, have been refused shelter after disclosing, or have not sought new sources of medication because they have not disclosed



This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

their status to people whose homes they evacuated to (Kalb and Murr 2005, Wockner 2006). Since they may be financially eligible for state-subsidized medication, not disclosing could have serious health ramifications.

People with diseases and conditions that do not have targeted funding streams need health insurance. Before Hurricane Katrina, 134,249 New Orleans residents were covered by Medicaid and, assuming that the Louisiana rate of being uninsured applied to New Orleans, approximately 93,000 additional residents were uninsured (Kaiser Family Foundation 2005b). Almost one-third of the workers in the state lived in New Orleans; many lost their jobs, and subsequently their insurance coverage, when many businesses were forced to close (SAMHSA 2005a).

Within six weeks after the hurricane, approximately 8,400 Louisiana households had sought Medicaid coverage. Of the 6,700 completed applications, well over half (58 percent) were not approved. Due to the unique circumstances, after 16 September eligibility workers gave unapproved households a "pending" status, not "screened out," to facilitate subsequent approval when criteria were met (Ross 2005).

Evacuees who went, or were taken, to other states faced similar hurdles. A survey of evacuees in Houston[1] revealed that "half" the respondents had no health insurance, although 41 percent had a chronic condition such as heart disease, hypertension, asthma, diabetes, or cancer (Kalb and Murr 2005). While they could apply for Medicaid, each state determines eligibility criteria, coverage, and benefits. Many evacuees did not meet local eligibility criteria, or had certain uncovered conditions (Ross 2005). Some families found that children who had been covered by SCHIP in Louisiana did not meet the host state age requirements (Kaiser Family Foundation 2006d).

As a result of all these factors, many people went without care. A Spring, 2006, study of evacuees showed that 14 percent of children had gone without prescribed medication during the three months prior to the study (Dewan 2006c). A second study, of people who remained in FEMA housing in the 11-20 February period, revealed that many children had been hospitalized or repeatedly visited the emergency room for asthma care, as their caregivers could not get medication. Nearly half who had had a pediatrician before Hurricane Katrina no longer had one.

Some did not know their medical needs or medical history.

Many patients do not know the names of medications they are on, or where in a course of treatment – such as radiation – they are. "They would tell the physician, 'I take a blue pill'," health care providers report (Kalb and Murr 2005). Children's vaccination histories were also lost, which compounded with multiple moves made it difficult for many to remain on their schedule (Splete 2005).

New and expectant mothers were particularly affected.

Many women about to give birth, or who had just given birth, had to evacuate. One arguably lucky woman was airlifted with her 2 ½-pound premature son to Baton Rouge, wearing just her

[1] This survey was reported in Newsweek; the sampling methodology and sample size were not provided.


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

hospital robe (Mercy Corps 2006). Other mothers watched their premature, incubated infants flown out to undetermined sites (Barringer and McNeil 2005). Over the months following the exodus, the Houston Fire Department reports numerous calls for rides for sick children or women going into labor (Shamlian 2006). In Arkansas, a physician who operates the only abortion clinic offered to perform free abortions on hurricane evacuees, if they chose, because late-term abortions carry more risk for the mother (Associated Press 2005a).

***Withdrawal.*** Some people, suddenly without a supply of drugs or alcohol, went into withdrawal (Boo 2005, Baum 2006). Hospital pharmacies were threatened by armed assailants (Graham 2005). There were stories of people wading through deep water, holding large amounts of alcohol and little else (Baum 2006).

***Previously Undiagnosed Morbidity.*** Some evacuees were diagnosed with illnesses for which treatment would be critical to their health. Four cases of tuberculosis were identified among evacuees, widely dispersed in California, Connecticut, Pennsylvania, and Texas (CDC 2006i). Others were suspected in Colorado (CDC 2006b).

***Site-specific Morbidity.*** Many Hurricane Katrina evacuees were sent to geographical regions with characteristics vastly different from those of New Orleans. Approximately 6,000 evacuees were distributed throughout Colorado in September 2005, and as many as 9,000 were there in December. The most common medical needs were related to altitude sickness, as demonstrated by two measures. A survey of 106 households evacuated to Colorado between 4 and 9 September shows that the "most common acute medical conditions among households reporting one or more conditions were related to altitude sickness (e.g., dehydration, lightheadedness, or problems breathing)." A review of the 124 emergency room visits by evacuees between 1 and 23 September also demonstrates prevalent symptoms related to altitude sickness: 20 percent of visits were for pain or headache and 15 percent for an "other" reason, including dizziness (CDC 2006b).

### 7.3.1.2.1.3 Potential Future Morbidity or Mortality

*New Orleans*

Health care in New Orleans remains seriously unavailable. By late March, there were only 456 staffed hospital beds, one-fifth the number prior to the hurricane (Kaiser Family Foundation 2006b). The Tulane University School of Medicine, whose residents supplied a large proportion of care to the uninsured, is operating in Houston through at least the 2005-2006 academic year.

Need for psychiatric services is expected to increase as a result of the "psychological stress and trauma caused by the destruction of homes, the loss of jobs, the separation of families, and the death and devastation surrounding those in the areas hit by Hurricane Katrina" (Kaiser Family Foundation 2006c). In December, some psychiatrists in New Orleans reported that clients who had been stable before the hurricane were "preoccupied with death and suicide" (Nossiter 2005). One survey indicated that 39 percent of Louisiana residents reported feeling angry, and 53 percent depressed, following the hurricane season (Kalb and Murr 2005).

But availability of services decreased. In mid-February, only ten psychiatric beds in local hospitals were staffed. As a result, mental health patients are referred to emergency rooms


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

(creating even more pressure on them) (Reuters 2006, Barringer 2006). For patients who are referred to care, just three city psychiatric clinics are open, raising concerns about potential suicides. Funding care is a challenge, as FEMA money may be used for referral, but not treatment, and private care providers are eligible for Medicaid reimbursement only if they served Medicaid patients before the hurricane (Reuters 2006, U.S. DHHS 2006).

HIV prevention efforts were interrupted by the hurricane, to the great concern of U.S. Surgeon General Richard Carmona, M.D. (Kaiser Family Foundation 2006c). Five of the Louisiana Office of Public Health community-based HIV prevention contractors went out of business because they lost facilities and staff (Wockner 2006).

*Nationwide*

Health insurance coverage

As discussed in morbidity due to disruption in care above, the mass interstate migration had a significant impact on Medicaid and on systems for providing care to the uninsured in many states. The Centers for Medicare and Medicaid Services (CMS) implemented emergency mechanisms to provide states with some flexibility and financial support to provide coverage to evacuees. However, these mechanisms are short-term.

CMS approved 17 waivers (from 15 states, the District of Columbia, and Puerto Rico). These waivers provided temporary Medicaid or the State Children's Health Insurance Program (SCHIP) to eligible evacuees – parents, pregnant women, children, disabled people, Medicare beneficiaries, and people in need of long-term care who meet income criteria. States cannot extend Medicaid or SCHIP to adults without dependent children or to "certain groups of immigrants, regardless of income." Sixteen of the 17 states that requested this waiver can provide coverage through June 2006. (Ohio's waiver only allowed temporary coverage through 31 December 2005.) (Kaiser Family Foundation 2005a).

To ensure service to the uninsured, eight waivers allow states[1] to reimburse providers "that incur uncompensated care costs of furnishing services to uninsured evacuees (including adults without dependent children) and to pay for services not covered under the states' Medicaid or SCHIP programs that are provided to evacuees (Kaiser Family Foundation 2005a). Some of these states had extremely high numbers of uninsured residents before Hurricane Katrina. Texas ranked first with 28 percent of the population uninsured; 20 percent of Arkansas' had no coverage (Kaiser Family Foundation 2006c). The uncompensated care pool coverage will end on 30 June 2006 (Kaiser Family Foundation 2006d).

An additional significant change to the United States health insurance system is that, as of 1 January 2006, Medicaid drug coverage was terminated for low-income elderly and disabled Medicare beneficiaries who had been dually eligible. There were only four months between Hurricane Katrina and the scheduled implementation of the Medicare Part D prescription drug program. While a large proportion of the dually enrolled will have been automatically enrolled in Medicare Part D, there will inevitably be a great deal of confusion regarding coverage. Addi-

---

[1] Alabama, Arkansas, Georgia, Louisiana, Mississippi, South Carolina, Tennessee, and Texas.



This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

tionally, others were terminated from Medicaid but not eligible for Medicare Part D (Kaiser Family Foundation 2006c).

People with HIV/AIDS can be eligible for medication through the AIDS Drug Assistance Programs (ADAP). However, each state also determines financial eligibility and covered medications. Patients may not qualify in new states, or may have to change drug regimens (Wockner 2006). Louisiana residents who go to Texas, for example, will face more-restricted coverage. Additionally, the federal AIDS initiative was not renewed, forcing some people from federal into state systems after 1 October 2005.

Among those who evacuated to states where they were eligible for insurance (and food stamps), some who returned to New Orleans found they were not eligible in Louisiana, despite their changed circumstances (Dewan 2006c).

The dispersion of hundreds of thousands of people across the country will have effects on many areas other than New Orleans. Cities and states that welcomed evacuees on an emergency basis are facing the reality that many evacuees may not want to – or cannot – return to New Orleans. Medical professionals believe that the "city's sickest residents were among the first to leave New Orleans after Hurricane Katrina and should be the last to return" (Barringer 2006). These people will need medical care in their host locations.

Health care needs

A survey of 1,335 New Orleans households that had evacuated to San Antonio, TX, demonstrates significant medical needs among some evacuees. Fully 42 percent (563) of households reported having a family member with chronic illness and 28 percent (367) had a family member with physical or mental disability. These rates are extremely high, so it should be noted that the survey was administered to the 3,700 evacuees who remained by 14 September 2005, out of 12,700 who were there on 3 September. That is, the more healthy households may have been able to move out of the evacuation centers more rapidly than households with greater medical needs or less physical mobility. Of the remaining households, "approximately half" plan to settle in San Antonio. Of these, half the heads of household had held unskilled jobs, and one-third were "unemployed, retired, or on disability assistance before evacuation" (CDC 2006e).

A similar review of approximately 6,000 evacuees in Colorado during 7-21 September 2005, demonstrated that 10.5 percent had a chronic disease – including hypertension (28 percent), asthma or chronic lung disease (21 percent), cardiovascular disease (18 percent), and diabetes (14 percent) – and 49 percent planned to remain in Colorado (CDC 2006b).

People who left the evacuation centers first, finding housing and possibly jobs, are healthier than people who continued to rely on evacuation systems. Those who remained in FEMA-funded hotel rooms as long as December 2005, tended to be elderly, disabled, mentally ill, or felons who were "routinely rejected" for other housing. Some, having been homeless before the hurricane, are not eligible for FEMA rental assistance, so have few options (Wilgoren 2005).

A March 2006 study of people currently in FEMA housing supports this theory: "nearly half" of adults said they have at least one chronic condition such as diabetes. The children among


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

these evacuees show increased rates of asthma, anxiety, and behavioral problems: 34 percent report these conditions compared with 25 percent before the hurricane (Dewan 2006c).

The influx of evacuees without health insurance has increased the demand for emergency medical services in many areas, such as Houston (Shamlian 2006). Some experts predict that those who were homeless in New Orleans will become homeless in their new locations (Wilgoren 2005), increasing pressure on local emergency services.

***Stress from living conditions***

Missing children

Compounding these stressors were the 4,710 Louisiana children who were missing in the aftermath of the storm. These children were mostly from New Orleans, "where heavy flooding and frantic rescues separated families." (This number includes some children displaced by Hurricane Rita.) Even premature infants evacuated in incubators were separated from parents (Barringer and McNeil 2005) All the children were ultimately identified, the last after 6 ½ months (Plaisance 2006). While reunited with at least one guardian, many were missing at least one other family member as of early March (Dewan 2006b).

In addition to separating families, Hurricane Katrina separated as many as 3,400 children from their "Big Brothers" and "Big Sisters," adult volunteers who provide the children with a stable role model. Still other children were transferred from the New Orleans juvenile detention facility to Baton Rouge (Kelly and Boyle 2005).

Housing and food instability

Between Hurricane Katrina and April 2006, families had moved an average of 3.5 times, often between evacuation centers (Dewan 2006c, Cowan 2006, Dewan and Roberts 2005). While many people who received temporary housing from FEMA were able to return to their homes or find longer-term housing, many remained on FEMA housing. For these people, the threat of losing housing subsidies could be quite stressful. Approximately 5,000 evacuees had either not received an extension or had not contacted FEMA before the 14 February deadline. More than 20,000 had received extensions, but likely face tighter housing markets than people who found housing quickly (Easton 2006).

Nearly 400,000 hurricane evacuees remained unemployed (including those affected by Hurricane Rita) on 6 March 2006. The benefit period was extended, so Hurricane Katrina evacuees can collect disaster unemployment assistance through 4 June 2006 (Kaiser Family Foundation 2006c). Employment may be difficult for the approximately 40 percent of the population that returned to New Orleans (Dewan et al. 2006, Rivlin 2006) as well as those who entered other job markets. Although there is significant cleanup work, a far smaller proportion of sustainable jobs than people have returned. Many local businesses have lost their base: "What's a neighborhood pharmacy without a pharmacy?" asked one former owner (Rivlin 2006, Seelye 2006).

Food shortages are an unexpected consequence of Hurricane Katrina relief efforts, as food pantries and shelters around the country found themselves in competition for donated food


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

(Salzman 2005). Many evacuees will find themselves needing the assistance of these pantries and shelters. Six months after the hurricane, 10 percent of evacuees surveyed said they were homeless or still needed a permanent place to live, and "a majority of whites and blacks reported that they had depleted their savings since the storm." Since the poorest evacuees were not reached by this survey, the true number of needy will be higher (Dewan et al. 2006). Food shortages will affect new as well as the regular users. Some people who were homeless in New Orleans have already appeared in official counts of the homeless elsewhere (Horner 2006). In order to avoid a flood of new homeless when FEMA aid is cut off, Houston sent housing inspectors to determine whether evacuees could be returned to their New Orleans homes (Nichols 2006a).

Overcrowded conditions

According to a CDC Survey of households in Jefferson and Orleans Parishes between 17 and 22 October 2005, approximately a quarter of households "included a person not present in the household before Katrina struck," implying substantial migration within New Orleans as well as from New Orleans (CDC 2006a). It also implies that crowding may have increased in habitable buildings. In fact, six months after the hurricane, a survey of people who were in a Web database of evacuees – which by definition does not include the poorest people – demonstrated that one-fifth were living in someone else's home (Dewan et al. 2006). The sudden influx of evacuees to small towns as well as large cities has certainly caused local overcrowding. There are numerous stories of people housing large numbers of family, friends, and even pets (Steinhauer 2005, Shamlian 2006, Nichols 2006b, Griffin et al. 2005, McKinney 2005). The additional residents also caused shortages of everyday supplies, as demonstrated in Baton Rouge, which added 100,000 evacuees to its 225,000 residents (Campo-Flores 2006, Egan et al. 2005). The Wal-Mart was forced to close for a few hours each night to restock. "It has been like Christmas every day," said a spokeswoman. Lines at stores are longer, and with increased traffic came a doubling in traffic accidents (Steinhauer 2005).

Resentment

During the evacuation, resentment built among evacuees and hosts. People in host cities and towns began to lose their patience with the crowding, high level of need among evacuees, and perceived increasing crime (Steinhauer 2005, Shamlian 2006, Nichols 2006b, Montero 2006). Evacuees, meanwhile, learned that twists of choice – about whether and when to leave New Orleans – and fate led them to their current state, and different states offered vastly different levels of support and services. In addition to varying medical coverage, described in Section 3.2.2 (subhead "Morbidity due to disruption in care or medication after the hurricane") above, states had vastly different degrees of preparation, coordination, and of course ratio of evacuees to residents. In South Carolina, a volunteer group provided evacuees in FEMA-funded hotels with meals prepared by a local restaurant chain. Free public transportation – which was rerouted to accommodate evacuees – provides access to a local thrift shop and church groups collected furniture for future homes. Finally, the state Emergency Management Department provided the volunteer group with a three-month contract to support its efforts in finding housing and convincing evacuees to move (Wilgoren 2005, Bartels 2005, Working 2005). In contrast, evacuees who landed "miles from the edge of nowhere in the middle of eastern Oklahoma"



This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

where cell phones were out of range were treated – with apparently good intentions – like "summer campers," with scheduled meals and strict rules (Wilkerson 2005).

A final source of stress comes from the feeling among many refugees that they have been "left behind." As discussed in the *American Journal of Public Health*:

"Katrina highlighted a population already left behind by government, civic, and corporate leadership.... [D]istrust of the government by racial and ethnic minority groups is a critical concern in the context of terrorism, when adherence to government directives may be essential to protect the health of Americans" (Quinn 2006).

**7.3.1.2.2. Environmental Health Exposures and Outcomes.** Infectious and vector borne diseases are the primary causes of environmental health impacts due to hurricanes. Flooding exposes people to microbial contaminants that result in skin, diarrhea, and respiratory infections in survivors (CDC 2005c, CDC 2006a, Dewan and Goodnough 2005).

The second significant risk is vector-borne disease, as stagnant waters provide breeding habitat for mosquitoes, which tend to transmit diseases such as malaria, cholera, and West Nile virus (Bourque et al. 2006c, Dewan and Goodnough 2005).

However, in developed countries, infectious and vector-borne disease outbreaks following natural disasters are rare. Instead, the potential threat occurs from the failure of the essential infrastructure that provides safe drinking water, wastewater removal, and power (electric and natural gas), combined with crowded and unsanitary living conditions in shelters, along with stagnant water. The existence of all these conditions after the extensive and prolonged flooding of Hurricane Katrina increased the risk of infectious and vector-borne disease outbreaks (Bourque et al. 2006c, Dewan and Goodnough 2005, Peres and Janega 2005).

After acute exposures to floodwaters was no longer an issue it became apparent that mold-growth in the thousands of flooded structures had the potential to be both an acute and long-term environmental health problem (CDC Joint Task Force 2005, CDC 2005e, Bennett 2006).

Public health professions were concerned about risk of exposure to chemicals and toxins in the floodwaters. The EPA identified 54 Superfund sites in the area affected by Hurricane Katrina, including sites with pesticides and dioxins (Manuel 2006). Immersed vehicles could leak gasoline; demolished residences and businesses could have cleaning fluids, caustic drain cleaners, solvents, and other materials draining into the floodwaters. Skin exposure could potentially lead to burns, infections, and rashes. Finally, after New Orleans was dewatered, heavy metals, pesticides and petroleum products would settle into sediment. These contaminants present a potential long-term health risk (CDC Joint Task Force 2005).

**7.3.1.2.2.1. Exposure to Floodwaters.** Immediately after the hurricane, two groups tested the floodwaters to provide a snapshot of the chemical and biological characteristics of the water immediately following the flood caused by Hurricane Katrina.

The EPA and Louisiana Department of Environmental Quality (LDEQ) analyzed the floodwaters for "more than 100 hazardous pollutants such as volatile and semi volatile organic


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.

compounds, metals, pesticides, herbicides, and polychlorinated biphenyls. … They also tested for biological agents such as *Escherichia colo*" (Manuel 2006).

Pardue and colleagues also measured volatile and semivolatile organic compounds as well as microbial agents. Samples were collected in the main area of New Orleans, the East Bank, where human contact with floodwaters occurred during rescue operations, as well as from the 17th Street drainage canal. Samples were collected on 3 and 7 September 2005 (Pardue et al. 2005).

A few months later, the Natural Resources Defense Council (NRDC) tested sediment from the floodwaters for arsenic and other carcinogenics (Manuel 2006). The results of these three sets of tests are presented below.

***Microbial contamination of floodwaters and infectious disease.*** The EPA/LDEQ reported "greatly elevated" levels of E. coli. (Manuel 2006, Kent 2005). Therefore, on 6 September 2005, the director of the Centers for Disease Control and Prevention announced the high levels of sewage-level bacteria in the floodwater and warned against contact with it (Manjoo 2005).

Perdue et al. confirmed elevated fecal coliform bacteria (Mid-City average of $1.4 \times 10^5$ MPN/100 mL), which was similar to levels historically observed in storm water runoff in the region, but still much higher than the water quality standard for primary contact (200 MPN/100 mL). Fecal coliform is a general indicator of the presence of human pathogens. Another team of researchers found high concentrations ($5.6 \times 10^6$ MPN/100 mL) of *Aeromonas* spp. in water samples near the Superdome and Charity Hospital. EPA also conducted floodwater testing and reported that samples revealed elevated bacteria levels associated with untreated sewage (Dewan and Goodnough 2005, EPA 2005b).

It is likely that rescue workers, emergency response personnel, and stranded populations had at least dermatological exposure to human pathogens and, therefore, increased risk of illness. For example, a study of beachgoers in Los Angeles reported a higher incidence of gastrointestinal illness and upper respiratory infections among individuals swimming in marine water impacted by storm-water runoff than among non-exposed populations (Haile 1999, Dewan and Goodnough 2005).

CDC received reports of clusters of diarrheal disease among persons in evacuation centers in Louisiana, Mississippi, Tennessee, and Texas. Gastrointestinal illness was widespread in some areas, with as many as many as 21 percent of adults and 40 percent of children at one large evacuation center having acute gastroenteritis on any given day between 2 and 12 September 2005. About half the illnesses were demonstrated to be caused by norovirus. While the CDC suspects substantial secondary person-to-person transmission occurred in crowded evacuation shelters, many of the index cases may have been infected by contaminated food or water. For example, lack of electricity leads to food spoilage and potential for poisoning (CDC 2005d). In addition to the food left in homes and over 300,000 now-useless refrigerators, large amounts of food in the delivery chain were deserted – for example, 40 tons of packaged chicken and more than six million dead poultry and livestock (Dewan and Goodnough 2005, Manuel 2006).


This report is the independent opinion of the IPET and is not necessarily the official position of the U.S. Army Corps of Engineers.