# In the United States Court of Federal Claims

Case No. 05-1259L
(**Filed:** July 27, 2007)
**TO BE PUBLISHED**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | * | |
| SHEILA NICHOLSON, and SHELLEY NICHOLSON, and RICHARD HIRSTSUS, *Plaintiffs,* | * | Tucker Act Jurisdiction, 28 U.S.C. § 1491(a)(1); Cases Sounding in Tort; Takings Clause, U.S. CONST. amend. V; Inverse Condemnation; Distinguishing Between a Taking and a Tort. |
| v. | * | |
| THE UNITED STATES OF AMERICA, *Defendant.* | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * | | |

***Mitchell J. Hoffman, Michael R. Allweiss, Hillary Hurst Landry***, and ***Jeffrey M. Hoffman***, New Orleans, LA, for Plaintiffs.

***Fred Disheroon, Mark T. Romley, Sue Ellen Wooldridge***, Assistant Attorney General, and ***Matthew J. McKeown,*** Acting Assistant Attorney General, Environment and Natural Resources Division, Department of Justice, Washington, D.C., for Defendant.

***John M. Bergen***, Law Clerk; ***Sarah Haddy*** and ***Lucas Kline***, Interns.

---

## OPINION

---

**BASKIR**, Judge.

This case presents an inverse condemnation claim under the takings clause of the Fifth Amendment to the U.S. Constitution. Plaintiffs base their claims on the Government's failure to adequately design, build, or maintain certain levees in New Orleans before and after Hurricane Katrina, resulting in a permanent loss of value to their properties. The Plaintiffs cite the failure of the levees and flood walls along the city's major canals, particularly the 17th Street Canal, the London Avenue Canal and the "Industrial Avenue Canal," properly known as the Industrial or Inner Harbor Navigation Canal (IHNC). Compl. at ¶ 11. As we explain more fully below, Plaintiffs' claims as

pleaded fail to rise to the level of takings and, thus, must be rejected. Consequently, we conclude that Defendant is entitled to judgment as a matter of law. **We GRANT Defendant's motion for summary judgment, and DENY Plaintiffs' cross motion.**

## BACKGROUND

Sources of Factual Information

The following background facts are undisputed unless otherwise noted. They are included here to place the issues in context. We note, however, that the parties do not concede an undisputed record for purposes of the pending cross-motions for summary judgment. In the Consolidated Statement of Uncontroverted Facts (CSUF) 49 of the 51 proposed findings of fact are disputed. Notwithstanding the current procedural posture of this case, there is little need to search beyond the factual allegations in Plaintiffs' pleadings. As we address in the Discussion, even viewed in the light most favorable, we do not believe the Plaintiffs make a case for a valid takings claim or establish an entitlement to any remedy cognizable in this Court.

In the pages that follow we have taken factual information from various sources provided by the Government as well as by the Plaintiffs. As can be expected in the wake of one of the most devastating cases of hurricane damage in recent history, prevention and response issues have been exhaustively studied. The parties have referenced "fact sheets" published by the U.S. Army Corps of Engineers, declarations and testimony by officials within that agency, reports on Hurricane Katrina issued by the National Hurricane Center, and draft findings of an Interagency Performance Evaluation Task Force (IPET).

The IPET was created by the Chief of Engineers, U.S. Army Corps of Engineers, in response to Hurricane Katrina. It is an independent reviewing body made up of government, academic, and private sector scientists and engineers to study the issue of hurricane protection in that region. The draft report of the study, which has been subjected to routine and repeated peer review, is entitled "Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System." The March 2007 version of the report, which we received just prior to oral argument, is labeled "Interim Final (Subject to Revision)." Although the IPET report was commissioned by the Corps, the Government noted at the oral argument and in its supplemental brief that the Corps has not yet adopted the report and that it is still a draft document.

We have since been offered an even more recent version, which reflects certain data that was not available at the time of the March 26 edition. *See* Pls.' Mot. for Leave to File a Memorandum in Response to Defendant's Response to Plaintiffs' Surreply (July 3, 2007) ("[O]n June 20, 2007, the [IPET] released new information regarding the Final Risk and Reliability Analysis Report which assesses the risk of future flooding in New Orleans.") This evidence, coming well after the record had been closed, was not

accepted. Order (July 10, 2007). The preface to the report clearly states: "[i]n spite of the large amount of work accomplished by the IPET and others, it is important to recognize that the body of knowledge that has been generated is not complete and much remains to be done to gain a comprehensive understanding of all aspects of hurricane risk reduction for the future." IPET Interim Final Report (Mar. 26, 2007) (hereinafter cited as "IPET Report") at I-iv; *see id.*, at I-18 (Section entitled "Overall Uncertainty in IPET Analysis").

The Government objects to use of the IPET report either for purported Government admissions or as a source of undisputed facts. However, the Government cites an earlier version of the IPET report in its own papers. At the outset of oral argument, counsel explained that the Defendant relied on the IPET report for background because it was the best factual information available at the time of motions for summary judgment. We do the same.

Our task here is to reflect upon the nature of the Government's actions and to determine whether those actions are compensable under a takings theory. We believe it is appropriate to consider the information contained in the report. We shall cite the information in the March 2007 version of the IPET report, as well as other evaluative reports, articles and declarations attached to these proceedings by the parties, for background purposes only. *See e.g., Hartwig v. United States*, 202 Ct. Cl. 801, 807-08 (1973) (considering official post-flood assessment in affidavit form).

<u>Hurricane Katrina</u>

On August 25, 2005, Hurricane Katrina made its first U.S. landfall in Southeastern Florida as a Category 1 hurricane on the Saffir-Simpson Hurricane scale. Pl. Br. at Ex. B; Tropical Cyclone Report, Hurricane Katrina, National Hurricane Center, December 20, 2005, at 2. The Saffir-Simpson Hurricane scale, developed by the National Weather Service, measures hurricanes based on wind levels rather than storm surge and wave conditions. IPET Report at I-26, I-70; Pl. Reply at Ex. I. The storm traveled southwest over land for six hours, crossing the southern portion of Florida and finally entering the Gulf of Mexico. Tropical Cyclone Report at 2. Between August 26 and 28, Katrina remained over the Gulf of Mexico, nearly doubling in size, escalating from a Category 1 to a Category 5 hurricane, and then diminishing in intensity to a Category 3 hurricane just prior to making its next landfall at the mouth of the Pearl River near the Louisiana -Mississippi border. *Id.* at 3.

Over the course of the next two days, the hurricane caused fatalities and widespread infrastructural damage within the Gulf Coastal communities, including those located in and around New Orleans, Louisiana. *Id.* Specifically, Katrina brought upon the greater New Orleans area anywhere from a 5- to a 19-foot storm surge and 10 to 12 inches of rain, which raised Lake Pontchartrain's water-level and severely strained both the local levee system and the flood walls along the city's canals. *Id.* at 9.

Early on August 29, the eye of Hurricane Katrina passed within 20 miles east of New Orleans. The storm surge waters breached the levees and flood walls surrounding the city's outfall canals and the IHNC. *Id.* Within 24 hours, roughly 80 percent of the city of New Orleans was flooded to depths ranging up to 20 feet. *Id.* The Army Corps of Engineers worked for more than a month to remove the flood waters brought by both Katrina and its late September counterpart, Hurricane Rita. *Id.* This prolonged flooding, combined with the strong wind and other immediate effects of Katrina, caused an estimated total damage cost of $81 billion, making Katrina, "far and away the costliest hurricane in United States history." *Id.* at 12. Not surprisingly, Hurricane Katrina has left a plethora of litigation in its wake. The Eastern District of Louisiana is currently handling a massive consolidated action, involving claims against various agencies of the United States, the Orleans Levee District and insurers. *In re Katrina Canal Breaches Consol. Litig.*, Civ. Action No. 05-4182 (E. D. La.); *see* www.laed.uscourts.gov/canalcases/intro.htm ("The common factor among all of the claims in this umbrella is that the recourse sought involves a determination as to whether the failing of a specific levee or levees was caused by negligent design, construction or maintenance.").

The extent of damage has caused many, including the Plaintiffs, to question the flood control measures taken to prevent such a catastrophe. New Orleans has always been susceptible to flooding due to its proximity to the Gulf of Mexico and the fact that the entirety of the city rests below sea level. Aggressive flood management dates back to the 19th century.

History of the Canals and Levees of New Orleans

In 1899, the Sewerage and Water Board of New Orleans was created; it was formed for the purpose of and continues to be responsible for the drainage in the city. IPET Report at I-24. The drainage system was created by the Water Board in part because the geographic location of New Orleans made it particularly vulnerable to hurricanes. *Id.* at I-25. According to the declaration of the Deputy District Engineer for the New Orleans District, U.S. Army Corps Of Engineers, the London Avenue and 17th Street Canals were drainage, or "outfall," canals privately constructed in the 19th century and later adopted by the local government to be used for its drainage system. Def. Br. at Ex. A; Decl. of Lieutenant Colonel (LTC) Murray P. Starkel (Oct. 30, 2006) at ¶¶ 5-7.

The Port of New Orleans built the Inner Harbor Navigation Canal (IHNC) and its locks in the early 20th century as a toll facility to allow navigation between the Mississippi River and Lake Pontchartrain. *Id.* at 2. The Federal Government assumed operation and maintenance of the IHNC in the 1940s and acquired ownership of the canal and its lock shortly thereafter. *Id.* LTC Starkel emphasizes, however, that its ownership of the IHNC and the IHNC lock does not include ownership of, or operation

and maintenance responsibility for the adjacent levees. *Id.* In fact, the levees alongside of the three named canals were originally built and maintained by state and local government entities, not the Army Corps of Engineers. *Id.*

In 1965, New Orleans was hit by Hurricane Betsy. IPET Report at I-25. The flood caused 75 deaths and severely damaged property. *Id.* After Hurricane Betsy, Congress passed the Flood Control Act of 1965, Pub. L. 89-298, authorizing the first Federal hurricane protection project in the New Orleans area. Specifically, the law authorized funds for "the construction, repair, and preservation of certain public works on rivers and harbors for navigation, flood control, and for other purposes." *Id.* We note parenthetically that the Flood Control Act of 1928 limits governmental liability associated with the failure of Federal flood control projects. *See* 33 U.S.C. § 702 (c) (2006) ("no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place"). This immunity provision is inapplicable to the present dispute because the Plaintiffs' claims are based on the U.S. Constitution, not on the statutes providing for the Corps flood control or hurricane protection. *See Berenholz v. United States.*, 1 Cl. Ct. 620, 628 n.1 (Cl. Ct. 1982) (discussing limits of § 702 (c) immunity in relation to flood control projects, and finding it inapplicable to cases involving a taking).

The project authorized by the Flood Control Act was intended to protect the areas around Lake Pontchartrain from flooding caused by a hurricane. IPET Report at I-25. It was to be a joint Federal, state, and local effort. *Id.* at I-26. The Corps was to be responsible for the design and construction of the system, while local groups, including the Louisiana Department of Transportation and Development and the Sewerage and Water Board, were responsible for the operation and maintenance of the levees as well as the flood control structures. *Id.* During the first 17 years, the planned system included levees situated along the lakefront, concrete floodwalls along the IHNC, and barriers and flood control gates at the entrances to Lake Pontchartrain. *Id.*

This "barrier plan" was designed to prevent storm surges from entering Lake Pontchartrain and flowing over the levees along the lake front. *Id.* However, the plan gave rise to environmental concerns, cost overruns, legal issues, and a significant amount of local opposition. *Id.* In 1977, a court injunction prohibited the Corps from completing the barrier complexes. The Corps subsequently conducted a "re-evaluation study," published in 1984, and adopted a plan retaining the use of lakefront levees, constructing floodgates at the lake ends of the outfall canals instead of at the entrances to Lake Pontchartrain, and constructing parallel protection levees and floodwalls along the length of the canals. *Id.* at I-27.

<u>Parallel Protection Plan</u>

In 1992, Congress passed the Energy and Water Development Appropriations Act, mandating the Corps' implementation of the locally favored "parallel protection plan." IPET Report at I-27. The mandated plan scrapped the floodgates on the outfall

canals, relying completely on parallel levees and floodwalls along the outfall canals (including the 17th Street Canal, Orleans Avenue Canal, and London Avenue Canal) and the INHC. *Id*. Under the plan, the Corps crowned the levees on both sides of each canal with I-wall structures vertically implanted into the levees and surrounded at the base with compacted materials. *Id.* at I-29.

It is worth highlighting the difference between the authorization for the protection of New Orleans, which occurred with the Flood Control Act in 1965, and the final resolution of how best to provide this protection more than 25 years later. *Id* at I-27. As the IPET noted, the Corps did not arrive at a determination on the appropriate flood control system until 1992, and yet the construction of parts of the system took place through a series of steps, many of which began in the late 1960s. *Id.* Construction began with levees and floodwalls and progressed to the installation of flood-proof bridges and pumping stations throughout the area. *Id.* Construction continued for many years, yet, interestingly, no parish or basin was ever protected to the level of the protection plan authorized in 1965. *Id.*

Design of the Floodwalls

The entire parallel protection system consists of approximately 350 miles of structures, 56 miles of which are floodwalls. *Id.* at I-28. The majority of the floodwalls in place prior to Katrina were I-walls; only a few T-walls and even fewer L-walls. *Id.* T-walls, a more expensive alternative to I-walls, involve a similar structure with two anchors in the ground on both sides of the vertical steel. *Id* at I-29. T-walls are designed to prevent erosion in places where I-walls do not. *Id*. L-walls are similar to T-walls with only a horizontal anchor on one side. *Id.* at I-29. The criteria for the design of the I-walls and T-walls were based on maximum water elevations of a hypothetical model hurricane referred to as the "Standard Project Hurricane" (SPH).

The SPH was envisioned as the most severe meteorological event "reasonably characteristic" for the region, with a wind velocity of 100 miles per hour in the New Orleans area. *Id.* at I-26. Congress established this design hurricane as the standard hurricane protection level for the New Orleans project under the Flood Control Act of 1965, well before the National Weather Service adopted the currently used Saffir-Simpson Scale. Hurricane data from 1900 to 1956 was analyzed in the creation of the SPH. *Id.* It was originally projected that a hurricane like the SPH would hit the area of New Orleans once in 200-300 years. *Id.* In 1979, the National Oceanic and Atmospheric Administration updated the SPH by increasing the wind speed to 115 mph. *Id.* at I-62. The Corps, however, continued to use the original SPH for the projects around Lake Pontchartrain. *Id.*

Hurricane strength, as measured by the Saffir-Simpson scale, only roughly correlates to the engineering concepts applied by the Corps in its flood control projects. It is generally believed, however, that the SPH or design hurricane used in developing the parallel protection measures is the equivalent to a fast-moving category-3 hurricane

on the Saffir-Simpson Scale; it has a wind speed of 100 miles per hour. *Id.* at I-26. We reiterate that unlike the SPH, the Saffir-Simpson scale does not directly measure storm surge, and to this extent the Saffir-Simpson scale does not correlate to flood danger. For instance, as the IPET concluded, "surge and waves are the hazard, not the storm," and Katrina, a category-3 storm, generated higher storm surges than Hurricane Camille, a category-5 hurricane. *Id*. at I-70. Nonetheless, for purposes of these motions, we will accept the Plaintiffs' assertion that the Corps of Engineers used design criteria based on providing a level of protection from a category-3 hurricane.

Construction continued on the system in accordance with the SPH. The structures, with the exception of the very few T-walls, did not prevent overtopping. *Id.* at I-29. As such, the systems were designed to protect the area when water levels reached to the top of the walls but not beyond. *Id.* Cost justification was a major consideration during construction of the system, and many more I-walls were built than the more expensive T-walls, even though T-walls were better equipped to handle erosion. *Id.*

Preliminary Assessments of Levee and Floodwall Performance

According to the preliminary IPET findings, other problems existed beyond simply the use of I-walls instead of T-walls. *Id.* at I-61. Among the challenges facing the flood control project was the piecemeal fashion in which it was completed; allegedly, certain areas used a slightly different SPH standard. *Id.* at I-62, I-63. The floodwalls on the 17th Street, London Avenue, and Inner Harbor Navigation Canals were also built using design assumptions of stronger soil than were used for other floodwalls. *Id.* at I-62. Later analysis proved these more optimistic assumptions erroneous. *Id.*

Designers also allegedly failed to consider or plan for the circumstance that water pressure against the wall could cause a gap between the floodwall and the levee, allowing water to penetrate and erode the base of the wall. *Id.* Testing conducted at these sites used acceptable, but outdated, methods for determining the safety and stability of the flood walls. *Id.* at I-30. Additionally, between the time they were constructed and Hurricane Katrina, the levees supporting the floodwalls suffered serious subsidence, leaving many (including the INHC levees) more than two feet lower than their authorized height. *Id.*

Prior to Hurricane Katrina, a substantial risk of flooding was recognized. New Orleans was below sea level, the flood control system was never fully constructed, and had never been fully tested and repaired. *Id.* at I-59. In particular, the "gap failure" we describe in more detail below was not contemplated in the design and testing of the system, because the area had never experienced water levels above 5 feet. *Id.* Levee sections had never been faced with water at the design level, let alone higher than the design level. *Id.* The probability of some failure of the floodwalls and levees was high. *Id.*

Unfortunately, Hurricane Katrina was apparently more severe than the hypothetical "design hurricane." Even so, the system performed at a level below that intended. IPET Report at I-62, I-63. The system experienced 50 major breaches, most of which were attributable to overtopping of the floodwalls and subsequent erosion of the backsides of the supporting levees. *Id.* at I-65. Plaintiffs, however, focus on the four breaches which can be attributed to erroneous assumptions or design defects.

At 5:00 a.m. on August 29, the I-wall at the IHNC breached when water elevation levels reached 10.5 feet -- *below* the top of the wall. *Id.* at I-45 (emphasis added). According to the IPET findings, a gapping effect led to the failure of the floodwalls. The soil at the base of the wall was not strong enough to prevent water pressure against the wall from deflecting the wall backward. *Id.* The displacement of the wall created a gap between the wall and its supporting levee. *Id.* Water quickly entered through this gap, flowed to the base of the wall, and eroded the supporting soil. *Id.* Erosion weakened the system and allowed further deflection of the wall, ultimately resulting in complete breach. *Id.* At 6:30 a.m., the I-wall located at the 17th Street Canal experienced a similar failure. *Id.* In that case, however, the wall began to fail when water reached a mere 7 feet. *Id.* Finally, at approximately 7:00 a.m., the London Avenue Canal breached in two areas, involving a similar gap as had occurred at the 17th Street Canal and IHNC. *Id.* at 46. At all three canals, breaches occurred before water levels rose to the top of the wall. *Id.*

According to our understanding of the IPET Report, although rainfall and overtopping of the floodwalls and levees would have led to a substantial flood in the city, the total volume of flooding would have been approximately one-third of that experienced in Katrina. *Id.* at I-51.

<u>Post-Katrina Response</u>

The combined effects of the system's flaws and Katrina's severity were devastating. *Id.* at I-2, I-3. The Corps of Engineers recognized the possibility of breaches in the system as long as 20 years ago. *See* Pl. Br. at App. C; Independent Levee Investigation Team Report at 12-7. It was also known that if a hurricane the size of Katrina hit New Orleans, the results for the people and property would be disastrous. *Id.* at 12-10. In the face of these concerns, however, the Corps provided only so much protection for the region as that which would safeguard against the hypothetical SPH. IPET Report at I-3, I-26. Furthermore, many components of the system had not yet been completed, and no part of the New Orleans area had the fully planned or authorized protection in place when Katrina struck. *Id.* at I-27. Whether due to design inadequacies of the levees and floodwalls, the failure to prepare for a hurricane of Katrina's size, or Katrina's unprecedented storm surge, or all three factors, the flood control system was overwhelmed.

Many repairs have begun in the New Orleans area, and response actions will continue well after the publication of this decision. Replacing the I-walls sections in the IHNC with T-walls will dramatically reduce risk there. *Id.* at I-59. Although I-walls are still being employed in places, the Corps is using a different design. Def. Reply at Ex. A; Decl. of LTC Murray P. Starkel (Feb. 1, 2007) at ¶ 5. Levee sections are also being rebuilt. IPET Report at I-59. There continues to be a risk in the city, however, especially for areas below sea level and those which are exposed to the full force of surge waters that can be created with large storms. *Id.* at I-60. The Hurricane Katrina response is obviously still a work in progress. We turn now to a brief summary of the issues which have been presented in this case.

## SUMMARY OF CLAIMS

Plaintiffs Sheila and Shelley Nicholson and Richard Hirstsus brought this action on behalf of themselves and a class of similarly situated persons who own property in New Orleans. The issue of class certification was stayed until the Court determined whether jurisdiction was proper. Compl. at 1. Plaintiffs Richard Hirstus and Sheila Nicholson claim that their homes were inundated by 9 and 10 feet of water, respectively, which they attribute to the breaches of levees at the outfall canals. The property of Plaintiff Shelly Nicholson was not physically damaged by the flood waters but she – like her co-parties in this case – nevertheless claims injury in the lost value of the property due to the public recognition of the defectively designed floodwalls and the lack of safety from future floods. *Compare* Aff. of Sheila Nicholson (Jan. 11, 2007) *and* Aff. of Richard Hirstus *with* Aff. of Shelley Nicholson (Jan. 11, 2007).

The primary basis of each of the three claims is that the flood control system in New Orleans was defectively designed and constructed and was maintained improperly by the Defendants. Compl. at ¶¶ 9-10. Consistent with the IPET findings we just addressed, Plaintiffs argue that the floodwalls were designed to withstand the equivalent of a category-3 hurricane; that Hurricane Katrina had diminished in force to a category-3 hurricane by the time it hit New Orleans; and yet the floodwalls failed to contain the flooding caused by the hurricane and its storm surge. *Id.* at ¶¶ 14-16. Plaintiffs further argue that their property is and will continue to be devalued as a consequence of the system's uncorrected limitations and the Corps' decision not to construct a system capable of withstanding a category-5 hurricane. *Id.* at ¶¶ 48-49. Therefore, the Corps' hurricane protection measures, past and present, constitute a taking on behalf of the United States, compensable under the Fifth Amendment. *Id.* at ¶ 51.

Plaintiffs attribute the property damage to a series of events caused by "organizational and institutional failures" of the Corps of Engineers. Pl. Br. at 10. According to the Plaintiffs, the Corps not only built an ineffective system but also knew or should have known of the system's defects and of the probable disaster in the event

of a hurricane. *Id.* at 18. It is difficult to pinpoint the so-called organizational and institutional failures in Plaintiffs' papers. Plaintiffs' allegations seem to alternate between negligence and deliberate indifference by the Corps of Engineers.

We glean from Plaintiffs' submissions the following principal governmental defects. First, as we indicated earlier, the floodwalls were only built to withstand the equivalent of a "fast-moving Category-3 hurricane," leaving the city vulnerable to hurricanes of greater magnitude, such as Katrina. Pl. Br. at Ex. D; Corps of Engineers Project Fact Sheet. Moreover, Plaintiffs argue, the system did not even achieve this limited goal. At oral argument, counsel identified as design flaws the Corps' apparent misunderstanding of the soil consistency and its impact on the levees and the floodwalls, and the Corps' use of I-walls when the more stable T-wall technology was available. Finally, Plaintiffs argue that the use of floodwalls as a backup to the existing levees was ill-conceived whatever the configuration of the base or the height of the wall.

In order to demonstrate that there are no actual disputes in material facts, Plaintiffs point to the testimony of the Corps' own Lieutenant General Strock, Chief of Engineers. He appeared before the Senate Appropriations Subcommittee on Energy and Water Development and confirmed the IPET's preliminary findings on design problems with the flood-control structures used in the 17th Street Canal area. *See* Pl. Br. at Ex. G; Hearing on Fiscal Year 2007 Appropriations for the Army Corps of Engineers before the S. Appropriations Comm., Energy and Water Dev. Subcomm, 109th Cong., 11 (April 5, 2006) (Statement of Lt. Gen. Strock, Chief of Engineers, Army Corps of Engineers).

General Strock's statement was made in the context of an overall review of a wide array of projects for the 2007 budget for the Army Civil Works Program; it was not a special inquiry on Hurricane Katrina or hurricane protective measures in New Orleans. Furthermore, the statement was far from the admission of legal responsibility that Plaintiffs portray it as – General Strock merely highlighted a few of the conclusions coming out of the task force and, in the case of the 17th Street Canal reference, noted that the finding was still pending independent review by the American Society of Civil Engineers. *Id.* Moreover, government counsel insists – quite legitimately – that there has been no legal admission for purposes of this litigation.

For what it is worth – and that might not be much in the context of a Fifth Amendment takings case – this acknowledgment of the fruits of the IPET investigation from a top official of the Corps of Engineers could certainly demonstrate that the agency employed flawed technology with foreseeable results. *See id.* ("[W]e have now concluded that we did have a problem with the design of the structures there – something we had hoped would not be the case, but now must confront that as a reality.") As a formal matter, as of this writing, the Corps has not yet completed its review of the draft report and there is no official position on its contents.

The Plaintiffs also allege they have suffered a permanent reduction in property values as a result of the Corps' floodwall design. Pl. Br. at 16. The floodwalls not only caused the breach which flooded their property during Hurricane Katrina, they also present a future danger to the property since essentially the same strategy is being employed in the reconstructed flood control system. *Id.*

## DISCUSSION

The parties do not dispute that flooding stemming from the breach of the levees and floodwalls resulted in injury to local residential property in New Orleans. The parties, however, diverge in their views regarding the government's alleged responsibility for this injury and whether the government's role constitutes a Fifth Amendment taking.

### Jurisdiction Under the Tucker Act

The Plaintiffs invoke this Court's jurisdiction under the Tucker Act. 28 U.S.C. § 1491(a)(1) (2006). Prior to exercising our Tucker Act jurisdiction, we require a plaintiff to plead a money-mandating basis for recovery – an independent substantive right to money damages, enforceable against the United States. Specifically, the Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated damages in cases not sounding in tort.

*Id.* at § 1491(a)(1). In the present case, the substantive right to money damages arises under the "just compensation" guarantee within the Fifth Amendment to the Constitution; an alleged taking is a claim against the United States, founded upon the Constitution, for purposes of the Tucker Act. *See* 28 U.S.C. § 1491(a)(1); *United States v. Causby*, 328 U.S. 256, 267 (1946); *Murray v. United States*, 817 F.2d 1580, 1583 (Fed. Cir. 1987). Plaintiffs, having alleged a non-frivolous takings claim, thereby satisfy the requirements of subject-matter jurisdiction under Rule 12(b)(1) of the Court of Federal Claims ("RCFC"). *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (*en banc*)*; Brodowy v. United States*, 482 F.3d 1370, 1375-76 (Fed. Cir. 2007); *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 687-88 (Fed. Cir. 1992). Of course, Plaintiffs may only avail themselves of the constitutional provision if they allege a valid takings claim. We examine that question in the discussion below.

### Procedural Context and Standard of Review

In this case, the Government opened the briefing by filing a motion for summary judgment pursuant to RCFC 56. Plaintiff subsequently filed a cross-motion for summary judgment, limited to the issue of liability. However, the merits or threshold

elements of the alleged takings are not as much in issue as is the question of whether a takings claim is in fact being asserted. In fact, among the Defendant's affirmative defenses in its Answer is the Plaintiffs' failure to state a claim upon which relief can be granted and a lack of subject matter jurisdiction. Answer at 5. The Government chose the summary judgment procedure rather than seeking dismissal by motion on the pleadings under either RCFC 12(b)(1) or RCFC 12(b)(6).

The standard of review is, of course, governed by the type of motion being asserted. In a summary judgment context we look at the merits of the case in order to discern whether the moving party can establish that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 670 (1997). In considering motions for summary judgment, the Court resolves all reasonable inferences in the light most favorable to the non-moving party. RCFC 56(c). Where, as here, both parties have moved for summary judgment, the Court evaluates each motion on its own merits. *See Kanehl v. United States*, 38 Fed. Cl. 89, 98 (1997) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

When determining whether a complaint should be dismissed for the failure to state a claim upon which relief may be granted, we do not question the accuracy of the factual allegations. Facts are legally irrelevant since the test permits us to determine legal sufficiency under any set of facts . *See Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (Upon consideration of a Rule 12(b)(6) motion Court "must assume all well-pled factual allegations are true and indulge all reasonable inferences in favor of the nonmovant" ); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (Complaint's allegations should be construed favorably to the pleader); *Owen v. United States*, 851 F2d 1404, 1407 (Fed. Cir. 1988).

Although the caption of its papers may not reflect it, Defendant does indeed argue that the jurisdictional prerequisites of a valid takings claim have not been met by Plaintiffs:

> Plaintiffs fail to specify any particular cause of action in their Complaint. Rather, they allege only that the "decision not to rebuild and/or replace the levee system to withstand a Category 5 hurricane constitutes a taking under the appropriate provisions of the United States Constitution and related legislation." Compl. at ¶ 51. As we demonstrate below, Plaintiffs have not alleged a claim within the jurisdiction of this Honorable Court and Defendant is entitled to judgment as a matter of law.

Def. Br. at 2. The Government does not rely solely on this strictly legal basis for dismissal. The Defendant's motion introduces factual information contained within exhibits, including a National Hurricane Center fact sheet and two declarations executed by the New Orleans District Engineer. As we outlined earlier, Plaintiffs' briefs

are likewise accompanied by numerous exhibits. Accordingly, we will treat the Defendant's motion in the form presented – as a motion for summary judgment. *See* RCFC 12(b) (provides that a motion to dismiss for failure to state a claim upon which relief may be granted shall be treated as a motion for summary judgment, under RCFC 56, if matters outside the pleadings are presented.).

Elements of a Takings Claim

The takings clause of the Fifth Amendment to the U.S. Constitution provides: "[N]or shall private property be taken for public use, without just compensation." U.S CONST. amend. V, cl. 4. This provision is intended "to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Eastern Enterprises v. Apfel*, 524 U.S. 498, 522 (1998) (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). The provision does not prohibit the taking of private property or deter governmental interference with property rights, but rather guarantees compensation for property owners when otherwise legitimate activities of the government amount to a taking. *Commonwealth Edison Co. v. United* States, 46 Fed. Cl. 29, 41 (2000) (citation omitted).

Among the hallmarks of a Fifth Amendment taking is that the governmental conduct forming the basis of the taking is authorized and legitimate. As a threshold matter, takings claimants must concede the propriety of the governmental interference with their property interests. *Tabb Lakes, Ltd. v. United* States, 10 F.3d 796, 802-03 (Fed. Cir. 1993) (citing *Florida Rock Indus. v. United States*, 791 F.2d 893, 899 (Fed. Cir. 1986), *cert. denied*, 479 U.S. 1053 (1987)); *see, Acadia Tech., Inc. v. United States*, 458 F.3d 1327 (Fed. Cir. 2006) (property that depreciated in value due to unreasonable delay of Customs Service in subjecting property to forfeiture proceedings is not grounds for takings claim). Unauthorized or tortious conduct is not compensable under the Fifth Amendment. *See generally*, Jed M. Silversmith, *Takings, Torts & Turmoil: Reviewing the Authority Requirement of the Just Compensation Clause*, 19 UCLA J. ENVTL. L. & POL'Y 359 (2001-02).

Allegations Sounding in Tort

Our jurisdiction under the Tucker Act expressly excludes claims in cases sounding in tort. *See* 28 U.S.C. § 1491(a)(1); *Shearin v. United States*, 922 F.2d 1195, 1197 (Fed. Cir. 1993). Therefore, we may not resolve in this forum Plaintiffs' many inferences that the United States Army Corps of Engineers was negligent or otherwise remiss in designing and constructing flood walls to protect against the hurricane threat. As has been previously held:

> The court does not have jurisdiction over claims that defendant engaged in negligent, fraudulent, or other wrongful conduct when discharging its official duties.... Even where the claim is framed under non-tort law, the court lacks jurisdiction if the essence of the claim lies in tort.

*Cottrell v. United States*, 42 Fed. Cl. 144, 149 (1998) (citations omitted).

The Plaintiffs take the Corps of Engineers to task for what they claim was the predictable failure of the floodwalls. The parties volley back and forth on a range of tort-resembling questions in both the briefs and in the attempt at a Consolidated Statement of Uncontroverted Facts: Was the flooding foreseeable? Was the flood control strategy inadequate? Was the technology employed by the Corps plagued by defects in design? Was the power of the hurricane and resulting damage greater than could have been reasonably expected? At first blush the case reads as if the Plaintiffs took a common law tort cause of action and applied a takings label to it. And for the most part the Government utilized this litigation as a forum for the Corps of Engineers to defend its activities. By introducing substantive exhibits in its opening brief, the Government proceeded directly to the merits and precipitated a debate on issues such as flood control responsibility, causation and foreseeability. *See* App. A and B (Starkel declaration and Tropical Cyclone Report).

In a takings context, we do not assign blame. Instead, we determine whether admittedly legitimate conduct of the Government resulted in a taking of private property for public benefit. Despite the familiar ring of tort in Plaintiffs' pleadings, we are also well aware that takings claims often contain elements of tort law. *See Moden v. United States*, 404 F.3d 1335, 1339, n.1 (Fed. Cir. 2005) (citations omitted). And furthermore, due to the often factually intensive nature of the claims, takings jurisprudence warns against "precipitous grants of summary judgment." *Teegarden v. United States*, 42 Fed. Cl. 252, 256 (1998) (quoting *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir. 1983)).

Therefore, rather than limiting our consideration to the pleadings filed in this matter, we adopt the more cautious approach of examining the evidence in support of the Rule 56 motions. *See Moden*, 404 F.3d at 1340-42 (Finding error in trial court's dismissal based on jurisdictional grounds); *Bagwell v. United States*, 21 Cl. Ct. 722, 726 (1990) (Motion to dismiss denied without prejudice where insufficient information for court to conclude whether actions constitute taking or whether the allegations sound in tort); *see also, Tommaseo v. United States*, 75 Fed. Cl. 799, 804 (2007) ("[W]hen the Government challenges this court's jurisdiction over a plaintiff's inverse condemnation claim, arguing it is merely a tort and therefore outside this court's jurisdiction, the Federal Circuit requires that the trial court conduct a 'two-part inquiry' to determine whether the alleged inverse condemnation claim is subject to the requirements of the Just Compensation Clause and within the court's jurisdiction.") (citing *Ridge Line v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003)).

Flooding in Takings Jurisprudence

Key to understanding whether a claim establishes a taking, as opposed to a tort, is characterizing the Government's actions resulting in the injury to the property-owner. The question arises in the context of taking via inverse condemnation, the analogue to the Government's formal exercise of the power of eminent domain. *Moden*, 404 F.3d at 1342; *see Tommaseo*, 75 Fed. Cl. at 803 ("[I]nverse condemnation occurs where the federal government condemns property, without conducting an eminent domain proceeding.") (citing *Agins v. City of Tiburon*, 447 U.S. 255, 258 n.2 (1980)).

There is a long line of cases addressing this question in the context of government-caused flooding – the quintessential taking-tort controversy. As the Court of Claims stated:

> The Supreme Court and this court have recognized that the United States can appropriate land to its own use as effectively by flooding it as by occupying it in other ways.... It is equally settled, however, that not all floodings caused by or partially attributable to governmental activities amount to a taking.

*Nat'l By-Products, Inc. v. United States*, 186 Ct. Cl. 546, 575-76 (1969) (citations omitted).

The takings doctrine has traditionally extended only to cases of inundation or intermittent overflows that result from the government's control, intended or unintended, over water. The most common scenario occurs when a governmental agent takes some action which is intended to benefit the public at large, but also impacts adversely the property rights of a specific individual or group of individuals. Typically the governmental activity causes changes to the water table, alters the direction or intensity of water flow, or in some other way affects adjoining land owned by the claimant. *See e.g., Barnes v. United States*, 210 Ct. Cl. 467, 474 (1976) (frequent and recurring flooding of crops caused by flow of river through dams).

Only under limited circumstances may the property-owner be compensated for a taking. *See Moden v. United States*, 60 Fed. Cl. 275, 281-83 (2004) (summarizing case law differentiating between tort and takings in the context of government-induced flooding), *aff'd on alternate grounds*, 404 F.3d 1335 (Fed. Cir. 2005). Some requirements for a valid takings claim have been eased. *See e.g. Owen v. United States*, 851 F.2d 1404 (Fed. Cir. 1988) (overturning requirement that flood waters effecting a taking rise above river's high-water mark). Other requirements from the earliest recognition of this legal theory persist. The flooding must result in sustained and substantial damage – if not permanent flooding, then at the very least it must result in a "permanent liability to intermittent but inevitably recurring overflows." *United States v. Cress*, 243 U.S. 316, 328 (1917). And the flooding must be sufficiently frequent in order to constitute a taking. *Fromme v. United States*, 188 Ct. Cl. 1112, 1118-19

(1969); *see also*, *Nat'l By-Products*, 186 Ct. Cl. at 579 (plaintiff failed to demonstrate damage due to overflow "rises above a temporary, incidental injury").

The Court of Appeals for the Federal Circuit in *Ridge Line, Inc. v. United States*, 346 F.3d 1346 (Fed. Cir. 2003) clarified the law in this area. In that case, a landowner alleged a taking against the Government when the construction of a Postal Service facility adjacent to and uphill from the plaintiff's property increased storm drainage runoff onto the plaintiff's property. The trial court erred in failing to address the plaintiff's inverse condemnation argument or to assess the possibility that the Government had taken a water flowage easement, as a result of the additional runoff. *Id.* at 1354. In remanding the case on appeal, the panel set forth a two-part inquiry for differentiating between potential takings and tort claims:

> First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." Second the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

*Id.* at 1355-56 (citations omitted). Because the Plaintiffs do not contend that the Government intended the invasion here, they must rely on the alternate definitions provided in *Ridge Line*.

We wish to make it clear, however, that we read *Ridge Line* as an intermittent flooding case, which has little bearing here. The decision stands for the proposition that private property need not be intentionally taken, nor must it be effectively destroyed or be permanently occupied by governmental activities, in order to give rise to a Fifth Amendment claim. *Id.* at 1354. The injury complained of here does not fit the standard model of *government-induced* flooding, which led to the development of this branch of takings jurisprudence. *See e.g., Cress*, 243 U.S. at 318 (navigation improvements caused river to overflow on Plaintiff's land); *United States v. Dickinson*, 331 U.S. 745, 751 (1946) (dam project resulted in intermittent flooding).

Despite our reluctance to force a *Ridge Line* analysis, we address the two-part test in context below. (Before we do so, we advise the reader that, quite independent of the *Ridge Line* test, as many as three precedents preclude a takings finding. We treat those cases following our *Ridge Line* analysis).

Analysis Under *Ridge Line*

*(i.) Invasion is Direct, Natural, or Probable Result of an Authorized Activity -- Not Incidental or Consequential Injury Inflicted by the Action*

The first prong of the *Ridge Line* model can be thought of in terms of causation. We conclude that the claims do not satisfy this element of the Federal Circuit's inquiry because the flooding in question was not the direct, natural, or probable result of the Government's construction or maintenance of the parallel flood protection system in New Orleans. Rather the flooding was the result of the hurricane. Put quite simply, the construction of the floodwalls did not cause the flooding; the flooding was caused by the storm surge.

Moreover, this threshold element of the *Ridge Line* model would not be satisfied simply by demonstrating that governmental activity was the cause of the flooding in question. As the Court of Appeals has recently clarified, "proof of causation, while necessary, is not sufficient ... an inverse condemnation plaintiff must prove that the government should have predicted or foreseen the resulting injury." *Moden*, 404 F.3d at 1343.

The Government suggests that the devastation wrought by Hurricane Katrina was unforeseeable because a Category-5 hurricane is an "intervening cause break[ing] the chain of causation." *Moden*, 404 F. 3d at 1344 (citing *Avery v. United States*, 330 F.2d 640, 644-45 (1964)). Based on the factual record before us, there is substantial room for disagreement on the actual strength of Hurricane Katrina when it hit the city of New Orleans. Experts can debate the role various factors – the direct impact of the hurricane, the storm surge, and rainwater not associated with the breached levees – may have played in the flood damage that resulted in the city of New Orleans. One of the Plaintiffs before us even avers that she suffered no flood damage whatsoever as a result of the breached floodwalls. Pl. Br., App. H; Aff. of Shelley Nicholson at ¶ 5. As we indicated earlier, the interagency task force studying the issue has yet to publish its findings in final form.

All reports agree on one point – the storm surge created by Hurricane Katrina was of immense proportions. The Plaintiffs contend in their brief, however, that if a storm of that magnitude is foreseeable, it cannot be considered a legal intervening cause relieving the Defendant of liability. Pl. Br. at 11. More specifically, if the Corps could foresee that the floodwalls would breach under the conditions created by such a hurricane, then Defendant can show no intervening cause. *Id.* The causation argument is reduced to the simplest terms – but for the Corps' defectively designed flood control system in New Orleans, the flooding would not have occurred. Although they admit that the *direct* cause of damage may have been the hurricane, Plaintiffs contend that the Corps disregarded the obvious shortcomings inherent in the placement of floodwalls near the levees. Consequently, the Government may not blame Hurricane Katrina for exposing these shortcomings. Pl. Br. at 14.

The Plaintiffs rely on the decision in *Cotton Land Co. v. United States*, 109 Ct. Cl. 816 (1948), a case which tests the limits of the direct cause-consequential loss dichotomy. There the Government's construction of Parker Dam in association with the Colorado River system, had the desired and intended affect of impounding water behind it. However, it also triggered a change in the water's velocity, which over the course of several years resulted in sand being deposited in the river bed well beyond the area of the dam, thus raising the water level so that it overflowed the riverbanks onto the plaintiff's property. The Court rejected the Government's argument that the connection between the Governmental action and the damage to the property owner was too remote, suggesting, as does the Plaintiff here, that engineering studies might have led the Government to predict the resulting flooding. *Id.* at 829.

This early case merely illustrates the *Ridge Line* premise that it is unnecessary to find that the Government's agents were aware that their acts would result in the flooding of the plaintiff's land. The chain of causation for the flooding was somewhat attenuated in *Cotton Land*, making it an ideal case for takings claimants where the causal connection is remote.

Still, we do not find *Cotton Land* particularly helpful in this context. The Court of Appeals has since reaffirmed the direct cause and foreseeability requirements in light of that decision. *See Moden*, 404 F.3d at 1343-44 (limiting *Cotton Land*) (citing *Avery v. United States*, 165 Ct. Cl. 357 (1964)). Furthermore, this often misquoted decision was grounded squarely upon the inescapable fact that the government's construction of a dam initiated "a succession of events ... which, when the events had all occurred in their natural order," caused the elevation of water to rise and flood the plaintiff's land. *Cotton Land*, 109 Ct. Cl. at 828; *see Laughlin v. United States*, 22 Cl. Ct. 85 (1990) (distinguishing *Cotton Land*, Court noted "[o]nly one possible component of causation existed – the construction of Parker Dam.").

In our case, by contrast, there is no indication that either the hurricane, storm surge or flood waters, were conditions initially set in motion by the construction of floodwalls. Accordingly, although the Government expends considerable effort in establishing Hurricane Katrina as an unforeseeable intervening cause, we do not need to reach the question of remoteness where, as here, the Government actions which allegedly constitute a taking did not in the least cause the flood.

Even if Plaintiffs could prove that the Corps' installation of floodwalls contributed to the hurricane's destruction, it would not follow that the flooding was "directly attributable" to the Corps' protective measures, as opposed to the severe nature of the storm. *See Bartz v. United States*, 224 Ct. Cl. 583, 593 (1980) ("Excessive precipitation was the root cause of the flooding ... [t]he government's manipulation of releases from the dam played only a secondary role."); *Columbia Basin Orchard v. United States*, 132 Ct. Cl. 445, 450 (1955) (noting unprecedented rainfall, Court found that governmental action was "at most a contributing factor" towards overflow of spring, and

resulting contamination of plaintiff's fruit trees). While the flooding in New Orleans was devastating in nature, the property losses *as alleged by the Plaintiffs* fall into the category of "indirect or consequential damages." *See Sanguinetti v. United States*, 264 U.S. 146, 149-50 (1924) (concluding there was no remedy against the United States where carrying capacity of government-constructed canal was insufficient to avoid overflow during heavy rains).

*(ii.) Preemption of the Right to Enjoy Property for Extended Period of Time*

The second prong of *Ridge Line* prompts our consideration of whether the Corps' interference with property rights "was substantial and frequent enough to rise to the level of a taking." *Ridge Line*, 346 F.3d at 1357. In *Hartwig v. United States*, the Court of Claims traced the development of this requirement in early case law. We quote at length:

> As a means of separating the direct injuries from those which are consequential, in cases in which the Government is alleged to have caused the flood damages, the courts have followed the principle long ago expressed in *United States v. Cress*, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917), and adhered to ever since. In that case, the Court required the plaintiff to show that the property would be subjected to inevitably recurring inundation due to the action of the Government. The principle may be reduced to the simple expression: "One flooding does not constitute a taking ... ". *B-Amusement Co. v. United States*, 148 Ct. Cl. at 341, 180 F. Supp. at 389. *See Fromme v. United States*, 188 Ct. Cl. 1112, 412 F. 2d 1192 (1969). Indeed, several floods would not necessarily constitute a taking. *Cf. Nat'l By-Products, Inc. v. United States, supra* and *North Counties Hydro-Elec. Co. v. United States, supra*.
>
> It is this principle which serves as an insurmountable obstacle to these plaintiffs. At no time do they allege that a flood of the type that injured their property in 1971 will ever inevitably occur again.

*Hartwig*, 202 Ct. Cl. at 809-10.

In the case of Hurricane Katrina, we have a unique and isolated atmospheric phenomenon which caused unprecedented flooding. In an attempt to supplement the record after oral argument, Plaintiffs brought to the Court's attention new findings, recently added to the IPET report, which assess the risk of future flooding. *See* Final Risk and Reliability Analysis Report (June 20, 2007). Based on this new evidence, Plaintiffs argue that recurrence is inevitable. *See* Pl. Br. at 4 ("Katrina was a 400-year storm, which has a .25 percent chance of recurring in any given year.") Beyond revealing the statistical probabilities of the storm itself, Plaintiffs' theory does little to show the persistent threat of "repeated invasions of the same type" required for a taking. *Ridge Line*, 345 F.3d at 1357 (quoting *Eyherabide v. United States*, 170 Ct. Cl.

598, 605 (1965)). As tragic as they may be, the damages suffered by Plaintiffs appears to fall into "the category of mere consequential injury, or tort." *Id.* at 1355 (quoting *Barnes*, 210 Cl. Ct. at 475).

Because of the Government's remedial actions following Hurricane Katrina, we cannot in any event apply the inevitably recurring standard. As we noted earlier, the Corps of Engineers indicates that it has installed improved floodwalls, submerging them deeper in the earth in an effort to avoid the problems experienced previously. The Plaintiffs dismiss these reconstructed floodwalls as no better a safeguard than the initial measures. The argument is that the floodwall strategy was inadequate to protect against Katrina and, therefore, the rebuilt floodwalls will necessarily fail to protect against storms of equal or greater magnitude. Pl. Br. at 16-17. We do not know who is correct, and we may never know. But the situation "on the ground" has changed such that we could never replicate the circumstances of the Katrina flood.

We will not attempt to resolve factual disputes relating to the city's protection against future hurricanes. We do not believe that the law requires that we address this question. Plaintiff has not demonstrated that the flooding associated with the breached levees around the canals in question has been a "frequently and inevitably recurring" phenomenon. *Bagwell*, 21 Cl. Ct. at 726; *Nat'l By-Products*, 186 Ct. Cl. at 576; *Eyherabide v. United States*, 170 Ct. Cl. 598, 605 (1965); *Singleton v. United States*, 6 Cl. Ct. 156, 162-63 (1984).

Although the damages of Hurricane Katrina were disastrous, Plaintiffs have suffered flooding damage only one time (if at all). They do not claim the flooding is continuous, but rather that the "property values of the property in the City of New Orleans will remain at an artificially low level" because of the *possibility* of another hurricane. Complaint at ¶ 50. *See Fromme*, 188 Ct. Cl. at 1116 (Plaintiff lacked a valid takings claim even when the flooding of the property could "reasonably be expected to recur at intervals of about once in every 15 years.").

Character of the Government's Invasion

*(i.) Affirmative Act Lacking*

Plaintiffs' entire cause of action rests on the premise that the Corps' conduct in this case is similar in effect to the kinds of projects or activities that have been reviewed by this Court under the *Ridge Line* torts-takings rubric. As we have observed, Plaintiffs' claims do not fit the familiar model in which the "overflow [is] the direct result of the structure" built by the Corps of Engineers. *Sanguinetti*, 264 U.S. at 149. Beyond failing the *Ridge Line* test, however, the Plaintiffs' cause of action cannot satisfy the most basic requirements of a governmental taking for a public purpose.

In one of the many iterations the Plaintiffs offer as the basis for the taking, they allege that "the *decision* not to rebuild and/or replace the levee system to withstand a Category 5 hurricane" gives rise to their Constitutional entitlement. Compl. at ¶ 51 (emphasis added). This particular allegation at least provides some separation from negligence and design defects, but it still does not allege an action on part of the Government capable of taking property. In no case that we know of has a governmental agency's failure to act or to perform its duties correctly been ruled a taking. Indeed, the proposition has profound implications. The Federal Circuit, in a non-flooding context, has very recently held that such conduct may not be redressed under the 5th Amendment takings clause. *See Acadia Tech., Inc. v. United States*, 458 F.3d 1327, (Fed. Cir. 2006) (property that depreciated in value resulting from Customs Service' unreasonable delay in subjecting property to forfeiture proceedings is not grounds for takings claim).

The Court has consistently required that an affirmative action on the part of the Government form the basis of the alleged taking. *Last Chance Mining Co. v. United States*, 12 Cl. Ct. 551, 556-57 (1987); *B&G Enter., Ltd. v. United States*, 43 Fed. Cl. 523, 526-27 (1999); *Pendleton v. United States*, 47 Fed. Cl. 480, 485 (2000). During oral argument, when pressed to cite an affirmative act, Plaintiffs clarified that the "action" constituting the taking was both designing the parallel protection system and failing to remedy existing shortcomings of that system. According to Plaintiffs, the Corps was charged with the responsibility to ensure that the level of protection that purported to exist did actually exist, and to improve it if it did not.

Still uncertain whether the Plaintiffs were describing an affirmative act by the Government, as opposed to a broader failure on the part of the Corps to fulfill its duties, we asked whether the construction of the floodwalls constituted the specific action underlying their claims. At oral argument, Plaintiffs confirmed that the building of the floodwalls was effectively the affirmative action or taking. We listened carefully throughout the Plaintiffs' presentation, however, and found no indication that the specific design of the walls, their placement or their function, imperfect as it was, exacerbated the flooding. Notwithstanding what might have been in their written materials, Plaintiffs' Fifth Amendment claims in oral argument merely allege that the protection the Corps of Engineers sought to provide by installing floodwalls in support of the existing levees proved inadequate.

*(ii.) Inadequate or Defective Design*

There is no authoritative takings guidance, in the *Ridge Line* analysis or elsewhere, that grants relief for omissions, oversights, or bad decisions. There are cases predating the formal two-prong *Ridge Line* test which come close. For instance, in the *Berenholz* case, this Court's predecessor found that the elements of a taking claim had been satisfied in the case of an allegedly ill-advised decision by the Army Corps of Engineers to temporarily remove a 35-foot section of the dike protecting the plaintiff's property from Lake Erie. *Berenholz v. United States*, 1 Cl. Ct. 620 (1982).

This course of action was necessary in order to transport equipment across the plaintiff's property to effect repairs on the dike bordering a nearby village. The section of dike was allegedly impaired upon reconstruction, and gave way, resulting in permanent flooding of the plaintiff's land. *Id.* at 628-29.

*Berenholz* is noteworthy because it is consistent with the allegations concerning the faulty design of floodwalls in the present case. As with the "parallel protection" scheme in New Orleans, the Corps of Engineers in the *Berenholz* case took a calculated risk that individual property might be damaged, despite the precautionary measures taken. However, the Court also recognized that "[n]egligent flooding is by definition tortious and thus not a taking." *Id.* at 626. Moreover, the Court reaffirmed:

> [W]here there is no such showing of inevitable recurrence, but rather, "a random event induced more by an extraordinary natural phenomenon than by Government interference" there can be no taking, even if there is permanent damage to property attributable to Government activity.

*Id.* (quoting *Wilfong v. United States*, 202 Ct. Cl. 616, 622 (1973)). Therefore, in order to establish a compensable taking, Plaintiffs must demonstrate that the Corps erected floodwalls that will *inevitably* cause damage to their property. In *Berenholz*, a dike that had performed satisfactorily in the past had deteriorated as a direct result of the Government's actions. *Id.* at 628-30. The same cannot be said here.

In the Plaintiffs' reply brief, which was untimely filed and accepted over Defendant's objection, the Plaintiffs argue a number of cases for the proposition that an omission or defective governmental projects may be remedied under the takings clause. However, in this eleventh-hour brief, Plaintiffs rest on non-binding state court cases; worse yet, they are not even on point. As such they do not require more than a short discussion.

Under California jurisprudence, the Government's attempt to control flood waters by designing a system to divert water does not automatically render the state liable if the system does not function properly. *See Bunch v. Coachella Valley Water Dist.*, 935 P.2d 796 (Cal. 1997). The court must determine whether the state's actions are reasonable; in particular, the court must weigh the "public need against the gravity of private harm." *Bunch*, 935 P.2d at 808. There is no precedent for applying a similar reasonableness test in this Court. Even if this standard applied to the Corps of Engineers flood control project here, in order to establish their burden the Plaintiffs would have to present substantial evidence of specific knowledge of the risks likely to materialize, deliberate action contradicting outlined policies, and an unreasonable plan of maintenance. *See Arreola v. County of Monterey*, 99 Cal.App.4th 722 (2002).

The Texas and Missouri decisions cited by Plaintiffs are also distinguishable. The *Harris County* decision involved a government-designed and authorized highway, which led to increased flooding. *Harris County Flood Control Dist. v. Adams*,

56 S.W.3d 665 (Tex. App. 2001). The highway project which results in severe flooding is more along the lines of the traditional takings case. But it bears no resemblance to the Corps floodwalls along the New Orleans canals.

Finally, in *Collier*, a government-maintained sewer system caused a backup in the Plaintiff's basement. *Collier v. City of Oak Grove*, 2007 Mo. App. LEXIS 643 (Apr. 24, 2007). The Plaintiff notified the City after the first incident, but the City failed to take action to repair the sewer. *Id.* at *2. After the sewer backed up numerous times over the following years, the Plaintiff sought damages for inverse condemnation. *Id.* at *5. The City's liability was based on its failure to repair the sewer after being informed of the damage. *Id.* at *5. This inaction contrasts with our case, in which the Corps of Engineers pursued a decided-upon flood protection system, and has now begun to repair and improve that system.

Under the decisions controlling this Court, omissions or claims that the Government should have done more to protect the public do not form the basis of a valid takings claim. This is so even if, as the Plaintiffs suggest, the Government suspected that the floodwall system might not withstand the storm surge associated with a hurricane of equal magnitude to Katrina. *See e.g., Nat'l By-Products*, 186 Ct. Cl. at 579 ("[T]he Government's foreknowledge will not convert an otherwise insufficient injury into a taking. At most, it could strengthen the plaintiff's case in a tort action.").

*(iii.) Intent to Convert Property to Public Use*

In determining the question of compensation for a taking, we are instructed to look to the character of the governmental invasion of private property rights. *Berenholz*, 1 Cl. Ct. at 627, (quoting *R.J. Widen Co. v. United States*, 174 Ct. Cl. 1020, 1098 (1966)). The key to distinguishing "a taking from an incidental injury is the presence on the part of the Government of an intent to appropriate." *Id.* There is no dispute that the floodwalls result in a certain level of protection, even if it is open to debate as to the measure of the protection afforded against the various categories of hurricanes or degrees of storm surge. As we shall see, where the government neither diverts flood waters onto a plaintiff's property nor creates a greater threat of damage to that property, there is no intent to convert it to public use.

Unlike the construction of a faulty dam or the intentional breach of a dike, the act of building the floodwalls in New Orleans was not, as we have seen, the direct cause of the flooding. *Compare Pashley v. United States*, 140 Ct. Cl. 535, 538 (1957) (Despite level of care exercised in preventing seepage onto nearby land, "defendant's act of building the dam was the cause of the taking") and *Berenholz,* 1 Cl. Ct. at 628 ("[O]nce the dike was compromised [by the COE's breaching action, as opposed to natural causes], the subsequent erosion at the breach point and the flooding of the land were the natural and probable consequences of defendant's action.").

Plaintiffs' case would be stronger if the floodwalls *as designed,* channeled the flood waters toward their property or had a net effect of increasing the level of flooding. For example, the Chief of Engineers indicated that preliminary assessment that the Mississippi River Gulf Outlet (MRGO), a federal navigation project unrelated to the parallel protection measures challenged here, "does contribute, to some degree, in storm surge in the inner harbor." Hearing on Fiscal Year 2007 Appropriations for the Army Corps of Engineers before the S. Appropriations Comm., Energy and Water Dev. Subcomm, 109th Cong., 11 (April 5, 2006) (statement of Lt. Gen. Strock, Chief of Engineers, Army Corps of Engineers). That case may ultimately pose a takings scenario. *See Tommaseo*, 75 Fed. Cl. at 803-04 (Hurricane Katrina victims' alleged takings theory based on the creation of the MRGO; Court ruled it was premature to reach the merits until discovery is completed); *but see, In re Katrina Canal Breaches Consolidated Litigation*, C.A. No. 05-4182 (E. D. La.) (Pertains to *Robinson v. United States*, C.A. No. 06-2268) (Raising Federal Tort Claims Act as basis for damages allegedly caused by design, construction, operation and maintenance of MRGO).

The design of the parallel protection strategy, however faulty it proved to be, does not evidence a governmental intent to convert Plaintiffs' property to a public use. *Cf. Thune v. United States*, 41 Fed. Cl. 49, 54 (1998) (Damage resulting from Forest Service's controlled burn which spread beyond intended target "was not a direct, natural and probable consequence of the project *as designed* ... the damage resulted from intervening government impropriety or unanticipated natural events ..."). (Emphasis added).

Challenges to Inadequate Protection: *Hartwig*, *Teegarden*, and *Sponebarger*

At bottom, Plaintiffs contend that the Corps of Engineers took their property without providing just compensation because they failed to protect the property. The Court of Claims disposed of this argument in *Hartwig*, which we have discussed in another context. Having determined under the traditional takings-torts precedent that there was no demonstration of inevitably recurring flooding, the decision addressed another "problem afflicting the plaintiff's cause." *Hartwig*, 202 Ct. Cl. at 810. The Court observed that it was "left with the argument that the operation of the dams helped the problem of the flooding, but they could have been operated in a way that would have helped more; therefore, the Government is liable for the damage that ultimately occurred." *Hartwig*, 202 Ct. Cl. at 811. The Court granted summary judgment in favor of the government on multiple grounds, not the least of which was the fact that the plaintiffs had "not provided the court with any evidence that the flood would have been less severe in the absence of the dams." *Id.*

This Court reached a similar result, albeit not in a flooding context, in *Teegarden v. United States*, 42 Fed. Cl. 252 (1998). In fighting an immense forest fire with limited manpower and equipment, the U.S. Forest Service concentrated fire suppression efforts in high priority areas, thus leaving the plaintiffs' property vulnerable

to the fire which ultimately consumed it. The Court ruled that the fire, not the Forest Service, caused the destruction of the plaintiffs' property. *Id.* at 257 ("'[A] random event induced more by an extraordinary natural phenomenon than by Government interference cannot rise to the level of a compensable taking.") (citing *Berenholz*, 1 Cl. Ct. at 626). For purposes of the present discussion, the Court found that the Government's "intent to preserve property, including that of the plaintiffs in accordance with the approved prioritization plan, conflicts with the alleged taking." *Id.* at 257-58. Substituting fire for water, the following footnote could have been drafted for the Plaintiffs in our case, and we adopt it as our own reasoning:

> Plaintiffs fail to appreciate the significant distinctions between the government action of the instant case and government action typical of inverse condemnation claims in which compensation is awarded. First, plaintiffs cannot identify any action of the Forest Service that directly, indirectly, or incidentally imposed upon the integrity or value of plaintiffs' land; rather, plaintiffs point out that the Forest Service failed to act, insofar as there was a failure to protect plaintiffs' land from the destructive forces of the fire. Despite the novelty of this theory, plaintiffs do not cite any cases in which compensation has been awarded under the Fifth Amendment for an omission or failure to act on the part of the Government. It also bears noting that claims involving omission or failure to act sound in tort and, therefore, necessarily fall beyond the jurisdiction of the Court of Federal Claims (citations omitted).
>
> It is difficult to ascertain the property allegedly taken from the plaintiffs; stated differently, what it is exactly that the Government allegedly took. In the case at bar, the Government neither diminished the value of plaintiffs' land through enactment of a regulation or denial of a permit, nor constructed a dam, bridge, highway, airport, or other structure detrimentally infringing on plaintiffs' property rights. The Forest Service did not physically appropriate any property of plaintiffs to protect government or privately held lands assessed at a higher value. The Forest Service merely exercised its discretion and judgment in an attempt to secure and maintain the status quo, taking nothing.

*Id.* at 257, n.4.

The Court refused to re-litigate "the propriety of the Forest Service's tactical decisions and fire suppression actions," which had been the subject of a separate district court action under the Federal Tort Claims Act. Although Plaintiffs here have not challenged the Corps actions in district court, we have noted the fact that other litigants affected by Hurricane Katrina have filed claims in United States District Court for the Eastern District of Louisiana. *See e.g., In re Katrina Canal Breaches Consolidated Litigation*, C.A. No. 05-4182 (E. D. La.). Any challenge to the Corps'

choice of its hurricane protection scheme cannot be heard here for the same reasons advanced in the *Teegarden* decision.

Long before either *Teegarden* or *Hartwig*, the Supreme Court spoke directly to this issue in *United States v. Sponebarger*, 308 U.S. 256 (1939), a case in which a plaintiff challenged the Government's failure to build additional levees to support the Mississippi floodway, as required by the Mississippi Flood Control Act of 1928, 33 U.S.C. §§ 702a-702m. The Court roundly rejected the claim that the Government effectuated a taking, where the program of improvement under the statute "had not increased the immemorial danger of unpredictable major floods to which the respondent's land had always been subject." *Sponebarger*, 308 U.S. at 265. According to the Court:

> [T]o hold the Government responsible for such floods would be to say that the Fifth Amendment requires the Government to pay a landowner for damages which may result from conjectural major floods, even though the same floods and the same damages would occur had the Government undertaken no work of any kind. So to hold would far exceed even the "extremest" conception of a "taking" by flooding within the meaning of that Amendment. For the Government would thereby be required to compensate a private property owner for flood damages which it in no way caused.
>
> * * *
>
> When undertaking to safeguard a large area from existing flood hazards, the Government does not owe compensation under the Fifth Amendment to every landowner which it fails to or cannot protect.

*Id.*

The Plaintiffs have not attempted to distinguish this case, nor have they reconciled their attacks on the Corps' floodwalls with the Supreme Court's treatment of similar challenges to the Mississippi levee system. The *Sponebarger* rationale applies with even greater force to Plaintiffs' forward-looking takings theory – the assumption, on their part, that their property has been devalued due to the Government's decision not to overhaul the levee system. *See* Compl. at ¶ 48 alleging that the Government refuses to rebuild a levee system capable of withstanding a Category-5 storm despite available technology.

Plaintiffs misperceive the purpose and intended reach of the Fifth Amendment's promise of just compensation. An attack on a Federal agency's exercise of discretion in providing the appropriate level of flood protection belongs in an entirely different legal challenge. The Government continues to act to increase the safety of Plaintiffs'

property from natural flooding damage, just not to a level they find desirable. The Supreme Court directly addressed the fallacy in Plaintiffs' claims:

> [t]he Government has not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted; and the Fifth Amendment does not make the Government an insurer that the evil of floods be stamped out universally before the evil can be attacked at all."

*Sponebarger*, 308 U.S. at 266.

## CONCLUSION

The allegations contained in the Complaint do not rise to the level of a taking. As the Plaintiffs acknowledge in their Complaint, the parallel protection system of levees and floodwalls was actually intended to mitigate flood damage. The natural and probable consequence of their construction by the U.S. Army Corps of Engineers was to protect against rather than to cause damage from flooding. The Plaintiffs' property losses cannot be considered "the predictable result of the [Corps'] action." *Moden*, 404 F.3d at 1343 (quoting *Ridge Line*, 346 F.3d at 1356.)

Even assuming that the Government failed to meet some unspecified duty of care in designing, building or maintaining the flood control system in New Orleans, we can find no basis for relief under the takings clause. *See Columbia Basin*, 132 Ct. Cl. at 452 ("An accidental or negligent impairment of the value of a property is not a taking, but, at most, a tort.")

We also conclude that Plaintiffs' claims as often articulated, sound in tort, which is beyond this Court's jurisdiction.

Therefore, we must dismiss the Plaintiffs' Complaint and find for the Defendant as a matter of law. **Defendant's Motion for Summary Judgment is GRANTED. Plaintiffs' Motion for Partial Summary Judgment is DENIED.**

**The Clerk of Court is directed to dismiss the Complaint and enter judgment in favor of the Defendant. No costs.**

**IT IS SO ORDERED.**

/s/ Lawrence M. Baskir
LAWRENCE M. BASKIR
Judge